# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

|  |  |  |
|---|---|---|
| JUDITH K. ROGAN | ) | |
| | ) | |
|        Plaintiff | ) | Civil Number: 2:07 CV 403PS |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA | ) | Judge Joseph Van Bokkelen |
| AND DEXIA CRÉDIT LOCAL, f/k/a | ) | |
| DEXIA PUBLIC FINANCE and CREDIT | ) | |
| BANK and CREDIT LOCAL DE FRANCE | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

# DEXIA CRÉDIT LOCAL'S MOTION
## TO TRANSFER VENUE AND MEMORANDUM IN SUPPORT

Scott Mendeloff
Gabriel Aizenberg
Eric S. Pruitt
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Defendant Dexia Crédit Local*

# TABLE OF CONTENTS

INTRODUCTION …………………………………………………………………………..1

A.    Some Details on the Multiple Frauds Peter Rogan Perpetrated in Chicago.

    1.    The Healthcare Fraud.

        a.    Peter Rogan's Control of Edgewater Medical Center and
        Subsequent Transfer of Ownership of EMC's Management
        Company to his Children……………………………………...………..6

        b.    The Healthcare Fraud Scheme Peter Rogan Perpetrated At and
        Against EMC……………………………………………………..........7

        c.    The Healthcare Fraud Suits Against Peter Rogan and his Companies.

            (1)    U.S. False Claims Act Suit Against Peter Rogan in NDIL……….7

            (2)    Dexia's Suit Against Peter Rogan and his Companies in NDIL….8

            (3)    EMC's Suit for Fraud, Breach of Fiduciary Duty, and
            Breach of Contract in the Northern District of Illinois
            Bankruptcy Court…………………………………………………9

    2.    Peter Rogan's Property Fraud………………………………………………9

B.    Peter Rogan Transferred a Portion of the Funds his Companies Fraudulently Obtained
from EMC in Chicago to Judy Rogan Through JKR Business…………………………10

C.    Dexia's Extensive Discovery Efforts in the Northern District of Illinois……………..11

D.    Peter and Judith Rogan's Actions to Hinder and Delay Judgment Enforcement………..12

E.    Judy Rogan's Primary Assets are Located Outside of the Northern District of
Indiana………………………………………………………………………………14

F.    The United States' Foreclosure Complaint and Lis Pendens……………………………15

ARGUMENT…………………………………………………………………………………15

I.    THE "FIRST TO FILE" RULE STRONGLY SUPPORTS TRANSFERRING THIS
CASE TO THE NORTHERN DISTRICT OF ILLINOIS………………………………16

     A.     The Pending Citation Actions Against Judy Rogan in the Northern District of Illinois Were Filed First………………………………………………17

     B.     The Pending Citation Actions Involve The Same Parties and Issues as Judy Rogan's Later Filed Declaratory Judgment Action……………………………...18

II.     THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF ILLINOIS UNDER 28 USC. § 1404(a)…………………………………………………20

     A.     Venue is Proper in the Northern District of Illinois……………………………...20

     B.     The Interest of Justice Requires Transfer of this Case to Illinois………………..21

     C.     The Various Other Private and Public Interests, Including Convenience of the Parties and Witnesses, Weigh in Favor of Transfer……………………………...23

          1.     Various Public and Private Factors Favor Transfer……………………...23

          2.     Convenience of the Parties/Witnesses Weigh in Favor of Transfer……..27

CONCLUSION…………………………………………………………………………………29

**STATEMENT OF ISSUES**

Issue Presented:  Do the interest of justice and other private and public interests require

transfer of this case to the Northern District of Illinois, Eastern Division,

under 28 USC. § 1404(a)?

# TABLE OF AUTHORITIES

## CASES

*Asset Allocation & Management Co. v. W. Empl. Insurance Co.*, 892 F.2d 566 (7th Cir. 1989)...........................................................................................................17

*Barrington Grp., Ltd. v. Genesys Software System, Inc.*, 239 F. Supp. 2d 870 (E.D. Wis. 2003) .............................................................................................16, 17

*Campbell Software, Inc. v. Kronos, Inc.*, 1996 WL 124457 (N.D. Ill. 1996)...................17

*Central States, Southeast & Southwest Areas Pension Fund v. Paramount Liquor Co.*, 34 F. Supp. 2d 1092 (N.D. Ill. 1999) ...................................................................17

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986) ...................................20, 21

*Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319 (7th Cir. 1983)...............................................................................................................6

*Elmhurst Automobile Parts, Inc. v. Fencl-Tufo Chevrolet, Inc.*, 600 N.E.2d 1229 (Ill. App. Ct. 1992).................................................................................................18

*EMC v. EPC*, 2007 WL 2325187 (Bankr. N.D. Ill. Aug. 15, 2007).........................6, 9, 10

*EMC v. Rogan*, 332 B.R. 166 (Bankr. N.D. Ill. 2005)...................................................6, 8

*EMC v. Rogan*, 344 B.R. 864 (Bankr. N.D. Ill. 2006).................................................8, 9

*In re Elmes*, 289 B.R. 100 (Bankr. N.D. Ill. 2003) ..........................................................19

*Harris Custom Builders, Inc. v. Hoffmeyer*, 2001 WL 811661 (N.D. Ill. 2001) ..............19

*Heller Financial, Inc. v. Riverdale Auto Parts, Inc.*, 713 F.Supp. 1125 (N.D.Ill.1989)…………………………………………………………...……28

*Hoosier Energy Rural Electric Cooperative, Inc. v. Exelon General Co., LLC*, 2005 WL. 4882703 (S.D. Ind. 2005) .........................................................................17

*Indianapolis Motor Speedway v. Polaris Indust. Inc.*, 2000 WL 777895 (S.D. Ind. 2000) .......................................................................................................16, 17

*Kelly Buick of Atlanta, Inc. v. TIG Insurance Co.*, 2005 WL 3238325 (N.D. Ind. 2005) .................................................................................................23, 26, 27

*Kretz v. Harsco Corp., BMY Wheeled Vehicles Division*, 1992 WL 392633 (N.D. Ind. 1992)..................................................................................................23, 27, 28

*Pettiford v. Lesher*, 89 F.3d 838, 1996 WL 341218 (7th Cir. 1996) ..........................21, 23

*Pollack & Weis v. Gussin*, 1994 WL 529355 (N.D. Ill. 1994) .........................................18

*RTC v. Ruggiero*, 994 F.2d 1221 (7th Cir. 1993) .............................................................19

*Schak v. Blom*, 777 N.E.2d 635 (Ill. App. Ct. 2002)........................................................19

*Schwarz v. National Van Lines, Inc.*, 317 F. Supp. 2d 829 (N.D. Ill. 2004).....................16

*Serlin v. Arthur Andersen & Co.*, 3 F.3d 221 (7th Cir. 1993)....................................15, 16

*Skill-Craft Enterprises, Inc. v. Astro Manufacturing, Inc.*, 1990 WL 300705 (N.D. Ind. 1990)...................................................................................................20, 23

*Strategic Management Harmony, LLC v. Enhanced Bus. Reporting Consortium, Inc.*, 2007 WL 2316484 (S.D. Ind. Aug. 10, 2007) ....................................................24

*Tempco Electric Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746 (7th Cir. 1987) ........................................................................................................16

*Textile Banking Co. v. Rentschler*, 657 F.2d 844 (7th Cir. 1981).....................................18

*US v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006) .................................................1, 6, 7, 8

## FEDERAL STATUTES AND RULES

28 U.S.C. § 1391(b) ....................................................................................................20, 21

28 U.S.C. § 1391(d) .........................................................................................................20

28 U.S.C. § 1404...............................................................................................................1

Federal Debt Collection Procedure Act ("FDCPA"), 28 U.S.C. § 3001, *et seq* ...............15

28 U.S.C. § 1404(a) ....................................................................................................16, 20

Fed. R. Civ. P. 69 ..............................................................................................................4

## STATE STATUTES

735 ILCS § 5/2-1402 ......................................................................................................17

735 ILCS § 5/2-1402(c) ..................................................................................................19

Defendant Dexia Crédit Local ("Dexia") hereby moves this Court to transfer this action pursuant to the "first-to-file" rule and 28 U.S.C. § 1404 to the U.S. District Court for the Northern District of Illinois, Eastern Division.  In support of its motion, Dexia states as follows:

## INTRODUCTION

Since early 2002, Dexia, the United States ("U.S."), and Edgewater Medical Center ("EMC") have pursued a series of fraud cases in the Northern District of Illinois ("NDIL") against Peter G. Rogan ("Peter Rogan") and his wholly-owned or controlled companies.  Peter Rogan is plaintiff Judith K. Rogan's ("Judy Rogan") husband.  These cases have resulted in judgments for tens of millions of dollars against Peter Rogan and his companies.[1]  From initial discovery through post-judgment enforcement proceedings, Peter and Judy Rogan has advanced a concerted effort to hinder and delay his cases.  The evidence from those cases reveals that Peter Rogan and his minions have caused the proceeds of these fraud schemes to be funneled into a complex web of foreign and domestic trusts, partnerships, corporations, and accounts held in the name of the Rogans and their children to shield and conceal Peter Rogan's assets from judgment creditors.[2]  At the core of this scheme is a trust in The Bahamas that held more then $25M as recently as 2005 and from which an additional $5M+ has issued since 2002.  By asking this Court to issue a declaration shielding her assets from Peter

---

[1] Dexia is EMC's primary secured and largest unsecured creditor.  Through a court-approved funding agreement, Dexia finances EMC's litigation and receives 85% of the proceeds of those cases. In a separate settlement agreement, EMC/Dexia and the United States have agreed to share the proceeds recovered in their respective health care fraud actions against Rogan.

[2] Judge Darrah found as much in *United States v. Rogan*, holding that "Rogan had a direct financial interest [in the fraud scheme at EMC] as Rogan and his family effectively owned and controlled [the hospital's management company] between 1995 and at least March 2000.  Rogan's ownership interest was concealed through an elaborate scheme of inter-locking financial entities owned by Rogan, Rogan's children, and other entities owned by Rogan."  459 F.Supp.2d 692, 698 (N.D. Ill. 2006).  Judge Darrah also found that Peter Rogan "testified falsely" when he denied knowledge that proceeds of the fraud at EMC had been diverted to Belize trusts set up in the names of his three children.  *Id.* at 699.

Rogan's creditors, Judy Rogan attempts to obtain an order of this Court that will substantially advance The Rogans' scheme to insulate Peter Rogan's ill-gotten gains from attachment by those Peter Rogan has been adjudged to have injured in the Northern District of Illinois.

**Fraud Cases Against Peter Rogan and his Companies.**  The fraud judgments against Peter Rogan and his wholly-owned hospital management and property companies arise from two independent, substantial fraud schemes that Peter Rogan perpetrated via his role as CEO of EMC from 1994-2001:  (i) a massive healthcare fraud scheme; and (ii) a scheme to deceive EMC into foregoing an option to purchase real estate adjacent to the EMC hospital buildings, and instead to pay his company exorbitant rents to lease the property.

Scheme #1:  Healthcare Fraud.  In *United States v. Rogan*, 02 C 3310 (*US v. Rogan*), *Dexia Crédit Local v. Rogan*, 02 C 8288 (*Dexia v. Rogan*), and *Edgewater Medical Center v. Braddock Management, L.P.,* 04 A 2327 (*EMC v. Braddock*), are three NDIL cases arising out of identical core facts, but leading to three different injuries.  The cases led to entry of three separate judgments against Peter Rogan and his companies, which total **$201,629,112.01**.[3]

Scheme #2:  Real Estate Fraud.  In *Edgewater Medical Center v. Edgewater Property Co.*, 04 A 2328 ("*EMC v. EPC*"), NDIL bankruptcy court entered judgment against Peter Rogan's wholly-owned real estate company, Edgewater Property Company ("EPC"), for fraud and breach of contract.  Again, this fraud had no relation to the healthcare fraud.  In addition to ordering specific performance on an option, the court awarded damages of **$4,643,857.24**.  The period for appeal on this verdict has passed.

**Collection Efforts.**  Due to the extended, highly-contested financial discovery in these cases, defendants have developed proof that Peter Rogan has attempted to conceal assets in

---

[3] *EMC v. Braddock* is not ripe for appeal, as the remaining damages issues are not yet resolved.  *U.S. v. Rogan* is on appeal.  No appeal was lodged in *Dexia v. Rogan.*, and the period for appeal has run.

excess of $30M by funneling those funds via domestic and off-shore businesses, trusts, and accounts in the names of his family.  We have not yet completed this discovery, due to:  (i) the refusal of Judy and Peter Rogan to provide critical portions of the documents requested; (ii) the sheer complexity of the business entities and financial structures Peter Rogan has caused to be erected in the U.S. and abroad;[4] and (iii) the Rogans' continuing attempt to shield the transfers of funds from discovery, in part, by causing funds to transfer offshore through the possession of Judy Rogan.  Recently, defendants served citations to discover assets upon Judy Rogan, Peter Rogan, and others with access to proof regarding the Rogans' finances.  Judy Rogan responded to Dexia's citation by producing records in Chicago, which production is severely incomplete.  Judy Rogan's complaint also alleges that the U.S. filed a lien against real property in Valparaiso held in her name for the beneficial interest of Peter Rogan.[5]

**Plaintiff's Decision to Sue in the Northern District of Indiana.**  In her complaint before this Court, Plaintiff's only claim involving *any* Indiana connection is her action to quash the defendants' liens against Indiana property she holds for Peter Rogan's beneficial interest.  Nevertheless, Judy Rogan asks this Court to enter an order shielding all assets that may have been placed in her name from attachment creditors, whose hard-fought judgments against her husband emanated from the NDIL.  So why has Judy Rogan sued Dexia in NDIN?

For over five years – through trials in *US v. Rogan* and *EMC v. EPC*, and myriad discovery disputes in *Dexia v. Rogan* – judges of the NDIL have become intimately familiar with the cases underlying this action and the intricacies of Peter Rogan's finances, including the

---

[4] As we proceed, we continually find new entities (with associated bank and financial institution accounts) we never knew existed.  As of now, we know of approximately 52 such businesses.

[5] Am. Cmplt. ¶¶ 8-13.

significant gaps in production left to be filled.  *See* Ex. EE (listing of numerous prior discovery pleadings and rulings pertaining to Dexia/EMC's efforts to obtain financial discovery from Peter Rogan and related persons).

Defendants have initiated efforts to execute upon the judgments against Peter Rogan, including efforts to reach Peter Rogan's property that is beneficially held in his wife's name.[6]

On August 24, 2007, after numerous requests for these records had gone unheeded, Dexia's counsel informed Plaintiff's Chicago counsel that on August 28, 2007, Dexia would move the NDIL court for a rule to show cause as to why Judy Rogan should not be held in contempt for her failure to produce critical records for her account at Oceanic Bank – the same Bahamian bank that then contained the Peter Rogan Trust through which millions have passed in since 1996.[7]  On August 27, 2007 – *one day before* the date Dexia stated it would file that motion – Judy Rogan sued in Indiana.

Judy Rogan's decision to file suit here – instead of NDIL – is but the latest step in an ongoing strategy to attempt to interpose geographic and/or jurisdictional inconvenience to frustrate defendants' just collection efforts.  For example:

a)  Very shortly after Judge Darrah entered judgment for $64M against Peter Rogan in *United States v. Rogan*, Peter Rogan fired his attorneys in each of the fraud actions referenced earlier and fled the United States.  As detailed hereafter, Judy Rogan had before and since that time performed numerous material acts in aid of her husband's flight to Canada and his effort to conceal his control over millions of dollars of assets stashed abroad.

b)  After fleeing the country, Peter Rogan repeatedly ignored orders by the courts in NDIL to appear and to act in accordance with Court rulings.  Thus, on October 3, 2007, Bankruptcy

---

[6] Under Fed. R. Civ. P. 69, which states that federal judgments are to be executed under state law, defendants initiated supplementary proceedings against Judy Rogan in NDIL on January 30 and June 7, 2007 via citations to discover assets.

[7] Ex. V.

Judge Bruce Black held Peter Rogan in contempt of court for failing to comply with orders to appear in *EMC v. EPC*.[8]

Furthermore, this is the second time the Rogans sued in Indiana to undercut actions in NDIL.  On September 28, 2005, in an attempt to derail the summary judgment proceeding against Braddock Management, L.P. and Bainbridge Management, L.P., Peter Rogan's management companies, Peter Rogan caused Bainbridge to file for bankruptcy in the Northern District of Indiana ("NDIN") instead of filing its response then due to EMC's summary judgment motion in NDIL Bankruptcy Court.  There also was no reason to file for bankruptcy at that particular time,[9] or in Indiana.[10]  The NDIN Bankruptcy Court transferred the Bainbridge bankruptcy to NDIL Bankruptcy Court.

**Dexia's Motion to Freeze the Proceeds of the Sale of Wexford Will Remove the Sole Reason Supporting Location of This Suit in the NDIN.**  Early next week, Dexia will be filing a motion to freeze the proceeds of the Wexford sale in its case in the NDIL.  The effect of this motion will be to obtain an order directing Mrs. Rogan to forego transferring any funds she may obtain from the sale of the Wexford property and to place those funds in escrow until proper ownership of that asset can be fully adjudicated.  This order would not be directed to the real estate in the NDIN, but to the person of Judy Rogan, over which that Court already has jurisdiction.  This will remove any conceivable legitimate reason to proceed in the NDIN any further.

---

[8] Ex. KK.

[9] EMC had been closed for almost four years, during which time the companies had been inactive, and nothing had occurred to prompt the bankruptcy filing.

[10] As Bainbridge's sole business had been to administer EMC and (for a brief time) Grant Hospital in Chicago, any Bainbridge-related creditor issues centered in Chicago, and Bainbridge's affairs were intertwined with the EMC bankruptcy, in which Peter Rogan had been active since its filing in Chicago in February 2002.

The summary that follows is based largely upon facts the courts have determined

and/or admissions of parties in NDIL.

A.     **Some Details on the Multiple Frauds Peter Rogan Perpetrated in Chicago.**

　　1.     **The Healthcare Fraud.**

　　　　a.     **Peter Rogan's Control of Edgewater Medical Center and Subsequent Transfer of Ownership of EMC's Management Company to his Children.**

In 1989, Peter Rogan purchased Edgewater Hospital, **Chicago**, Illinois, for $1M

plus the assumption of debt.[11]  In 1994, Peter Rogan caused the Hospital to be sold to an **Illinois**

not-for-profit corporation, Northside Operating Company ("Northside," d/b/a Edgewater Medical

Center),[12] for about $35M.[13]  EMC financed the purchase of the Hospital through the issuance of

tax-exempt bonds.[14]  The bond circular indicated that Peter Rogan would continue to work at

EMC as an employee of Braddock, under the ownership of third-parties.

Peter Rogan and Northside insiders concealed from the bond purchasing public

that Peter Rogan had secret arrangements with the individuals in control of Northside:[15]  after the

sale, Peter Rogan would continue to dominate EMC and Braddock[16]  Braddock/Bainbridge had

---

[11] *EMC v. EPC,* 2007 WL 2325187, *1 (Bankr. N.D. Ill. Aug. 15, 2007); Ex. A (*Dexia v. Rogan.*, 2d Am. Cplt. ¶ 25).  On May 3, 2007, a default judgment was entered in *Dexia v. Rogan*, which means that the allegations in Dexia's complaint and cited in this motion are now established as true as to the *Dexia v. Rogan* defendants.  *See Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.,* 722 F.2d 1319, 1323 (7th Cir. 1983) (upon default, "factual allegations of the complaint . . . are taken as true.")

[12] *EMC v. Rogan*, 332 B.R. 166, 169 (Bankr. N.D. Ill. 2005).

[13] *US v. Rogan*, 459 F.Supp.2d 692, 697 (N.D. Ill. 2006).

[14] Ex. A at ¶¶ 140-41.

[15] At the time of his sale of the hospital, Peter Rogan secretly negotiated the right to buy Braddock. Seven months later, while the world thought Peter Rogan was merely a Braddock employee, Rogan furtively acquired 99% ownership of Braddock, after which he later transferred the bulk of that asset to domestic and off-shore trusts in his children's names. *Id.* at 697-98  Peter Rogan's children had nothing to do with Braddock's affairs and knew nothing of these transactions. Ex. CC.

[16] Peter Rogan named four of the five directors of Northside, who then named Peter Rogan to serve as EMC's CEO and/or gave Rogan control of EMC through management contracts between EMC and two

6

an office in Merrillville, Indiana, but identified EMC as its "**Chicago** Office."[17]

> **b.     The Healthcare Fraud Scheme Peter Rogan Perpetrated At and Against EMC.**

From at least 1995-2000, Peter Rogan used Braddock/Bainbridge to orchestrate a scheme to defraud Medicare/Medicaid at EMC in **Chicago**.[18]   Peter Rogan conspired with doctors and others *inter alia* to cause residents of **Chicago** to be brought to EMC for unnecessary hospital admissions and  in many case unnecessary medical procedures, for all of which they billed Medicare/Medicaid.[19]    After being indicted in 2002, Rogan's hospital management companies, Braddock and Bainbridge, admitted their participation in this fraud when they entered guilty pleas in **NDIL** on January 15, 2003.[20]

> **c.     The Healthcare Fraud Suits Against Peter Rogan and his Companies.**

> **(1)     U.S. False Claims Act Suit Against Peter Rogan in NDIL**.

On May 8, 2002, the U.S. sued Peter Rogan in NDIL, alleging that he orchestrated the referenced scheme to defraud Medicare/Medicaid in Chicago.  On October 2, 2006, in *US v. Rogan*, Judge Darrah held Peter Rogan liable for violations of the False Claims Act, entering a **$64,259,032.50** judgment against Peter Rogan,[21] and holding that: (i) the $22M fees EMC paid to Braddock/Bainbridge were tied to patient admissions; (ii) Peter Rogan **and his family** had ownership interests in Braddock/Bainbridge that Peter Rogan concealed from EMC's

---

management companies (Braddock, and after March 2000, Braddock's successor-in-interest Bainbridge), which Peter Rogan controlled initially through a secret proxy agreement and later via full ownership. *US v. Rogan*, 459 F.Supp.2d 692, 697-700 (N.D. Ill. 2006).

[17] Ex. B (Braddock partnership agreement listing EMC's Chicago address as its "Illinois office"); Ex. C (Bainbridge Stat. Fin. Affairs, Attach. 18 – referring to closing its "Chicago office" in "spring 2001.")

[18] *Id.* at 722-26.  The facts in this section are also set forth in Dexia's complaint and because of Peter Rogan's default in *Dexia v. Rogan* are now taken as true.  *See, supra,* n. 5.

[19] *Rogan*, 459 F.Supp.2d at 722-26.

[20] *Id.* at 708.

[21] *Id* at 728.

auditors; and (iii) Peter Rogan had an incentive to fraudulently increase EMC's patient admissions due to his family's secret ownership of Braddock/Bainbridge.[22]

### (2)    Dexia's Suit Against Peter Rogan and his Companies in NDIL.

In 1997, after the inception of the fraud scheme but before the U.S. discovered it, Peter Rogan sought to refinance EMC's then-existing bond debt to obtain a lower interest rate and to raise additional funds for EMC.[23]  To obtain a lower interest rate, Peter Rogan and Northside asked Dexia to provide a letter of credit ("LOC") to guaranty repayment of the bonds. Peter Rogan presented EMC financial data to induce Dexia to issue the LOC, failing to disclose that the EMC finances had been inflated via healthcare fraud.  On the strength of this false data, Dexia in 1998 issued a $56M LOC to enhance EMC's credit under the bond refinancing.  From 1998-2001, to cause Dexia to believe that EMC's performance continued to meet its financial covenants, Peter Rogan, Braddock, and Bainbridge sent false financial reports to Dexia.

In 2001, after the return of a federal indictment in Chicago against Braddock and Bainbridge alleging a scheme to defraud Medicare/Medicaid,[24] the U.S. cut-off Medicare/Medicaid payments to EMC, forcing EMC to close in December 2001[25] and to default on its bonds, which obliged Dexia to cover the entire **$56M** purchase price of the tendered bonds.

On November 12, 2002, Dexia sued Peter Rogan, Braddock, Bainbridge, and their general partner, Bainbridge Management, Inc, in NDIL alleging that they schemed to defraud

---

[22] *Id*. at 697-700. *EMC v. Rogan*, 344 B.R. 864, 873 (Bankr. N.D. Ill. 2006).

[23] The facts in this paragraph are derived from Ex. A at ¶¶ 140-73.

[24] *Rogan*, 459 F.Supp.2d at 697-708; *EMC v. Rogan et al.*, 332 B.R. at 171-72.

[25] *EMC v. Rogan*, 332 B.R. at 171-172.

Dexia in order to induce it to issue (and ultimately pay on) a $56M LOC.[26]  On May 3, 2007,

Judge Filip awarded Dexia a **$124,280,712.70** judgment against Peter Rogan, the size of the

judgment due to the fact that Judge Filip assessed punitive damages.  Judge Filip ruled that Peter

Rogan is personally "liable for any judgment entered against Bainbridge or Braddock" because

Bainbridge/Braddock are Peter Rogan's alter egos.[27]

> **(3)      EMC's Suit for Fraud, Breach of Fiduciary Duty, and Breach
> of Contract in the Northern District of Illinois Bankruptcy
> Court.**

On April 23, 2004, EMC sued Peter Rogan and his companies for fraud, breach of

contract, and breach of fiduciary duty, asserting injury from the fraud scheme to which Braddock

and Bainbridge had pled guilty.  On June 29, 2006, in *EMC v. Braddock*, Judge Black granted

partial summary judgment of **$13,089,368.81** on EMC's claims of breach of contract and

fiduciary duty.[28]  Judge Black left a portion of EMC's damages claim for trial.

**2.      Peter Rogan's Property Fraud.**

In 1994, Peter Rogan conveyed to EMC only a portion of the real property that he

had obtained when he bought the hospital in 1989.[29]  Peter Rogan did not transfer several

adjacent buildings ("Adjacent Properties") that the Hospital had used, and that EMC continued to

use after the sale.[30]  Instead, Rogan retained ownership of the Adjacent Properties via Edgewater

Property Company ("EPC"), an Illinois corporation that Rogan 100% owned and controlled.[31]

As part of the sale, EPC transferred to EMC/Northside an option to purchase the Adjacent

---

[26] Ex. A at ¶¶ 1-15.

[27] Ex. D.

[28] *EMC v. Rogan*, 344 B.R. at 866.

[29] *EMC v. EPC,* 2007 WL 2325187, *1 (Bankr. N.D. Ill. Aug. 15, 2007).

[30] *Id.* at *2.

[31] *Id.*; *EMC v. EPC*, 04A2328, Bankr. N.D. Ill., Dckt. No. 121, Joint Pre-trial Order Submission at 23.

Properties.[32] EMC/Northside never exercised the option, and instead entered into a long-term lease for use of the Adjacent Properties, which lease was highly lucrative for EPC.

In *EMC v. EPC*, EMC sued Rogan (via EPC) for fraudulently causing the Northside Board to enter into the lease in lieu of exercising the option to purchase the property. Judge Black ruled that Rogan abused his responsibilities to EMC/Northside to deceive the Northside Board into: (i) foregoing the option to purchase the Adjacent Properties, which Rogan knew was much more financially advantageous; (ii) instead causing EMC/Northside to enter into an exorbitant lease with EPC for the Adjacent Properties; and (iii) thereby benefited himself and EPC to the substantial detriment of EMC.[33]

**B.**    **Peter Rogan Transferred a Portion of the Funds his Companies Fraudulently Obtained from EMC in Chicago to Judy Rogan Through JKR Business.**

Notably, this EPC-EMC lease for the Adjacent Property in Chicago listed "JKR Business" (JKRB") as the contract manager.[34] JKRB is a purported sole proprietorship of Judy Rogan.[35] JKRB has been the sole source of Judy Rogan's reported earned income since at least 1997. JKRB's sole source of income was from "Business Services Fees" it received from the Peter Rogan-controlled companies Braddock and EPC.[36] Despite all of the foregoing, Peter Rogan testified under oath that JKRB was a decorating business his wife established that never got off the ground.[37]

Thus, Rogan caused a portion of the funds that he fraudulently siphoned from

---

[32] *EMC*, 2007 WL 2325187, *2.

[33] *Id*. at *6-11.

[34] Ex. E (lease between EMC and EPC).

[35] Ex. F (summary of Judith Rogan tax records).

[36] *See, e.g.*, Ex. H (ledger of JKRB for only years for which records could be found - 1996, 1998-2000)

[37] Ex. G.

EMC via the healthcare and option frauds to be transferred to this business he put into Judy

Rogan's name.  Rogan carried out this scheme with JKRB in Chicago, JKRB depositing the

proceeds of these frauds into an account at the Private Bank & Trust in **Chicago**.[38]

C.    Dexia's Extensive Discovery Efforts in the Northern District of Illinois.

Dexia has expended enormous time and resources in the NDIL litigating

numerous complex issues to obtain discovery relating Rogan's assets and finances. Dexia has

been forced to file numerous motions to compel production of: (i) financial records from Rogan

and Rogan-controlled entities;[39] and (ii) documents from third parties to which Rogan and

Bainbridge had transferred funds.[40] Dexia's motions have caused judges in the NDIL to expend

substantial time and resources becoming intimately familiar with: (i) the complex, intertwined

ownership structures connecting Bainbridge, Braddock and the dozens of other Rogan-controlled

entities;[41] (ii) the complex financial dealings and transactions between and among Rogan and

numerous other entities he controlled;[42] and (iii) the numerous ways in which Rogan used

accounts in the name of his family to conceal the fruits of his fraud and place his assets beyond

the reach of creditors.[43]

Judy Rogan and JKRB.   Dexia issued subpoenas to both Plaintiff and her

purported sole proprietorship JKRB.  Judy Rogan's counsel in this action, Illinois attorney Mike

O'Rourke, also represented her in connection with these subpoenas and others in the various

---

[38] Ex. I.

[39] *See* Ex. J (motion to compel production of financial records); Ex. K (agreed order by which Bainbridge Parties agreed to produce financial records).

[40] *See* Exs. L & M (motions to compel production of financial records from parties to whom Peter Rogan and Bainbridge transferred funds); (Ex. N) (order granting motions to compel).

[41] Exs. L & M.  To date, Dexia has identified not less than 52 entities and trusts that Peter Rogan has used to conceal his assets.  *See* Ex. JJ (list of Rogan-controlled entities).

[42] *Id.*

[43] *Id.*

cases in NDIL.  Judy Rogan's Chicago counsel originally informed Dexia that JKRB had no

bank accounts.[44]  After Dexia subpoenaed the Private Bank & Trust in Chicago, however, Dexia

obtained account records for JKRB.  Dexia also had difficulty obtaining records relating to Judy

Rogan's finances from her husband, who asserted he could not produce documents related to

assets held in his wife's name, claiming he lacked control over such documents.  It was only

after Magistrate Judge Schenkier in the NDIL ordered Peter Rogan's counsel to personally

search for responsive documents at Peter Rogan's office that he produced his wife's tax returns

and bank and investment account records *which are now maintained in Chicago*. Also relevant to

the venue issues of this motion is the fact that the only JKRB financial records that Dexia have

been able to obtain have come from **Chicago-based** individuals:  (i) the Private Bank & Trust

Company in Chicago; (ii) EPC; and (iii) Rogan's Chicago attorneys John Foley and John

Tatooles.[45]

### D.   **Peter and Judith Rogan's Actions to Hinder and Delay Judgment Enforcement**.

During and after the pendency of the various fraud schemes, the Rogans

transferred the bulk of their assets to and through off-shore trusts – in The Bahamas and Belize –

for the benefit of themselves and their children.  Furthermore, to facilitate and conceal these fund

transfers, the Rogans opened off-shore bank accounts in, at least, The Bahamas, The Cayman

Islands, and Canada.

On October 12, 2006, shortly following Judge Darrah's ruling in *United States v.*

*Rogan* on September 29, 2006, Peter Rogan: (i) terminated his counsel in all actions pending

against him and his companies in NDIL; (ii) abandoned his office in Merrillville, Indiana,

including computers and selected financial records (removing or destroying the rest); and (iii)

---

[44] Ex. O

[45] Ex. I (JKRB bank statement); Ex. H (bearing "EPC" and "TF" [Tatooles/Foley] Bates label).

left his Indiana home and took up residence in Vancouver. [46]  Thereafter, Rogan flouted express

orders to appear by two different judges in the NDIL and ignored an express order that he

transfer property. [47]  For this, Peter Rogan was held in contempt.

In obvious coordination with her husband, Judy Rogan took substantial steps to

facilitate his departure to Canada,  On October 16 and 18, 2006 opened bank accounts at HSBC

bank in Canada[48] and on October 21, signed a lease for a residence in Vancouver where she and

her husband reside.[49]  Then, on November 3, 2006, Judy Rogan transferred $1.5M from an

account in her name in The Bahamas to one of her new HSBC accounts in Canada.[50]  By

November 24th, an additional $4.4M came into that account.  Later, Judy Rogan used a portion of

these funds in part to pay a $100,000 retainer fee to the Chicago law firm Hogan Marren, Ltd. to

represent Peter Rogan in his appeal of the *US v. Rogan* judgment to the Seventh Circuit via a

wire transfer from her account at HSBC Bank in Canada to the firm's account in Chicago.[51]  We

obtained this proof via a subpoena to the Hogan Marren firm.  Judy Rogan has refused to

produce the specifics of her accounts at HSBC despite numerous requests, thus preventing us

from obtaining a clearer picture of what she did with the money that came into these accounts.

That will be the focus of a motion to compel in the NDIL in the near future.

Moreover, financial records establish that ***Plaintiff has played a central role in***

***concealing Peter Rogan's assets from his judgment creditors***.  Tax records establish that Judy

---

[46] *Dexia v. Rogan.*, Civil No. 02C8288, N.D. Ill., Dckt. Nos. 283 and 297.

[47] Ex. KK (contempt order) and Ex. LL (transcript of Rogan's absences).

[48] Ex. Q (HSBC account opening document)

[49] Ex. P (Vancouver, British Columbia lease)

[50] Ex. S.

[51] Ex. R (record of wire transfer to Hogan Marren).

Rogan never has had substantial earned income or investments.[52]  Thus, there is no basis for concluding that she had earned the $5.9M she received in her HSBC accounts just after her husband fled to Canada.[53]  At least $1.5M of these funds appear to have been wired to Judy Rogan's HSBC account from Oceanic Bank and Trust in The Bahamas.[54]  As noted earlier,[55] Peter Rogan controls a trust at Oceanic Bank, which in 2005 held assets of $25M and which the tax filings of Judy Rogan indicate is owned entirely by Peter Rogan.[56]  Judy Rogan first filed a Treasury Department form acknowledging the existence of her Oceanic Bank account in 2006, indicating that she opened this account during the same period in which the Rogans were coordinating their transfer of assets to Canada.[57]

**E.**  **Judy Rogan's Primary Assets are Located Outside of the Northern District of Indiana.**

Judy Rogan's complaint seeks a declaration that "all personal property held by plaintiff and/or her trust is the lawful property of plaintiff, held free and clear from the claims of Peter Rogan's creditors . . . ."  (Cplt. ¶¶ 30, 51)  However, discovery conducted in NDIL establishes that the majority of her assets are located <u>outside</u> NDIN.  ***The only substantial asset in Judy Rogan's name in Indiana of which Dexia is aware is the real property at 476 Wexford, Valparaiso.***  Other than this property, all her assets appear to be located outside Indiana. Although it is not identified in her complaint, Judy Rogan owns a condominium at 55 E. Erie in **Chicago** that is also subject to defendants' liens.[58]  Although she contends to continue to reside

---

[52] Ex. F (summary tax records 1997–2004).

[53] Ex. S.

[54] *Id*.

[55] *See supra* at 1-4.

[56] Ex. T.

[57] Ex. U.

[58] Ex. W.

in the NDIN, Judy Rogan signed a lease in 2006 for a condominium in Vancouver, and renewed

that lease on May 1, 2007.  Similarly, Judy Rogan's primary bank accounts are not located in

Indiana, but instead are: (i) a HSBC account in Canada via which at least $5.9M has passed since

November 2006;[59] (ii) an account at Oceanic Bank from which Judy Rogan has transferred at

least $3.8M since September 2005;[60] and (iii) a DWS Scudder account through which at least

$5.2M has been transferred since 2005, which is maintained in Flossmoor, Illinois by L.P.

Littlewood & Associates.[61]

**F.    The United States' Foreclosure Complaint and Lis Pendens.**

On November 11, 2007, the U.S. filed a complaint seeking to foreclose on the

liens it has filed on the Wexford property and the condominium in Chicago that Judy Rogan also

holds for Peter Rogan's beneficial interest.[62]  This foreclosure complaint is part of the U.S.'s

effort to execute upon the judgment the U.S. obtained against Peter Rogan in NDIL.  Since the

U.S. liens were filed pursuant to the Federal Debt Collection Procedure Act ("FDCPA"), 28

U.S.C. § 3001, *et seq*, the complaint also is brought under the FDCPA.[63]  On or about November

14, 2007, the U.S. filed a *lis pendens* on the Wexford property in Porter County, Indiana.

**ARGUMENT**

There are two equally valid approaches that a court can take in deciding whether

to transfer a case.  Under the "first to file" rule, a court can transfer a suit "for reasons of wise

judicial administration . . . whenever it is duplicative of a parallel action already pending in

another federal court."  *Serlin v. Arthur Andersen & Co.,* 3 F.3d 221, 223 (7th Cir. 1993);

[59] Ex. S.

[60] Ex. BB.

[61] Ex. X.

[62] Ex. WW.

[63] *Id.*

*Barrington Grp., Ltd. v. Genesys Software Sys., Inc.*, 239 F. Supp. 2d 870, 873 (E.D. Wis. 2003).

Alternatively, a court can transfer a case under 28 U.S.C. § 1404(a). *See Barrington*, 239 F.

Supp 2d at 873. Transfer of this case to NDIL is proper under both approaches.

## I. THE "FIRST TO FILE" RULE STRONGLY SUPPORTS TRANSFERRING THIS CASE TO THE NORTHERN DISTRICT OF ILLINOIS.

For reasons of judicial economy and convenience to the parties, "[t]here is a

strong legal presumption against having related actions pending simultaneously in different

districts." *Indianapolis Motor Speedway v. Polaris Indust. Inc.*, 2000 WL 777895, at *1 (S.D.

Ind. 2000). Where two competing actions involving essentially the same parties and the same

issues have been filed in different districts, the general rule favors the forum of the first-filed

suit. *See Barrington*, 239 F. Supp. 2d at 873 ("The general rule in situations where mirror image

actions are pending in different districts . . . is that the first-filed action will be given priority . . .

"); *Indianapolis,* 2000 WL 777895, at *2 (the "first-to-file rule gives priority, for purposes of

venue selection, to the party who first establishes jurisdiction"). Thus, under this "first-to-file"

rule, courts normally transfer a suit whenever it duplicates another action pending in another

court. *See Schwarz v. Nat'l Van Lines, Inc.,* 317 F. Supp. 2d 829, 833 (N.D. Ill. 2004) (quoting

*Serlin*, 3 F.3d at 223). "The first-to-file rule at once eliminates duplicative litigation and adheres

to the inherently fair concept that the party who commenced the first suit should generally be the

party to attain its choice of venue." *Barrington,* 239 F. Supp. 2d at 873.

While the Seventh Circuit does not "rigidly" adhere to the "first-to-file" rule

where such adherence would conflict with the rule's rationale,[64] it has recognized a rebuttable

presumption that the first-filed action should be allowed to proceed and the second abated or

---

[64] For example, a filing made under threat of an imminent suit and asserting a mirror image of that suit in another district. *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 750 (7th Cir. 1987)

transferred to the forum of the first-filed action.  *See Asset Allocation & Mgmt. Co. v. W. Empl. Ins. Co.*, 892 F.2d 566, 573 (7th Cir. 1989); *Hoosier Energy Rural Elec. Coop., Inc. v. Exelon Gen. Co.,* LLC, 2005 WL 4882703, at *2 (S.D. Ind. 2005); *Barrington,* 239 F. Supp. 2d at 873; *Indianapolis,* 2000 WL 777895, at *1.  Thus, the plaintiff in the second-filed action "bears the burden of showing that there are sufficiently compelling circumstances or a sufficient imbalance of convenience to overcome the presumption that the second-filed case should be dismissed [or transferred] in favor of the case filed first."  *Barrington,* 239 F. Supp. 2d at 874; *Indianapolis,* 2000 WL 777895, at *2 (same); *Central States, Southeast & Southwest Areas Pension Fund v. Paramount Liquor Co.*, 34 F. Supp. 2d 1092, 1095 (N.D. Ill. 1999) (same).

Where the plaintiff in the second-filed suit is unable to make this requisite showing, courts repeatedly have transferred the second-filed action to the district in which the first-filed action is pending.  *See Indianapolis,* 2000 WL 777895, at *2 (granting transfer motion – plaintiff's "potential compelling reasons" were insufficient to "justify variance from the presumption in favor of the first-filed" action in Minnesota); *Barrington*, 239 F. Supp. 2d at 874 (same – plaintiff failed to "overcome the presumption that the [first-filed] Massachusetts case ha[d] priority and should go forward"); *Campbell Software, Inc. v. Kronos, Inc.,* 1996 WL 124457 *6 (N.D. Ill. 1996) (same – "ongoing, pre-existing litigation in Massachusetts concerning the identical issues and parties").[65]

## A.    The Pending Citation Actions Against Judy Rogan in the Northern District of Illinois Were Filed First.

A supplementary proceeding under 735 ILCS § 5/2-1402 authorizes a judgment creditor not only to examine a third party, but also empowers the court, upon a showing that the

---

[65] *See also Hoosier Energy,* 2005 WL 4882703, at *5 (same); *Central States,* 34 F. Supp. 2d at 1095 (same).

third-party is holding assets of the judgment debtor, to compel application of discovered assets to satisfy the underlying judgment. *See Elmhurst Auto Parts, Inc. v. Fencl-Tufo Chevrolet, Inc.,* 600 N.E.2d 1229, 1232 (Ill. App. Ct. 1992). As such, a "citation to discover assets commences the supplementary proceeding in the same manner that service of a summons commences an ordinary civil action." *Pollack & Weis v. Gussin*, 1994 WL 529355, at *1 (N.D. Ill. 1994) (citing *Textile Banking Co. v. Rentschler*, 657 F.2d 844, 850 (7th Cir. 1981)).

As the Illinois appellate court explained in *Elmhurst Auto*:

> Section 2-1402 is designed to provide a statutory foundation for an efficient and expeditious procedure to discover assets and compel their application to satisfy a prior judgment. It is also a versatile proceeding in which a judgment creditor may not only discover assets but also may obtain orders from the circuit court to restrain the transfer of assets, turn over property, garnish funds due to the debtor or property held for the debtor, or order the sheriff to sell discovered property. . . . A supplemental proceeding can itself be a final order that is independent of the initial lawsuit that has been reduced to judgment. . . . Thus, section 2-1402(e) permits the court to determine the rights of third parties in the property and such supplemental proceeding is an 'action.'

*Fencl-Tufo*, 600 N.E.2d at 1232-33 (internal citations and quotations omitted).

Here, on January 30, 2007 and June 20, 2007, the U.S. and Dexia, respectively, commenced supplementary proceedings against Judy Rogan by serving a citations to discover assets upon Judy Rogan under § 5/2-1402. Judy Rogan filed this action on October 30, 2007 in the Superior Court of Porter County. The U.S. removed the case on November 9, 2007. Because the citation actions were filed first, the first element of the first-to-file rule, *i.e.*, the existence of a pending, prior filed action, is satisfied.

**B.      The Pending Citation Actions Involve The Same Parties and Issues as Judy Rogan's Later Filed Declaratory Judgment Action.**

There also is no question that the pending citation actions involve the same parties and issues as the instant declaratory judgment action.

<u>Same parties</u>. Defendants brought their citation actions against Judy Rogan.

Same issues.  In the citation actions, defendants seek discovery from Judy Rogan[66] and ultimately a determination that real and personal nominally held in Judy Rogan's name actually belongs to her husband and thus should be applied to satisfy the judgments against him.  In Illinois, the ownership of assets and whether such assets can be used to satisfy a judgment against the judgment debtor are the *only* pertinent issues in a citation action.  *See Schak v. Blom,* 777 N.E.2d 635, 639 (Ill. App. Ct. 2002).  Thus, in a citation action, a court can order the turnover to the judgment creditor of all real <u>and</u> personal property of the judgment debtor that a third party holds.  *See* 735 ILCS § 5/2-1402(c).[67]  Here, via the citation actions, defendants will seek turnover from Judy Rogan of all real/personal property she holds for Peter Rogan's beneficial interest, including the Valparaiso home (or the funds resulting from the sale of the home).[68]

In her complaint, Judy Rogan seeks a ruling to the contrary:  a declaratory judgment that "all personal property held by plaintiff and/or her trust is the lawful property of plaintiff, held free and clear from the claims of Peter Rogan's creditors . . . ."  (Cplt. ¶¶ 30, 51), and that "the creditors of Peter Rogan have no right to seek turnover or possession of said assets to the detriment of plaintiff."  (*Id*. ¶¶ 35, 53)  Thus, the citation actions and the declaratory judgment action are mirror images of one another:  both seek a judicial determination as to the ownership of all real/personal property in Judy Rogan's name.  Thus, absent compelling circumstances that Judy Rogan will have the burden to establish, the first-to-file rule requires

---

[66] *See* Citation (Ex. Y).

[67] *See also RTC  v. Ruggiero,* 994 F.2d 1221 (7th Cir. 1993) (in citation action, affirming finding that real property the title to which was in judgment debtor's wife name belonged to judgment debtor such that judgment creditor could levy on it); *Harris Custom Builders, Inc. v. Hoffmeyer*, 2001 WL 811661, at *7 (N.D. Ill. 2001) (same – third party); *In re Elmes*, 289 B.R. 100, 106 (Bankr. N.D. Ill. 2003) (same).

[68] In anticipation of a future turnover motion, Dexia has asked NDIL to freeze Judy Rogan's assets under the citation statute and applicable case law.

that this action be transferred to NDIL, the forum of the first-filed case.

## II.    THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF ILLINOIS UNDER 28 USC. § 1404(a).

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  In ruling on a transfer motion, a court first must determine if the action might have been properly brought in the transferee district.  *See Skill-Craft Enters., Inc. v. Astro Mfg., Inc.*, 1990 WL 300705, *3 (N.D. Ind. 1990).  If venue is proper in both jurisdictions, the court should transfer where, on balance, doing so:  (1) is more convenient for the parties and witnesses; or (2) furthers the interests of justice.  *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986); *Skill-Craft*, 1990 WL 300705, at * 3.  The transfer analysis is a case-by-case, fact-intensive inquiry, which here weighs heavily in favor of transfer to NDIL.  *See Van Dorn*, 796 F.2d at 219.

### A.    Venue is Proper in the Northern District of Illinois.

Section 1391(d).  In relevant part, § 1391(d) provides that "[a]n alien may be sued in any district."  Because Dexia is a foreign agency, venue is proper in the Northern District of Illinois under 28 USC. § 1391(d).  In fact, because of Dexia's extensive litigation against Peter Rogan in NDIL, a substantial part of Dexia's US-based activities are in Chicago – none are centered in Indiana.  Thus, under § 1391(d), venue is more appropriate in Illinois than in Indiana.

Section 1391(e).  The pertinent portion of § 1391(e) states that in actions where the United States is a defendant, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  *See also* 28 USC. § 1391(b) (actions not based solely upon diversity jurisdiction, venue is proper where a substantial part of the events occurred, or

where a substantial part of the property is located.)  Because Judy Rogan alleges this action

arises pursuant to federal law and because the United States is one of the defendants, pursuant to

§ 1391 (b) and (e), venue is also proper where a substantial part of the events giving rise to this

claim occurred.  As described above, this litigation arises from defendants' attempt to enforce a

judgment that resulted from a massive fraud directed from, and largely carried out in, Chicago.

Essentially all of the relevant underlying events, including extensive pre-judgment litigation and

post-judgment supplementary proceedings, have taken place in Illinois, and none in Indiana.

Thus, venue is more appropriate in NDIL.

      **B.**      <u>**The Interest of Justice Requires Transfer of this Case to Illinois.**</u>

      The "interest of justice" analysis refers to the "efficient administration of the court

system."  *Van Dorn*, 796 F.2d at 221.  The interest of justice factor "may be determinative …

even if convenience of the parties and witnesses might call for a different result."  *Id*.  The

"interest of justice" is furthered by transferring an action when transfer creates the possibility of

consolidating related actions.  *Id*.; *Pettiford v. Lesher*, 89 F.3d 838, 1996 WL 341218, *5 (7th

Cir. 1996) (stating that "[i]ntracircuit transfers are often good docket management," and

suggesting district court should transfer action where it would allow consolidation).  While

courts have discretion in deciding motions to transfer, "related litigation *should* be transferred to

a forum where consolidation is feasible."  *Van Dorn*, 796 F.2d at 222.

      Here, with closely-related litigation pending in NDIL, the interests of justice

strongly favor transfer.  As discussed above, related actions have been pending in NDIL since

2002.  Judy Rogan's action is an outgrowth of those cases:  it seeks to adjudicate the effect of the

judgments entered in those cases – that is, whether Dexia and the government can execute upon

assets in her name to satisfy those judgments.  Judy Rogan's case thus should be consolidated

with the prior pending citation actions that seek to adjudicate the very same issue.

The interests of justice also would be served via transfer to NDIL because that court is uniquely positioned to assess the issue of whether Peter Rogan has used his family members, including his wife, to hold and maintain his assets.  In particular, in *Dexia v. Rogan*, the court has become intimately familiar with Peter Rogan's financial dealings by supervising extensive discovery regarding Peter Rogan's assets and finances.  NDIL has presided over numerous hearings relating to Peter Rogan's use of family members, including domestic and Belize trusts in the names of the Peter Rogan's children, to conceal the fruits of his fraud at EMC.[69]  As a result of Peter Rogan's repeated refusal to produce documents regarding his assets, NDIL also has presided over numerous motions to compel and motions for sanctions relating to Peter Rogan family asset discovery.  Time and again, Dexia was forced to go to the district court after discovering that Peter Rogan had actively concealed information regarding his assets, including assets he had placed in the names of his wife and other family members.

For example, Peter Rogan refused to produce documents related to assets held in his wife's name, claiming he lacked control over them.  It was only after NDIL ordered his counsel to go to his office and perform the review for responsive documents that Peter Rogan produced documents related to assets in his wife's name.  From his own office, Peter Rogan produced Judy Rogan's tax returns bank and investment account records.  In addition to the documents Peter Rogan produced, Dexia obtained discovery related to assets held in Judy Rogan name via subpoenas to her, JKRB, Chicago attorneys Tatooles, Foley & Associates, the Private Bank & Trust of Chicago, and via its deposition of Peter Rogan in Chicago.

If this case is not transferred to NDIL, the interests of justice will be undermined because having the cases run their course in two different judicial fora will risk inconsistent

---

[69] *See* Ex. EE.

22

judgments.  In the context of the citation actions, NDIL could rule that Peter Rogan is the

beneficial owner of some or all of the assets in Judy Rogan's name and thus permit defendants to

execute upon assets in her name to satisfy their judgments.  This Court could rule the opposite.

"[C]onsolidation of the cases  . . . [will] result in a substantial saving of judicial time and effort,

and permit a final resolution of all claims raised  . . .  without the danger of inconsistent decisions

in regard to the same claims."  *Pettiford*, 89 F.3d 838, 1996 WL 341218, at *7.

> ### C.    The Various Other Private and Public Interests, Including Convenience of the Parties and Witnesses, Weigh in Favor of Transfer.

Courts consider public and private interests to decide whether transfer is

appropriate.  *See Kretz v. Harsco Corp., BMY Wheeled Vehicles Div.*, 1992 WL 392633 (N.D.

Ind. 1992).  Relevant factors include:  (1) plaintiff's forum choice; (2) situs of material events;

(3) relative ease of access to sources of proof, including the court's power to compel the

appearance of unwilling witnesses at trial and the costs of obtaining the attendance of witnesses;

and (4) convenience to the parties – specifically their respective residences and abilities to bear

the expense of trial in a particular forum.  *Id.* at *2.  A court also should consider the local

interest in resolving a controversy, along with any practical issues regarding the speed and

expense of trying a case in a particular venue.  *See Skill-Craft*, 1990 WL 300705, at * 3.

> ### 1.    Various Public and Private Factors Favor Transfer.

(a)  Plaintiff's Forum Choice.  Judy Rogan's choice of Indiana carries little weight

because she does not live where she seeks to litigate.  *See Kelly Buick of Atlanta, Inc. v. TIG Ins.

Co.*, 2005 WL 3238325, *2 (N.D. Ind. 2005); *Skill-Craft*, 1990 WL 300705, at *5.  First, Judy

Rogan leases a residence in Canada, which Dexia believes is now the Rogans' primary

residence.[70]  Indeed, Judy Rogan is about to sell her Indiana home.  The only other residence in

---

[70] Ex. P (Lease for Vancouver, British Columbia condo).

Judy Rogan's name of which Dexia is aware – and which is at issue in this case – is located in Chicago.[71]  <u>Second</u>, Judy Rogan has opened numerous bank accounts at HSBC in Canada, listing a Canadian address as her home.[72]  <u>Third</u>, on information and belief, Judy Rogan and her husband have initiated the process to obtain permanent residency status in Canada.[73]

     (b)  <u>Location of Relevant Events</u>.  Nearly all of the relevant events occurred in Illinois, <u>not</u> in Indiana.  Several of the key events described in Judy Rogan's own Complaint occurred in Chicago.  The *US v. Rogan* and *Dexia v. Rogan* suits were litigated and adjudged in Chicago.  (Cplt. ¶¶ 7-8)  To execute upon these judgments, defendants initiated citation actions in Chicago against Judy Rogan.  (Cplt. ¶¶ 11)  Furthermore, the fraud underlying the *US v. Rogan* and *Dexia v. Rogan* lawsuits occurred in Chicago.  Peter Rogan's use of his wife to conceal the fruits of his fraud also occurred in Chicago.  Peter Rogan used Judy Rogan's purported sole proprietorship, JKRB, to siphon fraudulently-obtained funds out of EMC in Chicago, with JKRB depositing the proceeds into an account at the Private Bank and Trust in Chicago.

     In addition, contrary to the contention in her complaint (Cplt. ¶ 6), Judy Rogan does not own a variety of personalty throughout Indiana.[74]  Although Judy Rogan may have miscellaneous personal effects in the Wexford property where she used to reside and may still have *de minimis* amounts in Indiana bank accounts, Judy Rogan has moved the vast majority of the property that is in her name and subject to attachment outside of Indiana. [Although Judy

---

[71] Ex. Z (Peter Rogan's Amended Response to Dexia's First Set of Interrogatories)

[72] Ex. S.

[73] Ex. AA (invoice for Canadian immigration attorney)

[74] *See, e.g*., *Strategic Mgmt. Harmony, LLC v. Enhanced Bus. Reporting Consortium, Inc*., 2007 WL 2316484, *5 (S.D. Ind. Aug. 10, 2007) (transferring case to Northern District of Illinois and holding that "when a defendant challenges venue a court may examine facts outside the complaint in order to determine whether to transfer the case to another district).

Rogan has repeatedly used Indiana bank accounts to funnel millions of dollars of money from the Bahamas Trust to Peter Rogan, this is not her property.]  In stark contrast to the minimal funds Judy Rogan might maintain in Indiana, the vast bulk of the assets held in her name are located outside of Indiana.  These assets include her condominium in Chicago,[75] and her bank accounts at Oceanic Bank in The Bahamas and HSBC in Canada.[76]  Notably, although a form Judy Rogan filed with the Treasury Department declares that her Bahamian account has a balance of less than $50,000,[77] records Dexia has obtained establish that Judy Rogan has transferred not less than $3.8M through this account since September 2005.[78]  Similarly, $5.9M was deposited in Judy Rogan's HSBC account in Canada in November 2006 alone.[79]

The only fact that even arguably ties this case to Indiana is that the Judy Rogan's former residence in Valparaiso.  But that house will be sold, and the proceeds will be escrowed.  This means that the Indiana house's physical location will be wholly irrelevant to this case, which merely will seek to adjudicate who is entitled to the escrowed sales proceeds.  To adjudicate this, a court will have to determine whether Peter Rogan had beneficial/equitable ownership of the house despite his wife holding nominal title.  To assess if Peter Rogan is the beneficial owner, a court will have to examine, *inter alia*, the source of funds for the purchase of the real estate and construction of the home, Peter Rogan's use of the home, *etc*.  Even with only a minimal amount of discovery, it is clear already that the financing for and coordination of the construction of the home originated in Illinois.  Boulevard Bank in Illinois loaned Peter Rogan

---

[75] Ex. W.

[76] Ex. U.

[77] *Id*.

[78] Ex. BB.

[79] Ex. S.

the funds to pay for the house's construction.[80]  Peter Rogan directed construction of the house

from his office at EMC in Chicago.[81]  Daniel Schuman, an employee of Peter Rogan's company,

Braddock, which managed EMC in Chicago, assisted Peter Rogan in directing the home's

construction.[82]

        (c)  <u>Location of Relevant Records</u>.  The bulk of the relevant records either are

located in Illinois or outside of Indiana.  To date, via pre-judgment discovery and post-judgment

citation actions, Dexia has obtained financial records related to the Rogans' assets.  These

records are located in the Chicago office of Dexia's counsel.  Through its citation, Dexia

currently is in the process of attempting to obtain additional and more recent financial records

from Judy Rogan's Chicago attorney, Peter O'Rourke.  To the extent that Dexia is unable to

obtain records that pertain to assets in Judy Rogan's name from her, it will have to obtain the

records from third parties outside of Indiana, *e.g.*, financial institutions in Canada and The

Bahamas.

        (d)  <u>Local Interest in Resolving the Dispute</u>.  In *Kelly Buick*, a car dealership

sought a declaratory judgment that TIG, its insurance company, was required to indemnify it.

2005 WL 3238325, at *1.  The underlying claim against Kelly Buick, for which TIG had refused

to indemnify, was pending in the Northern District of Georgia.  *Id.* at *2.  And, the court noted

that although "a proceeding could be filed anywhere in the U.S., it would still relate to actions

taken by the dealership or garage operations in Georgia."  *Id.* at *5.  Because "some of the

conduct and events giving rise to the action occurred in Georgia, while none … took place in

Indiana," and because some facts raised in the underlying litigation might be relevant to the

---

[80] Ex. FF.

[81] Ex. GG (Letter from Peter Rogan to Precision Construction).

[82] *Id.*

declaratory action, the court transferred the action to Georgia. *Id.*, at *6; *see also Kretz*, 1992 WL 392633, at *5 ("the public interest would be best served by having age discrimination claims tried in the district where the alleged discrimination occurred."). The rationale for transfer in *Kelly Buick* and in *Kretz* applies equally, if not with more force, to the instant action.

Just like in *Kelly Buick* and *Kretz*, the local interest would best be served by having NDIL decide all claims regarding enforcement of the judgment against Peter Rogan that resulted from the fraud Peter Rogan and his companies committed in Chicago. Here, even more so than in *Kelly Buick*, <u>all</u> of the relevant events took place in Illinois. And, the facts regarding the Rogans' assets are being litigated in NDIL via the citation actions them.

Contrariwise, since the Indiana home will be sold, there is no local interest in litigating the claim here.

**2.     <u>Convenience of the Parties/Witnesses Weigh in Favor of Transfer.</u>**

(a) <u>Convenience of the Parties</u>. NDIL is somewhat more convenient than NDIN for both sides. Indiana is not Judy Rogan's home forum. She currently lives in Vancouver, Canada, and will have to travel to the U.S. for court proceedings. Because the international airport that services Chicago and Hammond is located in Chicago, *i.e.*, O'Hare, it is somewhat easier to get from Vancouver to Chicago than from Vancouver to Hammond. On balance, therefore, this favors transfer. *See Kretz*, 1992 WL 392633, at *4 (transferring action where, *inter alia*, plaintiff's travel costs to alternative location were "not prohibitive.").

In fact, the circumstances here favor transfer even more than in *Kretz*. There, the plaintiff brought an action in her home forum. She would incur travel costs only if the action was transferred. Nonetheless, the court transferred the action because such costs in that case were "not prohibitive." *Id.* Unlike the plaintiff in *Kretz*, Judy Rogan did not file this action in

Canada where she now lives. Judy Rogan will thus incur travel costs regardless of where the action is decided, and travel to Chicago will not be less convenient than travel to Indiana.

In addition, Judy Rogan hired an Indiana attorney just to sue here. She previously retained O'Rourke, Katten & Moody ("OKM") to represent her in Illinois proceedings,[83] including NDIL citation actions.[84] OKM, counsel in this action, is located in Chicago, as are Dexia's counsel, Sidley Austin, and the U.S.'s counsel, NDIL U.S. Attorney. Thus, it would be more convenient and less expensive to litigate in Illinois, and neither side would be have to retain additional counsel. *See Heller Financial, Inc. v. Riverdale Auto Parts, Inc.*, 713 F. Supp. 1125, 1130 (N.D. Ill. 1989) (convenience of the parties "involves the consideration of … their abilities to bear the expense of trial in a particular forum.")

(b) Convenience of the Witnesses. A court should consider the number of witnesses residing in each district, as well as "the nature and quality of their testimony in relationship to the issues of the case." *Kretz*, 1992 WL 392633, at *3. Potential witnesses for this action are widely dispersed and not subject to either court's subpoena power. A critical witness, Peter Rogan, currently resides in Canada. Peter Rogan's attorney, Fred Cuppy, who has played a central role in facilitating Peter Rogan's attempts to conceal his assets, lives in Florida. Other potential witnesses similarly reside outside the subpoena power of either NDIL or NDIN, *e.g.*, persons in Canada with whom the Rogans have had recent financial dealings. Thus, for the same reason that NDIL is more convenient for the parties, it is more convenient for the witnesses. Most witnesses will have to travel to court proceedings, and it likely will be more convenient for witnesses to arrange flights directly into Chicago than travel to Hammond.

---

[83] Ex. HH.

[84] Ex. II.

## **CONCLUSION**

For the foregoing reasons, Dexia respectfully urges this honorable Court to transfer venue of this action to the Northern District of Illinois, Eastern Division.

Dated: **November 18, 2007**                    DEXIA CRÉDIT LOCAL


/s/       Eric S. Pruitt
Scott Mendeloff
Gabriel Aizenberg
Eric S. Pruitt
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Dexia Crédit Local*

29

## CERTIFICATE OF SERVICE

I, Eric Pruitt, an attorney, do hereby certify that I filed the foregoing **DEXIA CRÉDIT LOCAL'S MOTION TO TRANSFER VENUE AND MEMORANDUM IN SUPPORT**, with the Clerk of Court and caused it to be served on the counsel below using the CM/ECF system (unless otherwise noted) this 18th day of November.

/s  Eric S. Pruitt

## SERVICE LIST

David Cerven
SMITH & DeBONIS, LLC
9696 Gordon Drive
Highland, Indiana  46322
(219) 922-1000
(219) 922-1600 (facsimile)

Alison G. Fox
BAKER & DANIELS LLP
205 West Jefferson Blvd., Suite 250
South Bend, Indiana 46601
(574) 239-1988
(574) 239-1900 (facsimile)

Michael J. O'Rourke
O'ROURKE, KATTAN & MOODY
161 N. Clark St., Suite 2230
Chicago, IL  60601
(312) 849-2020
(312) 849-2020 (facsimile)

**Of Counsel (served by email)**

AUSA Joseph S. Reid
AUSA Linda Wawzenski
AUSA Joseph Stewart
5400 Federal Plaza, Suite 1500
Hammond, Indiana 46320
(219) 937-5500
(219) 937-5544 (facsimile)

CH1 4071974v.1

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEXIA CRÉDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 02 C 8288 |
| | ) | |
| PETER G. ROGAN, | ) | |
| BRADDOCK MANAGEMENT, L.P., | ) | Honorable Mark Filip |
| a California Limited Partnership, | ) | |
| BAINBRIDGE MANAGEMENT, L.P., | ) | Mag. Judge Sidney I. Schenkier |
| f/k/a BRADDOCK MANAGEMENT, L.P., | ) | |
| an Illinois Limited Partnership, | ) | |
| BAINBRIDGE MANAGEMENT, INC., | ) | |
| f/k/a BRADDOCK MANAGEMENT, INC., | ) | |
| f/k/a WALDO POINT MANAGEMENT. | ) | |
| | ) | |
| Defendants. | ) | |



DOCKETED
NOV 15 2004

## SECOND AMENDED COMPLAINT

Plaintiff Dexia Crédit Local (formerly known as Dexia Public Finance Bank and

Crédit Local de France) ("Dexia"), for its second amended complaint against Defendants Peter

Rogan, Braddock Management, L.P., a California Limited Partnership ("Braddock"), Bainbridge

Management, L.P., f/k/a Braddock Management, L.P., an Illinois Limited Partnership

("Bainbridge"), Bainbridge Management, Inc. ("Bainbridge, Inc."), f/k/a Braddock Management,

Inc., f/k/a Waldo Point Management (collectively "Defendants"), alleges as follows:

### Introduction

1.      From at least in or about 1998 and continuing until at least in or about 2001,

Defendant Peter Rogan knowingly, intentionally, and recklessly participated in a scheme and

artifice to defraud Dexia by misleading Dexia as to the financial operations at Northside

Operating Company (d/b/a Edgewater Medical Center) ("Edgewater Medical Center" "EMC" or

"Edgewater"), to wit, leading Dexia and its employees to believe that Edgewater Medical

Center's revenues came from legitimate hospital operations, when in truth substantial portions of

Edgewater's revenues derived from a massive healthcare fraud scheme. The other Defendants,

together with others including Roger Ehmen ("Ehmen"), assisted Rogan to mislead Dexia and to

profit personally from the deception. Because of the conduct of Rogan, Ehmen, Braddock,

Bainbridge, and Bainbridge, Inc., Dexia has suffered injuries in excess of $56,000,000.

2.      Rogan, Braddock, Bainbridge, and Bainbridge, Inc. directly and through others

knowingly, intentionally, and recklessly prepared and caused to be prepared false and fraudulent

financial statements and other information relating to the finances of Edgewater Medical Center.

Rogan knew, should have known, or recklessly disregarded information that the Edgewater

financial statements and other financial information that Rogan and the Defendants provided and

caused to be provided to Dexia during the time period relevant to this case would be and were

materially false and misleading by failing to disclose that: (i) EMC's operations included a

massive healthcare fraud scheme against the Medicare and Medicaid programs and private

insurance companies; and (ii) over $13,000,000 of Edgewater's revenues derived from that

scheme to defraud the Medicare and Medicaid programs.

3.      In or about 2001 and 2002, Roger Ehmen and a number of doctors on the staff of

Edgewater Medical Center pled guilty to federal felony charges that, in conjunction with

Rogan's hospital management firms, Braddock and Bainbridge, Ehmen and the doctors

perpetrated a massive scheme to defraud Medicare and Medicaid through the operations of

Edgewater.

4.      On or about January 15, 2003, Braddock and Bainbridge pled guilty to federal

health care fraud charges of using Edgewater to operate a scheme to defraud Medicare and

2

Medicaid out of approximately $13,644,598. Upon information and belief, as President and sole owner (through the Peter G. Rogan Revocable Trust) of Bainbridge, Inc., Rogan caused Braddock and Bainbridge to enter into their respective plea agreements and to plead guilty.

5.      Rogan, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly gave and caused to be given to Dexia the false and misleading financial statements and other information regarding Edgewater to induce Dexia to issue a letter of credit totaling approximately $56,000,000.00 for the benefit of Edgewater. Dexia reasonably relied upon these financial statements and other information regarding Edgewater in agreeing to issue the letter of credit. In particular, Dexia was aware that a substantial portion of Edgewater's revenues came through the Medicare and Medicaid programs. If the aforementioned Defendants had provided Dexia with true and complete information on Edgewater, including disclosing that a portion of Edgewater's revenue derived from a fraud scheme against Medicare, Medicaid, and private insurance companies, Dexia never would have agreed to issue and would never have issued the letter of credit.

6.      After Dexia issued the letter of credit on behalf of Edgewater, Rogan, Braddock, Bainbridge, and Bainbridge, Inc. knowingly, intentionally, or recklessly advanced their scheme by acting to lull Dexia into a false sense of security, sending and causing to be sent to Dexia false and misleading financial statements and reports and other information regarding Edgewater's financial viability, prospects, and operations. For example, Defendants routinely provided Dexia financial statements that failed to disclose the ongoing fraud scheme against Medicare and Medicaid. Rogan, Braddock, Bainbridge, and Bainbridge, Inc. also omitted and concealed substantial material information to induce Dexia to refrain from protecting itself by exercising its contractual rights under its reimbursement and credit agreements with Edgewater, thereby

3

allowing Defendants to pillage Edgewater of the collateral Defendants had caused Edgewater to post to secure Dexia's letter of credit. For example, Defendants actively concealed from Dexia important information relating to the nature and scope of the federal grand jury investigation by inter alia the Federal Bureau of Investigation and the United States Attorney's Office of health care fraud at Edgewater, i.e., that Edgewater and the hospital's officers were targets of that investigation.

7.     Had Defendants not engaged in this lulling and concealment, Dexia would have learned that Edgewater, Defendants, and many doctors on the staff at Edgewater were the focus of the federal grand jury investigation. This information would have provided notice that it was quite possible that the Edgewater's financial statements, financial information and other operating information that Defendants provided Dexia were false and that Edgewater's operations may have been tainted by fraud against Medicaid and Medicare. If Defendants had not concealed this and other material information from Dexia, Dexia immediately would have acted to protect itself from that fraud scheme, reported the matter to the authorities, and prevented Defendants from continuing their scheme to defraud. If Defendants had disclosed that any portion of Edgewater's revenues had come through fraud against Medicare or Medicaid, Dexia would have immediately taken steps to protect its interests and avoid or limit its losses.

8.     Rogan and all of the other Defendants along with other individuals who were responsible for protecting and preserving the remaining assets of Edgewater, failed to do so. Rogan and Ehmen, Braddock, Bainbridge, and Bainbridge, Inc. pillaged and squandered Edgewater of assets consisting of Dexia's collateral. Defendants directly or indirectly diverted those assets to Rogan personally and to Braddock, Bainbridge, and Bainbridge, Inc. In so doing, Defendants used a substantial portion of Edgewater's resources to benefit Rogan, Braddock,

4

Bainbridge, and Bainbridge, Inc. at the expense of the operational and financial health of Edgewater. These misapplications of Edgewater assets breached the fiduciary duty that Rogan, Ehmen and other individuals owed to Edgewater and Dexia. This activity also caused the collateral supporting the letters of credit to waste away.

9.    Rogan with Braddock, Bainbridge, and Bainbridge, Inc. knowingly, intentionally, and recklessly siphoned enormous portions of Edgewater's finances away from Edgewater by causing Edgewater to enter into a variety of fraudulent "Management Agreements," with Braddock and Bainbridge under which Edgewater paid Rogan, Braddock and Bainbridge millions of dollars in fees.

10.    Rogan, Braddock, Bainbridge and Bainbridge Inc. represented in the Management Agreements that Braddock, and Bainbridge would operate as a fiduciary of Edgewater in the execution of all of their duties under the Management Agreements.

11.    At the time Rogan, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly entered into the foregoing Management Agreements, Rogan, Braddock, Bainbridge and Bainbridge Inc. knew and had reason to know that those agreements contained material misrepresentations including that Braddock, and Bainbridge would uphold a fiduciary responsibility toward Edgewater. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew and had reason to know that Braddock, and Bainbridge would and did: (a) use Edgewater to perpetrate a massive scheme to defraud Medicare and Medicaid of more than $13 million; and (b) make (and provide to Dexia) numerous false and misleading financial records for Edgewater and other representations which fraudulently failed to disclose the existence of the healthcare fraud scheme referenced above.

5

12.    Rogan, Braddock, Bainbridge, and Bainbridge Inc. gave and caused to be given copies of each Management Agreement to Dexia, intending for Dexia to rely upon the terms therein, including the foregoing fiduciary representations. Defendants encouraged Dexia's employees to believe that Rogan, Braddock and Bainbridge were responsible for Dexia's financial success and that the continued presence and participation of those Defendants was essential to Edgewater's continued success. Defendants failed to disclose the fact that a substantial portion of Edgewater's success derived from the healthcare fraud scheme referenced above.

13.    At the time Rogan, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly provided copies of the foregoing Management Agreements to Dexia, those Defendants knew, had reason to know, or recklessly disregarded that Rogan, Braddock, and Bainbridge would not and did not fulfill their fiduciary responsibilities and many of their other responsibilities under the Management Agreements.

14.    By paying Braddock and Bainbridge millions of dollars in management fees and other compensation, Defendants advanced the healthcare fraud scheme to unjustly enrich Rogan, Braddock, Bainbridge, and Bainbridge Inc. at the expense of Edgewater and Dexia. This activity also caused the assets of Edgewater to waste away.

15.    After the government finally discovered and revealed the fraudulent conduct Braddock and Bainbridge perpetrated at Edgewater, Medicare/Medicaid suspended payments to Edgewater, cutting off this source of fraudulently-obtained revenue from Defendants, whereupon Edgewater almost immediately closed. This caused Dexia's letters of credit to be drawn upon, which required Dexia to pay approximately $56,000,000 on Edgewater's behalf. The collateral that Rogan, Braddock and Bainbridge Inc. caused Edgewater to post as security for the letter of

6

credit is greatly inadequate to reimburse Dexia for its loss, causing Dexia to lose tens of millions

of dollars. Rogan and the other Defendants pillaged and squandered vast amounts of that

collateral as part of their scheme to defraud.

### Jurisdiction and Venue

16.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332. The

amount of the matter in controversy exceeds $75,000, the plaintiff is a foreign corporation, and

the Defendants are citizens of Illinois, Indiana, and California.

17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a). Many of the

Defendants reside in this judicial district and a substantial part of the events and omissions

giving rise to the claims in this complaint occurred in this judicial district.

### Parties

18.    Plaintiff Dexia is a bank with its principal offices located in Paris, France, and is a

specialized financial corporation organized under the laws of France. It conducts operations in

the United States through its New York Agency, which is licensed under the laws of the State of

New York as an unincorporated agency of Dexia.

19.    Defendant Peter G. Rogan ("Rogan") is a citizen and resident of the State of

Indiana. During the events referenced in this Complaint, Rogan controlled directly and

indirectly the management and operations of Edgewater, including all billings, collections, cost

reporting, and other financial matters related to the day-to-day operations of the hospital. Rogan

did this by his personal involvement in that management, his direct or indirect ownership

control of the commercial entities that managed Edgewater, and his domination of the boards of

directors of Edgewater (f/k/a Northside Operating Company), Access Community Health

Services, Inc., and Vital Community Health Services, Inc. Rogan held the position of Chief

Executive Officer of Edgewater from 1994-1997, and after this time held himself out as a person

in control of Edgewater (e.g., signing documents as CEO or President of Edgewater). From on or about December 1997, Joanne A. Skvarek ("Skvarek"), acted as the Chief Executive Officer of Edgewater. Rogan directly and indirectly controlled Skvarek; Skvarek was an employee of Rogan's management companies, Braddock and Bainbridge, had worked for Rogan before he became involved with Edgewater, and has been an employee of Bainbridge Inc. from 2002-present. From December 2000, Clarence Nagelvoort ("Nagelvoort"), was the Chief Executive Officer of Edgewater. Rogan directly and indirectly controlled Nagelvoort, who was an employee of Rogan's management companies, Braddock and Bainbridge.

20.    Defendant Braddock Management L.P. ("Braddock") is a California limited partnership that from on or before August 17, 1994 and continuing until in or about March 2000 had management contracts with Edgewater. These contracts provided not only that Defendant Braddock would act as the exclusive manager of the day-to-day operations of Edgewater, but also that Defendant Braddock would supervise and manage all billings, collections, cost reporting, and other financial matters related to the day-to-day operations of Edgewater. Rogan controlled Braddock as it President. From in or about August 17, 1994 through on or about October 1998, the general partner of Braddock was Waldo Point Management, which Rogan controlled as its President and through a power of attorney. On or about October 22, 1998, Bainbridge Management, Inc. (f/k/a Braddock Management, Inc.) replaced Waldo Point Management as the general partner of Braddock through a purchase of all of Waldo Point's stock and continued in that capacity until at least in or about May 2002. During the events referenced in this Complaint, (a) Bainbridge Management, Inc., which owns 1% of Braddock and is its sole general partner, operated, controlled, and had full, exclusive, and complete discretion in the management and control of the business and affairs of Braddock and made all decisions affecting

Braddock's business and affairs; and (b) Boulevard Management Limited, which owns 99% of Braddock, was Braddock's sole limited partner. Rogan controlled all of these entities.

21.     Defendant Bainbridge Management L.P. ("Bainbridge"), f/k/a Braddock Management L.P. (Illinois), is an Illinois limited partnership that from in or about March 2000 and continuing until in or about May 2001 had management contracts with Edgewater. Bainbridge bought out Braddock's contract with Edgewater effective in or about March 2000, resulting in Bainbridge acting as the exclusive manager of the day-to-day operations of Edgewater, and Defendant Bainbridge supervising and managing all billings, collections, cost reporting and other financial matters related to the day-to-day operations of Edgewater. In March 2000, Rogan controlled both Braddock and Bainbridge. During the events referenced in this Complaint, (a) Bainbridge Management, Inc., which owns 1% of Bainbridge and is its sole general partner, operated, controlled, and had full, exclusive, and complete discretion in the management and control of the business and affairs of Bainbridge and made all decisions affecting Bainbridge's business and affairs; and (b) Boulevard Investors Limited, which owns 99% of Bainbridge, was Bainbridge's sole limited partner and had no control over Bainbridge's business.

22.     Defendant Bainbridge Management, Inc. ("Bainbridge Inc."), formerly known as Braddock Management, Inc., is an Illinois corporation that, at all times relevant herein, Rogan controlled as its president and sole director. The Peter G. Rogan Revocable Trust is the sole owner of Bainbridge Inc. Rogan possesses sole control and is the sole trustee of the Peter G. Rogan Revocable Trust.

23.     During the events referenced in this Complaint, Rogan controlled directly and indirectly Braddock, Bainbridge, and Bainbridge Inc. There was such a unity of interest and

ownership between and among these entities and between Rogan and these entities that as a

practical matter separateness no longer existed between them. These entities functioned as alter

egos of each other and of Rogan. Rogan and each of these entities should be held liable for any

judgment in this case because Rogan created and caused to be created and manipulated these

entities and their assets for his own personal uses.

### Non-Parties

24.    Roger Ehmen ("Ehmen") is a citizen of the State of Illinois and a resident of the

Oxford FCI Federal prison in Grand Marsh, Wisconsin. During the period of the events

referenced in this Complaint, Ehmen was a Senior Vice President of Edgewater. Rogan directly

and indirectly controlled Ehmen, who was an employee of Rogan's management companies,

Braddock (1995-9/30/00) and Bainbridge (9/30/00-2001), and had worked for Rogan when

Rogan owned Edgewater. Having pled guilty to healthcare fraud charges for using Edgewater to

operate a widespread scheme to defraud Medicare and Medicaid, Ehmen is currently in federal

prison serving a sentence on those charges. On June 7, 2004, the Court in this action entered a

default judgment against Ehmen.

### Defendant Rogan's Control and Domination of Edgewater Hospital

25.    Founded in 1929, Edgewater Hospital was a family-owned hospital in 1989, when

Rogan purchased it for $1 million plus the assumption of the hospital's debts. As part of his plan

to acquire the hospital in 1989, Rogan created a corporation called Edgewater Operating

Company ("EOC") to operate the hospital, and a corporation called Edgewater Property

Company ("EPC") to acquire the hospital's real property consisting of nine buildings, a parking

structure, and several vacant or partially vacant lots. Following EPC's 1989 acquisition of the

hospital facility and certain contiguous and proximate properties, EPC leased these properties to EOC.

26.    Rogan was, through his wholly-owned entities, EOC and EPC, the beneficial owner and operator of Edgewater Hospital from 1989 until he purported to sell the hospital to Northside Operating Company ("Northside") (d/b/a Edgewater Medical Center) in 1994 for approximately $34 million.

27.    Rogan effected this purported sale through a multi-step process. First, Rogan caused EPC to separate off certain assets EPC had acquired in Rogan's original hospital purchase in 1989, i.e., three hospital buildings (and underground passageways) and a parking structure, and caused that property to be sent (via several intermediary steps) to EOC. This was the property that Rogan then caused EOC to sell to Northside, which thus became the Edgewater-owned portion of the Hospital (hereinafter the "Edgewater Property"). Then, after EPC transferred away the "Edgewater Property," Rogan sent one building – the Kane Building – and the vacant lots to another Rogan-controlled entity, PGR Properties, Inc. ("PGR"), which property became the PGR-owned portion of the hospital property (hereinafter the "PGR Property"). EPC retained and continues to own four of the buildings from Rogan's 1989 original hospital purchase (hereinafter the "EPC Property").

28.    On November 19, 1993, as President of both EOC and EPC, Rogan entered into an Agreement of Merger with Northside. EOC merged into Edgewater, thus completing the conveyance of the Edgewater Property to Edgewater. Rogan agreed to be bound in his personal capacity to several of the provisions in the Agreement of Merger. In particular, Rogan explicitly agreed to cooperate with Northside to enable Northside to procure tax-exempt financing of the

11

transactions set forth in the Agreement of Merger, so that Rogan and his entities could get paid for the purported sale of the Hospital to Northside.

29.    Edgewater Medical Center, d/b/a Northside Operating Company, is an Illinois not-for-profit corporation, organized and operated exclusively for charitable purposes under Section 501(c)(3) of the Internal Revenue Code.

30.    From in or about 1994 until in or about October 1998, Permian Health Care Inc., a Colorado not-for-profit corporation, was the parent holding company of Edgewater. Edgewater's Articles of Incorporation before October 1998 provided that Permian was Edgewater's sole member, and had such powers as set forth in Edgewater's bylaws. The Articles of Incorporation also stated that Edgewater's directors made up a majority of the board of directors of Permian. Edgewater's bylaws at the time provided that Permian had the right to vote only to elect and remove Edgewater's directors. The bylaws provided no other member voting rights for Permian. Upon information and belief, from in or about 1994 until in or about October 1998, Rogan controlled directly or indirectly the Board of Edgewater and the operations at Edgewater.

31.    In or about October 1998, Rogan caused Edgewater's Board to amend its bylaws to become a self-perpetuating entity, separate from Permian. Pursuant to Edgewater's amended bylaws, all policymaking powers for Edgewater were then vested in Edgewater's board, including responsibility, control and management over all the policies, properties, affairs and funds of the corporation.

32.    In or about at the latest mid-1999, Rogan learned of the existence of the substantial federal grand jury investigation referenced earlier in this Second Amended Complaint.

33.    In or about February 2000, Rogan caused Edgewater to undertake a corporate reorganization pursuant to which Edgewater became part of a parent holding company structure. The sole corporate member of Edgewater became Vital Community Health Services, Inc. ("Vital"). The sole corporate member of Vital became Access Community Health Services, Inc. ("Access"). Upon information and belief, Rogan instituted this two-level corporate governing structure in part in an attempt to insulate himself from exposure under the grand jury investigation.

34.    Following the 2000 corporate reorganization, Edgewater retained a local, advisory Board of Directors. As a practical matter, this board had no significant authority, bearing limited powers as to matters such as relating to credentialing. The corporate organization ostensibly provided decision-making authority over all significant matters pertaining to Edgewater to the Board of Directors of Vital and Access. These powers purported to include all major decisions on behalf of Edgewater, including, among other things, appointing its directors, amending its corporate documents, approving budgets, strategic plans and construction projects, approving major corporate transactions such as mergers, sale or dissolution, approving the compensation of Edgewater's managers, authorizing real estate purchases and sales, and making determinations as to whether litigation should be pursued on behalf of Edgewater. Decision-making authority regarding financial matters purported to be reserved in the Finance Committee of Access, who exercised that power on behalf of Edgewater.

35.    Although the Access, Vital, and Edgewater boards purported to be separate corporate entities, at no time following the 2000 corporate reorganization did the Access, Vital and Edgewater boards observe the requisite corporate formalities. By way of illustration, rarely – if ever – did the Access, Vital and Edgewater boards meet separately. Non-director members

13

of the Access Finance Committee also attended all meetings of the Access board as if they were actual directors of Access. Individual directors of Access and Vital were frequently unaware of which boards they were serving on and on behalf of which they were taking action.

36.　　Moreover, notwithstanding the corporate reorganization, Access and Vital and their committees did not exercise ultimate control over Edgewater. From the time Access and Vital were formed until at the earliest in or about 2001, Rogan directly and indirectly controlled, dominated, and operated Access, Vital and Edgewater. Rogan's personal attorney, John Tatooles, attended each of the meetings of the boards of Access and Vital, and kept the minutes, rather than such records being created and maintained by an officer or agent of Access, Vital, or Edgewater.

37.　　After the sale of Edgewater to Northside in 1994, Rogan directly and indirectly caused Edgewater and other related entities to enter into myriad lucrative management contracts with Braddock and Bainbridge (the terms of the Management Agreements are discussed in greater detail below), through which Rogan dominated the hospital's operations and siphoned millions of dollars from Edgewater, the vast majority of which consisted of the proceeds of the healthcare fraud scheme against Medicare and Medicaid.

38.　　Using a wide array of different forms, organizations and stratagems, Rogan attempted to create the appearance that Edgewater operated independently via the Edgewater Board of Directors from 1994-early 2000, and via Vital and Access from early 2000-2001. In reality, Rogan managed, operated, controlled, and dominated Edgewater and the Edgewater Board of Directors from 1994-early 2000, and Vital and Access and their Boards of Directors from early 2000-April 2001. Rogan also used these different forms, organizations, and stratagems to attempt to insulate himself from responsibility for the misconduct he knew was,

14

had reason to know was, or recklessly disregarded being perpetrated at and through Edgewater, and otherwise engaged in such conduct in conscious disregard of and indifference to the risk that such misconduct was being perpetrated at and through Edgewater.

39.     The boards of directors (and/or finance committees) of Edgewater, Vital, and Access consisted primarily of persons including: Wessel Bengston, B. Macon Brewer, George Chapas, Fred Cuppy, William Fruland, Roger Mays, John Mullen, David Shanahan, and George Thoma. Significantly, as described in the paragraphs below, these persons did not exercise independence from Rogan. These persons were in fact Rogan's personal friends, long-time business associates, and/or had other relationships with Rogan. As a result of the foregoing, Rogan exercised control and domination of Edgewater's board, Vital, Access and the finance committee of Access.

40.     Wessel Bengston ("Bengston"). Upon information and belief, Wessel Bengston is a long-time friend and business associate of Rogan. Bengston received substantial compensation for performing accounting services and other work for Rogan, including preparation of tax returns, administration of trust accounts associated with Rogan and his family, and via administration or business services for various Rogan-affiliated business entities. Upon information and belief, Rogan continues to refer accounting work to Bengston's son, who manages Bengston & Co., Ltd, the accounting firm with which Bengston was affiliated before he retired. Upon information and belief, Rogan caused EPC to allow Bengston personal, day-to-day use of several EPC-owned automobiles. Upon information and belief, Bengston received directors' fees, lavish trips and other perquisites for service on the board of directors for numerous other entities affiliated with EMC and Rogan, including Edgewater Grant Property Company, Edgewater Foundation, and the Chicagoland Services Foundation.

15

41.    B. Macon Brewer ("Brewer").  Upon information and belief, B. Macon Brewer and Rogan have been friends and business associates for at least 15 years.  Since 1988, Brewer has served as contingent co-trustee for the Peter Rogan Revocable Trust.  Upon information and belief, the Peter Rogan Revocable Trust has received numerous transfers of funds that originated at EMC and were paid as fees to Braddock and Bainbridge.  Brewer also serves as contingent co-trustee for Rogan's children's' trusts, which have received approximately 99% of the revenues EMC paid to the management companies.  The Rogan children also hold ownership interests in PGR Properties, Inc, a Rogan-controlled entity.  Upon information and belief, Brewer has had additional business dealings and ventures with Rogan or companies affiliated with Rogan.

42.    George Chapas ("Chapas").  Upon information and belief, George Chapas and Rogan have been good friends and business associates for more than 20 years.  Chapas has had a long-standing business relationship and economic dependence upon Peter Rogan.  Upon information and belief, Chapas lived on Bainbridge Street in Schaumburg, Illinois, at the same time Rogan lived on that street.  Upon information and belief, Chapas and Rogan currently own homes in Valparaiso, Indiana, where both now reside, that are located approximately 2000 feet apart.  Peter Rogan invited George Chapas to serve on the Edgewater boards because of "common interests" and "common ownership interests in many entities."  As a member of the Vital and Access Boards, Chapas was so subservient to Rogan as to cause witnesses to refer to him as Rogan's "puppet" on those Boards.  Upon information and belief, Rogan has referred business to Chapas' company, Instructional Design Associates.  Upon information and belief, Chapas' has received business revenue from and through Rogan or companies affiliated with Rogan.

43.    Fred Cuppy ("Cuppy").  Upon information and belief, Fred Cuppy co-owns residential property in Valparaiso, Indiana with Roger Mays, that is located approximately 7000 feet from Rogan's residence, and within 5000 feet of Chapas' residence.  Cuppy has received significant compensation for performing substantial legal work for Rogan and for trust accounts associated with Rogan and/or Rogan's children.  Upon information and belief, Cuppy also received significant compensation for performing legal work to create certain off-shore trusts and accounts at Rogan's request, to which a substantial quantity of EMC's funds have been transferred.  In addition, as of December 1996, Cuppy received at least one substantial personal loan from Rogan for $100,000.  Upon information and belief, Cuppy has participated in other joint business ventures with Rogan (either directly, or indirectly through individuals who are affiliated with Peter Rogan, such as Rogan's assistant, David Miller).  These ventures include, but are not limited to, Diagnostic Equipment, Inc., Computersmarts.net and certain real estate investments in Savannah, Georgia.  Cuppy serves as the Managing Director of Boulevard Investors, Ltd., Belize corporation and limited partner in the Rogan-controlled management company, Defendant Bainbridge.  On information and belief, Cuppy also is the trustee of three Belize trusts in the names of Rogan's children – Sara Caitlan Rogan, Brian Peter Rogan, and Robert Cashman Rogan – which are the sole shareholders of Boulevard Investors, Ltd.  Cuppy also is the Trustee for the Sara Caitlan Rogan Trust, the Brian Peter Rogan Trust, and the Robert Cashman Rogan Trust.  These trusts, which were created for the benefit of Rogan's children, received substantial portions of the revenues EMC paid to its Rogan-controlled management companies.  Cuppy also is named as a contingent co-trustee for the Peter Rogan Revocable Trust which received, upon information and belief, numerous transfers of funds EMC paid to the Rogan-controlled management companies.

17

44.    <u>William Fruland</u> ("Fruland").  Upon information and belief, William Fruland has

been a friend and business associate of Rogan for more than 20 years.  Fruland resided in

Schaumburg, Illinois, on Bainbridge Street at a time Rogan also lived there.  Upon information

and belief, Fruland has had additional business dealings with Rogan or companies affiliated with

Rogan.  Upon information and belief, Fruland also received directors' fees, lavish trips and other

perquisites for service on the Board of Directors for other entities affiliated with EMC and

Rogan, including the Chicagoland Services Support Foundation and Hope Community Health

Services, Inc.

45.    <u>Roger Mays</u> ("Mays").  Upon information and belief, Roger Mays currently

resides in Valparaiso, as do Rogan and George Chapas.  Upon information and belief, Mays co-

owns residential property in Valparaiso with Cuppy, which is approximately 7000 feet from

Rogan's residence, and within 5000 feet of Chapas' residence.  Rogan has paid fees to Mays in

connection with "consulting" work Mays purportedly has performed on behalf of, upon

information belief, a company owned by a relative of Rogan and in which Rogan owns or has

owned 99% of the Class A stock, <u>i.e.</u>, Knowlton Machine Company.  Upon information and

belief, as of June 2002, Mays was employed as the Supervisor in the Service and Maintenance

Department in the Burns Harbor, Indiana Division of Bethlehem Steel, and was selected for

Board service not based on his qualifications, but solely because of his personal loyalty to Rogan

and his willingness to vote in accordance with Rogan's wishes.  In 2000, Mays spoke on behalf

of and acted for the interests of Rogan and the Rogan-controlled management companies in

negotiations with Dexia.

46.    <u>John Mullen</u> ("Mullen").  Upon information and belief, John Mullen has received

substantial compensation for real estate consulting services provided to Rogan and/or Rogan-

affiliated companies, including work relating to the development of properties next to EMC,

through which Mullen stood to profit handsomely. Upon information and belief, Mullen has

other business dealings with Rogan or companies affiliated with Rogan. Upon information and

belief, Mullen also received directors' fees, lavish trips and other perquisites for service on the

Board of Directors for numerous other entities affiliated with EMC and Rogan, including the

Edgewater Foundation, the Chicagoland Services Support Foundation, the Chicagoland Services

Foundation, and Hope Community Health Services, Inc.

47.     David Shanahan ("Shanahan"). Upon information and belief, David Shanahan

and Rogan have been friends and business associates for more than 20 years. Shanahan owns

residential property in Longboat Key, Florida, which upon information and belief, is located less

than 15 miles from Rogan's property there. Shanahan worked at Ernst & Young with Rogan

early in his career.

48.     Shanahan was vice president of finance at Valuation Counselors, a company that

Rogan regularly employed to provide valuation reports of EMC's equipment and other assets.

Upon information and belief, Shanahan received substantial compensation for this work. In or

about 1994, Valuation Counselors performed a valuation of EMC which helped Rogan get a $7

million loss on sale rebate from the government related to Medicare. At the time Rogan

purported to sell EMC to Northside, Valuation Counselors also provided the valuation of the

properties Rogan owned through Edgewater Property Company and PGR Properties, Inc., which

were part of and essential to the EMC's operations, at the request of Rogan. Valuation

Counselors also provided the valuation report of Dr. Andrew Cubria's medical practice at a time

when Rogan and/or Ehmen proposed to the EMC's board that Cubria's practice be bought out.

Upon information and belief, the proposed purchase of Dr. Cubria's medical practice was part of

19

an effort by the Rogan-controlled management companies and Rogan to conceal the nature of the relationship between Cubria and the management companies as part of the Medicare fraud they were then perpetrating.

49.     Shanahan's willingness to act at Rogan's direction and instruction continued even after the boards received legal advice that indictment was imminent, and that EMC should terminate the management companies. After receiving that advice, Shanahan continued to act to benefit Rogan at the expense of EMC.

50.     On repeated occasions, Shanahan called EMC personnel, minutes after speaking with Rogan, to demand that Rogan's management companies receive immediate payment of hundreds of thousands of dollars in supposedly outstanding management fees. Such orders were contrary to the best interests of EMC, which was then in increasing financial peril.

51.     In or about October 2001, Shanahan instructed EMC employees to withhold information from McDermott, Will & Emory, EMC's attorneys at the time, and excluded counsel from board of directors' meetings. At or about that time, McDermott resigned.

52.     Upon information and belief, Shanahan received almost $36,000 in direct payments from EMC in the timeframe between March 2001 to November 2001 alone. Upon information and belief, Shanahan has other business dealings with Rogan or companies affiliated with Rogan. Upon information and belief, Shanahan also received directors' fees, lavish trips and other perquisites for service on the board of directors for numerous other entities affiliated with EMC and Rogan, including Edgewater Grant Property Company, the Edgewater Foundation, and the Chicagoland Services Support Foundation.

53.     George Thoma ("Thoma"). Upon information and belief, George Thoma and Rogan have been friends and business associates for over 10 years. Thoma worked with Rogan,

20

and served on the board of EMC with Rogan before Rogan's purported 1994 sale of EMC to

Northside Operating Co. Thoma served as President of Chicagoland Medical Associates, PC,

which borrowed money from the Rogan-controlled management companies, and had a

Management Agreement with the Rogan-controlled management companies until the company's

voluntary dissolution in or about September 2001. Upon information and belief, Thoma also

received directors' fees, lavish trips and other perquisites for service on the board of directors for

numerous other entities affiliated with EMC and Rogan, including the Edgewater Foundation,

the Chicagoland Services Support Foundation, the Chicagoland Services Foundation, and Hope

Community Health Services, Inc.

54.     Rogan finally lost control of Edgewater in 2001, only as a result of supreme

pressure being placed upon the individuals Rogan had earlier hand-selected to serve on the Board

of Directors of Vital and Access. At or about that time, the federal grand jury investigation into

the operations at Edgewater led to notification that the United States Attorney's Office was

seriously considering asking the grand jury to indict Edgewater. Furthermore, also at or about

that time, Edgewater's primary secured creditor, Dexia, notified Edgewater that events of default

had occurred in relation to Edgewater's financial performance. As a result of these events,

among others, representatives from Dexia met with the Board of Directors of Access and Vital

and demanded Rogan's ouster.

### The Doctors

55.     Throughout the time relevant to this case, Ravi Barnabas, M.D. ("Dr. Barnabas")

was a licensed internist who admitted patients to Edgewater and acted as an attending physician

for patients at Edgewater. Dr. Barnabas had contracts with Edgewater for a medical directorship

as well as physician recruitment, both of which Ehmen signed.

21

56.    Throughout the time relevant to this case, Sheshiqiri Rao Vavilikolanu, M.D. ("Dr. Rao") was a licensed internist and anesthesiologist who operated a clinic on the south side of Chicago and who referred patients to Edgewater. Two companies Dr. Rao owned - Rao M.D., S.C. and Florascribe, Inc. – had service agreements with Edgewater. Acting in concert with the other Defendants in this case, Ehmen signed those service agreements on behalf of Edgewater.

57.    Throughout the time relevant to this case, Kumar Kaliana, M.D. ("Dr. Kumar") was a licensed internist who referred patients to Edgewater.

58.    Throughout the time relevant to this case, Andrew Cubria, M.D. ("Dr. Cubria") was a licensed cardiologist who had a medical clinic at Edgewater.

### The Fraud upon Medicare, Medicaid, and Private Insurance Companies

### Legal Framework

59.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395c-1395I-4.

60.    HHS is responsible for the administration and supervision of the Medicare program. The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

61.    Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

22

62.    As detailed below, Defendants submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

63.    To assist in the administration of Medicare Part A., CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h.

64.    Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

65.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a From UB-92.

66.    As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

67.    After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(l).  Hence, Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

68.     At all times relevant to this Complaint, Medicare rules and regulations required Edgewater Hospital to submit annually a hospital cost report to the fiscal intermediary.

69.     During the relevant time period, Medicare payments for hospital services were determined by the claims the provider submitted for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments Medicare made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

70.     Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit Edgewater's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right included the right to make retroactive adjustments to hospital cost reports that a provider previously submitted if any overpayments have been made. 42 C.F.R. § 413.64(f).

71.     Every hospital cost report contains a "Certification" that the provider's chief administrator or responsible designee must sign.

72.     At all times relevant to this complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

73.   At all times relevant to this complaint, the responsible provider official was required to certify, in pertinent part:

to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

74.   Thus, the provider had to certify that the filed hospital cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider, and (4) compliant with the Stark Statute and not infected by kickbacks in relation to the services referenced in the cost report.

75.   A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

Whoever...having knowledge of the occurrence of any event affecting (a) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a...concealment or failure...be guilty of a felony.

76.   Edgewater Hospital submitted cost reports at all times material to this Complaint. Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Kenneth W. Huff, vice president of finance to submit and sign the cost reports, which attested, among other things, to the certification quoted above.

77.   Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching fluids and ensuring that states comply with minimum standards in the administration of the program.

78.   The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

79.   Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

80.   In Illinois, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Illinois Department of Public Aid for payment.

### The Healthcare Fraud

81.   Rogan, Ehmen, Braddock, Bainbridge, and Bainbridge Inc., along with the above-referenced physicians and others, knowingly, intentionally and recklessly defrauded the federal government and the State of Illinois, through the Medicare and Medicaid programs, by submitting and causing to be submitted false and fraudulent claims for reimbursement and cost reports.

82.   On or about May 17, 2001, a federal grand jury indicted Braddock, Bainbridge, and Ehmen for, among other things, "devising and participating in a scheme to defraud healthcare providers … in violation of 18 U.S.C. §§ 1341 and 1347."

83.   On or about January 15, 2003, Braddock and Bainbridge pled guilty to federal felony charges that they used Edgewater to operate a scheme to defraud Medicare and Medicaid out of approximately $13,644,598. Upon information and belief, as President and sole owner

(through the Peter G. Rogan Revocable Trust) of Bainbridge, Inc., Rogan caused Braddock and

Bainbridge to enter into their respective plea agreements and to plead guilty.

84.    In pleading guilty to the federal felony charges, i.e., health care fraud in violation

of 18 U.S.C. § 1347, Braddock and Bainbridge (upon Rogan's direction) admitted that, from in

or about 1995 and continuing until approximately in or about December 2000, Braddock and

Bainbridge, in conjunction with Ehmen and others, devised and intended to devise and

participate in a scheme to defraud and obtain money and property from Medicare, Medicaid and

private insurance companies by means of materially false and fraudulent pretenses,

representations and promises, including without limitation the following:

a)    causing Edgewater to make payments and kickbacks to certain doctors and other individuals in exchange for patient referrals and concealing these payments and kickbacks by creating contracts and other instrumentalities that created the false impression that the payments and kickbacks were for legitimate services;

b)    concealing and causing others to conceal from Edgewater that doctors receiving the payments and kickbacks were recruiting patients by giving patients cash and/or other benefits and promising these patients that hospital services would cost the patients nothing;

c)    coaching and causing others to coach patients to lie about their physical condition;

d)    lying and causing others to lie to patients regarding their need for hospitalization;

e)    admitting and causing others to admit patients to Edgewater who did not need to be admitted to Edgewater for any medically necessary reason;

f)    performing and causing others to perform medically unnecessary procedures and testing on certain patients;

g)    creating and causing others to create false records to justify and support claims submitted to insurers, including false medical and business records;

h)    submitting and causing others to submit false and fraudulent claims to Medicare, Medicaid, and private health insurers fraudulently seeking compensation for medically unnecessary admissions, services, procedures and testing, and for services rendered to patients who were referred to Edgewater in exchange for kickbacks; and

i)    submitting and causing others to submit cost reports to Medicare that falsely represented that services provided by Edgewater were provided in compliance with the laws and regulations regarding the provision of health care services.

85.    By the scheme described above, Braddock and Bainbridge have admitted that they caused Medicare and CMS to be fraudulently billed and to lose approximately $13,644,598.

86.    On or about October 1, 2001, Ehmen pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. At his sentencing, Ehmen admitted directly and through his attorney that he was in fact guilty and that he was responsible for working with Rogan and a number of doctors to perpetrate a scheme to defraud Medicare, Medicaid, and other insurers. Ehmen, through his attorney, stated unequivocally that Rogan was the chief leader and organizer of the scheme, and that Ehmen served merely as a manager carrying out the orders of Rogan. Among the ways in which he and Rogan perpetrated this scheme, Rogan and Ehmen directly and indirectly: submitted and caused others to submit false and fraudulent billing information to Medicare, Medicaid, and other insurers; caused doctors to perform a large number of medically unnecessary procedures to generate fees for Edgewater; and paid and caused others to pay bribes and kickbacks to doctors to cause them to admit patients to Edgewater irrespective of the patients' need for medical care. Through his lawyer, Ehmen stated that in the cases of two Edgewater doctors, i.e., Drs. Barnabas and Rao, Rogan finalized the contours of the kickback arrangements with those doctors and then sent them to Ehmen to get contracts drafted. On November 28, 2001, Ehmen was sentenced to 78 months' incarceration and ordered to pay restitution of $5 million to Medicare and Medicaid.

87.    On May 24, 2001, Dr. Kumar pled guilty to Counts One and Nine of the indictment relating to the doctor's acceptance of kickback payments for the admission of patients, and the submission of false claims to Medicare and Medicaid. In so doing, Dr. Kumar admitted that from no later than October 1996 and continuing at least until September 1998, he: (a) and Braddock, Ehmen, Dr. Barnabas and Dr. Rao devised and participated in a scheme to

defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, and by means of material omissions, and to deprive patients of the intangible right of honest services; and (b) knowingly and willfully executed and attempted to execute a scheme to defraud healthcare benefit programs, including Medicare, Medicaid, and private insurance plans. Specifically, Dr. Kumar admitted that he: (a) received cash kickbacks from Ehmen, Braddock, and Drs. Rao and Branabas in exchange for sending patients to Edgewater; (b) along with Ehmen, Braddock, and Dr. Rao caused patients to Edgewater for admission, knowing that those patients did not need hospitalization; and (c) arranging to have the cash kickbacks paid to family members in order to conceal the payments. On October 10, 2001, Dr. Kumar was sentenced to 16 months' incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $1,156,000 to Medicare and Medicaid.

88.    On May 24, 2001, Dr. Rao pled guilty to Count 57 of the indictment, on racketeering under 18 U.S.C. § 1962. In his guilty plea, Dr. Rao admitted that he, along with Braddock and Bainbridge, Ehmen, Drs. Barnabas and Kumar, and others, were members an associated of an enterprise that engaged in a scheme to defraud Medicare, Medicaid, and certain private insurers and to deprive Edgewater patients of their doctors' honest services by inter alia: (a) hospitalizing and causing others to hospitalize patients that did not need hospitalization; (b) performing and causing others to perform medically unnecessary procedures; (c) giving and causing others to give kickbacks to doctors and others in exchange for patient admissions; (d) creating and causing others to create false records to support claims submitted to insurers; and (e) submitting and causing others to submit Cost Reports to Medicare knowing that the reports contained false statements. On October 10, 2001, Dr. Rao was sentenced to 35 months of

incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $6 million to Medicare and Medicaid.

89.     On October 1, 2001, Dr. Barnabas pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962, as a result of his participation in the scheme to use Edgewater to defraud Medicare and Medicaid. On November 28, 2001, Dr. Barnabas was sentenced to 52 months' incarceration and, thereafter, three years of supervised release, and ordered to pay restitution of $100,000 to Medicare and Medicaid. On March 27, 2003, Dr. Barnabas sentence was reduced to 46 months' incarceration.

90.     On February 8, 2002, Dr. Cubria pled guilty to Count 57 of the indictment, racketeering under 18 U.S.C. § 1962. In pleading guilty, Dr. Cubria admitted that he was guilty of racketeering, which included that he and others engaged in a pattern of racketeering activity made up of a pattern of acts of mail and wire fraud, that were separate and continuous through an enterprise engaged in interstate commerce. More specifically, Dr. Cubria admitted that he took numerous actions to increase Edgewater's revenues by obtaining revenues from Medicare, Medicaid and other insurers through a scheme and artifice to defraud and obtain money through false and fraudulent pretenses representations, and promises. In this respect, Dr. Cubria admitted that he acted in conjunction with a number of individuals, including Ehmen, Defendants Braddock, Bainbridge and Bainbridge Inc., Drs. Barnabas, Rao, and Kumar, and an individual identified only as "Person A." On information and belief, "Person A" is Defendant Rogan. Dr. Cubria also admitted that the false and fraudulent activities of himself, Ehmen, and "Person A" (on information and belief, Rogan) included obtaining revenues from Medicare, Medicaid and other insurers by: (i) performing hundreds of medically unnecessary tests and procedures (at least half of the procedures he performed) to generate fees for Edgewater and himself; (ii) in

30

January 1999 and April 2000, performing medically unnecessary angioplasties upon two

patients, each of whom died as a result of the unnecessary procedures, after which Dr. Cubria

specifically admitted that Ehmen and "Person A" (on information and belief, Rogan) encouraged

him to continue to perform additional unnecessary angioplasties despite the two patients' deaths;

(iii) receiving financial payments and benefits from Edgewater ("kickbacks and bribes") to

exchange for patient admissions, many of which involved patients that did not need medical

treatment; and (iv) making false entries on medical records and bills and on submissions to

Medicare, Medicaid, and other insurers either to obtain revenue for Edgewater, himself, and

others or to conceal the foregoing racketeering activity. Dr. Cubria admitted that he and others

did these things so as to conduct the affairs of Edgewater through a pattern of racketeering

activity. On June 28, 2002, a federal district judge in Chicago sentenced Dr. Cubria to 12 ½

years' incarceration and, thereafter, two years of supervised release, and ordered him to pay

restitution of $14,362,499 million to Medicare and Medicaid.

### Kickbacks to Doctors, including Drs. Rao and Kumar

91.    In or about the early 1990s, Dr. Barnabas observed Rogan and Ehmen solicit

another doctor to come to Edgewater by agreeing to compensate that doctor for admitting

patients at Edgewater.

92.    Among other things, in or about October 1996, Rogan met with Drs. Rao and

Barnabas to offer to pay them money for admitting patients at Edgewater.

93.    In or about October 1996, Rogan met with Dr. Rao and set-up an arrangement by

which Rogan would cause Dr. Rao to be paid for the patients he admitted to Edgewater and for

Dr. Rao to provide anesthesia services at Edgewater. In return, Dr. Rao agreed that he would

refer a substantial number of patients to Edgewater for admission for medical treatment or for

detoxification treatment.

94.     In or about October 1996, Roger Ehmen met with Dr. Rao to put together contract terms covering a portion of that arrangement.

95.     In or about April 1997, Rogan, Ehmen, Braddock gave or caused others to give Dr. Rao's company, Rao, M.D., S.C., a contract that enabled him to bill for all anesthesia services provided at the hospital, in return for patient admissions by Dr. Rao to Edgewater.

96.     Between in or about May 1997 and in or about May 1998, Rogan, Ehmen, Braddock and Bainbridge Inc. paid and caused others to pay Rao, M.D., S.C. approximately $15,000 per month, for a total of more than $200,000, in exchange for Dr. Rao causing patients to be admitted to Edgewater. Dr. Rao used $156,000 of those funds to pay Dr. Kumar for patients Dr. Kumar sent to Edgewater. Between in or about May 1997 and in or about June 1998, Dr. Kumar referred approximately 20 to 30 patients per month to Edgewater. Dr. Rao also paid patient recruiters to refer patients to Edgewater and sent patients from his clinic to Edgewater.

97.     In or about October 1996, Rogan met with Dr. Barnabas and set-up an arrangement by which Rogan would cause Dr. Barnabas to be paid for the patients he admitted to Edgewater. In return, Dr. Barnabas agreed that he would refer a substantial number of patients to Edgewater for admission for medical treatment.

98.     In or about October 1996, Ehmen met with Dr. Barnabas to put together contract terms covering a portion of that arrangement.

99.     On or about November 14, 1997, Rogan, Ehmen, Braddock and Bainbridge Inc., working with Dr. Barnabas, gave and caused others to give a sham contract to Dr. Rao's company, Florascribe, to conceal Edgewater's payments to Dr. Rao for patient referrals and admissions. The contract stated that Florascribe would provide services for Edgewater's

detoxification program, including marketing and coordination of the aftercare treatment. In fact, Florascribe provided no legitimate marketing or aftercare services.

100.    Between in or about May 1997 and in or about April 1998, Rogan, Braddock, Bainbridge Inc. and Ehmen paid and caused others to pay Florascribe in excess of $200,000 in exchange for patient admissions. Dr. Rao used some of those funds to recruit patients to be admitted for detoxification treatment at Edgewater. Dr. Rao also referred such patients from his own clinic at Edgewater.

101.    Rogan and Ehmen were directly involved in the payment of kickbacks to the aforementioned doctors and others.

102.    After the contracts were arranged, Ehmen had repeated contacts with Dr. Rao and Dr. Kumar to advance this part of the scheme. In or about April 1998, for example, Ehmen told Drs. Rao and Barnabas that Rogan would not tolerate anything less than 25 admissions a month, as they had agreed to provide in return of the payments Rogan had agreed to make to them.

### "Recruiting" Patients

103.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. fraudulently "recruited" and caused others to "recruit" homeless individuals, substance abusers, and others to seek hospitalization at Edgewater Hospital.

104.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly admitted and caused others to admit individuals who did not meet the Medicare and Medicaid criteria for hospital admission.

105.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. gave and caused others to give certain individuals cash, cigarettes, and food in order to induce them to seek admission as patients at Edgewater, knowing that these people did not require hospitalization.

33

106.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. coached and caused others to coach these individuals to complain of chest pain, dizziness, abdominal pain, and other symptoms that would justify admission, knowing full well that these people did not have those symptoms.

107.    On or about April 10, 1998 and at other times, Ehmen repeatedly instructed Drs. Rao and Barnabas to tell Dr. Kumar that he should educate the individuals recruited to be patients as to what they should say to state a condition that would merit hospitalization. Ehmen also instructed Drs. Rao and Barnabas to coach the individuals themselves.

108.    When doctors failed to admit sufficient numbers of patients, Rogan and Ehmen, directly and indirectly, communicated to the doctors that they had to increase the number or patient admissions. If the doctors did not do this, Rogan and Ehmen fired the doctors or caused them to be fired.

109.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally and recklessly waived and caused others to waive Medicare and Medicaid co-payments for patients and failed to make any good faith effort to collect such co-payments or deductibles, repeatedly misrepresented to Medicare and Medicaid that they had made such payments, made a good faith effort to obtain such payment, and concealed that they had not done so. Rogan and Ehmen participated in this activity with Drs. Cubria, Rao, and Barnabas, among others.

### Medically Unnecessary Procedures

110.    For the purpose of fraudulently generating revenue for Edgewater, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. lied and caused physicians and others to lie to patients who were legitimately admitted to Edgewater, falsely telling the patients that they needed to be hospitalized and that they needed certain tests and procedures due to medical

34

problems, when in fact, Rogan, Ehmen, Braddock, Bainbridge, Bainbridge Inc., physicians and others knew full well that the patients did not need hospitalization or the specified tests or procedures.

111.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. caused physicians, including Dr. Cubria, to perform medical procedures on these patients, without regard to whether these procedures were medically necessary, for the purpose of fraudulently submitting bills to insurance providers, including Medicare and Medicaid, without regard to the patients' true needs. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these physicians hundreds of thousands of dollars in kickbacks to cause the physicians to perform these procedures upon patients, without regard to the patients' true needs.

112.    Rogan and Ehmen, directly and indirectly, caused Barnabas and other doctors to use Dr. Cubria on all cardiac consultations, knowing that Dr. Cubria would and did perform unnecessary cardiac catherizations (angioplasties) to generate millions of dollars in fraudulent revenue for Edgewater.

113.    Rogan and Ehmen, directly and indirectly, hired and caused others to hire personnel to obtain patients for various hospital programs, including a home visitation process, and knew or had reason to know that the programs were admitting patients that did not need hospitalization.

114.    In or about January 1999 and April 2000, during the course of two of these procedures, both wholly unnecessary cardiac catherizations (angioplasties), two patients died as a result of complications from the procedures.

115.    On numerous occasions, hospital personnel, including without limitation doctors responsible for medical quality control, complained to Ehmen that Dr. Cubria and others were

performing unnecessary procedures or admitting patients that did not need hospitalization. On several occasions, Ehmen responded to these complaints by stating that he had raised the matter with Rogan and that, "he's not going to do anything about it."

### The Submission of False Claims, Cost, and Other Information to Medicare, Medicaid, and Other Insurers

116.     Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc., along with the doctors referenced earlier in this Complaint and others, knowingly, intentionally, and recklessly submitted, and caused others to submit false claims to Medicare and Medicaid for payment, including:

a)      claims in violation of the Stark Statute, 42 U.S.C. § 1395nn;

b)      false and fraudulent cost reports to Medicare;

c)      falsely representing that various medical services were medically necessary;

d)      false and fraudulent claims for medically unnecessary admissions, services, procedures, and testing to Medicare, Medicaid, and private health care insurers;

e)      concealing the fact that certain admissions and procedures were medically unnecessary, that certain costs were not properly incurred; and that various co-payments had been waived, knowing that the disclosure of any of the foregoing would have resulted in the denial of those claims;

f)      creating myriad false records in furtherance of their scheme, including without limitation medical records containing false entries, false diagnoses, and other false information; business records that contained false information to create the appearance that Edgewater had made efforts to collect the co-payments or deductibles when, in fact, the intention all along was to waive those payments in order to get patient admissions; and

36

g)      fraudulent claims for services rendered to patients who were recruited for

hospitalization at Edgewater Hospital (in exchange for kickbacks) to Medicare,

Medicaid, and private health care insurers.

117.    Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. submitted, and caused

others to submit false claims to Medicare for the years 1995, 1996, 1997, 1998, and 1999 with

supporting documents and certifications in order to obtain payments from Medicare knowing that

those documents included false representations including:

a)      The cost reports for 1995, 1996, 1997, 1998 and 1999 each included a

certification falsely representing that the hospital provided services in compliance

with pertinent laws and regulations when in fact, Defendants knew that they had

violated various laws and regulations, including those pertaining to kickbacks,

providing medically necessary services, and the waiver of co-payments and

deductibles; and

b)      The cost reports for 1997 and 1998 each included a provider cost report

reimbursement questionnaire which contained the false representation that there

had been no waivers of Medicare co-payments or deductibles during calendar

year 1997 and 1998, when in fact Defendants and others had waived and caused

to be waived co-payments in order to induce patients in order to induce patients to

be admitted to Edgewater.

118.    From in or about 1995 through in or about 2000, Rogan, Ehmen, Braddock,

Bainbridge and Bainbridge Inc. submitted and caused to be submitted fraudulent claims to

Medicare and Medicaid that:  caused Medicare to pay Edgewater at least $13,000,000 in

Medicare funds, and caused Medicaid to pay Edgewater at least $4,000,000.  Rogan, Ehmen,

37

Braddock, Bainbridge and Bainbridge Inc. submitted and caused these claims to be submitted with actual knowledge that the claims were false or in deliberate ignorance and reckless disregard that such claims were false and fraudulent.

119.    Rogan and Ehmen, directly and indirectly, instructed and caused others to instruct hospital personnel to falsify hospital administrative records to advance and conceal the fraud scheme, including but not limited to time sheets.

### Payments to Dr. Cubria

120.    For a period of years through at least in or about December 2000, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid or caused to be paid monies exceeding $1,000,000 for television advertising that generated patients for Dr. Cubria's medical practice. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these amounts and caused them to be paid so that Dr. Cubria would maintain and/or increase the number of patients he admitted to Edgewater and to encourage Dr. Cubria to help increase its revenues.

121.    From approximately in or about 1998 and through at least in or about December 2000, Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. contracted with Dr. Cubria to act as medical director for the Edgewater Cardiac Rehabilitation Program, paying Dr. Cubria approximately $48,000 per year.  Dr. Cubria performed little or no work under the contract. Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. paid these amounts and other substantial amounts and caused them to be paid to Dr. Cubria to incent Dr. Cubria to maintain and increase the number of patients he admitted to Edgewater, to increase Edgewater's revenues by fraud.

122.    In addition, Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Edgewater to pay Dr. Cubria $15,000 per month to serve as the administrator of an organization called the Latino Cardiology Institute.

## Concealment of the Fraud Scheme

123.    Throughout the time relevant to this case, Rogan, Ehmen, Braddock, Bainbridge, and Bainbridge Inc. actively concealed their fraudulent activities from the federal government, the State of Illinois, and Dexia. For example, Rogan instructed his employees to create Medicare time studies that would contain false information about the hours certain doctors worked. In doing so, Rogan instructed his employees to use different colored pens and to ensure that the hours varied to make the false reports look more legitimate and not appear as if the doctors signed the forms all at one time. Rogan submitted these false forms and caused them to be submitted to Medicare on an annual basis.

## The Management Agreements

124.    To facilitate the scheme to defraud Dexia as detailed elsewhere in this Second Amended Complaint by providing a means of siphoning money from Edgewater, beginning no later than in or about 1994, Rogan caused Edgewater to enter into a series of Hospital Management Agreements (the "Management Agreements") with Braddock and, later, with Bainbridge  The first agreement was entered into on or about August 17, 1994. The second agreement was entered into on or about August 1, 1997. The third agreement was entered into on or about March 1, 2000. In or about March 2000, Bainbridge succeeded Braddock in Braddock's Management Agreement with the Edgewater. Though not identical, the Management Agreements contain substantially the same terms and conditions.

125.    Expansive Powers. As the sole and exclusive manager of Edgewater, Braddock and Bainbridge (and thus Rogan) were given expansive control over virtually all aspects of Edgewater's affairs. Among other things, Braddock and Bainbridge were given:

a)    sole authority for the day-to-day operations of Edgewater, including the power to appoint and salary "senior administrative managers," including Rogan and Ehmen;

39

b)   responsibility for supervising Edgewater personnel and authority to take any actions with respect to Edgewater personnel that Braddock and Bainbridge, in their sole discretion, deemed necessary to manage Edgewater in accordance with the management agreements, including all hiring, counseling, disciplinary and termination decisions;

c)   authority to hire or retain any consultants, accountants, attorneys or other professional personnel that Braddock and Bainbridge, in their sole discretion, deemed necessary or appropriate to assist it in carrying out its duties and responsibilities in accordance with the terms of the management agreements;

d)   responsibility for supervising and managing all purchasing, billings, collections, payables, data processing, accounting, cost reporting and other financial matters related to the day-to-day operation of Edgewater;

e)   authority to make or direct to be made deposits in Edgewater's bank accounts of all receipts and moneys arising from the operation of Edgewater;

f)   authority to make disbursements from Edgewater's bank accounts on behalf of Edgewater in such amounts and at such times as required;

g)   responsibility for the negotiation and preparation of service and all other contracts determined by Braddock and, Bainbridge, in their sole discretion, to be necessary or desirable in connection with the operation of Edgewater in the usual course of business;

h)   responsibility for the execution of all physician agreements, medical director agreements, joint venture agreements and provider agreements necessary and appropriate to obtain and maintain facility status as a reimbursable provider of services under Medicare and Medicaid;

i)   responsibility for the performance of all acts reasonably necessary or required in connection with the operation of Edgewater in accordance with Edgewater's approved annual capital and operating budgets and standards and policies established or to be established by Braddock and Bainbridge;

j)   responsibility to create, implement and review annual budgets for Edgewater, and to take all actions determined by Braddock and Bainbridge, in their sole discretion, to be necessary to implement such budgets;

k)   responsibility for processing all payroll checks;

l)   authority to enter into, modify, discharge, make any settlements with respect to or terminate contracts in the name of Edgewater with vendors, physicians, or any other persons or entities as necessary and appropriate to manage and operate Edgewater pursuant to the management agreements;

m)   authority to make withdrawals from and use Edgewater accounts for the purpose of operating Edgewater, as well as for the purpose of paying itself management fees and reimbursements under the management agreement; and

n)   authority to take any other actions necessary and appropriate, in its sole discretion, to manage Edgewater, provided that such action was under the authority of Braddock and Bainbridge.

126.   <u>Other Promises</u>. Braddock and Bainbridge also made several material promises and representations to Edgewater in the Management Agreements. In particular, Braddock and Bainbridge promised that they would:

a)   perform their duties under the Management Agreements in accordance with all applicable laws, rules, and regulations issued or adopted by any Federal, state or local agency having jurisdiction over Edgewater or any of its operations or properties;

b)   use their best efforts and all due diligence to ensure that Edgewater complied with all applicable laws, rules, and regulations or orders of any governmental or regulatory body having jurisdiction over Edgewater, including all licensure laws, and that Edgewater maintained in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for its ongoing operations;

c)   execute all physician agreements, medical director agreements, joint venture agreements and provider agreements necessary and appropriate to obtain and maintain facility status as a reimbursable provider of services under Medicare and Medicaid;

d)   cause the preparation and filing of all federal and state cost reports necessary for reimbursement of Edgewater;

e)   refrain from acting in any manner which could adversely affect the licensure of Edgewater by the State of Illinois as an acute care hospital or the accreditation of Edgewater by the Joint Commission on the Accreditation of Healthcare Organizations;

f)   supervise and manage the business affairs of Edgewater to ensure that funds were collected and expended for and on behalf of Edgewater and in accordance with the terms of the Management Agreements;

g)   maintain all books, documents, and records of Braddock and, later, Bainbridge as they pertained to Braddock's and, alter, Bainbridge's actual cost of providing services under the Management Agreements and make such documents available to the Secretary of the United States Department of Health and Human Services, the Comptroller General of the United States Government, or any of their duly authorized representatives; and

h)   maintain a quality control program at Edgewater designed to provide for quality patient care at Edgewater.

127.   <u>Special Projects.</u>  In addition to receiving money from Edgewater under the Management Agreement, Braddock and Bainbridge also received substantial additional compensation from Edgewater for providing assistance and advice with regard to the planning, coordination, and development of special projects for Edgewater.

128.   To facilitate the scheme to defraud by providing an additional means of siphoning money from Edgewater, Edgewater entered into two special projects agreements with Braddock (the "Corporate Services Agreements").

129.   On May 5, 1999, Braddock and Edgewater entered into an Agreement for Exclusive Corporate Services for the Corporate Reorganization of Northside Operating Co. in connection with a purported reorganization which had occurred in October 1998. This agreement required Edgewater to pay Braddock $1,131,337.98 plus any purported out-of-pocket expenses.

130.   On May 5, 1999, Braddock and Edgewater entered into an Agreement for Exclusive Corporate Services for the Acquisition of Grant Hospital in connection with Edgewater's acquisition of Grant Hospital, which already had been agreed to under an asset purchase agreement between Edgewater and Grant Hospital's seller on March 5, 1999. This agreement required Edgewater to pay Braddock, <u>inter alia,</u> a "transaction manager's fee" of $100,000 per month beginning in December 1998 and ending the month immediately following the closing of the asset purchase agreement, an "acquisition success fee" of $750,000 if the deal closed, any purported out-of pocket expenses (including legal fees and expenses of Braddock's counsel).

131.  Over eight months in 1999, Rogan, Braddock and Bainbridge Inc. caused Edgewater to pay them $180,000 per month for the investigation of potential acquisitions that never actually occurred.

132.  On the strength of the Management Agreements, Edgewater's business affairs were entrusted to its fiduciaries, Braddock and Bainbridge, from whom Edgewater was entitled to: (i) actions and decisions in the sole and exclusive best interests of Edgewater; and (ii) receive absolute loyalty including without limitation the absence of any self-dealing by Braddock, Bainbridge or their principals.

133.  As the principal, the person in control, and agent of Braddock and Bainbridge, Rogan also had a fiduciary responsibility toward Edgewater.

134.  Edgewater (and, later, Dexia) would rely upon the promises and representations in the Management Agreements, including the fiduciary responsibility representation.

135.  As discussed in greater detail elsewhere in this Second Amended Complaint, Braddock, Bainbridge, Bainbridge Inc. and Rogan betrayed Edgewater's and Dexia's trust and confidence and breached their fiduciary duties to Edgewater and Dexia under the Management Agreements and otherwise by committing, or failing to disclose the existence of, massive Medicare and Medicaid fraud and siphoning money from Edgewater through management fees, consulting fees, the Corporate Services Agreements and other improper payments. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded information that the foregoing business arrangements would be and were not in the best financial interests of Edgewater.

136.  On or about March 1, 2000, Defendant Rogan caused other entities, including Access and Vital, to enter into Management Agreements with Defendants Braddock and

43

Bainbridge for the improper purpose of transferring substantial portions of Edgewater's revenues and other assets to those entities, and from them ultimately, to Rogan. Under these agreements, both Access and Vital agreed to pay $36,000 per year for certain purported management services to Defendants Braddock and Bainbridge.

137. Neither Access nor Vital had any independent operations that required management. In fact, other than their membership interest in Edgewater, Grant, and another organization, Hope Community Health Services, Inc. ("Hope"), Access and Vital had no discernable purpose. By virtue of their membership interests, Access and Vital received all of their income from Edgewater, Grant, and Hope, and used that income to pay the purported management fees to Braddock and Bainbridge.

138. Rogan further caused Braddock and Bainbridge to enter into management agreements with various entities that were affiliated with Edgewater and also were under Defendant Rogan's control. These entities included Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF"), Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF"). Upon information and belief, none of these payments were not used or intended to be used for a legitimate purpose.

139. The boards of directors of Chicagoland Services Support Foundation ("CSSF"), Chicagoland Services Foundation ("CSF") and Chicagoland Medical Associates, P.C. ("CMA"), and the Edgewater Foundation ("EF") entities consisted of persons under Rogan's control, including David Shanahan, John Mullen, and Wessel Bengston.

**Defendants Fraudulently Induced Dexia to Issue the Edgewater Letter of Credit**

140. As explained above, in or about 1994, Rogan (a) caused Northside to be created; and (b) through EOC, sold Edgewater to Northside. To finance Northside Operating Company's purchase of Edgewater, Rogan and Edgewater caused the Illinois Health Facilities Authority

44

("IHFA") to issue bonds, the proceeds of which Northside used: to purchase Edgewater from
EOC and Rogan; to provide capital for the operation and renovation of Edgewater; to set-up a
debt service reserve fund with respect to ongoing payment of the bond debt; and to pay for
various costs associated with the bond issuance. The total amount of the 1994 bond issuance
was approximately $41,000,000.

141.    After the IHFA issued the bonds, it became the obligation of Northside to repay
the bondholders at the interest rate set in the bonds.

142.    In or about 1997, Rogan, Braddock and Bainbridge Inc. arranged and caused the
arrangement of a new tax-exempt bond offering to refinance its then-existing bond debt to obtain
a lower interest rate and to raise additional funds.

143.    Rogan, Braddock and Bainbridge Inc. were intimately involved and spearheaded
the effort to secure the refinancing. Rogan, Braddock and Bainbridge Inc. investigated various
avenues for refinancing, selected an investment bank to aid in the process, selected the bank –
Dexia – to guarantee repayment on the bonds, negotiated – directly and through others including
Henry Zeisel, a Braddock employee – the terms of the deal with Dexia. Rogan had to and did
approve the material terms of the transaction with Dexia.

144.    In order to get a lower interest rate on the new tax-exempt bond financing, Rogan,
Braddock and Bainbridge Inc. sought and spearheaded the effort to obtain a letter of credit from
a financial institution to guaranty repayment of the bonds. The letter of credit would guaranty
payment of the purchase price of any tendered bonds. By getting a financial institution to issue a
letter of credit to back a new tax-exempt bond offering, Edgewater would receive a higher credit
rating (based upon the credit rating of the financial institution), which in turn would reduce the
overall interest rate Edgewater would have to pay on the new bonds. In return for the letter of

credit, Edgewater would pay a fee to the financial institution. If the letter of credit were ever drawn down, the financial institution would be forced to pay the amount drawn, which would then automatically convert to a loan from the financial institution to Edgewater at a pre-negotiated rate.

145.  In or about 1997, Rogan, Braddock and Bainbridge Inc. approached Cain Brothers ("Cain Bros."), an investment banking firm, to assist in locating a financial institution willing to provide a letter of credit to back Edgewater's bond refinancing. Eventually, Cain Bros. contacted Dexia and provided Dexia with financial statements and other financial information for Edgewater, which Cain Bros. had obtained from Rogan, Braddock and Bainbridge Inc.

146.  On January 30, 1998, Rogan executed an "Indication of Interest Proposal" on behalf of Edgewater outlining the terms and conditions of the deal between Dexia and Edgewater. Under his signature, Rogan wrote that his title was "CEO." Similarly, the distribution list for the 1998 bond refinancing lists Rogan as "CEO" of Edgewater.

147.  Under the terms of Management Agreements, Rogan caused Edgewater to enter into with Braddock and Bainbridge, Braddock and Bainbridge and their employees, including Rogan and Ehmen, prepared or caused to be prepared all of Edgewater's financial statements and other financial information.

148.  After reviewing the financial statements and other financial information Rogan, Braddock and Bainbridge Inc. prepared and caused to be prepared, Dexia personnel undertook a more expansive due diligence review of the deal, which included asking Edgewater to provide substantial additional financial information, traveling to Chicago to meet with Rogan and others about the operation at Edgewater, and other steps.

46

149.    In providing the Edgewater financial statements and other financial and operating records and information to Cain Bros. and Dexia, Rogan, Braddock and Bainbridge Inc. knowingly, intentionally and recklessly omitted information, which they knew and had reason to know would be material to any complete assessment of the finances and operation of Edgewater, including most significantly that: (a) Edgewater's operations and finances included substantial revenues obtained by fraud against Medicare and Medicaid; and (b) Braddock perpetrated that fraud. Rogan, Braddock and Bainbridge Inc. knew, should have known, or recklessly disregarded the fact that but for their omissions and material misrepresentations, Dexia never have or would have provided the letter of credit.

150.    Throughout Dexia's due diligence process, none of the Defendants or their employees ever disclosed to Dexia: (a) the existence of the Medicare/Medicaid fraud scheme at Edgewater; (b) the fact that Edgewater's financial records included substantial revenues obtained by fraud against Medicare and Medicaid; (c) that because the basic viability of Edgewater as an institution was dependent upon revenues generated by Medicare/Medicaid fraud, the continued viability of Edgewater depended upon the ability of Rogan, Ehmen, Braddock and Bainbridge Inc. to conceal that fraud from the federal and state authorities; and (d) that Braddock perpetrated that fraud.

151.    To induce Dexia to provide the letter of credit, Rogan, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly made the following statements to Dexia and caused them to be made:

a)    **Materially False and Misleading Audited Financial Statements, Unaudited Financial Statements and Projections.** On or about October 16, 1997, Defendants provided a document containing materially false projections for fiscal

years 1997 through 2000, audited financial statements from 1994 through 1996,

unaudited financial statements from January 1 through June 30, 1997, and for

1996, and other information, to Cain Brothers and directed Cain Brothers to send

these misleading documents from Chicago, IL to Dexia in New York, NY by

United States mail or by an interstate courier service.

b) **Mailed/Couriered Materially False and Misleading Financial Statements for 1995, 1996 and 1997.** On or about February 10, 1998, Defendants caused materially false financial statements for 1995, 1996, and 1997 to be sent from Chicago, IL to Dexia in New York, NY by United States mail or an interstate courier service.

c) **Faxed Materially False and Misleading March 25, 1998, Facsimile.** On or about March 25, 1998, Defendants caused an eight-page document detailing Edgewater's balance sheets for 1996 and 1997, as well as a balance sheet, operating statement and statement of cash flow dated February 28, 1998, to be sent by facsimile from Chicago, IL to Dexia in New York, NY.

d) **Other False and Misleading Statements.** Defendants also sent and caused to be sent a variety of other false and misleading statements and information to Dexia, including a copy of the Braddock-Edgewater Management Agreement. In the Management Agreement, Braddock made various material promises and representations described in paragraphs 124 - 139. Braddock knew and had reason to know that these promises and representations would be and were false when made.

152.    The documents that Rogan, Braddock and Bainbridge Inc. sent or caused to be sent to Dexia were false and misleading in several critical respects. First, the income, revenue, and financial projections represented in these documents failed to disclose that they included substantial amounts of Medicare, Medicaid, and private health insurance revenue obtained by fraud including kickbacks, Medicare fraud, and Medicaid fraud. Second, these documents materially misrepresented Edgewater's operating expenses with respect to, among other things, the hundreds of thousands of dollars that Rogan, Ehmen, Braddock and Bainbridge Inc. knowingly, intentionally, and recklessly paid out or caused to be paid out in kickbacks in connection with the healthcare frauds. Third, the documents omitted material information by failing to disclose the role that Braddock, Ehmen, numerous doctors in the Edgewater staff, and others played in the healthcare frauds.

153.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that the financial materials they gave or caused to be given to Dexia were false and misleading, in that, when the Medicare/Medicaid fraud schemes were discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States.

154.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded knowledge of the breach of various promises and representations in the Management Agreement by either committing the healthcare frauds, facilitating that misconduct, or failing to take steps to prevent or stop it (including notifying Dexia of the possibility that such misconduct was occurring.)

155.    Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that in deciding whether to issue the Edgewater letter of credit, Dexia would rely

49

upon financial and other materials Rogan, Braddock and Bainbridge Inc. provided and caused to be provided to Dexia and that Dexia would assume that the financial materials and representations regarding Edgewater and the Management Agreement did not contain intentional misrepresentations or omissions.

156. In deciding to issue the Edgewater letter of credit, Dexia reasonably believed that the financial statements and financial and other information Rogan, Braddock and Bainbridge Inc. provided and caused to be provided to Dexia were true and accurate. As Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded, Dexia reasonably relied upon the information Rogan, Braddock and Bainbridge Inc. had provided and caused to be provided to Dexia and incorporated the information into its analyses and underwriting of the proposed credit enhancement transaction.

157. Rogan, Braddock and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that a typical due diligence effort by a banking institution like Dexia would not likely discover a Medicare/Medicaid fraud scheme involving illegal kickbacks to doctors to cause them to admit healthy patients or to perform unnecessary procedures because a hospital's financial records would not disclose sufficient information to discover such details.

158. In reliance upon its review of Rogan, Braddock and Bainbridge Inc.'s false and fraudulent financial statements and financial and other information, Dexia agreed to issue the letter of credit in the amount of approximately $56,000,000.

159. Rogan, Braddock and Bainbridge Inc. knew or had reason to know that if Dexia had been informed that Edgewater's operations were in any way involved with healthcare fraud or that Braddock was committing this healthcare fraud, Dexia would not have issued the letter of credit to Edgewater.

160.    The IHFA issued the new bonds in two series: Series A in the aggregate principal amount of $44,475,000 and Series B in the aggregate principal amount of $10,525,000 (Series B taken together with Series A referred to as "the Edgewater Bonds"). The bond documents and agreements provided that the proceeds of the Series A Bonds, along with other funds, would be used to payoff the 1994 Edgewater Bonds. The bond documents and agreements specified that the Series B Bond proceeds would be used to renovate Edgewater Hospital's patient rooms, nursing units, the lobby and exterior facade of Edgewater Hospital's main building, and to help pay for significant additions and enhancements to Edgewater Hospital's information system.

161.    The Series A Bonds carried a fixed rate of 4.7% per annum through June 30, 2004. The Series B Bonds carried a weekly variable rate. If Rogan, Braddock and Bainbridge Inc. had not obtained letter of credit support, Edgewater would never have been able to obtain these interest rates and would have incurred a much higher interest charge on the new bonds.

162.    Edgewater secured the letter of credit with collateral of its unrestricted receivables, assignable general intangibles and a perfected first mortgage and security interest in the hospital facility, equipment and fixtures.

163.    On or about May 1, 1998, Rogan, Braddock and Bainbridge Inc. caused Edgewater to agree upon, execute, and deliver a reimbursement agreement with Dexia, in relation to and in consideration for Dexia's issuance of the Edgewater letter of credit.

164.    On or about May 1, 1999, Rogan, Braddock and Bainbridge Inc. caused Edgewater to agree upon, execute, and deliver the Edgewater Reimbursement Agreement, which amended and restated the 1998 reimbursement agreement with Dexia. The Edgewater Reimbursement Agreement contained various financial covenants that Edgewater was obligated to satisfy, including the maintenance of certain debt service ratios, capitalization levels, and

maintenance of unrestricted cash and investments on hand. Under the Edgewater
Reimbursement Agreement, a breach of these financial covenants would constitute an automatic
"Event of Default."

165.    To provide Dexia security under the letter of credit, Rogan, Braddock and
Bainbridge Inc. caused Edgewater to represent that Edgewater's operations would meet minimal
financial standards set forth in covenants to the Edgewater Reimbursement Agreement
("covenants"). Moreover, Rogan, Braddock and Bainbridge Inc. further caused Edgewater to
agreed that if Edgewater's financial performance ever dipped below any of these minimum
financial standards, Dexia would be entitled to declare an "Event of Default" under the
reimbursement agreement. An Event of Default would entitle Dexia to exercise certain rights
and remedies to protect its investment, including without limitation its right to declare all
obligations of Edgewater to be immediately due and payable, to take whatever actions were
necessary to collect the amounts due, and/or to take other action to enforce Dexia's rights under
the credit agreements. In short, if it ever appeared that Edgewater was in financial trouble, Dexia
could rush in to take steps to protect its investment and the collateral Rogan, Braddock and
Bainbridge Inc. posted and caused to be posted as security for the letter of credit.

## The Grant Acquisition

166.    In or about 1999, Rogan caused Edgewater to take steps to acquire Grant Hospital
("Grant") from Doctor's Hospital. To finance the acquisition of Grant, Defendants Rogan,
Access and Vital planned to raise an additional $20 million through a tax exempt hospital bond
issuance, similar to but wholly independent from the earlier Edgewater bond issuances in 1994
and 1998. Like the 1998 hospital bond issuance, Rogan wished to secure a lower interest rate for
the Grant bonds via a credit enhancement through a letter of credit to back Edgewater.

52

167.    In or about 1999, Rogan approached Dexia and caused Edgewater to approach Dexia to obtain Dexia's approval for Edgewater's planned acquisition of Grant and to obtain a letter of credit to help finance the acquisition. This request was wholly independent of the earlier Edgewater transaction and Dexia had no obligation to provide this additional letter of credit.

168.    As of this time, Edgewater had made all payments due on the 1998 letter of credit in a complete and timely fashion and, due to the lulling and concealment outlined above, Defendants had misled Dexia to believe that Edgewater was financially healthy and operating a wholly legitimate business.

169.    As part of their effort to convince Dexia to approve the transaction involving Edgewater assets and provide the Grant letter of credit, Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. directly and through Edgewater presented and caused to be presented false Edgewater financial statements to Dexia. Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. and their employees prepared and caused to be prepared all of Edgewater's financial statements, financial projections, and other financial information knowingly, intentionally and recklessly failing to disclose that the financial statements were false because they included substantial revenues from Medicare and Medicaid procured by fraud.

170.    In knowingly, intentionally and recklessly sending false and fraudulent financial statements and other financial information to Dexia and causing them to be sent, Defendants knew, had reason to know, or recklessly disregarded that when the fraud underlying the false financial materials was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois. Defendants knew, had reason to know, or recklessly disregarded that if this occurred, Edgewater

•

•

would be severely disadvantaged by the use of significant financial resources to obtain and operate Grant.

171.    Defendants sent these false financial statements and financial information to Dexia and caused them to be sent in order to convince Dexia to approve the transaction involving Edgewater assets and to induce Dexia to provide the letter of credit for Grant. Defendants knew, had reason to know, or recklessly disregarded that Dexia would rely upon the truth and accuracy of these financial statements and other financial information in agreeing to issue the Grant letter of credit.

172.    At the time of Edgewater's proposed acquisition of Grant, it was clear that the financial position of Grant was poor and that Grant would to operate at a loss for some time following Edgewater's acquisition of Grant. It also was clear that Grant would be financially dependent upon Edgewater for some time. Due to Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc.'s fraudulent misrepresentations to Dexia regarding Edgewater's financial health and operational legitimacy, Defendants Rogan, Braddock, Bainbridge and Bainbridge Inc. caused Dexia to believe that Edgewater was financially healthy enough to fulfill that role. As a result, Dexia required Edgewater to guarantee the obligations of Grant and to secure the guarantee with Edgewater's assets.

173.    Dexia reasonably relied on the truth and accuracy of these statements in approving Edgewater's acquisition of Grant and in issuing the Grant letter of credit. If not for these false and misleading statements made by and through Defendants, Dexia would not have approved Edgewater's participation in the transaction or issued the letter of credit to Grant. Dexia incorporated the false and misleading information into its analyses of the acquisition of Grant, and in reliance upon this false and misleading information, Dexia: (i) approved

54

Edgewater's participation in the transaction, including without limitation of Edgewater's contribution of $10,000,000 in capital to Grant and agreement to provide additional financial assistance to Grant; and (ii) agreed to issue the Grant letter of credit.

### The Insolvency of Edgewater

174.    Upon information and belief, throughout the time relevant to this case, Edgewater would have been insolvent without the revenues Defendants obtained by fraud or if the fact of that fraud was discovered by Medicare and Medicaid. Upon information and belief, Edgewater would not have been able to continue operating as a going concern had it been known or discovered that Defendants had used Edgewater to commit their fraud scheme. Indeed, shortly after the fraud was discovered, Edgewater ceased its operations. Despite the insolvency, however, Edgewater still had numerous valuable assets, including millions of dollars in cash, real estate, uncollected loans, accounts receivable, and potential legal claims. These assets largely constituted the remaining collateral for Dexia's letter of credit.

### Defendants' Lulling and Concealment to Advance the Scheme to Defraud

175.    To allow Dexia to keep watch over its investment and to permit Dexia to protect itself from loss, the agreements underlying the letter of credit required Edgewater to provide Dexia with truthful quarterly (and later monthly) financial reports on the operations of Edgewater. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew and had reason to know of these financial reporting requirements and their purpose. Among other things, Dexia substantially relied upon these financial reports to gauge whether Edgewater was continuing to operate effectively and/or whether Edgewater's financial position was deteriorating.

176.    In order to mislead Dexia into believing that Edgewater was satisfying these financial covenants, Rogan, Braddock, Bainbridge and Bainbridge Inc. knowingly, intentionally, and recklessly sent and caused to be sent false financial reports from Chicago, Illinois to Dexia

in New York, New York by United States mail or intrastate courier on numerous occasions, including but not limited to on or about the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) November 5, 1998; (d) March 8, 1999; (e) May 12, 1999; (f) July 30, 1999; (g) November 15, 1999; (h) February 15, 2000; and (i) April 7, 2000. Defendants also sent and caused to be sent false financial statements and other financial information from Chicago, Illinois to Dexia in New York, New York by facsimile on numerous occasions, including but not limited to on or about the following dates: (a) July 16, 1998; (b) July 29, 1998; (c) May 7, 1999; (d) June 16, 2000; (e) February 27, 2001; (f) March 1, 2001; and (g) March 16, 2001.

177.    These financial statements included statements of revenue and assets that Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded were materially misstated for the reasons detailed above.

178.    Rogan, Braddock, Bainbridge and Bainbridge Inc. provided these false financial statements and other financial information to Dexia to lull Dexia into a false sense of security regarding Edgewater's financial health and the legitimacy of Edgewater's operations. Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that Dexia would believe the false and fraudulent financial statements and other financial information were there and accurate, thus lulling Dexia to believe that Edgewater's was financially healthy and was operating wholly legitimately.

179.    Rogan, Braddock, Bainbridge and Bainbridge Inc. also sent these false and fraudulent financial statements and other financial information to Dexia, and caused them to be sent, to prevent Dexia from discovering that, but for its fraudulent revenues, Edgewater could not meet its financial covenants, and was perilously close to or in default on its covenants.

180.    By virtue of these false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. concealed crucial information from Dexia, which would have permitted Dexia to take steps to protect its investment. Rogan, Braddock, Bainbridge and Bainbridge Inc. well knew, should have known, or recklessly disregarded that their scheme to defraud would collapse if Dexia declared an Event of Default.

181.    In sending and causing to be sent to Dexia financial statements and other financial information that concealed the Medicare and Medicaid fraud at Edgewater, Rogan, Braddock, Bainbridge and Bainbridge Inc. knew, had reason to know, or recklessly disregarded that when the fraud underlying the false financial statement was discovered, the flow of fraudulently obtained revenue would not only come to a halt, but would have to be repaid to the United States and the State of Illinois.

182.    By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. enabled the continued operation of their fraud scheme.

183.    By inducing Dexia's inaction through their false and fraudulent financial reports of Edgewater's operations, Rogan, Braddock, Bainbridge and Bainbridge Inc. gave themselves time to loot and dissipate substantial portions of the collateral Rogan, Braddock and Bainbridge Inc. caused Edgewater to post as security for Dexia's letter of credit.

184.    On or about September 17, 1998, the U.S. Department of Justice served a subpoena duces tecum upon Edgewater seeking the production of medical files of patients treated at Edgewater. The subpoena stated that these documents were related to an investigation of "federal health care offenses as defined in 18 U.S.C. § 24(a)." The subpoena was addressed to

Peter Rogan, President, Edgewater Hospital. The subpoena sought patient medical records of approximately 87 Medicaid patients.

185.    In or about early 1999, Rogan, Ehmen, and the other Defendants learned that the U.S. Department of Justice had initiated a federal grand jury investigation of possible Medicare/Medicaid fraud at Edgewater.

186.    In or about early 1999, Rogan and Ehmen learned that the investigation extended beyond fraud by medical personnel to fraud by the Defendants themselves.

187.    On information and belief, in or about early 1999, Rogan and Ehmen learned that Dr. Cubria was one of the targets of the federal grand jury investigation. Given the corrupt relationship that existed between Rogan and Ehmen and Dr. Cubria as detailed above. Rogan knew or had reason to know that any proof the federal government might gather against Dr. Cubria might well also implicate Rogan and the other Defendants.

188.    In November 1999, Rogan, Ehmen, and the other Defendants caused Edgewater to enter into a Corporate Integrity Agreement with the Office of Inspector General ("OIG") of the Department of Health and Human Services, following an investigation by OIG into systemic overpayments being made to the Hospital as the result of "upcoding" of certain patient conditions (i.e., billing Medicare at higher reimbursement codes than actually treated). Rogan, Ehmen, and the other Defendants failed to disclose the OIG investigation and Corporate Integrity Agreement to Dexia.

189.    In 2000 and 2001, the government served additional grand jury subpoenas upon Edgewater (some of which inter alia sought documents related to Rogan, Ehmen, and Drs. Rao, Kumar, and Barnabas) and served such grand jury subpoenas upon Rogan's management

companies, Braddock and Bainbridge, seeking information <u>inter alia</u> about these entities' tax records, records of payments, records of ownership, and records related to Edgewater.

190.    In or about December 2000, Rogan met with Dr. Cubria and wrote on a piece of paper that Dr. Cubria should destroy all memos and notes that he had written to Rogan. Rogan also wrote to Dr. Cubria that he should not inform his attorney of these actions, because the actions constituted obstruction of justice. Rogan wrote to Dr. Cubria, instead of speaking to him, because he feared that federal law enforcement authorities had bugged his office.

191.    In January 2001, Rogan advised Dr. Cubria to retain a criminal attorney.

192.    Rogan also told Cubria to destroy his computer. In addition, in or about February 2001, Rogan caused approximately $9,8000 to be given to Cubria.

193.    In or about 2001, a Dexia employee confronted Rogan about the federal grand jury investigation. In response to questioning, Rogan lulled Dexia into a false sense of confidence by telling the Dexia employee that the criminal investigation was routine, related only to physicians, and did not relate to Edgewater itself.

194.    Rogan knew that the investigation was not "routine" and that his representations to Dexia were completely false. Rogan knowingly, intentionally, and recklessly made those representations to induce Dexia not to investigate further and declare an Event of Default under the Edgewater Reimbursement Agreement relating to the Edgewater letter of credit.

195.    From late 1998 through the first-half of 2001, Rogan, Braddock, Bainbridge and Bainbridge Inc. did not disclose to Dexia that Rogan, Ehmen, Braddock, Bainbridge and Bainbridge Inc. had learned that the government was investigating Edgewater's management including Rogan and Ehmen for fraudulently inflating the revenues at Edgewater. Nor did Defendants disclose to Dexia that Edgewater's precipitous financial decline after 2000, upon

59

information and belief, resulted from the hospital's loss of revenues attributable to Defendants' fraud scheme.  Instead, Defendants continued to report to Dexia that such decline was temporary and correctable.

196.    Upon information and belief, Rogan knowingly, intentionally, and recklessly concealed the truth regarding the government investigation to permit Defendants to continue to misappropriate assets of Edgewater and/or squander them on other business ventures and in an attempt to prevent Dexia from discovering the fraud and breaches of fiduciary duty Defendants had committed.

### The Criminal Indictments

### THE POST-INDICTMENT COLLAPSE

197.    The several indictments of Edgewater personnel and most significantly of Ehmen, Braddock, and Bainbridge led Medicare and Medicaid to suspend payments to Edgewater.  This led directly Edgewater's default on certain financial covenants set forth in the Edgewater Reimbursement Agreement.  Among the numerous defaults that have occurred under the Edgewater Reimbursement Agreement and other credit enhancement documents to date, Edgewater has failed to comply with the debt service coverage ratio requirements under § 6.10 of the Edgewater Reimbursement Agreement as of March 31, 2000 and has failed to comply with the reporting requirements of § 6.01 of the Edgewater Reimbursement Agreement.

198.    By on or about November 6, 2001, Edgewater bondholders tendered bonds with an approximate aggregate principal amount of $56,000,000 million.  Under the terms of the letter of credit, Dexia was obliged to pay and did pay the purchase price of the tendered bonds, that is, a total of approximately $56,000,000 million.

199.    As of the date of this Complaint, Edgewater is in bankruptcy and Dexia has received back only $500,000 as a result of liquidation of collateral.  The collateral posted to

60

support Edgewater's debt to Dexia is wholly insufficient to even begin to provide Dexia

adequate security for its loss.   Dexia stands to lose tons of millions of dollars as a result of

Defendants' fraud scheme.

## Count I

### Fraudulent Inducement

#### (Defendants Rogan, Bainbridge, Braddock, and Bainbridge, Inc.)

200.    Dexia restates and realleges the preceding paragraphs as if fully set forth herein.

201.    Defendants made numerous false and misleading statements of material fact to

Dexia regarding the true financial condition of Edgewater, including repeatedly providing Dexia

with financial reports and information that failed to disclose that Edgewater was involved in a

massive fraud scheme against Medicare and Medicaid and that a substantial portion of

Edgewater's revenues derived from that scheme.

202.    Defendants knew, had reason to know, or recklessly disregarded that these

representations were not true, and omitted material information.

203.    Defendants made these representations with the intention of inducing Dexia to

issue a letter of credit in the amount of approximately $56,384,100.

204.    Defendants knowingly, intentionally and recklessly acted to cause Dexia to rely

upon the truth of these representations.

205.    Dexia reasonably relied upon the truth of these representations, and but for these

statements, Dexia would not have issued the Edgewater letter of credit.

206.    On or about June 8, 1998, Dexia issued the Edgewater letter of credit.

207.    As a result of its reasonable reliance upon the Rogan Defendants' fraudulent

statements and inducements, Dexia has suffered substantial financial damages.

61

## Count II

### Fraudulent Concealment

### (Defendants Rogan, Bainbridge, Braddock, and Bainbridge, Inc.)

208.    Dexia restates and realleges the preceding paragraphs as if fully set forth herein.

209.    After Dexia issued the Edgewater letter of credit, Defendants provided numerous financial statements and reports and other information regarding Edgewater and its operations on a regular basis to permit Dexia to attend to its investment in Edgewater.

210.    In these regular financial statements, reports and presentations of information, Defendants knowingly, intentionally and recklessly made numerous false and misleading statements of material fact to Dexia regarding the true financial condition and operations of Edgewater, including repeatedly providing Dexia with financial statements, reports and other information that failed to disclose that Edgewater was involved in a massive fraud scheme against Medicare and Medicaid and that a substantial portion of Edgewater's revenues derived from that scheme.

211.    The statements, reports, and presentations of information represented acts in furtherance of Defendants fraud scheme against Dexia and Defendants' numerous false and misleading statements lulled Dexia into the false sense of security regarding the continuing safety of its investment so as to lead Dexia to the false belief:  that Edgewater's operations were entirely legitimate, that Edgewater's financial statements and reports included information from legitimate operations; that Edgewater was more stable than in fact it was; and that but for the revenues derived from illegal activities, Edgewater would not have maintained the minimum financial standards required in the Edgewater Reimbursement Agreement and would have violated its financial covenants, causing Events of Default to occur much earlier than they did on the Edgewater letters of credit.

62

212.    Defendants knew, had reason to know, or recklessly disregarded that these statements, reports and other information representations were not in fact true and omitted material facts.

213.    Dexia reasonably relied upon the truth of Defendants' representations, and but for those representations, Dexia would have taken steps to protect its collateral and to recover the money Edgewater owed it.

214.    Defendants took the foregoing steps to forestall Dexia from protecting itself financially, which Defendants knew and had reason to know would have terminated their scheme to defraud and ability to loot Edgewater of the collateral Defendants posted to induce Dexia to issue the letter of credit.

215.    As a result of Defendants' fraudulent statements, misrepresentations, omissions and lulling, Dexia suffered substantial financial damages.

## Count III

### Tortious Interference with an Existing Contract

### (Defendants Rogan, Bainbridge, Braddock, Bainbridge, Inc.)

216.    Dexia restates and realleges the preceding paragraphs as if fully stated herein.

217.    Dexia and Edgewater entered into a valid contract on or about June 8, 1998, in connection with a letter of credit Dexia issued for the benefit of Edgewater.

218.    Defendants knew that this contact existed and intentionally and maliciously induced Edgewater to breach its obligations under the contract.

219.    Defendants' wrongful conduct caused Edgewater to breach its contract.

220.    As a result of Defendants' interference with the contract between Dexia and Edgewater, Dexia has suffered substantial financial damages.

## Count V

### Breach of Fiduciary Duty

### (All Defendants)

221.　　Dexia restates and realleges the preceding paragraphs as if fully stated herein.

222.

223.　　Because Defendant Rogan was a corporate officer of, held himself out as a corporate officer of, and/or exercised control over Edgewater, he owed fiduciary duties to Edgewater creditors, including Dexia.

224.　　Because Defendants Braddock and Bainbridge controlled Edgewater under the terms of the Management Agreements and through employees and agents that acted as Edgewater's officers (e.g., Rogan, Ehmen, Joanne Skvarek, Clarence Nagelvoort), Braddock and Bainbridge owed fiduciary duties to Edgewater creditors, including Dexia.

225.　　Defendants Rogan, Braddock, and Bainbridge also owed fiduciary duties to Edgewater's creditors once Edgewater became insolvent.

226.　　Defendants Rogan, Braddock, and Bainbridge caused Edgewater to be operated in a reckless and illegal manner for their own personal benefit, including without limitation their own financial benefit.

227.　　Defendants Rogan, Braddock, and Bainbridge caused Edgewater to make business decisions which they knew, should have known, and recklessly disregarded would and did financially injure Edgewater, and thus imperiled Dexia's interests, including its investment in Edgewater.

64

228.    Defendants Rogan, Braddock, and Bainbridge knowingly engaged in a variety of conduct that furthered their own interests and was also detrimental to Dexia's interests, including its investment in Edgewater.

229.    Defendants Rogan, Braddock, and Bainbridge knowingly colluded with each other in breaching their fiduciary duties to Dexia.

As a result of this breach of fiduciary duty, Dexia has suffered substantial financial damages.

## Count VII

### Willful Conversion

### (All Defendants)

230.    Dexia restates and realleges the preceding paragraphs as if fully stated herein.

231.    Defendants directly, indirectly and without authorization, knowingly wrongfully obtained from Dexia and caused Dexia to pay approximately $56,000,000 on Edgewater's behalf to satisfy Edgewater's debt to the bondholders when Edgewater defaulted on those bonds and on the letter of credit.

232.    Dexia has an absolute and unconditional right to immediate possession of those funds totaling approximately $56,000,000, because Defendants wrongfully knowingly obtained the funds from Dexia and caused Dexia to pay those funds on Edgewater's behalf.

233.    As a result of this conversion, Dexia has suffered substantial financial damages.

## Count X

### Civil Conspiracy

### (All Defendants)

234.    Dexia restates and realleges the preceding paragraphs as if fully stated herein.

235.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants, directly and indirectly, individually and collectively, controlled or owned by them, acted in concert knowingly, intentionally, and recklessly to conspire among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to defraud Dexia.

236.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly combined, conspired, and agreed among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to defraud Dexia by virtue of the schemes and actions alleged in this Complaint.

237.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to make false and misleading statements to Dexia as to the veracity and accuracy of the financial records, reports, and statements for Edgewater.

238.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Defendants knowingly, intentionally, and recklessly conspired among themselves and with others including Ehmen and the various doctors named in this Second Amended Complaint to provide to Dexia false and misleading financial records, reports, and statements for Edgewater, and to conceal material information from Dexia regarding the fraud scheme against Medicare and Medicaid detailed elsewhere in this Complaint.

239.    Throughout the time relevant to this Complaint and as alleged elsewhere in this Complaint, Rogan, Ehmen, Bainbridge, Braddock and Bainbridge Inc. knowingly, intentionally,

66

or recklessly conspired among themselves and with others including Ehmen and the various

doctors named in this Second Amended Complaint to lull Dexia into a false sense of security and

to defraud Dexia by sending and causing to be sent to Dexia false and misleading financial

statements and financial information that concealed the existence of Defendants' scheme to

defraud Dexia as well as their scheme to defraud Medicare and Medicaid so as to forestall Dexia

from protecting itself by exercising its contractual rights under its reimbursement and credit

agreements with Edgewater, and to allow the Defendants to pillage Edgewater of the collateral

Edgewater had posted to secure Dexia's letter of credit.

240.    Throughout the time relevant to this Complaint and as alleged elsewhere in this

Complaint, Defendants conspired among themselves and with others including Ehmen and the

various doctors named in this Second Amended Complaint to pillage Edgewater of Dexia's

collateral and to squandered Edgewater's assets, including without limitation, directly or

indirectly diverting those assets to Rogan personally and to other Defendants using Edgewater's

revenue and assets for purposes other than maintaining the operations and financial health of

Edgewater, and using Edgewater's assets to benefit Rogan and the other Defendants personally

at the expense of Edgewater.

241.    Throughout the time relevant to this Complaint and as alleged elsewhere in this

Complaint, Defendants knowingly, intentionally, and recklessly coordinated efforts among

themselves and with others including Ehmen and the various doctors named in this Second

Amended Complaint to funnel money out of Edgewater, decreasing the value of Edgewater's

assets.

242.    Throughout the time relevant to this Complaint and as alleged elsewhere in this

Complaint, Rogan and the other Defendants knowingly, intentionally, and recklessly conspired

among themselves and with others including Ehmen and the various doctors named in this

Second Amended Complaint to siphon the proceeds of Defendants' scheme to defraud Medicare

and Medicaid from Edgewater in a variety of ways, including through a variety of Management

Agreements and Corporate Services Agreements, and otherwise.

243.    Throughout the time relevant to this Complaint and as alleged elsewhere in this

Complaint, Defendants conspired and agreed among themselves and with others including

Ehmen and the various doctors named in this Second Amended Complaint to conceal, suppress

and hide the foregoing misrepresentations and material omissions from Dexia. Defendants'

concealment, suppression and omission of these material facts prevented Dexia from taking steps

to limit the damage to Dexia as a result of Defendants' scheme.

244.    The wrongful acts alleged herein constitute some of the overt acts Defendants

took in furtherance of the conspiracy.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dexia hereby demands judgment against Defendants, including:

a)    Money damages to be proven at trial, but not less than $56 million;

b)    Punitive damages for fraudulent conduct;

c)    All costs and attorney's fees Dexia incurred; and

d)    Such further relief as the Court deems appropriate and just.


68

**JURY TRIAL DEMANDED**

Plaintiff Dexia demands a trial by jury.

Date: November 9, 2004

One of the Attorneys for Plaintiff
Dexia Crédit Local

Scott Mendeloff
Rene Pengra
Gabriel Aizenberg
Eric Pruitt
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

CHI 2960894v2

**EXHIBIT B**

cash reserves as the General Partner in it's discretion deems reasonably necessary for proper operation of the Partnership business.

1.7    Participating Percentage: The percentage of the profits, losses and distributions which a Partner is entitled as set forth on Exhibit A. The initial Participating Percentage of each Partner shall be determined by dividing the initial capital contribution of the Partner by the initial capital contribution of all of the Partners.

1.8    Partner or Partners: Unless the context in which the term is used requires otherwise, the term shall include the General Partner(s) and the Limited Partner(s).

1.9    Partnership: The limited partnership known as BRADDOCK MANAGEMENT, L.P. formed under this Agreement.

1.10    Partnership Property or Property: All properties, assets and rights of any type owned by the Partnership.

1.11    Permitted Transferee: Any Partner, any spouse, child or grandchild of a Partner or any trust created for the benefit of any of such persons.

1.12    Person: A natural person, corporation, trust, partnership, limited liability company, estate, unincorporated association or other entity.

1.13    Tax Matters Partner: The General Partner designated in the Agreement as the Partner who will act as the primary representative of the Partnership in the event of an audit of the Partnership's federal income tax return.

## ARTICLE II
## FORMATION OF THE PARTNERSHIP

The parties agree and do hereby enter into a limited partnership under and pursuant to the provisions of the Revised Uniform Limited Partnership Act of the State of Illinois, as amended, and the rights and liabilities of the Partners shall be as provided therein except as otherwise expressly provided in this Agreement.

## ARTICLE III
## NAME AND PRINCIPAL OFFICE

3.1    Name. The business of the Partnership shall be conducted under the name of BRADDOCK MANAGEMENT, L.P.

3.2    Principal Office. The principal office and place of business of the Partnership shall be located at 5700 N. Ashland, Chicago, Illinois 60660, or such other place as the General Partner may from time to time designate upon notice to the Limited Partner.

BM000813

-2-

# EXHIBIT C

In
re   **Bainbridge Management, L.P.**

Case
No.

Debtor(s)

## STATEMENT OF FINANCIAL AFFAIRS
### Attachment #18

Bainbridge Management, Inc is the Sole General Partner
Attn: Peter Rogan
240 East 90th Drive
Merrillville, Indiana 46410

Boulevard Investors Limited is the sole limited partner.
c/o Frederick M. Cuppy
3100 N. Ocean Blvd, Suite 703
Ft. Lauderdale, FL 33308

The partnership was initially formed on July 1, 1999 as a general partnership, and subsequently filed a Certificate of Limited Partnership on November 10, 1999.  The partnership's business was the provision of management services to hospitals and other various entities, including Edgewater Medical Center and Grant Hospital, both located in Chicago, Illinois. In May 2001, Debtor's management agreements with respect to its provision of its management services were terminated.  Grant Hospital was subsequently sold and Edgewater Medical Center closed and filed its own bankruptcy in 2002.

In spring 2001 Debtor closed its Chicago office and relocated this office, and maintained all files and records at its current address/location in Merrillville, Indiana.

There has been no change in "ownership" since the creation of Debtor's partnership. The partnership management and affairs has been conducted by, and through, Peter Rogan and David Miller (now deceased) the designated officer of Debtor's sole general partner, Bainbridge Management, Inc.

Debtor changed its name from Braddock Management, LP to Bainbridge Management, LP in October 2000.

Debtor's general partner changed its name from Braddock Management, Inc, to Bainbridge Management, Inc., in October 2000..

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 02 C 8288 |
| PETER G. ROGAN et al. | ) ) | Judge Mark Filip |
| | ) ) | Mag. Judge Sidney I. Schenkier |
| Defendants. | ) ) | |

## ORDER ENTERING FINAL JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 58

On April 11, 2007, the Court found defendants Peter Rogan ("Rogan"), Braddock Management L.P ("Braddock"), Bainbridge Management, Inc. ("Bainbridge") and counter-claim plaintiffs Edgewater Property Company ("EPC") and PGR Properties, Inc. ("PGR") in default. Due notice having been given, the Court now grants Plaintiff Dexia Credit Local's Motion For Entry Of Default Judgment against defendants Rogan, Braddock, Bainbridge, and counter-claim plaintiffs EPC and PGR.  In granting plaintiff's motion for default judgment, the Court hereby:

(i)     Finds that Bainbridge and Braddock are Rogan's alter-egos, that the corporate veils of Bainbridge and Braddock are therefore pierced, and that Rogan is therefore liable for any judgment entered against Bainbridge or Braddock;

(ii)     Enters judgment in favor of plaintiff and against defendants Rogan, Braddock and Bainbridge as follows: (i) actual damages of **$53,082,978.03**; (b) pre-judgment interest of **$18,103,779.99**; (c) punitive damages of **$53,082,978.03**; and (d) costs in the amount of **$10,976.74**.  The Court also awards plaintiff post-judgment interest in an amount to be determined once the judgment is satisfied; and

(iii)     Dismisses with prejudice the counterclaim of EPC and PGR.

Dated: May _03_, 2007

Honorable Mark Filip

**EXHIBIT E**

## BASIC LEASE INFORMATION

| | |
|---|---|
| DATE: | January 1, 1996 |
| LANDLORD: | Edgewater Property Company |
| TENANT: | Northside Operating Co. dba Edgewater Medical Center |
| PREMISES (Building Address): | See attached Exhibit "A" |
| USE: | Medical Related Facilities |
| INITIAL TERM: | Ten (10) years |
| COMMENCEMENT DATE: | January 1, 1996 |
| BASE RENT: | $954,000.00, per annum |
| PERIODIC BASE RENT ADJUSTMENTS: | Annually |
| CONTRACT MANAGER: | David Miller c/o JKR Business |

ADDRESS FOR NOTICES:

Landlord:  
Edgewater Property Company  
c/o John J. Tatooles  
One North LaSalle Street, Suite 3100  
Chicago, IL 60602

Contract Manager:  
David Miller  
c/o JKR Business  
P.O. Box 10489  
Merrillville, IN 46411-0489

Tenant:  
Northside Operating Co.  
5700 N. Ashland Avenue  
Chicago, IL 60660  
Attn: Henry Zelsel  
With a copy to Michael Olsen, General Counsel  
One Tower Lane, 15th Floor  
Oak Brook Terrace, Illinois 60181

Initialed By:    Tenant _____    Landlord _____

EXHIBIT  
14

EPC 000010

**EXHIBIT F**

| ITEM | Calculated Per Sidley Austin LLP | Bates # JR 0850 | Bates # JR 0684 | Bates # RDX 05439e | Bates # RDX 05398e | Bates # JR 0687 | Bates # JR 0678 | Bates # JR 0450 | Bates # JR 0354 |
|---|---|---|---|---|---|---|---|---|---|
| Wages, Salaries, Tips, etc | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Taxable Interest | $ 40,463 | $ 5,455 | $ 408 | $ 173 | $ 1,662 | $ 3,139 | $ 219 | $ 13,484 | $ 15,953 |
| Tax Exempt Inerest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ordinary Dividends | $ 239,283 | $ 5,845 | $ 10,288 | $ 9,696 | $ 25,058 | $ 58,971 | $ 37,223 | $ 40,255 | $ 51,957 |
| Taxable Refunds, Credits, etc | $ 10,908 | $ - | $ - | $ 1,336 | $ - | $ 1,610 | $ 3,452 | $ 3,118 | $ - |
| Business Income | $ 15,687 | $ - | $ - | | $ - | $ 7,664 | $ 4,724 | $ - | $ 3,299 |
| Capital Gains/Losses Gain | $ 455,637 | $ (1,500) | $ (1,500) | $ (1,500) | $ 1,174 | $ 42,606 | $ 169,696 | $ 86,359 | $ 160,302 |
| IRA Distributions | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pensions | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Rental Real Estate, etc from Schedule E | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other Income | $ 73 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 73 |
| Total Income | $ 762,091 | $ 9,800 | $ 9,196 | $ 9,705 | $ 27,894 | $ 113,990 | $ 215,314 | $ 143,216 | $ 232,976 |
| Adjusted Gross Income | $ 756,982 | $ 9,800 | $ 9,196 | $ 9,705 | $ 27,894 | $ 111,448 | $ 212,980 | $ 143,216 | $ 232,743 |

Form **1040**

Department of the Treasury – Internal Revenue Service

**U.S. Individual Income Tax Return** **2004** (99) IRS Use Only – Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2004, or other tax year beginning , 2004, ending , 20

OMB No. 1545-0074

**Label**
(See Instructions)

**Use the IRS label. Otherwise, please print or type.**

Your first name: **Judith K Rogan**    MI    Last name

Your social security number

If a joint return, spouse's first name    MI    Last name

Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions.    Apartment no.

**476 Wexford**

City, town or post office. If you have a foreign address, see instructions.    State    ZIP code

**Valparaiso, IN 46385-8045**

▲ **Important!** ▲
You must enter your social security number(s) above.

**Presidential Election Campaign**
(See Instructions)

▶ Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ........ ▶ You ☐ Yes ☒ No    Spouse ☐ Yes ☐ No

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☒ Married filing separately. Enter spouse's SSN above & full name here ▶ **Peter G Rogan**
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (see instructions)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a ...........
b ☐ Spouse .................................................................

Boxes checked on 6a and 6b | 1

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

No. of children on 6c who:
• lived with you ..
• did not live with you due to divorce or separation (see instrs)..
Dependents on 6c not entered above..
Add numbers on lines above .. ▶ | 1

If more than four dependents, see instructions.

d Total number of exemptions claimed ............................................

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 Wages, salaries, tips, etc. Attach Form(s) W-2 ........................ | 7 | |
| 8a Taxable interest. Attach Schedule B if required ....................... | 8a | 5,455. |
| b Tax-exempt interest. Do not include on line 8a ..... | 8b | |
| 9a Ordinary dividends. Attach Schedule B if required ................... | 9a | 5,845. |
| b Qualified dividends (see instrs) ......... | 9b | 4,464. |
| 10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | |
| 11 Alimony received ................................................. | 11 | |
| 12 Business income or (loss). Attach Schedule C or C-EZ ............. | 12 | |
| 13 Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ..... ▶ ☐ | 13 | -1,500. |
| 14 Other gains or (losses). Attach Form 4797 ........................ | 14 | |
| 15a IRA distributions ......... 15a | b Taxable amount (see instrs) | 15b | |
| 16a Pensions and annuities .... 16a | b Taxable amount (see instrs) | 16b | |
| 17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 Farm income or (loss). Attach Schedule F ......................... | 18 | |
| 19 Unemployment compensation ...................................... | 19 | |
| 20a Social security benefits ......... 20a | b Taxable amount (see instrs) | 20b | |
| 21 Other income | 21 | |
| 22 Add the amounts in the far right column for lines 7 through 21. This is your total income. ▶ | 22 | 9,800. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 Educator expenses (see instructions) ..................... | 23 | |
| 24 Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ ............ | 24 | |
| 25 IRA deduction (see instructions) ........................... | 25 | |
| 26 Student loan interest deduction (see instructions) ............ | 26 | |
| 27 Tuition and fees deduction (see instructions) ................ | 27 | |
| 28 Health savings account deduction. Attach Form 8889 ........ | 28 | |
| 29 Moving expenses. Attach Form 3903 ...................... | 29 | |
| 30 One-half of self-employment tax. Attach Schedule SE ....... | 30 | |
| 31 Self-employed health insurance deduction (see instrs) ....... | 31 | |
| 32 Self-employed SEP, SIMPLE, and qualified plans ............ | 32 | |
| 33 Penalty on early withdrawal of savings .................... | 33 | |
| 34a Alimony paid  b Recipient's SSN ▶ | 34a | |
| 35 Add lines 23 through 34a ................................. | 35 | 0. |
| 36 Subtract line 35 from line 22. This is your adjusted gross income ..... ▶ | 36 | 9,800. |

JR000950

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.    FDIA0112L 11/16/04    Form **1040** (2004)

| Form **1040** | Department of the Treasury — Internal Revenue Service | | | | | |
|---|---|---|---|---|---|---|

**U.S. Individual Income Tax Return** **2003** (99) IRS Use Only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2003, or other tax year beginning ____, 2003, ending ____, 20 ____   OMB No. 1545-0074

**Label**
(See instructions.)

**Use the IRS label. Otherwise, please print or type.**

Your first name: Judith    MI: K    Last name: Rogan

Your social security number: ▲

If a joint return, spouse's first name ____ MI ____ Last name ____

Spouse's social security number: ▲

Home address (number and street). If you have a P.O. box, see instructions.   Apartment no.
476 Wexford

City, town or post office. If you have a foreign address, see instructions.   State: IN   ZIP code: 46385-8045
Valparaiso

**▲ Important!** You must enter your social security number(s) above.

**Presidential Election Campaign** (See instructions.) ► Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ........ ► You: ☐ Yes ☒ No   Spouse: ☐ Yes ☐ No

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing jointly (even if only one had income)
3 ☒ Married filing separately. Enter spouse's SSN above & full name here ► Peter G Rogan
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ►
5 ☐ Qualifying widow(er) with dependent child. (See instructions.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a ............................................

b ☐ Spouse ............................................

No. of boxes checked on 6a and 6b: 1

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than five dependents, see instructions.

• No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instrs)
Dependents on 6c not entered above

d Total number of exemptions claimed ............................................  Add numbers on lines above ► 1

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 .................................... | 7 | |
| 8a | Taxable interest. Attach Schedule B if required .................................... | 8a | 408. |
| b | Tax-exempt interest. Do not include on line 8a ........... 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required .................................... | 9a | 10,288. |
| b | Qualified div (see instrs) ........... 9b | 6,074. | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | |
| 11 | Alimony received .................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ .................................... | 12 | |
| 13a | Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ................... ► ☐ | 13a | -1,500. |
| b | If box on 13a is checked, enter post-May 5 capital gain distributions | 13b | |
| 14 | Other gains or (losses). Attach Form 4797 .................................... | 14 | |
| 15a | IRA distributions ........... 15a | b Taxable amount (see instrs) | 15b | |
| 16a | Pensions and annuities ... 16a | b Taxable amount (see instrs) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F .................................... | 18 | |
| 19 | Unemployment compensation .................................... | 19 | |
| 20a | Social security benefits ........... 20a | b Taxable amount (see instrs) | 20b | |
| 21 | Other income | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ► | 22 | 9,196. |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses (see instructions) .................................... | 23 | |
| 24 | IRA deduction (see instructions) .................................... | 24 | |
| 25 | Student loan interest deduction (see instructions) ........... | 25 | |
| 26 | Tuition and fees deduction (see instructions) ........... | 26 | |
| 27 | Moving expenses. Attach Form 3903 .................................... | 27 | |
| 28 | One-half of self-employment tax. Attach Schedule SE ........... | 28 | |
| 29 | Self-employed health insurance deduction (see instrs) ........... | 29 | |
| 30 | Self-employed SEP, SIMPLE, and qualified plans ........... | 30 | |
| 31 | Penalty on early withdrawal of savings ........... | 31 | |
| 32a | Alimony paid ► b Recipient's SSN ► _____ | 32a | |
| 33 | Add lines 23 through 32a .................................... | 33 | |
| 34 | Subtract line 33 from line 22. This is your adjusted gross income ......... ► | 34 | 9,196. |

JR000966

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.   FDIA0112   01/16/04   Form 1040 (2003)

Form **1040**    Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return** **2002**    (99)    IRS use only — Do not write or staple in this space.

| Label | For the year Jan 1 - Dec 31, 2002, or other tax year beginning , 2002, ending , 20 | | OMB No. 1545-0074 |
|---|---|---|---|

(See instructions.)

Your first name: **Judith**    MI: **K**    Last name: **Rogan**

Your social security number

Use the IRS label. Otherwise, please print or type.

If a joint return, spouse's first name    MI    Last name

Spouse's social security number

Home address (number and street). If you have a P.O. box, see instructions.    Apartment no.

**476 Wexford**

▲ **Important!**
You must enter your social security number(s) above.

City, town or post office. If you have a foreign address, see instructions.    State: **IN**    ZIP code: **46385-8045**

**Valparaiso**

**Presidential Election Campaign** (See instructions.)

► Note: Checking 'Yes' will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? .......... ►    You: Yes [ ] No [X]    Spouse: Yes [ ] No [ ]

**Filing Status**

Check only one box.

1  [ ] Single
2  [ ] Married filing jointly (even if only one had income)
3  [X] Married filing separately. Enter spouse's SSN above & full name here. ► **Peter G Rogan**
4  [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ►
5  [ ] Qualifying widow(er) with dependent child (year spouse died ... ► ). (See instructions.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a ..................................

No. of boxes checked on 6a and 6b: **1**

b  [ ] Spouse ......................................

No. of children on 6c who:

| c Dependents: | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| (1) First name    Last name | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If more than five dependents, see instructions.

• lived with you
• did not live with you due to divorce or separation (see instrs)
Dependents on 6c not entered above
Add numbers on lines above ► **1**

d Total number of exemptions claimed .......................................... | **1**

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | |
| 8a | Taxable interest. Attach Schedule B if required | 8a | 173. |
| b | Tax-exempt interest. Do not include on line 8a ..... | 8b | |
| 9 | Ordinary dividends. Attach Schedule B if required | 9 | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see instructions) | 10 | 9,696. |
| 11 | Alimony received | 11 | 1,336. |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | |
| 13 | Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ► [ ] | 13 | -1,500. |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | IRA distributions ..... 15a | b Taxable amount (see instrs) .. | 15b | |
| 16a | Pensions and annuities ... 16a | b Taxable amount (see instrs) .. | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits ..... 20a | b Taxable amount (see instrs) .. | 20b | |
| 21 | Other income | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ► | 22 | 9,705. |

**Adjusted Gross Income**

| 23 | Educator expenses (see instructions) ..................... | 23 | | | |
| 24 | IRA deduction (see instructions) ......................... | 24 | | | |
| 25 | Student loan interest deduction (see instructions) ......... | 25 | | | |
| 26 | Tuition and fees deduction (see instructions) ............. | 26 | | | |
| 27 | Archer MSA deduction. Attach Form 8853 ................. | 27 | | | |
| 28 | Moving expenses. Attach Form 3903 ...................... | 28 | | | |
| 29 | One-half of self-employment tax. Attach Schedule SE ...... | 29 | | | |
| 30 | Self-employed health insurance deduction (see instructions).. | 30 | | RDX 054388 | |
| 31 | Self-employed SEP, SIMPLE, and qualified plans ............ | 31 | | | |
| 32 | Penalty on early withdrawal of savings ................... | 32 | | | |
| 33a | Alimony paid b Recipient's SSN .... ► | 33a | | | |
| 34 | Add lines 23 through 33a | 34 | | | |
| 35 | Subtract line 34 from line 22. This is your adjusted gross income ► | 35 | 9,705. |

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.    FDIA0112  12/26/02    Form **1040** (2002)

Form **1040**　Department of the Treasury — Internal Revenue Service
**U.S. Individual Income Tax Return** **2001**　(99)　IRS use only — Do not write or staple in this space.

For the year Jan 1 - Dec 31, 2001, or other tax year beginning　, 2001, ending　, 20　　OMB No. 1545-0074

**Label**
(See instructions.)

Your First Name　MI　Last Name
Judith　K　Rogan

Your Social Security Number

**Use the IRS label. Otherwise, please print or type.**

If a Joint Return, Spouse's First Name　Last Name

Spouse's Social Security Number

Home Address (number and street). If You Have a P.O. Box, See Instructions.　Apartment No.
476 Hexford

▲ **Important?**
You must enter your social security number(s) above.

City, Town or Post Office. If You Have a Foreign Address, See Instructions.　State　ZIP Code
Valparaiso　IN　46385-8045

**Presidential Election Campaign**
(See instructions.)

▶ Note: Checking 'Yes' will not change your tax or reduce your refund.

| | You | | Spouse | |
|---|---|---|---|---|
| Do you, or your spouse if filing a joint return, want $3 to go to this fund? ▶ | ☐ Yes | ☒ No | ☐ Yes | ☐ No |

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing joint return (even if only one had income)
3 ☒ Married filing separate return. Enter spouse's SSN above & full name here . . . . ▶ Peter G Rogan
4 ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶　). (See instructions.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a . . . . . . . . . . . . . . . . . . . . . . .

No. of boxes checked on 6a and 6b . . . . 1

b ☐ Spouse

No. of your children on 6c who . . . . 1

c Dependents:

| (1) First name　Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✔ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| S. Caitlin Rogan | | Daughter | |
| | | | |
| | | | |
| | | | |

If more than six dependents, see instructions.

● lived with you
● did not live with you due to divorce or separation (see instrs)
Dependents on 6c not entered above ▶

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . . . . . . .

Add numbers entered on lines above ▶ 2

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | |
|---|---|---|
| 7 Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . . . . . . . . | 7 | |
| 8a Taxable interest. Attach Schedule B if required . . . . . . . . . . . . . . . | 8a | 1,662. |
| b Tax-exempt interest. Do not include on line 8a . . . . . . . . | 8b | | |
| 9 Ordinary dividends. Attach Schedule B if required . . . . . . . . . . . . . . | 9 | 25,058. |
| 10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) . . | 10 | |
| 11 Alimony received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | |
| 12 Business income or (loss). Attach Schedule C or C-EZ . . . . . . . . . . . | 12 | |
| 13 Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | 1,174. |
| 14 Other gains or (losses). Attach Form 4797 . . . . . . . . . . . . . . . . . | 14 | |
| 15a Total IRA distributions . . . . . . | 15a | b Taxable amount (see instrs) . . | 15b | |
| 16a Total pensions & annuities | 16a | b Taxable amount (see instrs) . . | 16b | |
| 17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E . . | 17 | |
| 18 Farm income or (loss). Attach Schedule F . . . . . . . . . . . . . . . . . | 18 | |
| 19 Unemployment compensation . . . . . . . . . . . . . . . . . . . . . . . . | 19 | |
| 20a Social security benefits . . . . . . | 20a | b Taxable amount (see instrs) . . | 20b | |
| 21 Other income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21 | |
| 22 Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 27,894. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 IRA deduction (see instructions) . . . . . . . . . . . . . . | 23 | |
| 24 Student loan interest deduction (see instructions) . . . . . . | 24 | |
| 25 Archer MSA deduction. Attach Form 8853 . . . . . . . . . | 25 | |
| 26 Moving expenses. Attach Form 3903 . . . . . . . . . . . . | 26 | |
| 27 One-half of self-employment tax. Attach Schedule SE . . . . | 27 | |
| 28 Self-employed health insurance deduction (see instructions) . . | 28 | |
| 29 Self-employed SEP, SIMPLE, and qualified plans . . . . . . | 29 | |
| 30 Penalty on early withdrawal of savings . . . . . . . . . . . | 30 | |
| 31a Alimony paid b Recipient's SSN . . . . ▶ | 31a | |
| 32 Add lines 23 through 31a . . . . . . . . . . . . . . . . . . . . . . . . . . | 32 | |
| 33 Subtract line 32 from line 22. This is your adjusted gross income . . . . . ▶ | 33 | 27,894. |

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.　　Form 1040 (2001)
FDIA0112　12/10/01

RDX 053956

**FORM 1040**   Department of the Treasury – Internal Revenue Service
**U.S. Individual Income Tax Return**   **2000**   (99)   IRS Use Only - Do not write or staple in this space.

OMB No. 1545-0074

For the year Jan. 1 - Dec. 31, 2000, or other tax year beginning _____, 2000, ending _____, 20___

| Label | Your first name and initial | Last name | Your social security number |
|---|---|---|---|

JUDITH K. ROGAN

If a joint return, spouse's first name and initial   Last name   Spouse's social security number

Home address (number and street). If you have a P.O. box, see page 19.   Apt. no.

476 WEXFORD

City, town or post office, state, and ZIP code. If you have a foreign address, see page 19.

VALPARAISO, IN 46385-8045

▲ **IMPORTANT!** ▲
You must enter
your SSN(s) above.

**Presidential Election Campaign** (See page 19.)   Note. Checking "Yes" will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ....... ▶ ☐ Yes ☒ No   ☐ Yes ☐ No

**Filing Status**
Check only one box.

1. ☐ Single
2. ☐ Married filing joint return (even if only one had income)
3. ☒ Married filing separate return. Enter spouse's soc. sec. no. above & full name here ▶ PETER G. ROGAN
4. ☐ Head of household (with qualifying person). (See page 19.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5. ☐ Qualifying widow(er) with dependent child (year spouse died ▶ ). (See page 19.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a. .......
b ☐ Spouse

No. of boxes checked on 6a and 6b   **1**

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 20) |
|---|---|---|---|
| S. CAITLIN ROGAN | | DAUGHTER | X |

No. of your children on 6c who:
● lived with you   **1**
● did not live with you due to divorce or separation (see page 20)
Dependents on 6c not entered above

Add numbers entered on lines above ▶   **2**

d Total number of exemptions claimed .................

**Income**

Attach Forms W-2 and W-2G here. Also attach Form 1099-R if tax was withheld.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 .......................... | 7 | 3,139 |
| 8a | Taxable interest. Attach Schedule B if required .......................... | 8a | 58,971 |
| b | Tax-exempt interest. Do not include on line 8a ... | 8b | |
| 9 | Ordinary dividends. Attach Schedule B if required ...................... | 9 | 1,610 |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 22) ... | 10 | |
| 11 | Alimony received .......................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ............ | 12 | 7,664 |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ ...... | 13 | 42,606 |
| 14 | Other gains or (losses). Attach Form 4797 ........................ | 14 | |
| 15a | Total IRA distributions ...... 15a | b Taxable amount (see pg. 23) | 15b | |
| 16a | Total pensions and annuities 16a | b Taxable amount (see pg. 23) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E ....... | 17 | |
| 18 | Farm income or (loss). Attach Schedule F ........................ | 18 | |
| 19 | Unemployment compensation ................................. | 19 | |
| 20a | Social security benefits ...... 20a | b Taxable amount (see pg. 25) | 20b | |
| 21 | Other income. | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ......▶ | 22 | 113,990 |

If you did not get a W-2, see page 21.

Enclose, but do not attach any payment. Also, please use Form 1040-V.

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | IRA deduction (see page 27) ...... | 23 | 2,000 |
| 24 | Student loan interest deduction (see page 27) ...... | 24 | |
| 25 | Medical savings account deduction. Attach Form 8853 ...... | 25 | |
| 26 | Moving expenses. Attach Form 3903 ...... | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE ...... | 27 | 542 |
| 28 | Self-employed health insurance deduction (see page 29) ...... | 28 | |
| 29 | Self-employed SEP, SIMPLE, and qualified plans ...... | 29 | |
| 30 | Penalty on early withdrawal of savings ...... | 30 | |
| 31a | Alimony paid. b Recipient's SSN ▶ | 31a | |
| 32 | Add lines 23 through 31a ...................................... | 32 | 2,542 |
| 33 | Subtract line 32 from line 22. This is your adjusted gross income ............▶ | 33 | 111,448 |

KFA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 56.   Form **1040** (2000)

**JR00567**

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

## Profit or Loss From Business
### (Sole Proprietorship)

▶ Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.
▶ Attach to Form 1040 or Form 1041.    ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**2000**

Attachment
Sequence No. **09**

Name of proprietor **JUDITH K. ROGAN**

Social security number (SSN)

A  Principal business or profession, including product or service (see page C-1 of the instructions)
**CONSULTING**

B  Enter code from pages C-7 & 8
▶ 541600

C  Business name. If no separate business name, leave blank.
**JKR BUSINESS**

D  Employer ID number (EIN), if any

E  Business address (including suite or room no.) ▶ 240 E. 90TH DRIVE
City, town or post office, state, and ZIP code  MERRILLVILLE, IN  46411-0489

F  Accounting method:  (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 2000? If "No," see page C-2 for limit on losses  ☒ Yes ☐ No

H  If you started or acquired this business during 2000, check here  ▶ ☐

### Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. Caution: If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-2 and check here ▶ ☐ | 1 | 120,000 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 120,000 |
| 4 | Cost of goods sold (from line 42 on page 2) | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 120,000 |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund (see page C-2) | 6 | |
| 7 | Gross income. Add lines 5 and 6 ▶ | 7 | 120,000 |

### Part II  Expenses.  Enter expenses for business use of your home only on line 30.

| | | | | | |
|---|---|---|---|---|---|
| 8  Advertising | 8 | | 19  Pension and profit-sharing plans | 19 | |
| 9  Bad debts from sales or services (see page C-3) | 9 | | 20  Rent or lease (see page C-4): | | |
| 10  Car and truck expenses (see page C-3) | 10 | | a  Vehicles, machinery & equipment | 20a | |
| 11  Commissions and fees | 11 | | b  Other business property | 20b | |
| 12  Depletion | 12 | | 21  Repairs and maintenance | 21 | 1,890 |
| 13  Depreciation and section 179 expense deduction (not included in Part III) (see page C-3) | 13 | 2,756 | 22  Supplies (not included in Part III) | 22 | |
| | | | 23  Taxes and licenses | 23 | 5,887 |
| | | | 24  Travel, meals, and entertainment: | | |
| | | | a  Travel | 24a | |
| 14  Employee benefit programs (other than on line 19) | 14 | | b  Meals and entertainment | | |
| 15  Insurance (other than health) | 15 | | c  Enter nondeductible amount included on line 24b (see page C-5) | | |
| 16  Interest: | | | d  Subtract line 24c from line 24b | 24d | |
| a  Mortgage (paid to banks, etc.) | 16a | | 25  Utilities | 25 | |
| b  Other | 16b | | 26  Wages (less employment credits) | 26 | 72,000 |
| 17  Legal and professional services | 17 | 25,356 | 27  Other expenses (from line 48 on page 2) | 27 | 2,184 |
| 18  Office expense | 18 | 2,263 | | | |
| 28  Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ▶ | | | | 28 | 112,336 |

| | | | |
|---|---|---|---|
| 29 | Tentative profit (loss). Subtract line 28 from line 7. | 29 | 7,664 |
| 30 | Expenses for business use of your home. Attach Form 8829 | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see page C-5). Estates and trusts, enter on Form 1041, line 3. | 31 | 7,664 |
| | • If a loss, you must go to line 32. | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see page C-5). | | |
| | • If you checked 32a, enter the loss on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see page C-5). Estates and trusts, enter on Form 1041, line 3. | 32a ☐ All investment is at risk.  32b ☐ Some investment is not at risk. | |
| | • If you checked 32b, you must attach Form 6198. | | |

For Paperwork Reduction Act Notice, see Form 1040 instructions.                    Schedule C (Form 1040) 2000

KFA                                           IF0U54  11/09/00

**JR00571**

**F O R M 1040**

Department of the Treasury - Internal Revenue Service
**U.S. Individual Income Tax Return** **1999** (99)    IRS Use Only - Do not write or staple in this space.

For the year Jan. 1 - Dec. 31, 1999, or other tax year beginning _____, 1999, ending _____    OMB No. 1545-0074

| Label | | |
|---|---|---|
| (See instructions on page 18.) | Your first name and initial: **JUDITH K.** Last name: **ROGAN** | Your social security number |
| Use the IRS label. Otherwise, please print or type. | Home address (number and street). If you have a P.O. box, see page 18.: **476 WEXFORD**   Apt. no. | Spouse's social security number |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 18.: **VALPARAISO, IN 46383-8045** | ▲ **IMPORTANT!** ▲ You must enter your SSN(s) above. |

**Presidential Election Campaign** (See page 18.)
Do you want $3 to go to this fund? ....... Yes ☐ No ☒
If a joint return, does your spouse want $3 to go to this fund? Yes ☐ No ☒
*Note: Checking "Yes" will not change your tax or reduce your refund.*

**Filing Status**
Check only one box.

1 ☐ Single
2 ☐ Married filing joint return (even if only one had income)
3 ☒ Married filing separate return. Enter spouse's soc. no. above & full name here ▶ **PETER G. ROGAN**
4 ☐ Head of household (with qualifying person). (See page 18.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶ 19___). (See page 18.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a. ....... } No. of boxes checked on 6a and 6b: **1**

b ☐ Spouse

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 19) |
|---|---|---|---|
| **S. CAITLIN ROGAN** | | **DAUGHTER** | **X** |
| | | | |
| | | | |
| | | | |
| | | | |

No. of your children on 6c who:
- lived with you: **1**
- did not live with you due to divorce or separation (see page 19):
- Dependents on 6c not entered above:

If more than six dependents, see page 19.

Add numbers entered on lines above ▶ **2**

d Total number of exemptions claimed .......

**Income**

Attach Copy B of your Forms W-2 and W-2G here. Also attach Form 1099-R if tax was withheld.

If you did not get a W-2, see page 20.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ....... | 7 | |
| 8a | Taxable interest. Attach Schedule B if required ....... | 8a | 219 |
| b | Tax-exempt interest. DO NOT include on line 8a .... 8b | | |
| 9 | Ordinary dividends. Attach Schedule B if required ....... | 9 | 37,223 |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 21) ....... | 10 | 3,452 |
| 11 | Alimony received ....... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ....... | 12 | 4,724 |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ ....... | 13 | 169,696 |
| 14 | Other gains or (losses). Attach Form 4797 ....... | 14 | |
| 15a | Total IRA distributions .... 15a | b Taxable amount (see pg. 22) | 15b | |
| 16a | Total pensions and annuities 16a | b Taxable amount (see pg. 22) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E ....... | 17 | |
| 18 | Farm income or (loss). Attach Schedule F ....... | 18 | |
| 19 | Unemployment compensation ....... | 19 | |
| 20a | Social security benefits ...... 20a | b Taxable amount (see pg. 24) | 20b | |
| 21 | Other income. ....... | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ....... ▶ | 22 | 215,314 |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | IRA deduction (see page 26) ....... 23 | 2,000 | |
| 24 | Student loan interest deduction (see page 26) ....... 24 | | |
| 25 | Medical savings account deduction. Attach Form 8853 ....... 25 | | |
| 26 | Moving expenses. Attach Form 3903 ....... 26 | | |
| 27 | One-half of self-employment tax. Attach Schedule SE ....... 27 | 334 | |
| 28 | Self-employed health insurance deduction (see page 28) ....... 28 | | |
| 29 | Keogh and self-employed SEP and SIMPLE plans ....... 29 | | |
| 30 | Penalty on early withdrawal of savings ....... 30 | | |
| 31a | Alimony paid. b Recipient's SSN ▶ 31a | | |
| 32 | Add lines 23 through 31a ....... | 32 | 2,334 |
| 33 | Subtract line 32 from line 22. This is your adjusted gross income. ....... ▶ | 33 | 212,980 |

KFA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 54.    Form **1040** (1999)

JR 00478

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

**Profit or Loss From Business**
**(Sole Proprietorship)**

▶ Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.
▶ Attach to Form 1040 or Form 1041.    ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**1999**

Attachment
Sequence No. 09

Name of proprietor: **JUDITH K. ROGAN**

Social security number (SSN): ▨

**A** Principal business or profession, including product or service (see page C-1)
**CONSULTING**

**B** Enter code from pages C-8 & 9
▶ 541600

**C** Business name. If no separate business name, leave blank.
**JKR BUSINESS**

**D** Employer ID number (EIN), if any

**E** Business address (including suite or room no.) ▶ 240 E. 90TH DRIVE
City, town or post office, state, and ZIP code **MERRILLVILLE, IN  46411-0489**

**F** Accounting method: (1) ☒ Cash   (2) ☐ Accrual   (3) ☐ Other (specify) ▶

**G** Did you "materially participate" in the operation of this business during 1999? If "No," see page C-2 for limit on losses ........ ☒ Yes ☐ No

**H** If you started or acquired this business during 1999, check here ....................................... ▶ ☐

**Part I   Income**

| | | |
|---|---|---:|
| 1 | Gross receipts or sales. Caution: If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-3 and check here ▶ ☐ | **1** 136,610 |
| 2 | Returns and allowances | **2** |
| 3 | Subtract line 2 from line 1 | **3** 136,610 |
| 4 | Cost of goods sold (from line 42 on page 2) | **4** |
| 5 | Gross profit. Subtract line 4 from line 3 | **5** 136,610 |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund (see page C-3) | **6** |
| 7 | Gross income. Add lines 5 and 6 ▶ | **7** 136,610 |

**Part II   Expenses.** Enter expenses for business use of your home only on line 30.

| | | | | | |
|---|---|---:|---|---|---:|
| 8 | Advertising | **8** | 19 | Pension and profit-sharing plans | **19** |
| 9 | Bad debts from sales or services (see page C-3) | **9** | 20 | Rent or lease (see page C-4): | |
| 10 | Car and truck expenses (see page C-3) | **10** 4,056 | a | Vehicles, machinery & equipment | **20a** |
| 11 | Commissions and fees | **11** | b | Other business property | **20b** 6,244 |
| 12 | Depletion | **12** | 21 | Repairs and maintenance | **21** 1,860 |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see page C-3) | **13** 6,661 | 22 | Supplies (not included in Part III) | **22** |
| | | | 23 | Taxes and licenses | **23** 75 |
| | | | 24 | Travel, meals, and entertainment: | |
| | | | a | Travel | **24a** |
| 14 | Employee benefit programs (other than on line 19) | **14** | b | Meals and entertainment | |
| 15 | Insurance (other than health) | **15** | c | Enter nondeductible amount included on line 24b (see page C-5) | |
| 16 | Interest: | | d | Subtract line 24c from line 24b | **24d** |
| a | Mortgage (paid to banks, etc.) | **16a** | 25 | Utilities | **25** 737 |
| b | Other | **16b** | 26 | Wages (less employment credits) | **26** 78,000 ◁ |
| 17 | Legal and professional services | **17** 27,582 | 27 | Other expenses (from line 48 on page 2) | **27** 4,596 ◁ |
| 18 | Office expense | **18** 2,075 | | | |
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ▶ | | | | **28** 131,886 |

| | | | |
|---|---|---|---:|
| 29 | Tentative profit (loss). Subtract line 28 from line 7. | | | **29** 4,724 |
| 30 | Expenses for business use of your home. Attach Form 8829 | | | **30** |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | | |
| | ● If a profit, enter on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | | } | **31** 4,724 |
| | ● If a loss, you MUST go on to line 32. | | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see page C-6). | | | |
| | ● If you checked 32a, enter the loss on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | } | 32a ☐ All investment is at risk. 32b ☐ Some investment is not at risk. | |
| | ● If you checked 32b, you MUST attach Form 6198. | | | |

For Paperwork Reduction Act Notice, see Form 1040 instructions.    KFA

Schedule C (Form 1040) 199

JR 00482

**FORM 1040**

Department of the Treasury – Internal Revenue Service

**U.S. Individual Income Tax Return** **1998**

(99) IRS Use Only – Do not write or staple in this space.

For the year Jan. 1 – Dec. 31, 1998, or other tax year beginning _____ , 1998, ending _____ , 19 _____    OMB No. 1545-0074

| Label | | |
|---|---|---|
| (See instructions on page 18.) | Your first name and initial: **JUDITH K. ROGAN**    Last name | Your social security number |
| Use the IRS label. Otherwise, please print or type. | If a joint return, spouse's first name and initial    Last name | Spouse's social security number |
| | Home address (number and street). If you have a P.O. box, see page 18.    **476 WEXFORD**    Apt. no. | ▲ **IMPORTANT!** ▲ You must enter your SSN(s) above. |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 18.    **VALPARAISO, IN 46383-8045** | |

**Presidential Election Campaign** (See page 18.)

Do you want $3 to go to this fund? ........................................... Yes ☐ No ☒

If a joint return, does your spouse want $3 to go to this fund? ...............

Note: Checking "Yes" will not change your tax or reduce your refund.

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing joint return (even if only one had income)
3 ☒ Married filing separate return. Enter spouse's soc. sec. no. above & full name here ▶ **PETER G. ROGAN**
4 ☐ Head of household (with qualifying person). (See page 18.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶ 19 _____ ). (See page 18.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a ..........................................

b ☐ Spouse ....................................................................

No. of boxes checked on 6a and 6b **1**

c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 19) |
|---|---|---|---|
| **BRIAN P. ROGAN** | | SON | |
| **S. CAITLIN ROGAN** | | DAUGHTER | X |
| **ROBERT C. ROGAN** | | SON | |

If more than six dependents, see page 18.

No. of your children on 6c who:
• lived with you **3**
• did not live with you due to divorce or separation (see page 19)
Dependents on 6c not entered above

Add numbers entered on lines above ▶ **4**

d Total number of exemptions claimed ...........................................

**Income**

Attach Copy B of your Forms W-2, W-2G, and 1099-R here.

If you did not get a W-2, see page 20.

Enclose, but do not attach any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 ............................. | 7 | |
| 8a | Taxable interest. Attach Schedule B if required ............................ | 8a | 13,484 |
| b | Tax-exempt interest. DO NOT include on line 8a .......... 8b | | |
| 9 | Ordinary dividends. Attach Schedule B if required .......................... | 9 | 40,255 |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 21) ... | 10 | 3,118 |
| 11 | Alimony received .......................................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ...................... | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D ................................. | 13 | 86,359 |
| 14 | Other gains or (losses). Attach Form 4797 ................................ | 14 | |
| 15a | Total IRA distributions ..... 15a | b Taxable amount (see pg. 23) | 15b |
| 16a | Total pensions and annuities 16a | b Taxable amount (see pg. 23) | 16b |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E ... | 17 | |
| 18 | Farm income or (loss). Attach Schedule F ................................. | 18 | |
| 19 | Unemployment compensation ............................................. | 19 | |
| 20a | Social security benefits ..... 20a | b Taxable amount (see pg. 24) | 20b |
| 21 | Other income. ............................................................ | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 143,216 |

**Adjusted Gross Income**

If line 33 is under $30,095 (under $10,030 if a child did not live with you), see EIC inst. on page 36.

| | | | |
|---|---|---|---|
| 23 | IRA deduction (see page 25) ...................... | 23 | |
| 24 | Student loan interest deduction (see page 27) ...... | 24 | |
| 25 | Medical savings account deduction. Attach Form 8853 ... | 25 | |
| 26 | Moving expenses. Attach Form 3903 ............... | 26 | |
| 27 | One-half of self-employment tax. Attach Schedule SE ... | 27 | |
| 28 | Self-employed health insurance deduction (see page 28) ... | 28 | |
| 29 | Keogh and self-employed SEP and SIMPLE plans ...... | 29 | |
| 30 | Penalty on early withdrawal of savings ............ | 30 | |
| 31a | Alimony paid. b Recipient's SSN ▶ | 31a | |
| 32 | Add lines 23 through 31a .................................................. | 32 | 0 |
| 33 | Subtract line 32 from line 22. This is your adjusted gross income .......... ▶ | 33 | 143,216 |

KFA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 51.    Form **1040** (1998)

**JR 00430**

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service (99)

# Profit or Loss From Business
## (Sole Proprietorship)

▶ Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.
▶ Attach to Form 1040 or Form 1041. ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**1998**

Attachment
Sequence No. **09**

Name of proprietor
**JUDITH K. ROGAN**

Social security number (SSN)

A Principal business or profession, including product or service (see page C-1)
**CONSULTING**

B Enter NEW code from pages C-8 & 9 ▶ **541600**

C Business name. If no separate business name, leave blank.
**JKR BUSINESS**

D Employer ID number (EIN), if any

E Business address (including suite or room no.) ▶ **240 E. 90TH DRIVE**
City, town or post office, state, and ZIP code **MERRILLVILLE, IN 46411-0489**

F Accounting method: (1) ☒ Cash (2) ☐ Accrual (3) ☐ Other (specify) ▶

G Did you "materially participate" in the operation of this business during 1998? If "No," see page C-2 for limit on losses ........... ☒ Yes ☐ No

H If you started or acquired this business during 1998, check here .............................................................. ▶ ☐

## Part I Income

| | | |
|---|---|---|
| 1 Gross receipts or sales. Caution: If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-3 and check here ........................................ ▶ ☐ | 1 | 185,000 |
| 2 Returns and allowances .............................................................................. | 2 | |
| 3 Subtract line 2 from line 1 ........................................................................... | 3 | 185,000 |
| 4 Cost of goods sold (from line 42 on page 2) ........................................................ | 4 | |
| 5 Gross profit. Subtract line 4 from line 3 ............................................................ | 5 | 185,000 |
| 6 Other income, including Federal and state gasoline or fuel tax credit or refund (see page C-3) ..... | 6 | |
| 7 Gross income. Add lines 5 and 6 ............................................................... ▶ | 7 | 185,000 |

## Part II Expenses. Enter expenses for business use of your home only on line 30.

| | | | | | |
|---|---|---|---|---|---|
| 8 Advertising ................. | 8 | | 19 Pension and profit-sharing plans ............... | 19 | |
| 9 Bad debts from sales or services (see page C-3) .. | 9 | | 20 Rent or lease (see page C-5): | | |
| | | | a Vehicles, machinery & equipment ............. | 20a | |
| 10 Car and truck expenses (see page C-3) ......... | 10 | 2,885 | b Other business property ...................... | 20b | 36,310 ⟵ |
| 11 Commissions and fees .... | 11 | | 21 Repairs and maintenance ..................... | 21 | 2,961 |
| 12 Depletion ................. | 12 | | 22 Supplies (not included in Part III) ............. | 22 | 2,551 |
| 13 Depreciation and section 179 expense deduction (not included in Part III) (see page C-4) ...... | 13 | 5,277 | 23 Taxes and licenses .......................... | 23 | 1,419 |
| | | | 24 Travel, meals, and entertainment: | | |
| | | | a Travel ..................................... | 24a | |
| 14 Employee benefit programs (other than on line 19) .... | 14 | | b Meals and entertainment ............. 79 | | |
| 15 Insurance (other than health) ... | 15 | | c Enter 50% of line 24b subject to limitations (see page C-5) .... 40 | | |
| 16 Interest: | | | d Subtract line 24c from line 24b ............... | 24d | 39 |
| a Mortgage (paid to banks, etc.) .. | 16a | | 25 Utilities .................................... | 25 | 10,249 |
| b Other ................... | 16b | | 26 Wages (less employment credits) ............. | 26 | 98,800 ⟵ |
| 17 Legal and professional services .. | 17 | 22,591 | 27 Other expenses (from line 48 on page 2) ...... | 27 | 1,910 |
| 18 Office expense ............ | 18 | | | | |
| 28 Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ......... ▶ | | | | 28 | 185,000 ⟵ |

| | | |
|---|---|---|
| 29 Tentative profit (loss). Subtract line 28 from line 7 .................................................. | 29 | |
| 30 Expenses for business use of your home. Attach Form 8829 .......................................... | 30 | |
| 31 Net profit or (loss). Subtract line 30 from line 29. | | |
| • If a profit, enter on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | | |
| • If a loss, you MUST go on to line 32. | 31 | 0 |

32 If you have a loss, check the box that describes your investment in this activity (see page C-6).
  • If you checked 32a, enter the loss on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3.
  • If you checked 32b, you MUST attach Form 6198.

} 32a ☐ All investment is at risk.
32b ☐ Some investment is not at risk.

For Paperwork Reduction Act Notice, see Form 1040 instructions.

Schedule C (Form 1040) 1998

KFA

JR 00434

Form **1040** — Department of the Treasury - Internal Revenue Service

**U.S. Individual Income Tax Return** **1997** (99) IRS Use Only - Do not write or staple in this space.

OMB No. 1545-0074

For the year Jan. 1 - Dec. 31, 1997, or other taxpayer beginning ____, 1997, ending ____, 19

| Label | | |
|---|---|---|
| Your first name and initial | Last name | Your social security number |
| JUDITH K. | ROGAN | |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| Home address (number and street). If you have a P.O. box, see page 10. | | Apt. no. |
| 476 WEXFORD | | |
| City, town or post office, state, and ZIP code. If you have a foreign address, see page 10. | | For help finding line instructions, see pages 2 and 3 in the booklet. |
| VALPARAISO, IN 46383-8045 | | |

**Presidential Election Campaign** (See page 10.)

| | Yes | No | Note: Checking "Yes" will not change your tax or reduce your refund. |
|---|---|---|---|
| Do you want $3 to go to this fund? | | X | |
| If a joint return, does your spouse want $3 to go to this fund? | | X | |

**Filing Status**

Check only one box.

1 ☐ Single
2 ☐ Married filing joint return (even if only one had income)
3 ☒ Married filing separate return. Enter spouse's soc. sec. no. above & full name here ▶ PETER G. ROGAN
4 ☐ Head of household (with qualifying person). (See page 10.) If the qualifying person is a child but not your dependent, enter this child's name here ▶
5 ☐ Qualifying widow(er) with dependent child (year spouse died ▶ 19____). (See page 10.)

**Exemptions**

6a ☒ Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a ................. } No. of boxes checked on 6a and 6b: **1**

b ☐ Spouse

If more than six dependents, see page 10.

c Dependents:

| (1) First name  Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) No. of months lived in your home in 1997 | |
|---|---|---|---|---|
| BRIAN P. ROGAN | | SON | 12 | |
| S. CAITLIN ROGAN | | DAUGHTER | 12 | |
| ROBERT C. ROGAN | | SON | 12 | |

No. of your children on 6c who:
- lived with you: **3**
- did not live with you due to divorce or separation (see page 11):
- Dependents on 6c not entered above:
- Add numbers entered on lines above ▶: **4**

d Total number of exemptions claimed ................................................................ 

**Income**

Attach Copy B of your Forms W-2, W-2G, and 1099-R here.

If you did not get a W-2, see page 12.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required | 8a | 15,953 |
| b | Tax-exempt interest. DO NOT include on line 8a .... | 8b | |
| 9 | Dividends. Attach Schedule B if required | 9 | 51,957 |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 12) | 10 | 1,392 |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 3,299 |
| 13 | Capital gain or (loss). Attach Schedule D | 13 | 160,302 |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | |
| 15a | Total IRA distributions ..... 15a | | b Taxable amount (see pg. 13) | 15b | |
| 16a | Total pensions and annuities 16a | | b Taxable amount (see pg. 13) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits .... 20a | | b Taxable amount (see pg. 14) | 20b | |
| 21 | Other income. JURY DUTY | 21 | 73 |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ....▶ | 22 | 232,976 |

**Adjusted Gross Income**

If line 32 is under $29,290 (under $9,770 if a child did not live with you), see EIC inst. on page 21.

| 23 | IRA deduction (see page 16) | 23 | | |
|---|---|---|---|---|
| 24 | Medical savings account deduction. Attach Form 8853 | 24 | | |
| 25 | Moving expenses. Attach Form 3903 or 3903-F | 25 | | |
| 26 | One-half of self-employment tax. Attach Schedule SE | 26 | 233 | |
| 27 | Self-employed health insurance deduction (see page 17) | 27 | | |
| 28 | Keogh and self-employed SEP and SIMPLE plans | 28 | | |
| 29 | Penalty on early withdrawal of savings | 29 | | |
| 30 | Alimony paid. b Recipient's SSN ▶ | 30a | | |
| 31 | Add lines 23 through 30a | 31 | 233 |
| 32 | Subtract line 31 from line 22. This is your adjusted gross income ........................▶ | 32 | 232,743 |

For Privacy Act and Paperwork Reduction Act Notice, see page 34.

Form **1040** (1997)

JR 00364

**SCHEDULE C**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service

**Profit or Loss From Business**
**(Sole Proprietorship)**

▶ Partnerships, joint ventures, etc., must file Form 1065.

▶ Attach to Form 1040 or Form 1041.   ▶ See Instructions for Schedule C (Form 1040).

OMB No. 1545-0074

**1997**

Attachment
Sequence No. 09

Name of proprietor

JUDITH K. ROGAN

Social security number (SSN)

A  Principal business or profession, including product or service (see page C-1)

CONSULTING

B Enter principal business code
(from page C-6) ▶ 7286

C  Business name. If no separate business name, leave blank.

JKR BUSINESS

D Employer ID number (EIN), if any

E  Business address (including suite or room no.) ▶ 240 E. 90TH DRIVE
City, town or post office, state, and ZIP code  MERRILLVILLE, IN  46411-0489

F  Accounting method:   (1) ☒ Cash   (2) ☐ Accrual   (3) ☐ Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 1997? If "No," see page C-2 for limit on losses........................ ☒ Yes ☐ No

H  If you started or acquired this business during 1997, check here..................................................................... ▶ ☐

**Part I   Income**

| | | |
|---|---|---|
| 1 Gross receipts or sales. Caution: If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-2 and check here ▶ ☐ | 1 | 160,000 |
| 2 Returns and allowances .................................................. | 2 | |
| 3 Subtract line 2 from line 1 ............................................. | 3 | 160,000 |
| 4 Cost of goods sold (from line 42 on page 2) ......................... | 4 | |
| 5 Gross profit. Subtract line 4 from line 3 ............................. | 5 | 160,000 |
| 6 Other income, including Federal and state gasoline or fuel tax credit or refund (see page C-2) .................. | 6 | |
| 7 Gross income. Add lines 5 and 6 ..................................... ▶ | 7 | 160,000 |

**Part II   Expenses.** Enter expenses for business use of your home only on line 30.

| | | | | | |
|---|---|---|---|---|---|
| 8 Advertising ............ | 8 | | 19 Pension and profit-sharing plans .......... | 19 | |
| 9 Bad debts from sales or services (see page C-3)...... | 9 | | 20 Rent or lease (see page C-4): | | |
| | | | a Vehicles, machinery & equipment ...... | 20a | |
| 10 Car and truck expenses (see page C-3)............. | 10 | 68 | b Other business property .................. | 20b | 28,476 |
| 11 Commissions and fees .... | 11 | | 21 Repairs and maintenance .................. | 21 | 2,061 |
| 12 Depletion ............... | 12 | | 22 Supplies (not included in Part III)......... | 22 | |
| 13 Depreciation and section 179 expense deduction (not included in Part III) (see page C-3)...... | 13 | 19,468 | 23 Taxes and licenses ....................... | 23 | 956 |
| | | | 24 Travel, meals, and entertainment: | | |
| | | | a Travel .................................. | 24a | 1,315 |
| 14 Employee benefit programs (other than on line 19)... | 14 | | b Meals and entertainment ......... | | |
| 15 Insurance (other than health) ... | 15 | | c Enter 50% of line 24b subject to limitations (see page C-4). | | |
| 16 Interest: | | | d Subtract line 24c from line 24b | 24d | |
| a Mortgage (paid to banks, etc.) ... | 16a | | 25 Utilities ................................. | 25 | 10,456 |
| b Other ................... | 16b | | 26 Wages (less employment credits) .......... | 26 | 64,680 |
| 17 Legal and professional services | 17 | 23,776 | 27 Other expenses (from line 48 on page 2) .... | 27 | 467 |
| 18 Office expense .......... | 18 | 4,978 | | | |
| 28 Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ▶ | | | | 28 | 156,701 |

| | | |
|---|---|---|
| 29 Tentative profit (loss). Subtract line 28 from line 7............................. | 29 | 3,299 |
| 30 Expenses for business use of your home. Attach Form 8829 ...................... | 30 | |
| 31 Net profit or (loss). Subtract line 30 from line 29. | | |
| • If a profit, enter on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | | |
| • If a loss, you MUST go on to line 32. | | |
| 32 If you have a loss, check the box that describes your investment in this activity (see page C-6). | 31 | 3,299 |
| • If you checked 32a, enter the loss on Form 1040, line 12, and ALSO on Schedule SE, line 2 (statutory employees, see page C-5). Estates and trusts, enter on Form 1041, line 3. | 32a ☐ All investment is at risk. | |
| • If you checked 32b, you MUST attach Form 6198. | 32b ☐ Some investment is not at risk. | |

For Paperwork Reduction Act Notice, see Form 1040 instructions.

Schedule C (Form 1040) 1997

KFA

JR 00368

**EXHIBIT G**

PETER C. ROGAN       OCTOBER 6, 2004

Page 21

1     Q.   On the first page entitled lease
2 extension which is BM 002280, in the lower
3 righthand corner, do you see a signature?
4     A.   Yes.
5     Q.   For tenant JKR Business now known as
6 Braddock Management, LP?
7     A.   Correct.
8     Q.   Whose signature is that?
9     A.   That is my signature.
10     Q.   You signed as an authorized
11 representative of JKR Business; is that correct?
12     A.   Actually I signed as an authorized
13 representative of Braddock Management.
14     Q.   Had Braddock Management, LP always had
15 a portion of it that had formerly been JKR
16 Business?
17     A.   No.
18     Q.   When did that occur?
19     A.   It never occurred.
20     Q.   Why is JKR Business now known as
21 Braddock Management, LP?
22     A.   I don't quite understand why this was
23 put together this way. In other words, Braddock
24 Management was not a successor to JKR Business.

Page 22

1     Q.   It looks like Braddock Management was
2 assuming the lease possibly; is that correct?
3     A.   Correct.
4     Q.   So it probably shouldn't have said now
5 known as and there should just have been a lease
6 transfer of some sort, but that explains it.
7      Can you tell us, though, what business
8 JKR Business was in?
9     A.   JKR Business was a business that my
10 wife considered starting to do decorating, and
11 basically it didn't go very far and so she didn't
12 continue it.
13     Q.   Did she incorporate it?
14     A.   No.
15     Q.   Was -- so it basically just had a name?
16     A.   Correct.
17     Q.   Did it ever have any employees other
18 than your wife?
19     A.   Not that I know of.
20     Q.   What was the reason that JKR Business
21 was the first tenant on the predecessor lease to
22 the location at 240?
23     A.   I don't recall.
24     Q.   Do you know whether the lease these

Page 23

1 marked as Exhibit 50 is still in effect?
2     A.   I don't know whether this specific one
3 is still in effect, but there is a lease for this
4 property.
5     Q.   For that location?
6     A.   Correct.
7     Q.   I take it, then, that your businesses
8 that were in this office space are still in the
9 same office space they've been in since '95?
10     A.   I'm not certain I understand that
11 question.
12     Q.   Well, you indicated earlier that you
13 thought you first had a desk, your own desk, at
14 240 East 90th beginning around '95.
15      Is the space that held that desk the
16 same space you're in today?
17     A.   No.
18     Q.   When did that space change?
19     A.   We downsized that office. I just can't
20 recall the date of it, but it has -- we downsized
21 the office.
22     Q.   Can you give us a time range in which
23 you downsized the office?
24     A.   2001 possibly.

Page 24

1     Q.   Now, looking through this lease, lease
2 extension, please review it and tell us whether it
3 fairly and accurately reflects the lease that you
4 signed?
5     A.   Yes.
6     Q.   And you signed the lease in the
7 ordinary and normal course of your business at
8 Braddock Management, LP?
9     A.   Correct.
10     Q.   Sir, let me direct your attention to a
11 portion of this document -- well, before I do
12 that, can you describe the building at 240 East
13 90th drive, how many floors?
14     A.   It's a one-story building, office
15 building, professional offices. It's an office
16 building.
17     Q.   What portion of the building, what
18 percentage of the building roughly, did your
19 office space as reflected in this lease before the
20 downsizing take up?
21     A.   The building is laid out -- there is
22 not a description in this, but it's a long
23 building that has a number of different offices in
24 it and we were just one segment of that office

6 (Pages 21 to 24)

PETER C. ROGAN          OCTOBER 6, 2004

Page 29

1  same place?
2      A.  Yes.
3      Q.  What about for David Miller?
4      A.  That was his secretary.
5      Q.  You shared a secretary?
6      A.  Yeah.
7      Q.  Where in this facility is Mr. Cuppy's
8  office?
9      A.  In this facility?
10     Q.  Yes.
11     A.  There is not. He does not have an
12 office in this facility?
13     Q.  Now, using is this map, can you tell us
14 where BFB Limited was located?
15     A.  There were no separate so to speak in
16 terms of BFB had an office, all right. Mr. Miller
17 primarily handled the administrative side of BFB.
18     Q.  Can you tell us where JKR Business was
19 located?
20     A.  JKR Business as I said was -- you know,
21 had the entire office lease, but in terms of that
22 business not really functioning or demanding a lot
23 of time, it didn't require a lot of space.
24     Q.  What about Midwest Unwind Company,

Page 30

1  Limited, where was that located?
2      A.  Midwest Unwind Company is again another
3  company that we handled the administrative --
4  we -- David Miller handles the administrative and
5  the financial side of that.
6      Q.  Now, the tax records and other records
7  show that after 2001, Edgewater Property Company
8  shifted its location to 240 East 90th.
9          Where was Edgewater Property Company
10 located?
11     A.  Again, in our offices they were handled
12 as part of this office complex.
13     Q.  Where were Edgewater Property Company's
14 -- were Edgewater Property's files segregated in
15 any way?
16     A.  From the standpoint of keeping track of
17 records, yes. They would be. They were separate
18 file folders and those kinds of issues.
19     Q.  Did they have separate file drawers or
20 cabinets of any kind or are they just --
21     A.  I don't know the answer to that.
22     Q.  What about BFB, did that have any
23 separate file drawers or cabinets?
24     A.  I can't answer that.

Page 31

1      Q.  Midwest Unwind?
2      A.  Same issue, whether -- how that was
3  handled, I don't know.
4      Q.  Where was PGR Property, Incorporated
5  located?
6      A.  Again, within this office complex, and,
7  again, the files and the administrative side of it
8  were handled as part of that.
9      Q.  Who was the person who handled the PGR
10 Property, Incorporated business?
11     A.  I would say primarily David Miller.
12     Q.  Now, the Peter G. Rogan Revokable Trust
13 also had its address at this location?
14     A.  Correct.
15     Q.  Who handled the administration of that
16 at this location?
17     A.  Again, that would be a combination of
18 not just at this location but it would also be
19 handled by the tax attorneys.
20     Q.  Which tax attorneys handled PGR --
21 excuse me -- Peter G. Rogan Revokable Trust from
22 the time frame '94 to the present?
23     A.  Primarily that would be John Foley.
24     Q.  And that's of Tatooles & Foley?

Page 32

1      A.  Tatooles & Foley.
2      Q.  When did you first meet John Foley?
3      A.  I can't recall the exact date of when I
4  met him. Many years ago.
5      Q.  Roughly how many years have you known
6  him?
7      A.  You know what, I just don't recall a
8  date or a time frame. I just don't have that in
9  mind.
10     Q.  Your revokable trust was formed in
11 1988. Who formed it for you?
12     A.  I believe that was formed by the law
13 firm of Burke, Costanza & Cuppy.
14     Q.  Did you know Mr. Foley at that time?
15     A.  In 1988?
16     Q.  In 1988.
17     A.  I don't believe so.
18     Q.  So you would have met him sometime
19 after -- is it fair to say you met him sometime
20 after you made the purchase of Edgewater Hospital?
21     A.  That I'm not certain of. That I'm not
22 certain of.
23     Q.  So you purchased the hospital in '89?
24 You could have met him during the '88 to '89 time

8 (Pages 29 to 32)

# EXHIBIT H

**JKR Business**
**General Ledger**
For the Period From Jan 1, 1996 to Dec 31, 1996
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID Account Description | Date Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|
| | 6/1/96 | | Beginning Balance | | | -74,000.00 |
| | 7/1/96 | | Beginning Balance | | | -74,000.00 |
| | 8/1/96 | | Beginning Balance | | | -74,000.00 |
| | 9/1/96 | | Beginning Balance | | | -74,000.00 |
| | 10/1/96 | | Beginning Balance | | | -74,000.00 |
| | 11/1/96 | | Beginning Balance | | | -74,000.00 |
| | 12/1/96 | | Beginning Balance | | | -74,000.00 |
| | 12/31/96 | | Ending Balance | | | -74,000.00 |
| 25103 Capital Withdrawals | 1/1/96 | | Beginning Balance | | | |
| | 2/1/96 | | Beginning Balance | | | |
| | 3/1/96 | | Beginning Balance | | | |
| | 4/1/96 | | Beginning Balance | | | |
| | 5/1/96 | | Beginning Balance | | | |
| | 6/1/96 | | Beginning Balance | | | |
| | 7/1/96 | | Beginning Balance | | | |
| | 8/1/96 | | Beginning Balance | | | |
| | 9/1/96 | | Beginning Balance | | | |
| | 10/1/96 | | Beginning Balance | | | |
| | 11/1/96 | | Beginning Balance | | | |
| | 12/1/96 | | Beginning Balance | | | |
| | 12/3/96 1238 | CDJ | American National Bank - Capital Withdrawal - Open HCMLLC Checking A/C | 1,000.00 | | |
| | | | Current Period Change | 1,000.00 | | 1,000.00 |
| | 12/31/96 | | Ending Balance | | | 1,000.00 |
| 31401 Business Services Fees | 1/1/96 | | Beginning Balance | | | |
| | 2/1/96 | | Beginning Balance | | | |
| | 2/22/96 CR02-01 | CRJ | Braddock Management, LP - Business Services Jan & Feb | | 10,000.00 | |
| | | | Current Period Change | | 10,000.00 | -10,000.00 |
| | 3/1/96 | | Beginning Balance | | | -10,000.00 |
| | 3/20/96 CR03-01 | CRJ | Braddock Management, LP - Business Services March | | 10,000.00 | |
| | 3/28/96 CR03-02 | CRJ | Bradock Management, LP - Business Services April | | 10,000.00 | |
| | | | Current Period Change | | 20,000.00 | -20,000.00 |
| | 4/1/96 | | Beginning Balance | | | -30,000.00 |
| | 5/1/96 | | Beginning Balance | | | -30,000.00 |
| | 5/29/96 CR05-01 | CRJ | Braddock Management, LP - Business Services May | | 10,000.00 | |

PRIV LOG TF 00520

**JKR Business**
**General Ledger**
**For the Period From Jan 1, 1996 to Dec 31, 1996**
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID<br>Account Description | Date<br>Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|
| | | | Current Period Change | | 10,000.00 | -10,000.00 |
| | 6/1/96 | | Beginning Balance | | | -40,000.00 |
| | 6/26/96<br>CR 06-01 | CRJ | Edgewater Property Company -<br>Business Services Fees 1/96 -<br>6/96 | | 25,000.00 | |
| | | | Current Period Change | | 25,000.00 | -25,000.00 |
| | 7/1/96 | | Beginning Balance | | | -65,000.00 |
| | 8/1/96 | | Beginning Balance | | | -65,000.00 |
| | 9/1/96 | | Beginning Balance | | | -65,000.00 |
| | 9/27/96<br>CR09-01 | CRJ | Edgewater Property Company -<br>Business Services Fees | | 35,000.00 | |
| | | | Current Period Change | | 35,000.00 | -35,000.00 |
| | 10/1/96 | | Beginning Balance | | | -100,000.00 |
| | 11/1/96 | | Beginning Balance | | | -100,000.00 |
| | 12/1/96 | | Beginning Balance | | | -100,000.00 |
| | 12/4/96<br>CR12-01 | CRJ | Edgewater Property Company -<br>Business Services Fees | | 25,000.00 | |
| | | | Current Period Change | | 25,000.00 | -25,000.00 |
| | 12/31/96 | | Ending Balance | | | -125,000.00 |
| 61102<br>Salaries - Staff | 1/1/96 | | Beginning Balance | | | |
| | 2/1/96 | | Beginning Balance | | | |
| | 3/1/96 | | Beginning Balance | | | |
| | 3/21/96<br>1119 | CDJ | Sara C. Rogan - First Qtr 1996<br>Salary | 3,600.00 | | |
| | 3/21/96<br>1120 | CDJ | Brian P. Rogan - First Quarter<br>1996 Salary | 4,800.00 | | |
| | 3/21/96<br>1121 | CDJ | Robert C. Rogan - First Quarter<br>1996 Salary | 5,400.00 | | |
| | | | Current Period Change | 13,800.00 | | 13,800.00 |
| | 4/1/96 | | Beginning Balance | | | 13,800.00 |
| | 5/1/96 | | Beginning Balance | | | 13,800.00 |
| | 6/1/96 | | Beginning Balance | | | 13,800.00 |
| | 6/30/96<br>1166 | CDJ | Robert C. Rogan - 2nd Quarter<br>Salary | 5,400.00 | | |
| | 6/30/96<br>1167 | CDJ | Brian P. Rogan - 2nd Quarter<br>Salary | 4,800.00 | | |
| | 6/30/96<br>1168 | CDJ | Sara C. Rogan - 2nd Quarter<br>Salary | 3,600.00 | | |
| | | | Current Period Change | 13,800.00 | | 13,800.00 |
| | 7/1/96 | | Beginning Balance | | | 27,600.00 |
| | 8/1/96 | | Beginning Balance | | | 27,600.00 |
| | 9/1/96 | | Beginning Balance | | | 27,600.00 |

PRIV LOG TF 00521

**JKR Business**
General Ledger
For the Period From Jan 1, 1998 to Dec 31, 1998
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID<br>Account Description | Date<br>Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|
| | 9/1/98 | | Beginning Balance | | | -76,299.39 |
| | 10/1/98 | | Beginning Balance | | | -76,299.39 |
| | 11/1/98 | | Beginning Balance | | | -76,299.39 |
| | 12/1/98 | | Beginning Balance | | | -76,299.39 |
| | 12/31/98 | | **Ending Balance** | | | -76,299.39 |
| 31401<br>Business Services Fees | 1/1/98 | | Beginning Balance | | | |
| | 2/1/98 | | Beginning Balance | | | |
| | 2/1/98<br>CR02-01 | CRJ | BRaddock Management -<br>Professional Fees 1/98 & 2/98 | | 15,000.00 | |
| | | | Current Period Change | | 15,000.00 | -15,000.00 |
| | 3/1/98 | | Beginning Balance | | | -15,000.00 |
| | 3/20/98<br>CR03-01 | CRJ | Edgewater Property Company -<br>Professional Fees 1/98 - 3/98 | | 25,000.00 | |
| | | | Current Period Change | | 25,000.00 | -25,000.00 |
| | 4/1/98 | | Beginning Balance | | | -40,000.00 |
| | 5/1/98 | | Beginning Balance | | | -40,000.00 |
| | 6/1/98 | | Beginning Balance | | | -40,000.00 |
| | 6/12/98<br>CR06-01 | CRJ | Edgewater Property Company -<br>Professional Fees 4/98 - 6/98 | | 30,000.00 | |
| | 6/13/98<br>CR06-02 | CRJ | Braddock Management -<br>Professional Fees - 3/98 - 5/98 | | 25,000.00 | |
| | | | Current Period Change | | 55,000.00 | -55,000.00 |
| | 7/1/98 | | Beginning Balance | | | -95,000.00 |
| | 8/1/98 | | Beginning Balance | | | -95,000.00 |
| | 8/27/98<br>CR08-04 | CRJ | Edgewater Property Company -<br>Business Services 7/98 & 8/98 | | 20,000.00 | |
| | 8/27/98<br>CR08-05 | CRJ | Braddock Mangement, LP -<br>Business Services 6/98 - 8/98 | | 30,000.00 | |
| | | | Current Period Change | | 50,000.00 | -50,000.00 |
| | 9/1/98 | | Beginning Balance | | | -145,000.00 |
| | 10/1/98 | | Beginning Balance | | | -145,000.00 |
| | 11/1/98 | | Beginning Balance | | | -145,000.00 |
| | 11/30/98<br>CR11-05 | CRJ | Braddock Management, LP -<br>Business Service Fees 9/98 -<br>11/98 | | 20,000.00 | |
| | 11/30/98<br>CR11-06 | CRJ | Edgewater Property Company -<br>Business Service Fees 9/98 -<br>11/98 | | 20,000.00 | |
| | | | Current Period Change | | 40,000.00 | -40,000.00 |
| | 12/1/98 | | Beginning Balance | | | -185,000.00 |
| | 12/31/98 | | **Ending Balance** | | | -185,000.00 |
| 61102 | 1/1/98 | | Beginning Balance | | | |

EPC 000930

JKR Business
General Ledger
For the Period From Jan 1, 1999 to Dec 31, 1999
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID<br>Account Description | Date | Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|---|
| | 10/1/99 | | | Beginning Balance | | | |
| | 11/1/99 | | | Beginning Balance | | | |
| | 12/1/99 | | | Beginning Balance | | | |
| | 12/15/99 | 2243 | PRJ | Robert C. Rogan | | 255.00 | |
| | 12/15/99 | 2244 | PRJ | Brian P. Rogan | | 229.50 | |
| | 12/15/99 | 2245 | PRJ | Sara C. Rogan | | 178.50 | |
| | 12/15/99 | 2247 | CDJ | Indiana Dept. of Revenue -<br>IN W/H Tax P/R 4th Qtr<br>1999 | 663.00 | | |
| | | | | Current Period Change | 663.00 | 663.00 | |
| | 12/31/99 | | | Ending Balance | 663.00 | 663.00 | |
| 25101<br>Retained Earnings | 1/1/99 | | | Beginning Balance | | | -73,258.79 |
| | 1/1/99 | GJ01-01 | GENJ | To Record Sec 179<br>Carryforward Per 1998 Tax<br>Return | | 2,985.00 | |
| | | | | Current Period Change | | 2,985.00 | -2,985.00 |
| | 2/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 3/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 4/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 5/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 6/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 7/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 8/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 9/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 10/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 11/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 12/1/99 | | | Beginning Balance | | | -76,243.79 |
| | 12/31/99 | GJ12-02 | GENJ | To Reconcile 1999 P & L to<br>1999 Tax Return | 90.29 | | |
| | | | | Current Period Change | 90.29 | | 90.29 |
| | 12/31/99 | | | Ending Balance | | | -76,153.50 |
| 25103<br>Capital Withdrawals | 1/1/99 | | | Beginning Balance | | | |
| | 2/1/99 | | | Beginning Balance | | | |
| | 3/1/99 | | | Beginning Balance | | | |
| | 4/1/99 | | | Beginning Balance | | | |
| | 5/1/99 | | | Beginning Balance | | | |
| | 6/1/99 | | | Beginning Balance | | | |
| | 7/1/99 | | | Beginning Balance | | | |
| | 8/1/99 | | | Beginning Balance | | | |
| | 9/1/99 | | | Beginning Balance | | | |
| | 10/1/99 | | | Beginning Balance | | | |
| | 11/1/99 | | | Beginning Balance | | | |
| | 11/17/99 | 2235 | CDJ | Judith K. Rogan - Capital<br>Withdrawal | 15,000.00 | | |
| | | | | Current Period Change | 15,000.00 | | 15,000.00 |
| | 12/1/99 | | | Beginning Balance | | | 15,000.00 |
| | 12/31/99 | | | Ending Balance | | | 15,000.00 |
| 31401<br>Business Services Fees | 1/1/99 | | | Beginning Balance | | | |
| | 2/1/99 | | | Beginning Balance | | | |
| | 3/1/99 | | | Beginning Balance | | | |
| | 3/9/99 | CR03-02 | CRJ | Edgewater Property<br>Company - Services 1st Qtr<br>1999 | | 20,000.00 | |
| | 3/9/99 | CR03-03 | CRJ | Braddock Management, LP -<br>Services 1st Qtr 1999 | | 20,000.00 | |
| | | | | Current Period Change | | 40,000.00 | -40,000.00 |
| | 4/1/99 | | | Beginning Balance | | | -40,000.00 |
| | 5/1/99 | | | Beginning Balance | | | -40,000.00 |
| | 6/1/99 | | | Beginning Balance | | | -40,000.00 |
| | 6/4/99 | CR06-01 | CRJ | Braddock Management, LP -<br>2nd Qtr 1999 Business<br>Services Fees | | 20,000.00 | |
| | | | | Current Period Change | | 20,000.00 | -20,000.00 |
| | 7/1/99 | | | Beginning Balance | | | -60,000.00 |
| | 8/1/99 | | | Beginning Balance | | | -60,000.00 |

EPC 000881

JKR Business
General Ledger
For the Period From Jan 1, 1999 to Dec 31, 1999
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID<br>Account Description | Date | Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|---|
| | 9/1/99 | | | Beginning Balance | | | -60,000.00 |
| | 10/1/99 | | | Beginning Balance | | | -60,000.00 |
| | 10/31/99 | CR10-01 | CRJ | Braddock Management, LP - Invoice: 1099-01 | | 40,000.00 | |
| | 10/31/99 | CR10-02 | CRJ | Edgewater Property Company - Invoice: 1099-02 | | 25,000.00 | |
| | | | | Current Period Change | | 65,000.00 | -65,000.00 |
| | 11/1/99 | | | Beginning Balance | | | -125,000.00 |
| | 12/1/99 | | | Beginning Balance | | | -125,000.00 |
| | 12/31/99 | | | Ending Balance | | | -125,000.00 |
| 31501<br>Interest Income | 1/1/99 | | | Beginning Balance | | | |
| | 2/1/99 | | | Beginning Balance | | | |
| | 3/1/99 | | | Beginning Balance | | | |
| | 3/22/99 | CR03-04 | CRJ | NIPSCO - Interest Earned on Deposit | | 54.73 | |
| | | | | Current Period Change | | 54.73 | -54.73 |
| | 4/1/99 | | | Beginning Balance | | | -54.73 |
| | 5/1/99 | | | Beginning Balance | | | -54.73 |
| | 6/1/99 | | | Beginning Balance | | | -54.73 |
| | 7/1/99 | | | Beginning Balance | | | -54.73 |
| | 8/1/99 | | | Beginning Balance | | | -54.73 |
| | 9/1/99 | | | Beginning Balance | | | -54.73 |
| | 10/1/99 | | | Beginning Balance | | | -54.73 |
| | 11/1/99 | | | Beginning Balance | | | -54.73 |
| | 12/1/99 | | | Beginning Balance | | | -54.73 |
| | 12/31/99 | | | Ending Balance | | | -54.73 |
| 31701<br>Miscellaneous Income | 1/1/99 | | | Beginning Balance | | | |
| | 2/1/99 | | | Beginning Balance | | | |
| | 3/1/99 | | | Beginning Balance | | | |
| | 4/1/99 | | | Beginning Balance | | | |
| | 5/1/99 | | | Beginning Balance | | | |
| | 6/1/99 | | | Beginning Balance | | | |
| | 7/1/99 | | | Beginning Balance | | | |
| | 8/1/99 | | | Beginning Balance | | | |
| | 9/1/99 | | | Beginning Balance | | | |
| | 10/1/99 | | | Beginning Balance | | | |
| | 11/1/99 | | | Beginning Balance | | | |
| | 12/1/99 | | | Beginning Balance | | | |
| | 12/31/99 | GJ12-02 | GENJ | To Reconcile 1999 P & L to 1999 Tax Return | | 90.29 | |
| | 12/31/99 | | | Current Period Change | | 90.29 | -90.29 |
| | | | | Ending Balance | | | -90.29 |
| 61102<br>Salaries - Staff | 1/1/99 | | | Beginning Balance | | | |
| | 2/1/99 | | | Beginning Balance | | | |
| | 3/1/99 | | | Beginning Balance | | | |
| | 3/22/99 | 2124 | PRJ | Robert C. Rogan | 9,500.00 | | |
| | 3/22/99 | 2125 | PRJ | Brian P. Rogan | 8,550.00 | | |
| | 3/22/99 | 2126 | PRJ | Sara C. Rogan | 6,650.00 | | |
| | | | | Current Period Change | 24,700.00 | | 24,700.00 |
| | 4/1/99 | | | Beginning Balance | | | 24,700.00 |
| | 5/1/99 | | | Beginning Balance | | | 24,700.00 |
| | 6/1/99 | | | Beginning Balance | | | 24,700.00 |
| | 6/4/99 | 2162 | PRJ | Robert C. Rogan | 5,500.00 | | |
| | 6/4/99 | 2163 | PRJ | Brian P. Rogan | 4,950.00 | | |
| | 6/4/99 | 2164 | PRJ | Sara C. Rogan | 3,850.00 | | |
| | | | | Current Period Change | 14,300.00 | | 14,300.00 |
| | 7/1/99 | | | Beginning Balance | | | 39,000.00 |
| | 8/1/99 | | | Beginning Balance | | | 39,000.00 |
| | 9/1/99 | | | Beginning Balance | | | 39,000.00 |
| | 9/28/99 | 2215 | PRJ | Robert C. Rogan | 7,500.00 | | |
| | 9/28/99 | 2210 | PRJ | Brian P. Rogan | 6,750.00 | | |
| | 9/28/99 | 2211 | PRJ | Sara C. Rogan | 5,250.00 | | |
| | | | | Current Period Change | 19,500.00 | | 19,500.00 |
| | 10/1/99 | | | Beginning Balance | | | 58,500.00 |
| | 11/1/99 | | | Beginning Balance | | | 58,500.00 |

EPC 000882

JKR Business
General Ledger
For the Period From Jan 1, 2000 to Dec 31, 2000
Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID / Account Description | Date | Reference | Jrnl | Trans Description | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|---|---|
| | 12/1/00 | | | Beginning Balance | | | -65,877.50 |
| | 12/31/00 | | | Ending Balance | | | -65,877.50 |
| 25103 Capital Withdrawals | 1/1/00 | | | Beginning Balance | | | |
| | 2/1/00 | | | Beginning Balance | | | |
| | 2/8/00 | 2270 | CDJ | The Private Bank | 15,000.00 | | |
| | | | | Current Period Change | 15,000.00 | | 15,000.00 |
| | 3/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 4/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 5/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 6/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 7/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 8/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 9/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 10/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 11/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 12/1/00 | | | Beginning Balance | | | 15,000.00 |
| | 12/28/00 | 2395 | CDJ | Judith K. Rogan - Deposit in JKR Zurich A/C | 57,049.33 | | |
| | | | | Current Period Change | 57,049.33 | | 57,049.33 |
| | 12/31/00 | | | Ending Balance | | | 72,049.33 |
| 31401 Business Services Fees | 1/1/00 | | | Beginning Balance | | | |
| | 2/1/00 | | | Beginning Balance | | | |
| | 3/1/00 | | | Beginning Balance | | | |
| | 3/13/00 | CR03-01 | CRJ | Braddock Management, LP - Invoice: 300-01 | | 30,000.00 | |
| | | | | Current Period Change | | 30,000.00 | -30,000.00 |
| | 4/1/00 | | | Beginning Balance | | | -30,000.00 |
| | 5/1/00 | | | Beginning Balance | | | -30,000.00 |
| | 6/1/00 | | | Beginning Balance | | | -30,000.00 |
| | 6/28/00 | CR06-01 | CRJ | Braddock Management, LP - Invoice: 0600-01 | | 30,000.00 | |
| | 6/28/00 | CR06-02 | CRJ | Edgewater Property Company - Invoice: 0600-02 | | 10,000.00 | |
| | | | | Current Period Change | | 40,000.00 | -40,000.00 |
| | 7/1/00 | | | Beginning Balance | | | -70,000.00 |
| | 8/1/00 | | | Beginning Balance | | | -70,000.00 |
| | 9/1/00 | | | Beginning Balance | | | -70,000.00 |
| | 9/25/00 | CR09-03 | CRJ | Edgewater Property Company - Invoice: 0900-01 | | 20,000.00 | |
| | | | | Current Period Change | | 20,000.00 | -20,000.00 |
| | 10/1/00 | | | Beginning Balance | | | -90,000.00 |
| | 11/1/00 | | | Beginning Balance | | | -90,000.00 |
| | 12/1/00 | | | Beginning Balance | | | -90,000.00 |
| | 12/7/00 | CR12-04 | CRJ | Braddock Management, LP - Invoice: 1200-01 | | 30,000.00 | |
| | | | | Current Period Change | | 30,000.00 | -30,000.00 |
| | 12/31/00 | | | Ending Balance | | | -120,000.00 |
| 61102 Salaries - Staff | 1/1/00 | | | Beginning Balance | | | |
| | 2/1/00 | | | Beginning Balance | | | |
| | 3/1/00 | | | Beginning Balance | | | |
| | 3/13/00 | 2285 | PRJ | Robert C. Rogan | 9,000.00 | | |
| | 3/13/00 | 2286 | PRJ | Brian P. Rogan | 9,000.00 | | |
| | 3/13/00 | 2287 | PRJ | Sara C. Rogan | 6,000.00 | | |

**EXHIBIT I**

JKR Business

ADDITIONAL SIGNERS

| | ACCOUNT NUMBER |
|---|---|
| SIGNATURE | |
| SIGNATURE | NAME AND TITLE |
| SIGNATURE | NAME AND TITLE |
| SIGNATURE | NAME AND TITLE |
| | NAME AND TITLE |

DATE 5/4/95

# OF SIG. REQ. 1

TAX ID NO.

OFFICER 35   ACCEPTED BY SBB

COMMENTS

TYPE OF ACCOUNT BUSINESS

AMT/CONTENTS OF INITIAL DEP. $24,000

ID KNOWN

The depositor acknowledges receipt of a copy of the rules or agreements regulating the account and agrees to be bound by them and by any amendments to them. The depositor has read and certifies under penalty of perjury to the truthfulness of the tax withholding certificate applicable on the reverse side.

THE PRIVATEBANK AND TRUST COMPANY

ADDRESS
Judith K. Rogan
476 Wexford Road
Valparaiso, IN 46383

SIGNATURE

NAME AND TITLE Judith K. Rogan, President

SIGNATURE

NAME AND TITLE Peter G. Rogan, Vice President

PBTC 0287

#169252

**SOLE OWNERSHIP**

May 10    19⁹⁵

TO    **THE PRIVATEBANK AND TRUST COMPANY**
TEN NORTH DEARBORN
CHICAGO, ILLINOIS 60602

The undersigned does hereby certify that he is the sole owner of the business known as _____

____JKR Business_____ and that the principal place of business is located at

____240 East 90th Drive, Merrillville, IN 46410__ and that no one else has any right, title or interest therein.

In consideration of your acceptance of this account under the above designated trade name, I agree to protect and indemnify

you against all loss or liability, including court costs and attorneys' fees arising from or growing out of the acceptance by you for

payment or credit of checks drawn to the order of and endorsed in said trade name.

Checks, drafts and orders for the payment of money withdrawing funds from said account may be signed by any___1_____

of the following __Judith K. Rogan, Peter G. Rogan_____

_____

_____

and you are authorized to pay such checks, drafts or orders when so signed without inquiry as to the circumstances of their issue

or disposition of their proceeds whether drawn to bearer, or cash, or to the order of any of said signers or otherwise. Any of the

persons named above may endorse for deposit in the name of the proprietorship checks, drafts, notes and other negotiable instruments.

Such endorsements may be made in writing or by stamp and without designation of the person so endorsing.

The above instructions are to remain in effect until further order, in writing, from the undersigned, and the undersigned agrees

to inform you promptly of any change in the status of said business.

_____
Proprietor

Witness
_____

```
                                                    109252        Page 1 of 2

      TEN NORTH DEARBORN
      CHICAGO, IL 60602
      312-683-7100



                                              ENC: 22
                                              CYL: 30
                                              SLC: 001
      JKR BUSINESS                            LOC: 001
      PO BOX 10489
      MERRILLVILLE IN 46411-0489



  ************           BUSINESS ACCOUNT                ************

  Account Number      Account Title
                      JKR BUSINESS


  Account Summary - This statement is for the period from 03/01/'99 thru 03/31/99.

  Beg. Balance on 3/ 1/99      $30,497.99 Number of Enclosures
  Deposits & Other Additions    41,859.56                              22
  Checks                        33,390.63
  Other Deductions/Withdrawals      0.00
  Service Charges and Fees          0.00
  Ending Balance on 3/31/99    $38,966.92


  Transaction Summary
  ====================

  Date      Transaction Description             Deposits  Withdrawals Balance

  Mar. 1   Beginning Balance                                         $30,497.99

  Mar. 01  Check #       2108                             1,247.88   29,250.11
  Mar. 01  Check #       2111                               474.56   28,775.55
  Mar. 01  Check #       2112                               106.29   28,669.26
  Mar. 01  Check #       2113                                29.85   28,639.41
  Mar. 01  Check #       2115                             2,498.27   26,141.14
  Mar. 05  Check #       2114                                40.00   26,101.14
  Mar. 09  Check #       2120                             1,442.13   24,659.01
  Mar. 12  Deposit                             41,821.74             66,480.75
  Mar. 16  Check #       2117                                16.74   66,464.01
  Mar. 18  Check #       2121                                18.50   66,445.51
              Transactions Continued on Next Page

  00033925 0648                          Continued
```

**PBTC 0293**

109252          Page 1 of 2

TEN NORTH DEARBORN
CHICAGO, IL 60602
312-683-7100

ENC: 16
CYL: 30
SLC: 001
LOC: 001

JKR BUSINESS
PO BOX 10489
MERRILLVILLE IN 46411-0489

************          BUSINESS ACCOUNT          ************

Account Number     Account Title
                   JKR BUSINESS

Account Summary — This statement is for the period from 06/01/99 thru 06/30/99.

| | | |
|---|---|---|
| Beg. Balance on 6/ 1/99 | $31,732.9 | Number of Enclosures | 16 |
| Deposits & Other Additions | 31,480.49 | | |
| Checks | 15,428.73 | | |
| Other Deductions/Withdrawals | 0.00 | | |
| Service Charges and Fees | 0.00 | | |
| Ending Balance on 6/30/99 | $47,784.69 | | |

Transaction Summary
==============================

| Date | Transaction Description | | Deposits | Withdrawals | Balance |
|---|---|---|---|---|---|
| Jun. 1 | Beginning Balance | | | | $31,732.94 |
| Jun. 02 | Check # | 2153 | | 210.00 | 31,522.94 |
| Jun. 02 | Check # | 2159 | | 80.29 | 31,442.65 |
| Jun. 03 | Check # | 2161 | | 537.98 | 30,904.67 |
| Jun. 04 | Check # | 2160 | | 44.00 | 30,860.67 |
| Jun. 07 | Deposit | | 31,480.48 | | 62,341.15 |
| Jun. 07 | Check # | 2166 | | 3,038.39 | 59,302.76 |
| Jun. 09 | Check # | 2167 | | 23.45 | 59,279.31 |
| Jun. 10 | Check # | 2162 | | 4,083.12 | 55,196.19 |
| Jun. 10 | Check # | 2163 | | 3,722.32 | 51,473.87 |
| Jun. 10 | Check # | 2164 | | 2,969.97 | 48,503.90 |

Transactions Continued on Next Page

00021393 0648                    Continued

**PBTC 0297**

JKR BUSINESS
PO BOX 40489
MERRILLVILLE IN 46411-0489

November 30, 1999

Total days in statement period 30

Page 1 of 2

Direct Inquiries to:
Client Services, 312-683-7100
The Privatebank And Trust Company
Ten North Dearborn
Chicago IL 60602

Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Business Checking | | $63,708.83 |

PAGE

## Statement of Account

JKR Business
Page 2 of 2

Business Checking 0000109252
Avg collected balance $24,912.00

| Date 10-31 | Description Beginning balance | Additions | Subtractions | Balance | Number | T3 Enclosures Date | Amount |
|---|---|---|---|---|---|---|---|
| 11-01 | Check 2220 | 000031315705 | -286.46 | $13,633.20 | 2220 | 11-01 | 286.46 |
| 11-01 | Check 2226 | 000031314165 | -22.83 | 13,346.74 | 2226 | 11-01 | 22.83 |
| 11-01 | Check 2227 | 000031315704 | -2,143.75 | 13,323.91 | 2227 | 11-01 | 2,143.75 |
| 11-03 | Check 2228 | 000031297189 | -46.00 | 11,180.16 | 2228 | 11-08 | 46.00 |
| 11-08 | Check 2229 | 000031071468 | -478.30 | 10,701.86 | 2229 | 11-08 | 34.00 |
| 11-08 | Check 2230 | 000031071467 | -34.00 | 10,655.86 | 2230 | 11-03 | 478.30 |
| 11-09 | Check 2231 | 000031270597773 | -55.41 | 10,621.86 | 2231 | 11-09 | 55.41 |
| 11-12 | Check 2232 | 000031176519S | -210.00 | 10,566.45 | 2232 | 11-15 | 211.75 |
| 11-15 | Check 2233 | 000031275575 | -11.75 | 10,356.45 | 2233 | 11-12 | 210.00 |
| 11-16 | Check 2234 | 000032308679 | -34.50 | 10,344.70 | 2234 | 11-16 | 34.50 |
| 11-19 | Check 2235 | 000032328108d0 | -15,000.00 | 10,310.20 | 2235 | 11-19 | 15,000.00 |
| 11-22 | #Deposit | 65,000.00 | | -4,689.80 | | 11-26 | 23.50 |
| 11-26 | Check 2236 | 3,564.00 | 0000323200054 | 60,310.20 | 2236 | 11-29 | 141.87 |
| 11-29 | Check 2237 | 000031389587 | 0000313143288 | 63,874.20 | 2237 | | |
| 11-30 | Ending Totals | 68,564.00 | -23.50 | 63,850.70 | | # Skip in check sequence | |
| | | | -141.87 | 63,708.83 | | | |
| | | | -18,488.37 | 63,708.83 | | | |

0000109260     PAGE

## Statement of Account

JORDAN S FISHMAN FAM TR U/AD 5/10/89
C/O GARY KARLIN

NOVEMBER 30, 1999

Total days in statement period 30

JK2 BUSINESS
PO BOX 10489
MERRILLVILLE IN 46411-0489

March 31, 2000
Total days in statement period: 31
(19)
Page 1 of 2

Direct Inquiries to: 312-683-7100
The PrivateBank And Trust Company
Ten North Dearborn
Chicago IL 60602

Summary of Account Balance

| Account | Number | Ending Balance |
|---|---|---|
| Business Checking | ▓▓▓▓ | $19,229.11 |

PAGE

Statement of Account

JK2 Business
Page 2 of 2

Business Checking
Avg collected balance      $20,177.00

| Date | Description | | Additions | Subtractions | Balance | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|
| 02-29 | Beginning Balance | | | | $21,656.16 | 2277 | 03-07 | 2,143.75 |
| 03-06 | Check | 2278 | 0000313117700027 | -1,266.32 | 20,389.84 | 2278 | 03-06 | 1,266.32 |
| 03-06 | Check | 2280 | 0000313176454I | -595.82 | 19,794.02 | 2280 | 03-07 | 15.68 |
| 03-07 | Check | 2277 | 00003232008557 | -2,143.75 | 17,650.27 | 2281 | 03-17 | 595.82 |
| 03-07 | Check | 2279 | 0000323201204I | -15.68 | 17,634.59 | 2282 | 03-15 | 58.00 |
| 03-15 | Check | 2282 | 0000313167928626 | -55.41 | 17,579.18 | 2283 | 03-17 | 55.41 |
| 03-16 | Check | 2286 | 0000313102034? | -8,818.84 | 8,760.34 | 2284 | 03-21 | 50.00 |
| 03-16 | $Deposit | | 30,000.00 | | 38,760.34 | 2285 | 03-17 | 19.60 |
| 03-17 | | | 0000313113838808 | -58.00 | 38,702.34 | 2286 | 03-16 | 5,700.08 |
| 03-17 | Check | 2284 | 0000313113477A | -19.60 | 38,682.74 | 2287 | 03-17 | 5,700.08 |
| 03-17 | Check | 2285 | 0000313113726A | -5,700.08 | 32,982.66 | 2288 | 03-16 | 4,420.59 |
| 03-17 | Check | 2296 | 0000313113726S | -5,700.08 | 27,282.58 | 2289 | 03-16 | 8,818.84 |
| 03-21 | Check | 2287 | 00003131137264 | -4,420.59 | 22,862.00 | 2289 | 03-21 | 816.00 |
| 03-21 | Check | 2283 | 0000323276031O | -50.00 | 22,812.00 | 2290 | 03-29 | 50.00 |
| 03-21 | Check | 2289 | 0000323275849G | -816.00 | 21,996.00 | 2291 | 03-27 | 12.00 |
| 03-27 | Check | 2291 | 000032327561?9 | -12.00 | 21,984.00 | 2292 | 03-28 | 55.41 |
| 03-28 | Check | 2292 | 0000323268188O | -55.41 | 21,928.59 | 2293 | 03-29 | 148.48 |
| 03-29 | Check | 2290 | 0000323228622OO | -50.00 | 21,878.59 | 2294 | 03-31 | 350.00 |
| 03-31 | Check | 2293 | 00003232782729 | -148.48 | 21,730.11 | 2295 | 03-31 | 2,151.00 |
| 03-31 | Check | 2294 | 0000313113432O8 | -350.00 | 21,380.11 | | | |
| 03-31 | Check | 2295 | 0000313113442I9 | -2,151.00 | 19,229.11 | | | |
| 03-31 | Ending Totals | | 30,000.00 | -32,427.05 | $19,229.11 | | | |

19 Enclosures

0000109260      PAGE

Statement of Account

PBTC 0310

JKR BUSINESS
PO BOX 10489
MERRILLVILLE IN 46411-0489

July 31, 2000
Total days in statement period: 31

Page 1 of 2

Direct Inquiries to:
Client Services, 312-683-7100
The PrivateBank And Trust Company
Ten North Dearborn
Chicago IL 60602

## Summary of Account Balance

| Account | Number | |
|---|---|---|
| Business Checking | | Ending Balance |
| | | $24,878.01 |
| | | PAGE |

**XXH1992DPCSTM
Statement of Account
Jkr Business
Page 2 of 2

## Business Checking

Avg collected balance    $24,985.00

| Date | Description | | Additions | Subtractions | Balance |
|---|---|---|---|---|---|
| 06-30 | Beginning Balance | | | | $11,408.23 |
| 07-03 | Check | 2331 | 000031313130366 | -8,740.26 | 2,667.97 |
| 07-03 | Check | 2332 | 000031313130367 | -33.42 | 2,634.55 |
| 07-03 | Check | 2333 | 000032323254677 | -216.28 | 2,418.27 |
| 07-03 | Check | 2334 | 000032323251277 | -210.00 | 2,208.27 |
| 07-03 | Deposit | | 40,000.00 | | 42,208.27 |
| 07-05 | Deposit | | 000031313316656 | | |
| 07-05 | Check | 2335 | 000031313467739 | -1,890.21 | 40,318.06 |
| 07-06 | Check | 2325 | 000031313184739 | -2,251.00 | 38,067.06 |
| 07-06 | Check | 2329 | 000031313681838 | -816.00 | 37,251.06 |
| 07-06 | Deposit | | 3,516.29 | 000031313167995 | 40,767.35 |
| 07-10 | Check | 2326 | 000031313148776 | -5,700.08 | 35,067.35 |
| 07-10 | Check | 2327 | 000031313148775 | -5,700.08 | 29,367.19 |
| 07-10 | Check | 2328 | 000031313148777 | -4,420.58 | 24,946.61 |
| 07-12 | Check | 2336 | 000031313430356 | -68.60 | 24,878.01 |
| 07-31 | Ending totals | | 43,516.29 | -30,046.51 | $24,878.01 |

## 11 Enclosures

| Number | Date | Amount |
|---|---|---|
| 2325 | 07-06 | 2,251.00 |
| 2326 | 07-10 | 5,700.08 |
| 2327 | 07-10 | 5,700.08 |
| 2328 | 07-10 | 4,420.58 |
| 2329 | 07-06 | 816.00 |
| 2331 | 07-06 | 8,740.26 |
| 2332 | 07-03 | 33.42 |
| 2333 | 07-03 | 216.28 |
| 2334 | 07-03 | 210.00 |
| 2335 | 07-05 | 1,890.21 |
| 2336 | 07-12 | 68.60 |

* Skip in check sequence

0731000000109260

PAGE

**XXH1992DPCSTM
Statement of Account

PBTC 0314

0000109252

JKR BUSINESS
PO BOX 10489
MERRILLVILLE IN 46411-0489

September 30, 2000
Total days in statement period: 30

Page 1 of 2

Direct Inquiries to:
Client Services  312-683-7100
The PrivateBank And Trust Company
Ten North Dearborn
Chicago IL 60602

Summary of Account Balance

Account                          Number           Ending Balance
Business Checking                                 $13,353.23
                                                  PAGE

1RXRH19Z0PCSTH
Statement of Account

JKR Business
Page 2 of 2

Business Checking  0000109252
Avg collected balance        $10,743.00

| DATE | DESCRIPTION | NUMBER | ADDITIONS | SUBTRACTIONS | BALANCE | NUMBER | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 14 Enclosures | | |
| 08-31 | Beginning balance | | | | $21,961.37 | 2348 | 09-07 | 144.54 |
| 09-05 | Check 2352 | | 0000313160221 | -13.92 | 21,941.45 | 2351 * | 09-07 | 2,251.00 |
| 09-07 | Check 2353 | | 0000313160343 | -1,174.83 | 20,766.62 | 2352 | 09-05 | 13.92 |
| 09-07 | Check 2348 | | 0000313174827 | -144.54 | 20,628.08 | 2353 | 09-05 | 1,174.83 |
| 09-07 | Check 2351 | | 0000313174826 | -2,251.00 | 18,377.00 | 2354 | 09-13 | 18.43 |
| 09-13 | Check 2354 | | 000010000711930 | -18.43 | 18,358.65 | 2355 * | 09-25 | 210.00 |
| 09-15 | *Deposit | | | 1,069.10 | 19,427.75 | 2357 | 09-26 | 76.54 |
| 09-25 | Check 2356 | | 0000313161176 | -210.00 | 19,217.75 | 2358 | 09-29 | 5,700.00 |
| 09-26 | Check 2357 | | 000032332276 | -76.54 | 19,141.19 | 2359 | 09-27 | 5,700.00 |
| 09-26 | Check 2359 | | 0000313971917 | -5,700.00 | 13,441.19 | 2360 | 09-28 | 4,420.50 |
| 09-28 | Check 2360 | | 0000313174540 | -8,740.26 | 10,400.93 | 2361 | 09-28 | 8,740.26 |
| 09-28 | Check 2361 | | 000032328064755 | -147.92 | 10,253.01 | 2362 | 09-29 | 816.00 |
| 09-28 | *Deposit | | 20,000.00 | | 30,253.01 | 2362 | | |

0000109260

| DATE | DESCRIPTION | | ADDITIONS | SUBTRACTIONS | BALANCE | NUMBER | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 09-29 | Check 2358 | | 0000313185340 | -5,700.00 | 24,552.93 | 2363 | 09-28 | 147.92 |
| 09-29 | Check 2359 | | 0000313185341 | -5,700.00 | 18,852.85 | 2364 | 09-29 | 63.04 |
| 09-29 | Check 2360 | | 0000313185339 | -4,420.50 | 14,432.37 | | # Skip in check sequence | |
| 09-29 | Check 2362 | | 0000313183293 | -816.00 | 13,616.27 | | | |
| 09-29 | Check 2364 | | 0000313187232 | -63.04 | 13,553.23 | | | |
| 09-30 | Ending totals | | 21,069.10 | -29,477.24 | $13,553.23 | | | |

0000109260                   0930000000000109260

1RXRH19Z0PCSTH
Statement of Account

PBTC 0316

For personal assistance, call:
L. Hamilton Kerr III.
817-853-3900

JKR BUSINESS
PO BOX 10489
MERRILLVILLE IN 46411-0489

The PrivateBank And Trust Company
517 Green Bay Road
Wilmette IL 60091

## Business Checking

| | | |
|---|---|---|
| Account number | | |
| Enclosures | 8 | |
| Low balance | $3,813.48 | |
| Average balance | $37,447.80 | Beginning bal | $7,052.13 |
| Avg collect bal | $35,591.00 | Total additions | 57,535.54 |
| | | Total subtractions | 60,774.19 |
| | | Ending balance | $3,813.48 |

| Number | Date | Amount | Control |
|---|---|---|---|
| 2384 | 12-04 | 92.58 | 00003232332018 |
| 2385 | 12-01 | 56.54 | 000033333852527 |
| 2386 | 12-01 | 2,251.00 | 0000333385 2630 |
| 2387 | 12-08 | 60.00 | 00003131899991 |
| 2388 | 12-08 | 1,035.81 | 00003131895877 |
| 2389 | 12-14 | 18.93 | 00003131422303 |
| 2390 | 12-15 | 210.00 | 00003131611301 |
| 2395 ¤ | 12-29 | 57,049.33 | 00003131529107 |
| ¤ Skip in check sequence | | | |

### CREDITS

| Date | Description | Additions | Control Num? |
|---|---|---|---|
| 12-04 | 'Deposit | 1,357.67 | 00003131180- |
| 12-11 | 'Deposit | 56,177.87 | 000032320399- |

0000109252    PAGE

##XXH1992DPCSTM

JKR BUSINESS
December 31, 2000

Page 2 of 2
0000109252

### DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11-30 | 7,052.13 | 12-08 | 4,913.87 | 12-15 | 60,862.81 |
| 12-01 | 4,744.59 | 12-11 | 61,09.74 | 12-29 | 3,813.48 |
| 12-04 | 6,009.68 | 12-14 | 61,072.81 | | |

0000109260    PAGE

##XXH1992DPCSTM

PBTC 0320

**EXHIBIT J**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEXIA CREDIT LOCAL | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 02 C 8288 |
| PETER G. ROGAN, et al., | ) | DOCKETED |
| Defendants. | ) | Judge Mark Filip     JUN 0 1 2004 |
| | ) | Mag. Judge Sidney I. Schenkier |
| EDGEWATER PROPERTY COMPANY and PGR PROPERTIES, INC., | ) | **FILED** |
| Counterplaintiffs, | ) | MAY 1 8 2004 |
| v. | ) | JUDGE MARK FILIP UNITED STATES DISTRICT COURT |
| DEXIA CREDIT LOCAL, | ) | |
| Counterdefendant. | ) | |

**PLAINTIFF DEXIA CREDIT LOCAL'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO COMPEL DEFENDANTS PETER G. ROGAN, BRADDOCK
MANAGEMENT, LP, BAINBRIDGE MANAGEMENT, LP, BAINBRIDGE
MANAGEMENT, INC., EDGEWATER PROPERTY COMPANY, AND
PGR PROPERTIES, INC. TO RESPOND TO DOCUMENT
<u>REQUESTS AND ANSWER INTERROGATORIES</u>**

Scott T. Mendeloff
Gabriel Aizenberg
Eric S. Pruitt
Tara M. Charnes
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for Plaintiff Dexia Credit Local

U.S. DISTRICT COURT

## BACKGROUND

On January 9, January 11, February 4, and February 11, 2004, plaintiff Dexia Credit Local ("Dexia") served document requests and interrogatories upon defendants Peter Rogan ("Rogan"), Braddock Management LP ("Braddock"), Bainbridge Management LP ("Bainbridge"), Bainbridge, Management, Inc. (Bainbridge, Inc.), Edgewater Property Company ("Edgewater"), and PGR Properties, Inc. ("PGR") seeking discovery, among other things, on three subjects – all of which defendants refuse to produce. First, defendants refuse to provide discovery sufficient to permit a full accounting of defendants' *assets* (other than records of payments received directly from Edgewater ("EMC")), including discovery *inter alia* of the location and identity of defendants' bank accounts, records of real property and other assets held in the name of Rogan, Rogan's family, and the other defendants, unredacted records of defendants' checking, savings, money market and investment accounts, and complete and unredacted tax records. Specifically, Rogan refuses to respond (either in whole or in part) to Interrogatories Nos. 1, 2 and 3 and Document Requests Nos. 4, 7, 10, 11, 12, and 13. Braddock and Bainbridge refuse to respond (either in whole or in part) to Interrogatories Nos. 2 and 3 and Document Requests Nos. 6 (f), (l) and (m), 20, 21, 25, 27 and 28. EPC and PGR refuse to respond (either in whole or in part) to Interrogatories Nos. 1 and 2 and Document Requests Nos. 3 (c)-(g), (l), (m) & (o), 8, 9, 11 and 19.

Second, defendants refuse to respond to interrogatories and document requests sufficient to permit Dexia to *trace* asset transfers and payments between and among defendants and entities defendants directly or indirectly control, including the members of the boards of directors of EMC, Vital, and Access. Specifically, these requests seek discovery relating to defendants' financial and business dealings with other Rogan-affiliated entities and individuals which, on information and belief, facilitated Rogan's scheme by receiving and transferring the fraudulently obtained proceeds of the conspiracy between and among defendants and other Rogan-affiliated individuals and entities. Based on this objection, Rogan refuses to respond (either in whole or in part) to Interrogatories Nos. 1, 2, 3, 7 and 9 and Document Requests No. 3, 4, 5, 7, 8, 10, 11, 12, 13, 17 and 18. Braddock and Bainbridge refuse to respond (either in whole or in part) to Interrogatories Nos. 2 and 3 and Document Requests Nos. 4, 5, 6 (a)-(c), (e), (g), (h), (j), (k), (p), (aa), and (ff), 11, 15-20, 21-23, 25, 27 and 28. EPC and PGR refuse to respond

(either in whole or in part) to Interrogatories Nos. 1 and 2 and Document Requests Nos. 3 (a)-(i). (k)-(m) & (o), 5-9, 11-12, 18-19, 24, 26, 27, and 29.

Third, defendants refuse to respond to interrogatories and document requests sufficient to permit Dexia to determine the extent to which defendants exercised *control* over other entities.[1] Specifically, these requests ask for all documents relating to the control Rogan or his family exercised over the defendants or any of the entities specifically identified in the requests. Based upon this objection, Rogan refuses to respond (either in whole or in part) to Interrogatory No. 8 and Document Request No. 31. Braddock and Bainbridge refuse to respond (either in whole or in part) to Document Request No. 22. EPC and PGR refuse to respond (either in whole or in part) to Document Request No. 12.

The foregoing discovery requests are relevant to and reasonably calculated to lead to the discovery of admissible evidence regarding numerous key issues and allegations raised in EPC and PGR's recently-filed summary judgment motion and, more importantly, in Dexia's complaint, namely, Dexia's allegations that defendants: (a) are liable for punitive damages (Cplt. ¶ 63); (b) perpetrated a widespread conspiracy to loot EMC for Rogan's benefit (*id.* ¶¶ 6-9, 127-45, 190-96, 210-16, 221-56); (c) knew of and participated in the alleged fraud (*id.* ¶¶ 1-5, 53-126, 163-71, 178, 182-96, 245-56); (d) and others were Rogan's alter egos. (*id.* ¶¶ 26, 155-62, 224, 235, 238-43). Dexia's discovery requests are attached as Exhibits A - F.

On February 12, March 3, March 8, March 12 and March 24, 2004, defendants served responses to Dexia's discovery requests in which they refused to produce the requested documents and answer the interrogatories propounded, advancing the arguments that discovery requested is: (a) irrelevant to the allegations in Dexia's complaint (*See, e.g.,* Rogan Resp. to Dexia Req. Nos. 3 – 5, 7, 8, 10, 13, 16-18, and 31 and Int. Nos. 1-3, 8 and 9 (Ex. G)); and (b) irrelevant because Dexia has not established defendants' liability. (*See, e.g.,* Rogan Resp. to Dexia Interrog. 2 (Ex. G)). Additionally, defendants objected to Dexia's definition of "control"

---

[1] These entities and individuals were all either directly involved in EMC's affairs or directly or indirectly controlled by Rogan and involved in facilitating the control Rogan exercised over EMC, including: (i) doctors that pled guilty to perpetrating healthcare fraud at EMC; (ii) companies Rogan owned and which received payments from EMC; (iii) other companies known or believed to have been controlled by Rogan; (iv) various EMC-related entities with which Braddock and Bainbridge had management contracts; (v) Rogan's family; and (vi) trusts in the name of Rogan and his children, all of which have held ownership interests in defendants, including PGR, Braddock (via interests in Braddock's limited partner), and Bainbridge (via interests in Bainbridge's limited partner).

(which is intended to cover both direct and indirect control).  (Rogan Resp. to Dexia Interrog. & Doc. Req., Gen. Obj. 7 (Ex. G))  Defendants' objections to Dexia's discovery requests are attached as Exhibits G-L.  A summary table of Dexia's discovery requests, defendants' objections, and the relevance of the discovery is attached hereto as Exhibit M.

Counsel for Dexia initiated an effort to resolve these disputes, and conferred with counsel for defendants several times by telephone.  Exhibit N consists of letters Dexia's counsel wrote to counsel for each of the defendants memorializing their discussions.  Defendants' counsel did not respond to these letters, rendering these resolution efforts unsuccessful.[2]

For the reasons stated below, the discovery Dexia seeks plainly is proper and, indeed, essential because it is directly relevant to the allegations in its complaint, the remedies Dexia seeks, and the defenses EPC and PGR raise in their summary judgment motion.

### ARGUMENT

Dexia's motion to compel is governed by the Federal Rules of Civil Procedure, which contemplate liberal discovery and define "relevancy" under Rule 26 broadly. *Stallings v. Union Pacific R. Co.*, 2003 U.S. Dist. LEXIS 9550, at *17 (N.D. Ill. 2003); *EEOC v. Staffing Network, LLC*, 2002 WL 31473840, at *1 (N.D. Ill. 2002).  "A discovery request is relevant if there is any chance that the information sought may be relevant to the subject matter of the litigation." *Saket v. Am. Airlines, Inc.*, 2003 WL 685385, at *2 (N.D. Ill. 2003).  Discovery need not seek information admissible at trial, so long as the request appears reasonably calculated to lead to the discovery of admissible evidence. *See White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 366 (N.D. Ill. 2001).

## I.  DISCOVERY OF DEFENDANTS' ASSETS, TRANSFERS, AND THE ENTITIES THEY CONTROL IS DIRECTLY RELEVANT TO DEXIA'S CLAIMS AND THE REMEDIES IT SEEKS.

### A.  Defendants' Assets and Financial Records Are Relevant to Dexia's Claim for Punitive Damages.

In its complaint, Dexia properly seeks punitive damages on claims for which Illinois law allows such a recovery:  fraud (Counts I and II), *Stafford v. Puro*, 63 F.3d 1436, 1443

---

[2] Although not directly relevant to the discovery issues addressed in Dexia's motion to compel, Exhibit O hereto provides a some background regarding Sidley's representation of EMC and EMC's discovery requests under Fed. R. Bankr. P 2004.

(7th Cir. 1995); breach of fiduciary duty (Counts IV, V, VI, VIII), *O'Neill v. Gallant Ins. Co.*, 769 N.E.2d 100, 109 (Ill. App. Ct. 2002); willful conversion (Count VII), *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); *Motherway, Glen & Napleton v. Tehin*, 2003 WL 21501952, at *5 (N.D. Ill. 2003); and civil conspiracy (Count X). *Sarno v. Thermen*, 608 N.E.2d 11, 21 (Ill. App. Ct. 1993); *NPF, Inc. v. Sotka*, 2000 WL 574527, at *11 (N.D. Ill. 2000).

The discovery Dexia seeks regarding defendants' "assets" is relevant and admissible on Dexia's claim for punitive damages. "[E]vidence of a defendant's net worth and pecuniary position may be introduced in a case in which punitive damages is an issue." *Pickering v. Owens-Corning Fiberglas Corp.*, 638 N.E.2d 1127, 1139 (Ill. App. Ct. 1994) (allowing discovery of financial statements, business plans and financial projections, and appraisals, estimates, and statements of fair market value in connection to punitive damages claim) (internal citations omitted). *See also Deal v. Byford*, 537 N.E.2d 267, 272 (Ill. 1989) ("financial status of the defendant" relevant to assessing punitive damages award); *Kay v. First Continental Trading, Inc.*, 1997 WL 614378, at *2 (N.D. Ill. 1997) (evidence of net worth admissible where punitive damages are at issue). As *Aspen v. King World Prods. Corp.*, 2001 WL 1403001, at *3 (N.D. Ill. 2001) explains, "there can be no doubt that net worth is discoverable under Rule 26(b)(1) of the Federal Rules of Civil Procedure, as it regards a matter 'that is relevant to the claim' of a party; that is, plaintiff's punitive damages claim." *See also Pickering*, 638 N.E.2d at 1139 ("We are aware of no Illinois case which limits the scope of financial discovery relating to punitive damages").

Discovery of net worth and pecuniary position supports (but is not limited to) discovery of financial statements (both audited and unaudited), *JCW Inv., Inc. v. Novelty, Inc.*, 2003 WL 742184, at *1, *3 (N.D. Ill. 2003), tax returns, *EEOC v. Staffing Network, L.L.C.*, 2002 WL 31473840, at *1, *5 (N.D. Ill. 2002), valuations of assets and liabilities, *Aspen*, 2001 WL 1403001, at *1, business plans and financial projections, *Pickering*, 638 N.E.2d at 1139, any other documents relevant to establishing net worth, *Salstone v. Gen'l Felt Indus.*, 1986 WL 13738, at *1-*2 (N.D. Ill. 1986), and records of transfers, *i.e.*, discovery designed to trace the flow of assets in and out of the person/entity from whom punitive damages are sought. *EEOC v. Ian Schrager Hotels, Inc.*, 2000 WL 307470, at *4 (C.D. Cal. Mar. 8, 2000).

Obviously, discovery of "assets" is at the core of any net worth determination. The "tracing" requests track the flow of funds to and from defendants, allowing Dexia: (a) to

4

confirm that the discovery defendants' provide as to their net worth and pecuniary position is accurate; and (b) to ensure that any transfers of assets from defendants to others were made for proper consideration and not for the purpose of hiding assets. *See, e.g., Ian Schrager Hotels,* 2000 WL 307470, at *4 ("Clearly, plaintiff may obtain defendants' financial information, to the present, to determine whether defendants have attempted to transfer, or have transferred, income or assets to others to avoid potential liability if defendants lose the pending litigation. Such information is relevant under Rule 26(b) to plaintiff's claims for damages and punitive damages.") Dexia's "control" requests are simply a variant of the foregoing because discovering which entities defendants control is relevant to ascertaining defendants' respective net worth.

**B.    The Requested Assets, Tracing, and Control Records Are Of Core Relevance To Dexia's Conspiracy Allegations.**

A second, independent reason for this Court to uphold the propriety of Dexia's requests is that Dexia's complaint alleges a widespread conspiracy among numerous actors to loot EMC for Rogan's benefit. (Cplt. ¶¶ 1, 6, 8, 135, 141, 234, 244 & 251) In these circumstances, numerous courts have compelled discovery of all documents concerning transfers between and among these actors, *i.e.,* defendants, their coconspirators, and they control. The following cases illustrate this in circumstances closely analogous to our own.

In *Shapo v. Engle,* 1999 WL 446853, at *1 (N.D. Ill. 1999), plaintiff Director of Insurance of the State of Illinois, in his capacity as liquidator of three insurance companies (the "Insurance Companies") sued several individuals and companies alleging *inter alia* the existence of a conspiracy. The alleged mastermind of the conspiracy was defendant Clyde Engle, the former board chairman the Insurance Companies, who allegedly carried out the conspiracy with former directors of the Insurance Companies and other affiliated businesses. *Id.* The conspiracy involved a scheme to defraud the Insurance Companies through transactions by which Engle and others improperly funneled money out of the Engle-controlled Insurance Companies to Engle-controlled entities, *i.e.,* parents or other downstream entities of the Insurance Companies. *Id.* The challenged transfers included: $6 million in "management fees" to Engle-controlled parent companies; purchases of artwork, jewelry, and other collectibles for Engle's benefit; improper loans; and capital contributions for the benefit of Engle-controlled entities. *Id.* at *2-*4.

Plaintiff sought discovery as to transfers of funds and assets between and among the Insurance Companies, the parent companies, and the parent companies' subsidiaries. 2000

WL 876994, at *3 (N.D. Ill. 2000). Defendants objected to the discovery as irrelevant, so plaintiff moved to compel. Chief Judge Kocoras compelled discovery:

> In his complaint, Plaintiff has alleged a complex RICO conspiracy to defraud involving a network of transactions between various companies, subsidiaries, and affiliates. Even though Plaintiff may not have alleged transactions between some specific entities (i.e. two parent companies), <u>it is entirely possible that tracing the transfer of funds through the various entities "may be relevant to the subject matter of the action." Given the complexity and broad nature of the relationships and transactions at issue, the Court will not narrowly proscribe discovery so as to curtail the tracing of funds merely because the transfer of funds may involve two parent companies, rather than some other combination of entities.</u> Instead, the Court will grant the motion to compel and order Defendants to produce the documents demonstrating the transfer of cash and/or assets between the various entities.

*Id.* (emphasis added). Defendants did not fully comply with the order, so plaintiff moved to enforce it. 2001 WL 204804, at *1 (N.D. Ill. 2001) In a ruling of great significance to this case, Chief Judge Kocoras rejected defendants' efforts to narrow the scope of his order, holding that it clearly had "envisioned the Plaintiffs being able to trace the money from the Insurance Companies, through the Downstream Affiliates to the Parent Companies, and then to its ***ultimate destination***." *Id.* (emphasis added). The Chief Judge explained why it was critical for plaintiff to know where the funds ended up: "Documentation that proves the final destination of the money could show that the money was indeed used for the benefit of the Parent Companies, and not for the benefit of the Insurance Companies." Chief Judge Kocoras reasoned further:

> [I]t cannot be said that the financial records of the Parent Companies are not relevant. The Plaintiff has alleged a vast conspiracy. The aim of the alleged conspiracy, according to Plaintiff, was to funnel money out of the Insurance Companies and into the Parent Companies, to the detriment of the Insurance Companies, and the benefit of the Parent Companies. <u>The Plaintiff believes that being able to show *where the money ended up* is necessary to portray the breadth of the conspiracy.</u> Although the Defendants contend that this theory is inconsistent with the Plaintiff's Complaint, the Supreme Court has stated that discovery is not limited to issues raised in the pleadings.

*Id.* at *2 (emphasis added).

Other cases are in accord with Chief Judge Kocoras' rulings in *Shapo*. In *Van Kampen High Yield Mun. Fund v. O'Donnell & Naccarato*, 2003 WL 751005, at *2 (E.D. Pa. 2003), plaintiffs alleged that defendants had conspired to divert funds from a mismanaged construction project to defendant Thomas Holt, Jr., and sought to compel the production of

documents of the several defendants and others reflecting transfers between defendants and Holt-controlled entities. Holt objected because there was no evidence that funds from the project went to him. Defendants also objected because many of the specified entities were not defendants in the action and had no connection to the case. *Id.* The court these objections and compelled discovery, holding that Holt's personal financial records were relevant because plaintiff alleged that Holt had fraudulently transferred funds from the project and converted those funds for his own use. *Id.* As to the other objections, the court ruled that because the complaint included "allegations that the defendants conspired to divert funds from the Kaighn Point project, any transfer of funds between the defendants would indeed be relevant." *Id.* And, of particular relevance to the issues the Rogan defendants raise opposing discovery here, the court went on to hold that "transfers of funds between the Defendants and entities controlled by the Defendants would also be relevant and therefore discoverable." *Id.* (emphasis added).

In *Senise v. American Motor Club*, 129 B.R. 981, 987 (Bankr. E.D.N.Y. 1991), debtor American Motor Club alleged that defendants, AMC directors, diverted funds from AMC for their own personal use and sought to compel discovery of defendants' bank accounts and personal finances. Defendants objected to the relevance of such information. The court compelled discovery because defendants' financial records would "either belie or substantiate" debtor's allegations that defendants diverted funds, depending on whether monies could be "traced" from debtor to defendants' personal accounts. *Id.* The court also rejected defendants' contention that debtor's requests were unduly burdensome because defendants' financial records and bank accounts could provide debtor "with the only means of establishing that money belonging to the [d]ebtor was diverted by [defendants] for their own personal use." *Id.* at 988.[3]

Like the plaintiffs in the foregoing cases, Dexia alleges a "vast conspiracy" among defendants whose aim to "funnel money" out of EMC for "the benefit" of Rogan, *Shapo*, 2001 WL 204804, at *2, which funds constituted Dexia's collateral. Dexia's complaint is replete with such factual allegations. (Cplt. ¶¶ 1, 6, 8, 135, 141, 234, 244 & 251) Dexia also alleges that: (a) Rogan caused EMC to enter into numerous arrangements with Braddock and

---

[3] Other cases involving fraudulent siphoning of funds where discovery of financial records was allowed: *Constitution Bank v. Levine*, 151 F.R.D. 278, 280 (E.D. Pa. 1993); *Shearson Lehman Hutton, Inc. v. Lambros*, 135 F.R.D. 195, 198 (M.D. Fla. 1990) ("[T]he contents of defendants' tax returns may lead to admissible evidence concerning the merits of plaintiff's claims of financial impropriety and conversion. . . ."); and *Jacobs v. Kennedy Van Saun Mfg. & Eng. Corp.*, 12 F.R.D. 523, 526 (M.D. Penn. 1952).

Bainbridge that drained EMC of in excess of $25 million in management fees, benefit and salary reimbursements, and other expenditures (*id.* at ¶¶ 127-28); and (b) defendants Rogan, EPC, and PGR caused EMC to expend its funds to develop EPC and PGR properties at the expense of EMC and Dexia. (*Id.* at ¶¶ 135-39) Therefore, as in *Shapo, Van Kampen,* and *Senise,* defendants' financial records are relevant to and, indeed, could constitute the "only means of establishing" that money belonging to EMC – which, importantly, constituted Dexia's collateral – was diverted by Rogan and the other defendants for Rogan's own personal use. *Senise, supra.* To "portray the breadth of the conspiracy" to divert funds from EMC to Rogan, Dexia must be able to obtain discovery as to: (a) whom defendants controlled; (b) transfers of funds and assets between defendants and other entities defendants owned or controlled; and (c) "where the money ended up." *Shapo,* 2001 WL 204804, at *2. This discovery will "either belie or substantiate" Dexia's allegations that defendants perpetrated a conspiracy to divert EMC funds, depending on whether EMC monies can be "traced" from EMC to the accounts of defendants or those under defendants' control. *Senise, supra.*

### C. Defendants' Assets and Financial Records Are Relevant To Demonstrating That Defendants – Particularly Rogan – Knew Of The Fraudulent Scheme.

Dexia's requests are also relevant to demonstrating that defendants – particularly Rogan – knew of the fraud scheme Dexia alleges in its complaint. Defendants' *possession* of funds funneled out of EMC as part of the charged course of conduct would provide the foundation for the well-established inference that defendants knew of the illicit nature of those funds, which of course goes to the heart of our opponents' defense.

Seventh Circuit Federal Criminal Jury Instruction 3.14 provides that a juror "may reasonably infer that a person who possesses recently stolen property knew it had been stolen." *See also U.S. v. Bonnetts,* 747 F.2d 1159, 1162-65 (7th Cir. 1984) (trial court properly instructed on inference of knowledge arising from possession of recently stolen goods where evidence established that: (a) stolen car was delivered to the defendant at his work place; and (b) a few days later the defendant instructed co-worker to give the car keys to the defendant's wife).

The inference of knowledge arising from the possession of stolen property has been applied in cases – such as this one – involving the possession of fraudulently obtained funds. In *U.S. v. Bratton,* 875 F.2d 439 (5th Cir. 1989), Doris and George Bratton were indicted for fraudulently causing two unauthorized transfers from Doris' employer's futures accounts to

8

an account in George's name. Doris pled guilty to wire fraud, but testified at George's trial that he was not involved in the transfers and that she had told him the transferred funds were part of an inheritance of a recently-deceased relative. On appeal of his conviction for aiding and abetting Doris, George challenged the sufficiency of the evidence that he knew the funds were stolen. While the government pointed to certain circumstantial evidence of George's knowledge (*e.g.*, George's active control and management of the stolen funds), the Fifth Circuit noted that much of this evidence was consistent with Doris' exculpatory testimony. It nevertheless found the evidence sufficient based, in part, upon the inference of knowledge which could be drawn from George's possession of the stolen funds. *Id.* at 442.

Here, Dexia alleges that Rogan participated in a scheme to defraud Dexia, EMC, and others in a wide variety of ways, and that the other defendants worked with Rogan to accomplish this scheme, and to assist Rogan to profit personally from it. (Cplt. ¶¶ 1-5, 53-126, 163-71, 178, 190-96, 207-09 & 221-56). Knowledge and intent certainly are hotly contested in this case. In their guilty pleas, defendants Braddock, Bainbridge, and Ehmen admit that they knew of and participated in the healthcare fraud at EMC. (Exs. P-R) Yet, astoundingly, in their answers to Dexia's complaint, Braddock and Bainbridge deny that they participated in a scheme to defraud EMC, to Dexia's detriment. And, perhaps the central pillar of the defense of Rogan, EPC, and PGR is their claim that they knew nothing of the fraud scheme that their codefendants Braddock, Bainbridge, and Ehmen pled guilty to perpetrating through EMC. If Rogan, EPC, and PGR received the substantial portions of the money generated in the fraud scheme at EMC, Seventh Circuit Pattern Instruction 3.14 and *Bratton* provide that this is circumstantial proof that Rogan, EPC, and PGR knew of the funds' illicit source. Thus, Dexia must be allowed to discover defendants' assets and financial records to permit Dexia to show that defendants possessed the fraud proceeds. Given the significance of the issue of possession of the funds, Dexia is entitled to proof of any form of possession, *i.e.*, asset, tracing, and control records not only of Rogan but also of Rogan-controlled entities and the defendants Rogan owns or controls.

**D.**    **The Discovery Dexia Seeks Is Directly Relevant to Dexia's Allegation that Defendants and Others Were Rogan's Alter Egos.**

The discovery Dexia seeks also is directly relevant to Dexia's core allegation that defendants and others were Rogan's alter egos. Where, as here, a complaint "contains allegations suggestive of an alter ego argument," the plaintiff "must be allowed to take discovery

9

regarding the relationships among the various defendants." *Ross v. UKI Ltd.*, 2004 WL 67221, at *7 (S.D.N.Y. 2004). An established method for ascertaining the relationships among the various defendants here is through financial records and tracing of funds.

In *Pielet Bros. Scrap Iron & Metal Ltd. P'ship v. Reynolds Metal Co.*, 1994 WL 649105, at *1 (N.D. Ill. 1994), plaintiff, who had leased property from defendant Reynold Metals Company, brought suit against Reynolds seeking specific performance of the lease. Reynolds counterclaimed against various corporate defendants, their limited partners, and shareholders, seeking damages stemming from environmental contamination to the property. *Id.* Reynolds alleged that the three individual defendants, *i.e.*, the limited partners and shareholders of the corporate defendants, owned and controlled the corporate defendants such that the corporate defendants were alter egos or "shell entities" of the individual defendants and each other. *Id.* at *4. Reynolds initiated discovery aimed at uncovering evidence which it could use to support its alter ego allegations: financial records, including general ledgers and documents pertaining to bank accounts, banking institutions, and authorized signatories, as well as "documentation relation to agreements, financial transactions, transfers of assets, or other transactions." *Id.* at *3.

The counter-defendants refused to produce this discovery, so Reynolds moved to compel. The court granted the plaintiff's motion because the documents were "directly relevant" to proving plaintiff's alter ego theory inasmuch as they could show "whether funds have been commingled or whether an entity has been treating the assets of another as its own." *Id.*. *See also Chicago Dist. Council of Carpenters Pen. Fund v. D.P. Builders, Inc.*, 1997 WL 685021, at *3 (N.D. Ill. 1997) (discovery of cash receipt journals to allow tracing of transfers held relevant *inter alia* to alter-ego claim); *Abu-Nassar v. Elders Futures Inc.*, 1991 WL 45062, at *16 (S.D.N.Y. 1991) (discovery as to changes in corporate form, asset transfers, and related entities held "relevant to [plaintiff's] claims of alter ego liability"); *Electromatic (PTY) Ltd. v. Rad-O-Lite, Inc.*, 90 F.R.D. 182, 183-84 (E.D. Pa. 1981) (discovery of "information regarding financial transactions among the various defendants" held relevant to plaintiffs' claim that "the various entities are merely the alter egos of the individual defendants").[4]

---

[4] Other cases on this point include: *McLeod, Alexander, Powel & Apffel*, 894 F.2d 1482, 1485-86 (5th Cir. 1990) (tax returns and cancelled checks relevant to show how much defendant and corporation "paid on each other's bills and how closely their financial affairs were intertwined"); *United States v. Seaga Corp. of Ill.*, 2002 WL 31045388, at *2 (N.D. Ill. 2002) (tax returns relevant to alter ego claim).

Like the plaintiffs in the foregoing cases, Dexia makes numerous allegations establishing that defendants were Rogan's alter egos. As Judge Aspen recognized in denying EPC and PGR's motion to dismiss, "the crux of Dexia's complaint is that all of the entities involved in this case are owned and controlled by one defendant, Rogan, and that they are in essence all one entity under his complete dominance." *Dexia Credit Local v. Rogan*, 2003 WL 22349111, at *10 (N.D. Ill. 2003). Dexia alleges that Rogan directly and indirectly entered into myriad lucrative management contracts with EMC and other related entities to exert control over the hospital's operations and to siphon large sums of money from EMC. (Cplt. ¶¶ 26, 56, 57). The complaint further alleges that Rogan achieved these ends by using a wide array of different forms and organizations to attempt to insulate himself from personal responsibility for the misconduct he perpetrated and caused to be perpetrated at and through EMC. (*Id.* ¶ 26). Furthermore, Dexia alleges that, at all times relevant to this case, Rogan controlled defendants Braddock, Bainbridge, Access, and Vital. (*Id.* ¶¶ 54, 97, 155). The complaint further alleges that the reason Access and Vital failed to take any legal action against Braddock and Bainbridge for the millions of dollars of damage done to EMC in the form of bogus loans and forgiven debts is that Rogan entirely controlled Access and Vital, as well as Braddock and Bainbridge, and therefore any legal action taken against Braddock and Bainbridge on behalf of EMC would have benefited only EMC and its creditors, including Dexia, and not Rogan. (*Id.* at ¶ 162)

Dexia's discovery requests for the financial records of the various defendants are directly relevant to the foregoing portions of its complaint. This discovery could reveal if Rogan and the other defendants have "commingled" funds or have been "treating the assets of another as [their] own." *Pielet Bros.*, 1994 WL 649105, at *3. This discovery also could establish whether Rogan used the other defendants to: (a) siphon money from EMC, as Dexia alleges; and (b) route it to himself, other defendants, or persons or entities he controlled.

**D.      The Discovery Dexia Seeks Is Directly Relevant To The Board Independence Issue EPC And PGR Raise In Their Summary Judgment Motion.**

The foregoing authorities establish that Dexia is entitled to this discovery it seeks based upon the complaint's factual allegations and remedies sought. A wholly separate basis for the propriety of the discovery Dexia seeks lies in the issue of board independence upon which EPC and PGR base their recently-filed summary judgment motion. Dexia's complaint alleges that Rogan controlled the EMC, Vital, and Access boards (Cplt. ¶¶ 26, 129-36, 141-62) because

their members "consisted primarily of Rogan's personal friends, long-time business associates and others under Rogan's control." (*Id.* ¶ 26) After refusing Dexia discovery on this issue, EPC and PGR now file for summary judgment, arguing EPC and PGR's conduct could not have been improper because a "an independent Board – a Board of which Peter Rogan was not a member and whose members he did not control or appoint" (S.J. Mem. at 24) and "with no ties to Peter Rogan or his property companies"[5] (*id.* at 7) – approved EMC's transactions with Rogan's property companies: (a) EMC's initial decision to lease the EPC properties, rather than to purchase them; (b) the alleged oral contract between EMC and PGR to pay PGR's property taxes; (c) EMC's substantial improvements to the EPC and PGR properties; and (d) the decision to forego an option to purchase the EPC properties.

To assess the board's independence from Rogan, Dexia must be able to determine the existence, nature, and extent of any direct or indirect financial interconnections between Rogan and board members.[6] First, Dexia must be permitted to obtain records of all financial transactions between and among Rogan, Rogan entities, and Rogan's relatives, on the one hand, and the board members, their businesses, and their family members, on the other. This will establish whether Rogan directly or indirectly made payments to or for the direct or indirect benefit of board members. Second, Dexia requires discovery to determine whether Rogan and any given director have shared business interests, *i.e.*, discovery of the assets and holdings of: (a) Rogan, Rogan entities, Rogan's relatives; and (b) board members (including director-related entities and family members). This discovery would reveal if board members acted to further the business interests they shared with Rogan, instead of the interests of EMC. It also would reveal if these shared business interests were structured in a manner that made the board members beholden to Rogan, *e.g.*, Rogan was the majority owner and largest investor of the business, so the success of the business was directly tied to Rogan's substantial involvement in it.

---

[5] In their May 12, 2004 response to Dexia's statement of the discovery Dexia needs to respond to their summary judgment motion, EPC and PGR suddenly appear to back off their claim that Rogan lacked ties to the EMC directors, and now suggest that Rogan "had a personal acquaintance or friendship with one or more of the board members." (Opp. at 5-6)

[6] Additional detail supporting this rationale can be found in Dexia's recently-filed Statement Of Discovery Necessary To Respond To The Summary Judgment Motion Of Defendants Edgewater Property Company And PGR Properties, Inc.

**II.   DEFENDANTS' OBJECTIONS TO DEXIA'S ASSET, TRACING, AND CONTROL DISCOVERY REQUESTS ARE GROUNDLESS AND SHOULD BE OVERRULED.**

Defendants have raised only two objections to Dexia's discovery requests. First, defendants contend that the asset, tracing, and control discovery Dexia seeks is irrelevant to the "allegations contained in Dexia's First Amended Complaint." (*See, e.g.*, Rogan Response to Dexia Interrog. 2 (Ex. G)) The preceding section of this brief explains why this discovery is directly relevant and reasonably calculated to lead to the discovery of evidence relevant to the allegations in Dexia's complaint, the punitive damages remedy Dexia's seeks, and to the independent board defense EPC and PGR raise in their summary judgment motion. Accordingly, defendants' relevance objection should be overruled.

Second, defendants argue that the discovery Dexia seeks is not proper until Dexia has established liability, and therefore the requested discovery of their "financial assets and liabilities . . . where those assets and liabilities are held [and] whether [they] hold[] options to purchase property cannot lead to any relevant or discoverable evidence" at this time. (*See, e.g.*, Rogan Response to Dexia Interrog. 2 (Ex. G)) In all of the cases Dexia cites in Section I of this brief, however, the courts compelled discovery before trial, and thus before any finding of liability. None of these cases held – or even suggested – that a liability finding was a condition precedent to the production of the defendants' financial records. *See, e.g., Shapo, supra; Van Kampen, supra; Senise, supra; Pielet Bros., supra.*

Indeed, courts specifically have held that the type of discovery Dexia seeks is discoverable before trial, *e.g.*, as to punitive damages. In *Salstone v. Gen'l Felt Indust.*, defendants agreed that evidence regarding their net worth was admissible at trial for the purpose of assessing punitive damages, but argued that the plaintiff needed to make a prima facie case (*i.e.*, after a ruling on summary judgment) for punitive damages before they needed to produce this discovery. 1986 WL 13738, at *1 (N.D. Ill. 1986). Judge Williams rejected this argument and granted the motion to compel because Fed. R. Civ. P. 26(b)(1) entitles parties to obtain pretrial discovery regarding any non-privileged matter which is relevant to the action. *Id.* at *2.

In *Aspen*, defendants sought a protective order staying discovery of their financial and net worth status until after the trial of liability and compensatory damages. 2001 WL 1403001, at *1. The Northern District of Illinois court hearing the case rejected the

argument the Rogan defendants propound here, holding the information relevant to plaintiff's claim for punitive damages and thus discoverable before trial under Fed. R. Civ. P. 26(b)(1). *Id.* at *4. *Aspen* also stated two additional reasons for requiring production of the net worth information pretrial: (a) efficiency – disputes about the adequacy of defendants production could be resolved well before trial, without requiring the parties and the court to devote time at the eve of trial to discovery motions and last-minute depositions; (b) settlement – "if the net worth is sufficiently low, it may persuade a plaintiff that it has no real deep pocket for actual or punitive damages, and that its settlement position should be adjusted accordingly." *Id.*[7]

Thus, the law unequivocally demonstrates that Dexia need not wait to obtain this discovery until after a liability finding against defendants. Because the discovery rules and other considerations mandate pretrial discovery on all issues that are relevant to the subject matter of a case, defendants' objection to the pretrial production of discovery relevant to Dexia's asset, tracing, and control requests should be overruled.

## III. DEXIA'S DEFINITION OF "CONTROL" IS CLEAR AND DESIGNED TO OBTAIN RELEVANT INFORMATION.

In its discovery requests, Dexia defines "control" as "the possession, whether direct or indirect or through or in concert with one or more other persons, of the power to direct or cause the direction of the management or policies of a person[8] through, inter alia, membership, board representation, or an ownership interest (by vote or value) equal to or greater than 50 percent." (Dexia Interrog. & Doc. Req., Definition 4 (Ex. G)) Rogan has objected to this definition of "control" as being "vague," without offering any suggestion as to how or why this definition is vague. (Rogan Resp. to Dexia's Interrog. & Doc. Req., Gen. Obj. 7 (Ex. G))

Rogan's conclusory assertion that this definition is "vague" and/or his own belief that he would define "control" differently simply is not a valid basis for to object to Dexia's

---

[7] Other cases holding that a party seeking punitive damages is entitled to discovery as to financial condition before trial include: *United States v. Matsue Rental Co.,* 204 F.R.D. 396, 399 (S.D. Ohio 2001); *EEOC v. Klockner H & K Machines, Inc.,* 168 F.R.D. 233, 236 (E.D. Wis. 1996); *Krenning v. Hunter Health Clinic, Inc.,* 166 F.R.D. 33, 34 (D. Kan. 1996); *CEH, Inc. v. FV "Seafarer,"* 153 F.R.D. 491, 499 (D.R.I. 1994) ("To require a *prima facie* showing of entitlement of punitive damages before the completion of discovery would be to ignore one purpose of discovery – to locate evidence to support a claim before trial . . . . [T]o deny discovery of net worth until plaintiffs can make a showing of a *prima facie* case at trial would only lead to delay and confusion while plaintiffs digest the information.").

[8] Dexia's definition of "person" encompasses both individuals and entities. (Dexia Interrog. & Doc. Req., Definition 10 (Ex. A))

14

discovery requests. *See Meyer v. S. Pacific Lines*, 199 F.R.D. 610, 611 (N.D. Ill. 2001) ("The burden is on the party resisting discovery to clarify and explain precisely why its objections are proper given the broad and liberal construction of the federal discovery rules"). Dexia's "control" definition is clear and reasonably calculated to obtain information about entities which Rogan and the other defendants control controlled either on their own, or through concerted action with friends and associates – *i.e.*, precisely the type of control which was part and parcel of the Rogan-orchestrated conspiracy and essential to its success.

Information regarding defendants' control over other entities is relevant for the reasons stated previously in this brief and also to evaluate Rogan's (and other defendants') liability under agency law. "Principals are strictly liable for their agents' acts – even if the agents are not employees – if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized." *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1210 (7th Cir. 1993) ("[W]hen an agent acts on behalf of his principal, he binds the principal even if he exceeds his instructions"); *U.S. v. Rogan*, 2002 WL 31433390, at \*4 (N.D. Ill. 2002) ("[A] principal is liable for fraud upon a third person committed by an agent acting with apparent authority"). Dexia's complaint is replete with allegations that Rogan, directly and indirectly, controlled defendants, and that, on information and belief, Rogan also controlled additional entities that Rogan and other defendants used to transfer and conceal funds fraudulently obtained from EMC. (Cplt. ¶¶ 17-19, 22-23, 54, 132-33, 135 & 161-62) If Rogan controlled defendants and others, as their principal, he would be liable for their frauds and misconduct in addition to his own.[9] Thus, this Court should overrule Rogan's objection to Dexia's definition of "control."

## CONCLUSION

For the reasons stated, Dexia respectfully requests that this Court grant its motion to compel and order:

(a)     Rogan to fully and completely respond to Interrogatories Nos. 1-3, 7, 8 and 9 and Document Requests Nos. 3-5, 7, 8, 10-13, 17, 18 and 31 and Request No. 2 (Second Set of Document Requests);

---

[9] Presumably, for this reason, Rogan specifically denied Dexia's allegation that he controlled defendants Braddock and Bainbridge – the entities which have admitted to have committed healthcare fraud at EMC.

(b)     Braddock, Bainbridge, and Bainbridge, Inc. to fully and completely respond to Interrogatories Nos. 2 and 3 and Document Requests Nos. 4, 5, 6 (a)-(c), (e)-(m). (p). (aa), and (ff), 11, 15-20, 21-23, 25, 27 and 28; and

(c)     EPC and PGR to fully and completely respond to Interrogatories Nos. 1 and 2 and Document Requests Nos. 3 (a)-(i), (k)-(m) & (o), 5-9, 11, 12, 18, 19, 24, 26, 27, and 29.

Dated: May 18, 2004

Respectfully submitted,

One of the Attorneys for Plaintiff
Dexia Credit Local

Scott T. Mendeloff
Gabriel Aizenberg
Eric S. Pruitt
Tara M. Charnes
SIDLEY AUSTIN BROWN & WOOD LLP
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

**EXHIBIT K**

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8288 | **DATE** | 6/9/2004 |
| **CASE TITLE** | Dexia Credit Local vs. Rogan, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter attached order. Pursuant to the agreement of the parties as embodied in the attached order, Dexia's motion to compel [76-1] is denied without prejudice as moot. All matters relating to the referral of this action having been resolved, the referral is closed and the case is returned to the district judge for further proceedings.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUN 10 2004
date docketed

CLERK, U.S. DISTRICT COURT

2004 JUN 10 AM 3:18

courtroom deputy's initials

mm

Date/time received in central Clerk's office

docketing deputy initials

date mailed notice

mailing deputy initials

Document Number

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Credit Local de France, | ) ) ) ) | **DOCKETED** JUN 1 0 2004 |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) | No. 02 C 8288 |
|  | ) | District Judge Mark Filip |
| PETER G. ROGAN, et. al. | ) ) | Magistrate Judge Sidney I. Schenkier |
| Defendants. | ) ) |  |
| ———————————— | ) ) |  |
| EDGEWATER PROPERTY COMPANY and PGR PROPERTIES, INC., | ) ) ) |  |
| Counterplaintiffs, | ) ) ) |  |
| vs. | ) ) |  |
| DEXIA CREDIT LOCAL, | ) ) |  |
| Counterdefendant. | ) ) |  |

**ORDER**

This cause coming to be heard on Plaintiff, Dexia Credit Local's Motion to Compel

Defendants Peter G. Rogan, Braddock Management LP, Bainbridge Management LP, Bainbridge

Management, Inc., Edgewater Property Company, and PGR Properties, Inc. to Respond to Document

Requests and Interrogatories, by agreement of the parties it is HEREBY ORDERED that:

1.    On or before June 17, 2004, defendant Peter G. Rogan shall respond fully and completely to
      Dexia Interrogatories Nos. 1, 2, 3, 7, 8 and 9 (the time period covered by Interrogatory No.
      8 shall be 1990-present, and the time period for the remaining Interrogatories shall be 1994-
      present), Requests Nos. 3, 4, 5, 7, 8, 10, 11, 13, 17, 18 and 31 of the First Document Request,
      and Request No. 2 of the Second Set of Document Requests (the time period for Document



Requests 4, 10, 11, and 31 shall be 1990-present, and the time period for the remaining Document Requests shall be 1994-present).

2.    On or before June 17, 2004, defendants Braddock Management LP, Bainbridge Management LP, and Bainbridge Management, Inc. shall respond fully and completely to Dexia Interrogatories Nos. 2 and 3 (the time period covered by these Interrogatories shall be 1994-present) and Document Requests Nos. 4, 5, 6(a)-(c), (e)-(m), (p), (aa), and (ff), 11, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 27 and 28 (the time period for Documents Requests Nos. 6 and 27 shall be 1990-present, and the time period for the remaining Document Requests shall be 1994-present).

3.    On or before June 17, 2004, defendants Edgewater Property Company and PGR Properties, Inc. shall respond fully and completely to Dexia Interrogatories Nos. 1 and 2 (the time period covered by these Interrogatories shall be 1994-present), and Document Requests Nos. 3(a)-(i), (k)-(m), and (o), 5, 6, 7, 8, 9, 11, 12, 18, 19, 24, 26, 27 and 29 (the time period covered by Document Request No. 3 shall be 1990-present, and the time period for the other requests shall be 1994-present).

4.    In responding to the foregoing discovery requests, defendants Peter G. Rogan, Braddock Management LP, Bainbridge Management LP, Bainbridge Management, Inc., Edgewater Property Company, and PGR Properties, Inc. (a) shall abide by the definition of "Control" set forth in Dexia's discovery requests, and (b) shall not withhold any information or documents from production based on any of the objections they posed in their written responses to the discovery requests.

5.    Based on the agreements reached by the parties as embodied in this Order, Dexia's motion to compel is denied without prejudice as moot.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated:       June 9, 2004

2

# EXHIBIT L

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DEXIA CRÉDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France,<br><br>       Plaintiff,<br><br>       v.<br><br>PETER G. ROGAN,<br>BRADDOCK MANAGEMENT, L.P.,<br>BAINBRIDGE MANAGEMENT, L.P.,<br>BAINBRIDGE MANAGEMENT, INC.,<br>EDGEWATER PROPERTY COMPANY, an Illinois corporation, and<br>PGR PROPERTIES, INC., an Illinois corporation.<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No.  02 C 8288<br><br>Judge Mark Filip<br><br>Mag. Judge Sidney I. Schenkier |

## PLAINTIFF DEXIA CRÉDIT LOCAL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM FRED CUPPY

RESTRICTED DOCUMENT PURSUANT TO LOCAL RULE 26.2

DOCUMENT CONTAINS AND REFERS TO CONFIDENTIAL TAX RETURNS, BANK RECORDS AND FINANCIAL INFORMATION

FILED UNDER SEAL IN ACCORDANCE WITH PROTECTIVE ORDER ENTERED BY THE HONORABLE MARK FILIP ON MARCH 12, 2004

SIDLEY AUSTIN BROWN & WOOD LLP
Scott Mendeloff
Gabriel Aizenberg
Eric Pruitt
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Counsel for Plaintiff Dexia Crédit Local

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

THE SUBPOENA AT ISSUE AND THE BASIS FOR THAT DISCOVERY ...............................9

DEXIA'S COMPLIANCE WITH MEET AND CONFER OBLIGATIONS:
REPEATED ATTEMPTS TO OBTAIN FULL COMPLIANCE WITH SUBPOENAS .............12

THE DISCOVERY DEXIA SEEKS FROM FRED CUPPY PERSONALLY IS PROPER
AND RELEVANT TO DEXIA'S ALLEGATIONS OF ROGAN'S CONTROL OF THE
ACCESS BOARD, TO ITS CLAIM FOR PUNITIVE DAMAGES, AND TO HELP
DEXIA TRACE FRAUDULENTLY OBTAINED PROCEEDS FROM EDGEWATER. ..........12

    A.    Discovery of Mr. Cuppy's Business and Financial Records Is Directly
           Relevant to Dexia's Allegations of Rogan's Knowing Participation in the
           Fraud Scheme..........................................................................................................13

    B.    Discovery of Mr. Cuppy's Business and Financial Dealings Is Directly
           Relevant to Dexia's Claim for Punitive Damages Against Rogan. .......................15

    C.    Discovery of Mr. Cuppy's Business and Financial Records Is Directly
           Relevant to Dexia's Allegations of Rogan's Control of the Access Board. ..........16

    D.    Transfers Among Co-Conspirators .......................................................................17

    E.    Any Objection to the Breadth And Purported Burden of the Discovery
           Should Be Rejected. ...............................................................................................17

CONCLUSION......................................................................................................................18

# TABLE OF AUTHORITIES

## CASES

*EEOC v. Ian Schrager Hotels*, 2000 WL 307470, *4 (C.D. Cal. March 3, 2000)..................15

*In Re Folding Carton Antitrust Litigation*, 76 F.R.D. 420 (N.D.Ill.1977)...........................18

*Kissinger v. Reporters Committee for Freedom of the Press*, 100 S. Ct. 960 (1980) ..............18

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).......................................15

*Orman v. Cullman*, 794 A.2d 5 (Del Ch. Ct. 2002) .....................................................16

*Telxon Corp. v. Meyerson*, 802 A.2d 257 (Del. 2002) .................................................16

*White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364 (N.D. Ill. 2001)..............................16

*Wilson v. Sundstrand Corp.*, 2003 WL 21961359, *9 (N.D. Ill. Aug 18, 2003) ...................18

## RULES

Fed. R. Civ. P. 26 ................................................................................1, 12, 18

Fed. R. Civ. P. 37 ........................................................................................1

CHI 3059521v1

Plaintiff Dexia Crédit Local ("Dexia") moves to compel Fred Cuppy to produce documents in response to a subpoena Dexia served upon him pursuant to Rules 26 and 37, Fed. R. Civ. Pro. In support of its motion, Dexia states as follows:

## INTRODUCTION

1.      Fred Cuppy is an attorney from Merrillville, Indiana who, for over 15 years, has assisted Peter Rogan and the Rogan family with the most intimate details of their business and personal financial dealings, specifically with respect to the receipt and handling of millions of dollars that originated as management fees Edgewater paid to Braddock Management LP and Bainbridge Management LP, which fees were then transferred to one or more of the Boulevard Entities.[1]  Mr. Cuppy also assisted in the administration of Edgewater for a portion of Rogan's tenure there.

2.      On March 29, 2004, Dexia served a subpoena upon Fred Cuppy personally, seeking a variety of financial and business records.[2]

3.      Arguing relevance and overbreadth, Fred Cuppy has refused to produce certain documents that are within the ambit of the subpoena.

4.      This motion articulates the reasons why the documents requested in Dexia's subpoenas are relevant and should be produced.  Specifically, this motion presents legal authority demonstrating that the requested documents are discoverable to permit Dexia: (i) to trace the location of millions of dollars in Edgewater's funds that Rogan caused Edgewater to pay to Braddock and Bainbridge so as to establish Rogan's knowledge of the fraud scheme by showing *inter alia* that the lion's share of the proceeds of the scheme went to Rogan and/or his family; (ii) to identify the assets under Rogan's control as a part of Dexia's pursuit of punitive damages against Rogan; (iii) to establish the nature and scope of the conspiracy between Rogan,

---

[1] When Dexia filed the instant motion against Mr. Cuppy personally, Dexia also filed a second motion to compel addressed to entities under Mr. Cuppy's control: (i) Boulevard Investors, Ltd.; (ii) Boulevard Investors LLC; (iii) the trusts of Sara Caitlin Rogan, Robert Cashman Rogan, and Brian Peter Rogan; and (iv) Caribe Trustees, Ltd. ("Boulevard Entities"). That second motion to compel, entitled *Dexia's Motion to Compel Production of Records from Boulevard Investors, Ltd., et al.* (hereinafter "*Companion Motion*"), details Dexia's proof as to Rogan's ownership and control of Bainbridge, Braddock and the Boulevard Entities. *Companion Motion*, at ¶¶ 7-43.  The Companion Motion includes detail on law and facts that apply to the instant motion as well.  To reduce repetition, the instant motion references the Companion Motion where possible.

[2] At the same time, Dexia also served a subpoena upon the Boulevard Entities.

Bainbridge, Braddock and other entities; (iv) to determine whether the various entities receiving funds from Braddock and Bainbridge were merely alter egos of Rogan relevant *inter alia* to questions of fraudulent conveyance; and (v) to demonstrate Rogan's control over members of the Edgewater board of directors that Rogan has claimed approved many of the actions under review.[3]

## BACKGROUND
### Fred Cuppy

5.      Mr. Cuppy has long had quite substantial legal and financial dealings with Peter Rogan and his family, focussing upon the personal and business interests of Rogan and his family. Simply put, Dexia's investigation to date indicates that Mr. Cuppy appears to be one of two attorneys – Mr. Troy Myers of Florida being the other – upon whom Rogan has chiefly relied to assist him to attempt to protect from attack the millions of dollars Rogan has obtained from Edgewater. To this end, Mr. Cuppy *inter alia* formed, acted as trustee and/or administered numerous trusts in the names of Rogan and his children, administered businesses Rogan caused to be created, and assisted with the administration of Edgewater, in particular in relation to Braddock and Bainbridge.

6.      Mr. Cuppy has served the Rogan family in a vast array of different capacities involving business dealings of great significance to Peter Rogan and his immediate family. this work has included:

- **Peter G. Rogan Trusts**.

  - ➢      In 1988, Rogan created the **Peter G. Rogan Revocable Trust,** naming Mr. Cuppy as contingent trustee to administer the trust benefiting the Rogan children in the event of the death or incompetence of Rogan and his wife (Ex. C);

  - ➢      In 1996, Rogan created the **Peter G. Rogan Irrevocable Trust** in The Bahamas, to which Rogan later transferred over $18 million; upon information and belief, Rogan caused the trustee of the trust to name **DAI, Inc.** ("DAI") as U.S. tax agent for the Irrevocable Trust in The Bahamas; Mr. Cuppy is the registered agent, Secretary and majority owner of DAI (Ex. D);

---

[3] These issues were also briefed for this Court in relation to *Dexia's Motion to Compel Production of Documents by Peter Rogan, Braddock Management LP, Bainbridge Management LP, Edgewater Property Company, Inc., and PGR Properties, Inc.*, which Dexia incorporates by reference here. (Ex. A) U.S. District Court Magistrate Judge Sidney Schenkier ordered just this sort of tracing material produced in a ruling entered on June 9, 2004. *Dexia Crédit Local v. Peter G. Rogan et al.* (02 C 8288). (Ex. B)

- **Bainbridge Management LP** has two owners:  **Bainbridge Management, Inc.** (1% owner and general partner) and **Boulevard Investors, Ltd.** (99% owner and sole limited partner);[4] Mr. Cuppy has had significant roles in relation to each;

  ➤ **Bainbridge Management, Inc.** is wholly owned by the **Peter G. Rogan Revocable Trust**, for which Mr. Cuppy serves as a contingent trustee;

  ➤ **Boulevard Investors, Ltd.** is a Belize corporation, wholly owned by Trusts in Belize in the names of Rogan's three children, Sara, Robert and Brian ("**Belize Trusts**"); Mr. Cuppy serves **Boulevard Investors, Ltd.** as Managing Director and controls at least one account in the name of Boulevard Investors, Ltd. at Morgan Stanley;[5]

  ➤ **Belize Trusts:**  Mr. Cuppy is the legal representative of the **Belize Trusts** in the names of the three Rogan children, and controls those trusts (Ex. G);[6]

  ➤ **Caribe Trustees, Ltd.** ("**Caribe**") is a Belize corporation and is the trustee of the three **Belize Trusts** that own Boulevard Investors, Ltd. (Ex. G); Mr. Cuppy is Caribe's U.S. agent and its lawyer;

  ➤ K-1 forms for **Boulevard Management, Ltd.** indicate that Edgewater's funds have been distributed to "Boulevard Investors, Ltd., Caribe Trustees, Ltd., c/o Fred Cuppy" (Ex. H);

- **Braddock Management LP**:  Mr. Cuppy has had involvement with and/or significant roles in relation to the two owners of Braddock:  **Braddock Management, Inc.** (1% owner and general partner) and **Boulevard Management, Ltd.** (99% owner and sole limited partner);[7]

  ➤ **Braddock Management, Inc.** (n/d/b/a Bainbridge Management, Inc.) is wholly owned by the **Peter G. Rogan Revocable Trust**, which Mr. Cuppy serves as contingent trustee;

  ➤ **Boulevard Management, Ltd.** has four owners:  **Boulevard Investors, Ltd.** owns 49.5 % (limited partner); trusts in Florida ("**Florida Trusts**") in the names of Rogan's three children own 40.5% (limited partners); **Peter Rogan** owns 9% (limited partner); and **Boulevard Management, Inc.** owns 1% (sole general partner);

    ❖  Therefore, 90% of **Boulevard Management, Ltd.** is owned indirectly or directly by offshore and domestic trusts in the names of the Rogan children, 49.5% by **Boulevard Investors, Ltd.** (wholly owned by the **Belize Trusts**) and 40.5% by the **Florida Trusts**;

    ❖  Moreover, Rogan and Mr. Cuppy have thus arranged the ownership structure of Braddock and Bainbridge such that: (i) virtually *all* of Bainbridge and half of Braddock are owned offshore (by Belizean interests); and (ii) those Belizean interests are arranged to maximize concealment and protection by

---

[4] *See* Ex. E (ownership diagram of Bainbridge with Cuppy control areas shaded).

[5] The account is in the name of "Boulevard Investors, Ltd. c/o Fred Cuppy." (Ex. F) Thus far, this is the only account of Boulevard Investors, Ltd. for which Dexia has been able to obtain discovery.

[6] In light of his controlling function regarding the owners of Braddock and Bainbridge, Mr. Cuppy legally possesses and/or controls records of  Boulevard Investors, Ltd. and/or the various Rogan children's trusts that reflect how these entities *used funds that originated with Edgewater*.

[7] *See* Ex. I (ownership diagram of Braddock with Cuppy control areas shaded).

3

cloaking ultimate ownership behind numerous corporate layers – a *foreign* corporation (**Boulevard Investors, Ltd.**) owned by a *foreign* partnership consisting of a *foreign* general partner, itself a *foreign* corporation (**Caribe**),[8] and *foreign* limited partners, which are *foreign* trusts (**Belize Trusts**).[9]

➢ **Florida Trusts**:  Mr. Cuppy has consistently served as a trustee of these trusts and controls the trusts' bank accounts;[10]

➢ **Boulevard Management, Inc.** is wholly owned by the **Peter G. Rogan Revocable Trust**, yet, Mr. Cuppy possessed and produced the tax returns for Boulevard Management, Inc. for 1998-2003;[11]

➢ Furthermore, at least on occasion, Mr. Cuppy demonstrated his authority over and/or influence upon Braddock when Mr. Cuppy <u>directed</u> the timing and size of <u>Braddock's distributions to Boulevard Management, Ltd.</u> (Ex. J);

• **Boulevard Investors LLC** ("BILLC") is an Indiana limited liability company located at 240 E. 90th Drive, Merrillville, Indiana.[12]  Fred Cuppy is counsel to and the registered agent of Boulevard Investors LLC.  Boulevard Investors LLC has had repeated financial dealings with the domestic and off-shore trusts in the names of the Rogan children;[13]

• **Other Businesses**:  Upon information and belief, it was Mr. Cuppy who caused substantial funds to be transferred from the Rogan children's **Florida Trusts** and **Belize Trusts** as loans or investments in other business entities in which Mr. Cuppy and Rogan have been substantially involved, including real estate investments in Savannah, Georgia and Chicago (*see infra* at ¶¶ 9-15).

7.       As Managing Director of Boulevard Investors, Ltd. and trustee of Boulevard Management, Ltd., Mr. Cuppy thus controls the financial records of entities owning 90% of Braddock and 99% of Bainbridge.  He also controls the financial records of Boulevard Investors, Ltd., the largest percentage owner of both Braddock and Bainbridge, and of the Belize Trusts.

8.       Upon information and belief, Boulevard Investors, Ltd. received the vast bulk of the proceeds Rogan caused Edgewater to pay to Braddock and Bainbridge.  Accordingly,

---

[8] This renders quite significant Mr. Cuppy's large role has at Caribe.

[9] Furthermore, as detailed in the *Companion Motion*, citing a dubious claim of privilege, Mr. Cuppy has refused even to identify the beneficiaries or owners of the **Belize Trusts**.  *See Companion Motion*, at ¶ 20.

[10] When these domestic trusts were created in 1992, the Rogan children were ages 14, 11 and 8.

[11] Notably, neither Mr. Cuppy nor anyone at his law firm was the preparer of these tax returns.

[12] The same address as Braddock, Bainbridge, EPC, PGR, BFB Ltd., and numerous other Rogan-controlled entities.

[13] For example, in 2002, the Rogan's children's U.S. trusts (that own roughly 40% of Braddock) allegedly loaned funds to Boulevard Investors LLC.  (*See* 2002 Tax Return for Robert C. Rogan Trust, attached as Ex. K)

4

Mr. Cuppy controls financial records that are *absolutely vital* to Dexia's wholly proper tracing discovery in this case.

9. Mr. Cuppy Sent Millions of Dollars in Edgewater Management Fees from the Boulevard Entities to Other Entities that Rogan and Mr. Cuppy Controlled and/or Administered. Rogan controlled and Mr. Cuppy helped administer Three *Savannah, Georgia* real estate developments, **Gardens on Jones LLC** ("Gardens on Jones"), **Taylor Row LLC** ("Taylor Row"), and **410 Montgomery** ("410").[14]

10. Rogan's control over these entities is evident from multiple sources. Gardens on Jones and Taylor Row each list their principal place of business as 240 E. 90th Drive, Merrillville, IN, a small suite of offices that serves as the principal place of business for Boulevard Investors, LLC as well as many other Rogan-related businesses. (Ex. N) (floor plan of office taken from Braddock lease for 240 East 90th Drive).[15] Furthermore, a key Rogan employee, David Miller,[16] administered important elements of the financial affairs of all of the Savannah developments, (*see, e.g.*, Exs. M & O), in at least one instance connecting these actions with Bainbridge. (Ex. P) As detailed in Dexia's *Companion Motion*, the Florida and Belize trusts in the names of Rogan's children are heavily invested in these developments, owning 66% of Taylor Row and a substantial portion of Gardens on Jones. Finally, but most significantly, Peter Rogan's business records reflect that: (i) he personally traveled to Savannah with many of the other individuals involved in the Savannah development during important periods in the progression of the Savannah projects, i.e., on January 27-28, 2000, on February 7-10, 2001,[17] and on March 18-20, 2002; and (ii) during the last of the trips listed, Rogan met with individuals at **Darby Bank** on March 18, 2002, a Bank that provided substantial financing for the Savannah projects.

---

[14] Mr. Cuppy and others associated with the three developments treated them as a joint project. (Exs. L & M)

[15] Among the Rogan-related businesses located at 240 E. 90th Drive are Braddock, Bainbridge, EPC, PGR, BFB Ltd.

[16] Mr. Miller is a key employee in most, and perhaps all, of the Rogan businesses, in which he frequently served as an officer and in effect the chief financial officer, e.g., Braddock, Bainbridge, Edgewater Property Company, PGR Properties, Inc., BFB, Ltd., and JKR Business. Miller also serves as an accountant for the Rogan children's trusts.

[17] This trip appears to be especially significant because: (i) it occurred just before the beginning of a series of significant financings relating to the Savannah project; and (ii) Rogan brought along many of the other individuals who played important roles in the Savannah development prior to that time and after, i.e., Cuppy, Miller, Foley and Tatooles. **Rogan** expensed the trip to EPC, Inc. (Ex. Q)

11.     Dexia's *Companion Motion* details the numerous ways in which the Florida and Belize Trusts sent approximately $2M to BILLC – which in turn purchased a 100% interest in 410 for approximately $1.65M. *Companion Motion*, at ¶¶ 32-37.

12.     The Florida Trusts purchase ownership interests in the Taylor Row and Gardens on Jones developments for well in excess of $1.2M. Also, the Belize Trusts (via Boulevard Investors, Ltd.) spent almost $1M on the Savannah projects, although the nature of their investment – debt or equity – remains unclear. *Companion Motion*, at ¶¶ 38-40.[18]

13.     There can be no doubt that Mr. Cuppy caused these transfers from the trusts to BILLC and the Savannah developments. As noted, Mr. Cuppy is: (i) trustee of the Florida trusts and controls their bank accounts; (ii) the Managing Director of Boulevard Investors, Ltd. (owned 100% by the Belize trusts); (iii) counsel for the Belize Trusts; and (iv) counsel, manager, and registered agent of BILLC. Moreover, he is also: (iv) heavily involved with the Savannah development effort, likely as a result of the role BILLC plays as manager of the enterprise. (*See, e.g.,* Exs. L & M)

14.     Beyond the Savannah investments, Rogan and Mr. Cuppy also worked together to invest other Edgewater funds that flowed through the Boulevard Entities. One example is a 2002 investment in a real estate development in Chicago named **Premier Center LLC** ("Premier Center"): (i) Mr. Cuppy caused Boulevard Investors, Ltd. to send at least $986,029 to CFMT of Florida ("CFMT"), a Florida corporation, *which Mr. Cuppy manages*; (ii) CFMT then loaned funds to Premier Center (Ex. R); (iii) one of the principals of Premier Center, John Mullen, is himself a close associate of Rogan's;[19] and (iv) Rogan was directly involved with that loan and possibly the real estate development itself. (Exs. U & V)

15.     <u>Mr. Cuppy Has Volitionally Intertwined His Personal Financial Affairs with those of Rogan and his Family.</u> Beyond his leading role orchestrating the financial affairs of Rogan and his family, Mr. Cuppy has also chosen to intertwine his personal financial affairs with those of the Rogans. For example:

---

[18] Significantly, at around the same time, Mr. Cuppy caused BILLC to send about the same amount of money to many of these same businesses, e.g., Darby Bank and McCorkle.

[19] Peter Rogan's personal calendar reveals that Rogan and Mullen's association began as early as 1996. (Ex. S) Ledgers from Rogan's property company, EPC, establish that Rogan has made several payments for consulting services to Mullen and his company the Morgan Group. (Ex. T) Rogan cemented his relationship with Mullen by appointing him to the board of Edgewater's corporate parent, Vital Community Health Services, Inc. in 2000.

- Mr. Cuppy received a $100,000 personal loan from Peter Rogan in 1996 (Ex. W);

- **Diagnostic Equipment, Inc.** was a Florida corporation that Mr. Cuppy owned and served as President. Rogan loaned $70,000 to Diagnostic Equipment in 1996. Also, a key Rogan employee, David Miller,[20] served as DAI's Vice President (Ex. W);

- **Boulevard Investors LLC:** in or before 2001, Mr. Cuppy personally loaned **Boulevard Investors LLC** (located at the same Merrillville address as Rogan's other businesses) approximately $295,000, which money Boulevard Investors LLC then repaid in 2002 (Ex. X);

- **CFMT of Florida LLC ("CFMT")** is a Florida corporation that Mr. Cuppy manages; in 2002, Mr. Cuppy caused Boulevard Investors, Ltd. to invest at least $986,029 in CFMT (Ex. Y);[21]

- **Walnut Hills LLC ("Walnut Hills")** is an Indiana corporation; in 2002, Mr. Cuppy caused the Rogan children's **Florida Trusts** to enter into notes with this LLC,[22] whose principal place of business is listed as 9191 Broadway, Merrillville, Indiana, which was the address of Mr. Cuppy's law office at the time Walnut Hills was formed (Ex. BB);

- **DAI** is an Indiana corporation in which, upon information and belief, Mr. Cuppy and his family holds a 72% ownership; prior to mid-2001, DAI owned 50% of **Taylor Row** and the **Florida Trusts** owned the other 50%; in 2001, DAI sold its 50% interest in Taylor Row to the Florida Trusts for $264,000 (Ex. CC);

- Mr. Cuppy has received significant compensation for work he performed related to the administration of the Boulevard Investors Ltd., Boulevard Investors LLC, the Rogan children's trusts, and CFMT, and the creation and operation of certain domestic and off-shore entities at Rogan's request, to which millions of dollars of Edgewater's and/or Dexia's assets have been transferred;[23]

16.     Mr. Cuppy caused the Rogan children's trusts that he managed or controlled to invest in other entities which Mr. Cuppy also managed, e.g., Boulevard Investors LLC, CFMT and Walnut Hills, placing Mr. Cuppy on both sides of these transactions. (Exs. M, R, Y, & BB)

17.     <u>Mr. Cuppy's Service on the Finance Committee of Access Allegedly Administering Edgewater.</u>  In 2000, Rogan restructured Edgewater so as to place the Edgewater board of directors in its own corporation, named Access Community Health Services, Inc.

---

[20] Mr. Miller is centrally involved in most, and possibly all, of the Rogan businesses. He frequently served as an officer, in effect the chief financial officer, of these businesses, e.g., Braddock, Bainbridge, Edgewater Property Company, PGR Properties, Inc., BFB, Ltd., and JKR Business. Miller also serves as an accountant for the Rogan children's trusts.

[21] Specifically, the transfer went through CFMT's parent, CFMT Ltd., which we include under the "CFMT" rubric.

[22] Which notes Mr. Cuppy eventually converted to equity interests. (Ex. AA)

[23] The off-shore entities which have received substantial funds include the Peter G. Rogan Irrevocable Trust, located in The Bahamas.

("Access"). While Fred Cuppy was not a member of the board of directors of Access, Mr. Cuppy attended <u>every</u> meeting to the board of directors of Access from 2000 to 2001. In that capacity, Mr. Cuppy's responsibilities included editing and altering the minutes of Access board meetings (as distinguished from meetings of the Access Finance Committee), including minutes that Edgewater's outside counsel prepared for a meeting in April 2001. (Ex. DD)

18. From 2000-2001, Mr. Cuppy was an insider of Edgewater as a member of the Finance Committee of the Access Board, and served as Secretary of the Finance Committee in 2001. The Finance Committee on which Mr. Cuppy sat exercised substantial *de jure* and *de facto* influence over: (i) the financial affairs of Edgewater and (ii) the governance of the affairs of Edgewater, especially in relation to the administration of Edgewater's dealings with Bainbridge. (*See* Access Complaint (04 A 2330) ¶¶ 89, 91-117, 123, 127-28, and 136-159; *see infra* at ¶¶ 17, 23-25.)

19. The Finance Committee of Access supervised and controlled all aspects of the financial affairs of Edgewater. The Finance Committee's duties included: reviewing monthly financial statements and other financial reports of Braddock and Bainbridge; approving changes to the terms of Braddock's management contracts with Edgewater; monitoring and directing the dealings of Access, Braddock and Bainbridge with Edgewater's largest secured creditor, Dexia Crédit Local; and directing the actions of the Access board of directors with respect to its decision to terminate Bainbridge's management contracts in April 2001. Furthermore, once the federal grand jury investigation came to light, the Access Finance Committee took a leading role in determining how Edgewater would respond to the grand jury proceedings and whether to terminate Bainbridge.

20. Mr. Cuppy's participation in the meetings of Edgewater's (Access') Board of Directors and as a member and officer of the Access Finance Committee thus gave him a leading role in the administration of Edgewater's financial affairs, including Edgewater's very substantial dealings with Rogan's management firm, Bainbridge. (Ex. EE)

\*          \*          \*          \*          \*

21. The financial and business documents Dexia seeks from Mr. Cuppy accordingly are absolutely essential to this litigation both as proof of Rogan's control of the Access Board and as tracing documents without which Dexia will be unable to establish the

ultimate destination of millions of dollars of Edgewater's funds Braddock and Bainbridge obtained.

### THE SUBPOENA AT ISSUE AND THE BASIS FOR THAT DISCOVERY

22.    The subpoena Dexia served upon Mr. Cuppy consists of two interrelated parts: (i) a series of document requests identifying the sorts of documents sought, a number of which narrow those requests to documents pertaining to the individuals or entities appearing on a separately attached list designated "Rider B"; and (ii) Rider B, which is a list of persons and entities that are all related to Edgewater, and Rogan, Rogan's family, and/or businesses associated with them. The subpoena (including Rider B) is attached. (Ex. FF)

23.    A detailed articulation of the scope of the subpoena is set forth in the Companion Motion. Companion Motion, at ¶¶ 50-51.

24.    The subpoena Dexia served upon Fred Cuppy seeks *inter alia* Mr.

Cuppy's personal financial documents related to:

- any transfers, payments, ownership interest, common ownership or business dealings between Mr. Cuppy and any Cuppy business entities on the one hand and the individuals and entities on Rider B on the other hand (Request Nos. 21-28);

- documents relating to any benefits, gifts or other things of value given to Mr. Cuppy by the individuals and entities on Rider B; (Request No. 30);

- documents sufficient to identify Mr. Cuppy's residences (Request No. 35);[24]

- Mr. Cuppy's appointment to and service on the board of directors of Access, Vital and Edgewater-affiliated entities (Request Nos. 1-2, 19, 31-33).

(*See* Subpoena to Fred Cuppy, attached as Exhibit FF)

25.    Mr. Cuppy's personal financial records are relevant to this case due to: (i) Mr. Cuppy's role as an Edgewater insider; (ii) Mr. Cuppy's history of significant personal financial transactions with Rogan, his businesses, and his family's business interests; and (iii) Mr. Cuppy's management of numerous Rogan-related endeavors. Each of these points represents a reasonable direct and circumstantial basis for concluding that Mr. Cuppy's personal financial information will lead to valuable information relating to the assets and business dealings of Rogan and his family. Mr. Cuppy's personal finances provide a resource for tracing

---

[24] The location of Mr. Cuppy's residence(s) is pertinent to this case because Dexia has already turned up useful circumstantial proof tying the various individuals involved here together in part by showing that they are neighbors of Rogan.

9

or otherwise investigating: (i) the nature and extent of Mr. Cuppy's financial interrelationship with Rogan; (ii) the final destination of portions of the millions of dollars Braddock and Bainbridge obtained from Edgewater; and (iii) Rogan's assets.

26.    Cuppy as an Edgewater Insider.  Both Dexia and defendants have taken positions that directly implicate the issue of whether personal financial relationships exist between Rogan, the Rogan family, and Rogan's entities on the one hand and the members of the board and board committees controlling the operations of Edgewater on the other.  Dexia's Complaint alleges that Rogan controlled the Edgewater, Vital, and Access boards and board committees (Complaint at ¶¶ 26, 129-36, 141-62) *inter alia* because the board and board committees consisted primarily of Rogan's personal friends, long-time business associates ,and others under Rogan's control.  (*Id.*, at ¶ 26).  Conversely, Rogan maintains that the Edgewater and Access boards and committees that allegedly ratified his actions were wholly *independent* reviews of his actions, and authorized all of the actions Dexia has challenged.[25]  (Ex. GG)

27.    Thus, both Dexia and Rogan raise as a point of fact the question of the independence of the Edgewater and Access boards and committees. This issue, of course, turns upon the existence of personal and/or financial ties between Rogan and his family on the one hand and the board/committee members of Edgewater and Access and their families on the other hand.

28.    To this end, Dexia must be permitted to explore *inter alia* the nature and extent of any financial relationships that might exist between Rogan (and his family) and board committee members like Mr. Cuppy (and their families). To make determinations on this score, Dexia must have access to detailed information relating to the finances of Rogan and Rogan's family as well as Mr. Cuppy and Mr. Cuppy's family.

29.    Cuppy Personal Financial Records are Valuable Tracing Proof.  Under the circumstances of this case, Mr. Cuppy's personal financial records are also very valuable tracing proof: (i) business ventures that Mr. Cuppy owned, managed, or administered eventually received a portion of Edgewater's funds; and (ii) Mr. Cuppy's extensive history of personal financial dealings with Rogan and/or his family make Mr. Cuppy's personal financial records a useful means of identifying businesses enterprises in which Rogan and his family participated.

10

The foregoing is especially important when one considers the extensive efforts Rogan and Mr. Cuppy have taken to conceal the path of Edgewater funds that went into Rogan-related offshore entities. *See, e.g., supra,* at ¶ 6 & nn. 8 & 9, and *infra,* at ¶¶ 42-45.

30.    As noted, Mr. Cuppy caused the Boulevard Entities to send substantial proceeds of Edgewater funds to other business entities under Mr. Cuppy's control, including predominantly Rogan-related businesses like Taylor Row, Gardens on Jones, and 410 Montgomery,[26] as well as other businesses Mr. Cuppy managed, including CFMT, Walnut Hills, and DAI.[27]

31.    Also, as referenced earlier, even without the discovery that Mr. Cuppy has withheld, we have obtained records revealing that Mr. Cuppy has repeatedly engaged in personal financial dealings with Rogan, and with Rogan cohorts, e.g., David Miller. *See supra* at ¶¶ 5-15.

32.    This pattern of Mr. Cuppy's – (i) participation in the administration of numerous businesses and investments of Rogan and his family; and (ii) personal financial dealings with Rogan and his family – provides a strong basis upon which to conclude that Mr. Cuppy's personal financial records will be valuable to Dexia's effort to track down Edgewater assets and those of Rogan. Mr. Cuppy no doubt (i) received payments for administering and participating in Rogan businesses and entities, either in the form of compensation, distributions, or loans; or (ii) made payments, in the form of capital contributions and/or loan interest payments.

33.    The discovery that the subpoena seeks from Mr. Cuppy is nearly identical to that which this Court has already ordered Peter Rogan, Braddock Management LP ("Braddock"), Bainbridge Management LP ("Bainbridge"), and other Edgewater insiders to produce. Mr. Cuppy is effectively in the same position as the Rogan parties that were subject to those previous orders of this Court, in that: (i) he controlled received large amounts of money

---

[25] For example, Rogan has indicated the intention to rely upon this defense both by advancing it in the summary judgment motion of EPC and PGR as well as in defending against the fraud allegations against himself personally.

[26] Although Cuppy contends that Rogan has no involvement with these businesses, the circumstances surrounding them present a strong basis for the contrary view. *See Companion Motion,* at ¶¶ 41-43.

[27] Of course, the foregoing are the only entities Dexia has been able to find as yet. Mr. Cuppy undoubtedly received remuneration for his management services, so his financial records would assist us to obtain more detail about these businesses and, moreover, to identify other such businesses not discovered as yet.

11

from the Rogan entities; and (ii) due to the role Mr. Cuppy has played as administrator of the Rogans' most important enterprises and Mr. Cuppy's extensive history of personal financial dealings with Rogan, Rogan entities, Mr. Cuppy's financial records are likely to contain valuable leads as to the very same financial affairs of Rogan, his family, and his businesses that are the focus of the document requests that led to the previously compulsion orders of this honorable court.

## DEXIA'S COMPLIANCE WITH MEET AND CONFER OBLIGATIONS: REPEATED ATTEMPTS TO OBTAIN FULL COMPLIANCE WITH SUBPOENAS

34.     On April 5, 2004, Fred Cuppy responded and objected to Dexia's subpoenas. Mr. Cuppy refused to produce *inter alia* documents involving his personal finances and business interests, although he did produce documents relating to his service on the Finance Committee of Edgewater's parent member, Access.

35.     From April through June, Dexia's counsel engaged in extensive correspondence and discussion with counsel for Mr. Cuppy regarding his objections to Dexia's requests, explaining the relevance and necessity of the objected-to requests to the tracing of Edgewater's assets, its investigation of board independence issues, and the search for Rogan assets. Nevertheless, Mr. Cuppy continued to refuse to produce records relating to this personal finances.[28]

36.     For the reasons stated below, the discovery Dexia seeks from Mr. Cuppy clearly is proper under Rule 26, Fed. R. Civ. Pro.

## THE DISCOVERY DEXIA SEEKS FROM FRED CUPPY PERSONALLY IS PROPER AND RELEVANT TO DEXIA'S ALLEGATIONS OF ROGAN'S CONTROL OF THE ACCESS BOARD, TO ITS CLAIM FOR PUNITIVE DAMAGES, AND TO HELP DEXIA TRACE FRAUDULENTLY OBTAINED PROCEEDS FROM EDGEWATER.

37.     Mr. Cuppy objects to the subpoena for his personal financial records on relevance and overbreadth grounds.

38.     Mr. Cuppy's objections to discovery plainly lack substantial basis, for the documents sought are highly relevant to several core issues in this matter. The documents are directly relevant to: (i) the issue of Peter Rogan's control and domination of the board and

---

[28] Dexia's review of late-produced documents from Rogan and Rogan-related entities has revealed further connections between Mr. Cuppy, the Boulevard Entities, and the assets and affairs of Edgewater.

12

committees of Access through his long-standing personal and financial connections to its directors and members of its board committees, including Rogan's close relationship with Mr. Cuppy (Complaint ¶¶ 26, 129-36, 141-62); (ii) the location and amount of Rogan's assets as relevant to Dexia's claims for punitive damages; (iii) the issue of tracing, i.e., Dexia's allegations that Peter Rogan knowingly participated in a conspiracy to funnel fraudulently obtained management fees and payments out of Edgewater and to Peter Rogan and his family through elaborate transfers that Mr. Cuppy helped orchestrate.

39.    Dexia's Companion Motion provides a detailed articulation of the legal basis for discovery under these theories. Dexia incorporates those legal principles by reference here, and only cites additional legal support where necessary to a point unique to this pleading.

> **A.    Discovery of Mr. Cuppy's Business and Financial Records Is Directly Relevant to Dexia's Allegations of Rogan's Knowing Participation in the Fraud Scheme.**

40.    Substantial authority supports discovery designed to assist Dexia to locate the proceeds of the fraud scheme at Edgewater. *See Companion Motion*, ¶¶ 73-73, 77-84.

41.    Dexia's discovery efforts to date have been designed to identify the destination of the funds fraudulently transferred from Edgewater's coffers to Braddock and Bainbridge.

42.    Nevertheless, significant proof has arisen that Rogan and his cohort – of which Mr. Cuppy is a central part – have engaged in efforts to conceal the destination of these funds. They were transferred through multiple corporate layers, then into and through domestic and off-shore trusts in the names of Rogan and his children, on which Rogan claims he cannot provide discovery. With the assistance of Mr. Cuppy and others, Mr. Rogan has sought to shield the off-shore trusts in particular from any and all inquiry. After refusing to produce and arguing against the production of the "irrevocable" trust Rogan set up in the Bahamas, Rogan maintained he would have no way of knowing where he could obtain a copy of the trust. Only after the Court pressed his counsel were the records produced.

43.    Mr. Cuppy's conduct reveals a similar motive to conceal. Mr. Cuppy claims a "privilege" in refusing either to produce records for or even identify the beneficiaries of the Belize trusts, but he never states the basis for his claim of privilege. Revealingly, Mr. Cuppy has refused to provide any meaningful discovery regarding the Belize entities – Boulevard

Investors, Ltd. and the Belize Trusts – but has made *full production* of all documents relating to the Florida Trusts! There is no legally meaningful basis for this distinction between the domestic and offshore trusts – obviously, Mr. Cuppy is simply blocking production simply because offshore trusts are in Belize and thus naturally harder to reach.   This sort of obstruction smacks of an attempt to hide the location and true ownership of ill-gotten funds.

44.     Moreover, Mr. Cuppy has repeatedly pressed the dubious claim that Rogan has no influence upon the way in which he administers the funds in the Rogan children's trusts. (Ex. G)  Even without the discovery at issue, however, Dexia has been able to uncover many significant instances reflecting just this sort of control.  For example, on February 17, 1999, Mr. Cuppy, with the aid of Messrs. Myers and Miller, orchestrated a series of transactions designed to transfer funds Braddock received from Edgewater through the Boulevard Entities owned by the Rogan Children's trusts and then on into a personal account of Peter Rogan.  (*See, e.g.*, Letter dated Feb. 17, 1999, attached as Ex. HH, and chart illustrating transfers described in Letter dated Feb. 17, 1999, attached as Ex. II). Also, Mr. Cuppy would have this Court believe that his longstanding relationship with Rogan has nothing to do with the fact that he continuously invests the proceeds of the trusts in Rogan-related entities.

45.     While the facts and issues involved in this case would render Mr. Cuppy's personal financial records relevant and discoverable in any event, the foregoing course of asset concealment make production of those records even more important.  Under the circumstances of this case, any leads as to the location of Rogan family assets are important and relevant in light of the concerted attempts to conceal those transactions.

46.     Mr. Cuppy personally serves as the trustee and/or manager for numerous trusts and businesses benefiting the Rogan children as well as "director" of many family business enterprises, including most notably his participation in the administration of off-shore business activities.  Dexia has no reason to believe that it has identified the existence or location of all of these enterprises.  Mr. Cuppy's history of close involvement with such businesses makes his records a valuable source of information on these and other related issues. Mr. Cuppy undoubtedly receives payment for his service as trustee and for managing the myriad domestic and off-shore businesses he handles for Rogan and his family. Any records he possesses of this work, e.g., 1099s, invoices, are relevant to identifying such entities, their bank accounts, and other important facts.

14

47.     Moreover, an even more direct reason exists to order the requested discovery of Mr. Cuppy's finances.  As noted above, Dexia has already discovered evidence of Mr. Cuppy's repeated personal financial dealings with Rogan and his family.  *See supra* at ¶¶ 5-15.  Mr. Cuppy's personal finances therefore are likely to contain valuable leads as to the whereabouts of Rogan family assets.

### B.     Discovery of Mr. Cuppy's Business and Financial Dealings Is Directly Relevant to Dexia's Claim for Punitive Damages Against Rogan.

48.     The controlling legal principles establishing the discoverability of this sort of material is set out in the *Companion Motion*, at ¶¶ 85, 86, 88.

49.     Obviously, discovery of "assets" is at the core of any net worth determination.  The issue Mr. Cuppy is likely to raise on this score is that the foregoing principles permits discovery of Rogan's assets, not Mr. Cuppy's, for Mr. Cuppy is not a defendant in this case so there is no punitive damages basis upon which to discover Cuppy assets.

50.     Nevertheless, under the particular facts involved in this case – combining (i) the expansive, longstanding, and intimate interrelation of Mr. Cuppy's business activities and personal financial dealings with (ii) the great effort Rogan and Mr. Cuppy have expended to conceal those activities from disclosure and to block or retard discovery in this case[29] – a reasonable basis exists to believe that Mr. Cuppy's assets will provide useful insight into the location of Mr. Rogan's assets.  This is especially true in like to the extremely relaxed rules governing discovery under the Federal Rules of Civil Procedure.[30]

---

[29] *See, e.g., EEOC v. Ian Schrager Hotels,* 2000 WL 307470, *4 (C.D. Cal. March 3, 2000) ("Clearly, plaintiff may obtain defendants' financial information, to the present, to determine whether defendants have attempted to transfer, or have transferred, income or assets to others to avoid potential liability if defendants lose the pending litigation.)

[30] "Relevancy is construed broadly to 'encompass any matter that bears on or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Id.* (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978)). Discovery need not seek information admissible at trial, so long as the request appears reasonably calculated to lead to the discovery of admissible evidence. *See White v. Kenneth Warren & Son, Ltd.,* 203 F.R.D. 364, 366 (N.D. Ill. 2001).

C.    **Discovery of Mr. Cuppy's Business and Financial Records Is Directly Relevant to Dexia's Allegations of Rogan's Control of the Access Board.**

51.    The requested discovery is also essential to the board and committee independence issue, outlined earlier. (*See supra*, at ¶¶ 16-17, 22-25)

52.    A board is not independent: (i) if a person controls or dominates a majority of the board "through close personal or familial relationship or through force of will"; (ii) or if a majority of the board is "beholden" to the person, as when the person has "the direct or indirect unilateral power to decide whether the [majority of directors will] receive a benefit upon which [they are] so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the [directors are] able to consider the corporate merits" of the transaction at issue. *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002); *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del Ch. Ct. 2002) (same).

53.    To demonstrate the extent of Rogan's relationship with and control over the members of Access' board and Finance Committee, Dexia must be able to discover the existence, nature, and extent of any direct or indirect financial, personal or familial interconnections between Rogan and the board and committee members like Mr. Cuppy. Further, to establish whether Rogan directly or indirectly made payments to or for the direct or indirect benefit of board or board committee members, Dexia must obtain records of all significant financial transactions involving Rogan, Rogan entities, and Rogan's relatives, on the one hand, and the board and board committee members, their businesses, and their family members, on the other.

54.    This discovery will also permit Dexia to determine whether Rogan (and/or his family) and any given director or board committee member (and/or his family) have shared business interests and whether Rogan or board or committee members acted to further any business interests they shared. In addition, such activity would reveal if Rogan and the directors took actions contrary to Edgewater's and Dexia's best interests or received compensation for doing so, or whether any shared business interests were structured in a manner that made the board members beholden to Rogan.

55.    No reasonable question exists as to whether a sufficient basis exists to merit delving into the financial relationship between Rogan and Mr. Cuppy. The relevance of discovery related to Mr. Cuppy's business and financial dealings to the central issue of board independence cannot be disputed.

### D.    Transfers Among Co-Conspirators

56.    The controlling legal principles establishing the discoverability of this sort of material is set out in the *Companion Motion*, at ¶ 89.

57.    The information included in this pleading and others previously present to this Court provide more than a reasonable basis to believe that Mr. Cuppy operated as a co-conspirator with Rogan in the fraud scheme alleged in the complaint in this case.[31] Even if Mr. Cuppy is not considered a co-conspirator, however, his records are nonetheless discoverable under the doctrine permitting discovery of transfers among co-conspirators. This is because Mr. Cuppy has plainly had extensive personal financial dealings with entities that are *unquestionably* co-conspirators in Rogan's effort to conceal the money received from Braddock and Bainbridge, e.g., Boulevard Investors, Ltd. and BILLC. Not only did Mr. Cuppy manage these entities, but he also engaged in direct personal financial transactions with at least BILLC. Thus, Mr. Cuppy's personal financial records may include proof (or documents leading to proof) of transfers between and among any of the Boulevard entities or the defendants in this case. Therefore, those records should be produced.

### E.    Any Objection to the Breadth And Purported Burden of the Discovery Should Be Rejected.

58.    Mr. Cuppy contends that Dexia's requests are overly broad and unduly burdensome.

59.    Dexia's requests are not overbroad and are directed at properly discoverable information under Fed. R. Civ. P. 26. Apart from Mr. Cuppy's failure to offer a legitimate basis for his objection to breadth, an examination of the requests at issue illustrate that

---

[31] In saying this, Dexia does not assert that Mr. Cuppy was directly involved in the portion of the conspiracy pertaining to health care fraud occurring at Edgewater. Rather, it is Dexia's position that Mr. Cuppy assisted Rogan after he removed the ill-gotten funds from Edgewater, i.e., by helping Rogan conceal those funds to reduce the likelihood that they might be recovered. Indeed, *after* January 2003 when Braddock and Bainbridge pled guilty to federal criminal charges, there can be no question that any and all steps Mr. Cuppy took to advance or continue this concealment were undertaken with full knowledge that he was dealing with criminal proceeds.

they are neither overly broad nor unnecessarily burdensome.[32]  Dexia tailored its requests to focus primarily upon documents directly relating to Edgewater, Peter Rogan, and the former directors' dealings with Edgewater, Rogan, and Rogan-affiliated entities and individuals.  (*See* Ex. FF at 5-9)  Dexia's other requests relate to businesses, partnerships, trusts or other entities owned, managed, operated or controlled by the former directors. (*Id.* at 8-10)[33]

## CONCLUSION

WHEREFORE, for the reasons stated, Dexia respectfully urges this Court to grant its motion to compel and order Fred Cuppy to produce any and all records in his possession, custody or control that are responsive to the subpoena Dexia served upon him.

Dated: October 4, 2004

Dexia Crédit Local,

Plaintiff

By: _Eric S Pruitt_

One of its attorneys

SIDLEY AUSTIN BROWN & WOOD LLP
Scott Mendeloff
Gabriel Aizenberg
Eric Pruitt
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Counsel for Dexia Crédit Local

---

[32] Mr. Cuppy is obliged to retrieve any responsive documents that he can obtain that may be outside his immediate physical possession *Kissinger v. Reporters Committee for Freedom of the Press*, 100 S. Ct. 960, 975 n.6 (1980).  *See also Wilson v. Sundstrand Corp.*, 2003 WL 21961359, *9 (N.D. Ill. Aug 18, 2003) ("Control" for purposes of Rule 34(a) means "the legal right to obtain the documents requested upon demand."); *In Re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977) ("The test is whether the party has a legal right to control.").  Accordingly, Mr. Cuppy must seek out documents *inter alia* from attorneys, accountants, financial institutions and any other sources from which they have the right to request and receive documents responsive to Dexia's requests.
[33] As explained above, these requests go to core issues in this case relating to board independence and Rogan's control over Edgewater.

18

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEXIA CRÉDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France, ) ) | |
| Plaintiff, ) ) ) | |
| v. ) ) | No. 02 C 8288 |
| PETER G. ROGAN, ) | Judge Mark Filip |
| BRADDOCK MANAGEMENT, L.P., ) | |
| BAINBRIDGE MANAGEMENT, L.P., ) | Mag. Judge Sidney I. Schenkier |
| BAINBRIDGE MANAGEMENT, INC., ) | |
| EDGEWATER PROPERTY COMPANY, an ) | |
| Illinois corporation, and ) | |
| PGR PROPERTIES, INC., an Illinois corporation. ) ) | |
| Defendants. ) | |

**PLAINTIFF DEXIA CRÉDIT LOCAL'S MOTION TO COMPEL PRODUCTION OF
DOCUMENTS FROM BOULEVARD INVESTORS, LTD, BOULEVARD INVESTORS,
LLC, THE TRUSTS OF SARA CAITLAN ROGAN, ROBERT CASHMAN ROGAN,
AND BRIAN PETER ROGAN, AND CARIBE TRUSTEES, LTD**

RESTRICTED DOCUMENT PURSUANT TO LOCAL RULE 26.2

DOCUMENT CONTAINS AND REFERS TO CONFIDENTIAL TAX RETURNS, BANK RECORDS
AND FINANCIAL INFORMATION

FILED UNDER SEAL IN ACCORDANCE WITH PROTECTIVE ORDER ENTERED BY THE
HONORABLE MARK FILIP ON MARCH 12, 2004

SIDLEY AUSTIN BROWN & WOOD LLP
Scott Mendeloff
Gabriel Aizenberg
Eric Pruitt
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Counsel for Plaintiff Dexia Crédit Local

# TABLE OF CONTENTS

                                                                    **Page**

INTRODUCTION ............................................................................................1

BACKGROUND ............................................................................................2

INVOLVEMENT OF THE BOULEVARD ENTITIES IN THE OWNERSHIP
STRUCTURE OR OPERATIONS OF BRADDOCK AND BAINBRIDGE....................3

THE SUBPOENAS AT ISSUE AND THE BASIS FOR THAT DISCOVERY ...............11

DEXIA'S COMPLIANCE WITH MEET AND CONFER OBLIGATIONS:
REPEATED ATTEMPTS TO OBTAIN FULL COMPLIANCE WITH SUBPOENAS .................14

ARGUMENT...................................................................................................16

    I.      CONTROLLING LEGAL STANDARDS....................................................16

    II.     THE DISCOVERY DEXIA SEEKS FROM THE BOULEVARD ENTITIES IS
          DIRECTLY RELEVANT TO DEXIA'S EFFORTS TO TRACE FUNDS AND
          ESTABLISH PETER ROGAN AS THE ULTIMATE BENEFICIARY OF THE
          HEALTH CARE FRAUD PERPETRATED BY BRADDOCK AND
          BAINBRIDGE...................................................................................17

         A.     Initial Points....................................................................17

         B.     Dexia is Permitted to Trace the Destination of the Funds that are the
            Subject of its Fraud Claim...........................................................17

         C.     *Shapo v. Engle* Mandates the Requested Tracing Discovery...................19

         D.     Requested Discovery is Essential Proof Regarding Rogan's
            Knowledge..................................................................................21

         E.     The Requested Documents are Discoverable to Establish Defendants' Net
            Worth and Pecuniary Position. ....................................................21

         F.     Transfers Among Co-Conspirators.................................................23

          G.     Alter Ego Claims........................................................................23

CONCLUSION.................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Abu-Nassar v. Elders Futures Inc.*, 1991 WL 45062 (S.D.N.Y. Mar. 28, 1991) ........................................25

*In re Aircrash Disaster Near Roselawn*, 172 F.R.D. 295 (N.D. Ill. 1997) .......................................16

*Aspen v. King World Prods. Corp.*, 2001 WL 1403001  (N.D. Ill. Nov. 9, 2001) ........................22

*Burke v. New York City Police Department*, 115 F.R.D. 220 (S.D.N.Y. 1987) .......................17

*Constitution Bank v. Levine*, 151 F.R.D. 278 (E.D. Pa. 1993) ........................................18

*Deal v. Byford*, 537 N.E.2d 267 (Ill. 1989) ........................................22

*EEOC v. Ian Schrager Hotels*, 2000 WL 307470 (C.D. Cal. March 3, 2000) ........................22

*EEOC v. Staffing Network, LLC*, 2002 WL 31473840 (N.D. Ill. Nov. 4, 2002) ........................16

*In Re Folding Carton Antitrust Litigation*, 76 F.R.D. 420 (N.D.Ill. 1977) ........................21

*Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577 (11th Cir. 1986) ...............23, 24

*Jacobs v. Kennedy Van Saun Mfg. & Eng. Corp.*, 12 F.R.D. 523 (M.D. Penn. 1952) ..............18

*Kay v. First Continental Trading, Inc.*, 1997 WL 614378  (N.D. Ill. Sept. 23, 1997) ............22

*Kissinger v. Reporters Committee for Freedom of the Press*, 100 S. Ct. 960 (1980) ..............21

*McLeod, Alexander, Powel & Apffel*, 894 F.2d 1482 (5th Cir. 1990) ........................................24

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).......................................16

*Pickering v. Owens-Corning Fiberglas Corp.*, 638 N.E.2d 1127 (Ill. App. Ct. 1994) .............21

*Pielet Bros. Scrap Iron and Metal Limited Partnership v. Reynolds Metal Co.*,
1994 WL 649105 (N.D. Ill. 1994) ........................................24, 25

*Rorer Int'l Cosmetics, Ltd. v. Halpern*, 85 F.R.D. 43 (E.D. Pa. 1979) ........................................18

*Ross v. UKI Ltd.*, 2004 WL 67221 (S.D.N.Y. Jan. 15, 2004).......................................24

*Sabratek Liquidating LLC v. KPMG LLP*,  2002 WL 31520993 (N.D.Ill. Nov. 13, 2002) ...........16

*Shapo v. Engle*, 1999 WL 446853 (N.D. Ill. June 11, 1999)........................................19, 20

*Shapo v. Engle*, 2000 WL 876994 (N.D. Ill. July 3, 2000).......................................20, 23

*Shapo v. Engle*, 2001 WL 204804 (N.D. Ill. Mar. 1, 2001).......................................20, 23

*Shearson Lehman Hutton, Inc. v. Lambros*, 135 F.R.D. 195 (M.D. Fla. 1990) .......................18

*Stallings v. Union Pacific R. Co.*, 2003 U.S. Dist. LEXIS 9550 (N.D. Ill. 2003) ...................16

*United States v. Seaga Corp. of Ill.*, 2002 WL 31045388, (N.D. Ill. Sept. 11, 2002) ...............24

*Van Kampen High Yield Municipal Fund v. O'Donnell & Naccarato,* 2003 WL 751005 (E.D. Pa. Mar. 4, 2003)................................................................................................................18, 23

*White v. Kenneth Warren & Son, Ltd.,* 203 F.R.D. 364 (N.D. Ill. 2001) ............................18

*Wilson v. Sundstrand Corp.,* 2003 WL 21961359, *9 (N.D. Ill. Aug 18, 2003) ...................21

## STATUTES AND RULES

Bankruptcy Code § 101(31)(vi)............................................................................................2

Fed. R. Civ. P. 26 ..............................................................................................1, 2, **15**, 16, 17

Fed. R. Civ. P. 34 ...............................................................................................................21

Fed. R. Civ. P. 37 ...............................................................................................................1

CHI 3060053v1

Plaintiff Dexia Crédit Local ("Dexia") moves to compel Boulevard Investors, Ltd., Boulevard Investors LLC, the trusts of Sara Caitlin Rogan, Robert Cashman Rogan, and Brian Peter Rogan, and Caribe Trustees, Ltd. (collectively, the "Boulevard Entities") to produce documents in response to subpoenas Dexia served upon them pursuant to Rules 26 and 37, Fed. R. Civ. Pro. In support of its motion, Dexia states as follows:

## INTRODUCTION

1. The Boulevard Entities: (i) hold (directly or indirectly) a controlling ownership interest in Braddock Management, LP ("Braddock") and Bainbridge Management LP ("Bainbridge"); and/or (ii) have received a substantial portion of the funds from Braddock or Bainbridge that originated with Edgewater. Mr. Fred Cuppy has an agency relationship with each of the entities. Dexia has served subpoenas upon Mr. Cuppy as agent for the Boulevard Entities, seeking a variety of financial and business records.

2. Fred Cuppy is an attorney from Merrillville, Indiana who, for over 15 years, has assisted Peter Rogan and the Rogan family with the most intimate details of their business and personal financial dealings, specifically with respect to the receipt and handling of millions of dollars that originated as management fees Edgewater paid to Braddock Management LP and Bainbridge Management LP, which fees were then transferred to one or more of the Boulevard Entities. Mr. Cuppy also assisted in the administration of Edgewater for a portion of Rogan's tenure there.

3. Arguing relevance and overbreadth, Fred Cuppy on behalf of the Boulevard Entities has refused to produce a substantial quantity of documents that are within the ambit of the subpoenas and has also directed third parties, e.g., David Miller, to refuse to produce documents under similar requests for documents.

4. This motion articulates the reasons why the documents requested in Dexia's subpoenas are relevant and should be produced. Specifically, this motion presents legal authority demonstrating that the requested documents are relevant to permit Dexia: (i) to trace the location of millions of dollars in Edgewater's funds that Rogan caused Edgewater to pay to Braddock and Bainbridge so as to establish Rogan's knowledge of the fraud scheme by showing *inter alia* that the lion's share of the proceeds of the scheme went to Rogan and/or his family; (ii) to identify the assets under Rogan's control in relation to Dexia's pursuit of punitive damages

against Rogan; (iii) to establish the nature and scope of the conspiracy between Rogan, Bainbridge, Braddock and other entities; and (iv) to determine whether the various entities receiving funds from Braddock and Bainbridge were merely alter egos of Rogan relevant *inter alia* to questions of fraudulent conveyance.[1]

5.    This motion presents factual context followed by the aforementioned legal precedent to demonstrate that this Court should compel Mr. Cuppy and the Boulevard Entities to comply with the subpoenas that they to date have spurned.

## BACKGROUND

6.    On March 29, 2004, Dexia served subpoenas upon: (i) Boulevard Investors, Ltd.; (ii) Boulevard Investors LLC; (iii) the trusts of Sara Caitlin Rogan, Robert Cashman Rogan, and Brian Peter Rogan;[2] and (iv) Caribe Trustees, Ltd. (the "Boulevard Entities.") Mr. Cuppy either holds positions with the Boulevard Entities that afford him legal control over their financial records, or has demonstrated that he possesses or controls such records. While this pleading hereafter adds detail to the nature and extent of Mr. Cuppy's control over these entities, Dexia notes that recent events before this honorable Court in relation to ongoing discovery disputes between Dexia and Rogan and his companies have vividly demonstrated the extent of control Mr. Cuppy exercises over these entities. In relation to events pertaining to those proceedings, Mr. Cuppy attempted to block Dexia from discovering materials relating to those entities that were plainly in the possession and custody of Rogan's businesses and employees of those businesses.

---

[1] These issues were briefed for this Court in relation to Dexia's Motion to Compel Production of Documents by Defendants Peter G. Rogan, Braddock Management, LP, Bainbridge Management, LP, Bainbridge Management, Inc., Edgewater Property Company, and PGR Properties, which Dexia incorporates by reference here. (Ex. A) U.S. District Court Magistrate Judge Sidney Schenkier ordered just this sort of tracing material produced in a ruling entered on June 9, 2004. *Dexia Crédit Local v. Peter G. Rogan et al.* (02 C 8288). (Ex. B) Furthermore, in related proceedings, the U.S. Bankruptcy Court has repeatedly and resoundingly approved the discoverability of just this sort of material under Bankruptcy Rule 2004: (i) denying motions to quash of Rogan and several Rogan entities on January 21, 2004 (Ex C) (Judge Schwartz described defendants' argument against tracing discovery as "beyond the pale," Transcript of Proceedings, 2/20/04 (attached as Ex. D), at 16: 25, and held, "the subpoenas ought to be complied with." *id.* at 17: 11-12, 21-22.); and, (ii) granting Edgewater's motions to compel such discovery on February 20 and April 8, 2004. (Exs. D and E) U.S. District Court Judge Amy St. Eve refused to grant leave to appeal that court's denial of Rogan's Motion to Quash on April 19, 2004.

[2] Fred Cuppy was served with Rule 26 subpoenas in his capacity as trustee for trusts in the name of the children of Peter Rogan: Robert Rogan, Brian Rogan and Sara Rogan. As children of an insider, Mr. Rogan's children also are insiders of Edgewater under Section 101(31)(vi) of the Bankruptcy Code.

## INVOLVEMENT OF THE BOULEVARD ENTITIES IN THE OWNERSHIP STRUCTURE OR OPERATIONS OF BRADDOCK AND BAINBRIDGE

### Boulevard Investors, Ltd. and the Rogan Children's Trusts Own Braddock and Bainbridge

7.  Braddock Management LP ("Braddock") - As noted in prior pleadings, Braddock Management LP is a California limited partnership that had management contracts with Edgewater from in or about 1994 until in or about March 2000. Rogan and his family own a 100% interest in the partnership that owns Braddock. The ownership structure behind Braddock, set forth in the diagram at Exhibit F, consists of a 1% general partner that Rogan himself owns and a 99% limited partner (**Boulevard Management, Ltd.**) that is owned 10% by Rogan and 90% by domestic and offshore trusts in the names of Rogan's three children.

8.  More specifically, from on or about October 22, 1998 through the present: (a) Braddock's sole general partner and 1% owner has been Braddock Management, Inc., n/d/b/a **Bainbridge Management, Inc.**, which Rogan wholly owns through the Peter Rogan Revocable Trust; and (b) Braddock's sole limited partner and 99% owner has been **Boulevard Management, Ltd.**

9.  Ninety percent of Boulevard Management, Ltd. is owned directly and indirectly by trusts in the names of Peter Rogan's three children. These trusts are located in Florida and in the country of Belize. The **Florida Trusts** directly own 40.5% of Boulevard Management, Ltd. and the **Belize Trusts** indirectly own 49.5% (i.e., still another entity, **Boulevard Investors, Ltd.** directly owns that 49.5% interest, and the children's Belize trusts own 100% of Boulevard Investors, Ltd.) (*See* Stock Transfer Certificate, attached as Exhibit G)

10. Note that at the time the Florida trusts were created, the Rogan children were 14, 11, and 8 years old, and at the time the Belize trusts were created the children were roughly 19, 16, and 12. Rogan and Mr. Cuppy maintain that Rogan has had nothing to do with the trusts, as the Rogan children are adults and Mr. Cuppy controls the trusts.[3]

---

[3] That the Rogan children were minors at the time of the creation of the trusts is of course in and of itself not an adequate basis upon which to assert that Rogan controlled the trusts behind the scenes. However, the circumstances surrounding the creation and operation of the Rogan children's trusts becomes much more questionable when one considers the balance of the situation, e.g., that Mr. Cuppy is plainly orchestrating the transfer of funds with Rogan and that Mr. Cuppy is heavily involved with the operation of many Rogan-related businesses and has been so for many years.

11. As a result of its 99% ownership interest in Braddock, Boulevard Management, Ltd. received as partnership distributions the great bulk of the net management fees Edgewater paid to Braddock from 1998 through March 2000.

12. Peter Rogan directly and indirectly owns the remaining 10% of Boulevard Management, Ltd.

13. <u>Bainbridge Management LP ("Bainbridge")</u> - As prior pleadings also note, Bainbridge Management LP is an Illinois limited partnership that had a management contract with Edgewater from in or about March 2000 until in or about May 2001.[4] The ownership structure behind Bainbridge, set forth in the diagram at Exhibit H, consists of a 1% general partner that Rogan himself owns and a 99% limited partner (Belize-based **Boulevard Investors, Ltd.**) that is owned by offshore trusts in the names of Rogan's three children.

14. More specifically, since its formation, Bainbridge has been comprised of: (a) Bainbridge Management, Inc., which owns 1% of Bainbridge and is its sole general partner;[5] and (b) **Boulevard Investors, Ltd.**, which owns 99% of Bainbridge and was Bainbridge's sole limited partner. (*See* Bainbridge Management LP (f/k/a Braddock Management LP) partnership agreement, attached as Ex. I; Articles of Association of Boulevard Investors, Ltd., attached as Ex. J)

15. Again, **Belize Trusts** in the names of the three Rogan children directly own 100% of Boulevard Investors, Ltd. These are the same off-shore trusts referenced earlier that appear to have been created when the Rogan children were approximately 19, 16, and 12 years old.

16. As a result of its 99% ownership interest in Bainbridge, Boulevard Investors, Ltd. (and its owners, the Belize trusts of the Rogan children) received as partnership distributions the great bulk of the net management fees Edgewater paid to Bainbridge.

## <u>Boulevard Investors, Ltd. and the Three Trusts in Belize</u>

17. The aforementioned ownership diagrams for Braddock and Bainbridge reveal that Belize-based Boulevard Investors, Ltd. owns 49.5% of Boulevard Management, Ltd. (the 99% owner of Braddock) and 99% of Bainbridge. Boulevard Investors thus received a very

---

[4] Bainbridge bought out Braddock's contract with Edgewater effective in or about March 2000, and thereafter served as the exclusive manager of the day-to-day operations of Edgewater.
[5] Bainbridge Management, Inc. is 100% owned by the Peter Rogan Revocable Trust.

substantial portion of the fees Edgewater paid to both Braddock and Bainbridge.[6]  Mr. Cuppy states that three Belize trusts own Boulevard Investors, Ltd. and that he is the attorney for the three Belize trusts. (Ex. K at 3)

18. On the strength of this alone, Dexia is plainly entitled to obtain the financial records of Boulevard Investors, Ltd. and its owners, the three Belize trusts, as an essential step in the tracing analysis that this Court has already reviewed in this case.[7]  Those entities received millions in large cash distributions from Braddock and Bainbridge.  Furthermore, Dexia has already identified proof that, at least on occasion, Mr. Cuppy demonstrated his authority over Braddock and its parent, Boulevard Management, Ltd., by *directing* the timing and size of such distributions. (Ex. L)

19. It is beyond question that Fred Cuppy has actual and legal control over the complete financial records of Boulevard Investors, Ltd. and the Belize trusts that own it.  Mr. Cuppy is the managing director of Boulevard Investors, Ltd. (Ex. M), his name is on the account of Boulevard Investors, Ltd. at Morgan Stanley.[8]  Mr. Cuppy is also agent and legal representative for the Belize trusts. (Ex. K)  Furthermore, in a letter dated June 3, 1997, Mr. Cuppy appears to acknowledge in writing that he controls the Belize trusts in the names of the Rogan children.  (Ex. O) (referring to the Belize trusts as "these trusts that I have for the kids" and enclosing one check on behalf of each Rogan child's Belize trust to purchase 1/3 of 49.5% of Boulevard Management, Ltd. (16.5% each) from Rogan).[9]

20. Mr. Cuppy has refused to produce any financial records of Boulevard Investors, Ltd. before 2002 and had produced no records whatsoever for the three trusts that own it.  Even though he has been apprised of the rulings of this Court and the U.S. Bankruptcy Court on tracing discovery in In re Edgewater Medical Center., No. 02 B 7378, Mr. Cuppy insists that the requested financial information has nothing to do with Dexia's case or the bankruptcy case. In fact, upon claim of privilege,[10] Mr. Cuppy refuses even to identify the beneficiaries of the

---

[6] In January 2003, Braddock and Bainbridge pled guilty to using Edgewater in a scheme to defraud Medicare of over $13,000,000.

[7] See supra n. 1.

[8] The account is in the name of "Boulevard Investors, Ltd. c/o Fred Cuppy." (Ex. N)  Thus far, this is the only account of Boulevard Investors, Ltd. for which Dexia has been able to obtain discovery.

[9] As we shall see, the trustee of the Belize trusts is itself a Belize corporation named Caribe Trustees, Ltd. Due to stonewalling by Mr. Cuppy, we have not been able to obtain information relating to the internal legal structure of Caribe.

[10] Mr. Cuppy has not articulated how this information is privileged.

three trusts that own Boulevard Investors, Ltd. or the party responsible for establishing the trusts. (Ex. K)

21. Even so, Dexia has gleaned this information from other documents. In 1999, Bainbridge issued to Boulevard Investors three tax forms entitled "Foreign Partner's Information Statement of Section 1446 Withholding Tax." Those documents identify the shareholders in Boulevard Investors as "RCR002," "BPR002," and "SCR002." (Ex. P). These are the initials of Peter Rogan's children Robert Cashman Rogan, Brian Peter Rogan and Sara Caitlan Rogan.[11] Buttressing this identification is correspondence Mr. Cuppy produced in which he refers to the purchasers of the 49.5% interest in Boulevard Management, Ltd. interchangeably as Peter Rogan's children's Belize trusts and as Boulevard Investors, Ltd. (Ex. O)

22. There would be simply *no way* to perform the tracing analysis that the case law permits in these sorts of cases if the direct recipients of estate funds are permitted to refuse to produce essential financial records.

## Caribe Trustees, Ltd.

23. Mr. Cuppy has represented that Caribe Trustees, Ltd. ("Caribe") is a Belize corporation and is the trustee of the three trusts that own Boulevard Investors, Ltd. (Ex. K) Nevertheless, Mr. Cuppy maintains that the fact that – (i) Caribe is the trustee of the trusts that own Boulevard Investors, Ltd., the primary owner of Braddock and Bainbridge; (ii) Caribe's name appears on the Braddock and Boulevard Management, Ltd. K-1s as having received cash distributions from them; and (iii) the cash so distributed came from Edgewater – does not establish a connection between Caribe and Edgewater's funds or make Caribe's records discoverable. (Ex. R) This claim is as groundless as Mr. Cuppy's other positions.

24. Braddock and Boulevard Management, Ltd. generated K-1s and other tax forms in the name of Boulevard Investors, Ltd. that reflect distributions of funds, which funds originated with Edgewater. These tax forms identify the partner to whom the K-1 is being issued as **both** Boulevard Investors, Ltd. **and** Caribe Trustees, Ltd. ("Caribe"). (Ex. S) The forms then go on to list Mr. Cuppy as the U.S. agent for both of these businesses and reflects that money from Braddock went to Caribe.

---

[11] Several documents refer to the Rogan children's domestic trusts simply by the child's initials "RCR 002," "BPR 002," and "SCR 002." Dexia surmises that the "002" designation after each set of initials

25. Dexia subpoenaed Caribe, and requested all documents related to its formation, purpose, and assets.

26. Responding on behalf of Caribe, Mr. Cuppy has refused to produce any documents.

27. Considering that Caribe is the trustee for trusts that own – through Boulevard Management, Ltd. – *virtually all* of Bainbridge and half of Braddock, and that K-1s for Boulevard Management, Ltd. reflect that millions of dollars of Edgewater's funds have been distributed to "Boulevard Investors, Ltd., Caribe Trustees, Ltd., c/o Fred Cuppy," Mr. Cuppy's bald claim that no connection exists between Edgewater and Caribe is simply an insufficient basis upon which to refuse to produce the subpoenaed documents.

28. On the strength of the earlier rulings of this Court and the bankruptcy court as well as the legal support Dexia has cited in this motion and earlier to support this discovery, Dexia is entitled to determine who formed Caribe, for what purpose Caribe was formed, how much of Edgewater's funds Caribe received, and what Caribe did with the funds it received.

### Boulevard Investors LLC

29. Boulevard Investors LLC ("BILLC") is an Indiana limited liability company and Mr. Cuppy is its registered agent and attorney. This entity is plainly another Rogan-controlled entity that participated in financial transactions involving funds that originated at Edgewater.

30. Boulevard Investors LLC is located at 240 E. 90th Drive, Merrillville, Indiana, the same address as Braddock, Bainbridge, EPC, PGR, BFB Ltd., JKR Business, and numerous other Rogan-controlled entities. Not coincidentally, the trustee of the Rogan children's domestic and off-shore trusts – Fred Cuppy – is also counsel to and the registered agent of Boulevard Investors LLC.

31. While BILLC does not have an ownership interest in Braddock or Bainbridge, it nonetheless has handled millions of dollars that flowed from Edgewater and through Braddock and Bainbridge. After Braddock and Bainbridge received that money, they made cash

---

relates to the fact that there are two sets of trusts in the names of the Rogan children: one in the U.S. and one in Belize. (Exs. O & Q)

distributions or other transfers to the Florida and Belize Trusts,[12] whereupon Mr. Cuppy then sent the funds on directly to, or on behalf of, Boulevard Investors, LLC.

32. <u>Direct Transfers from the Florida and Belize Trusts to BILLC</u>. The Florida Trusts' direct transfers to BILLC appear to involve debt rather than equity transactions. The FATE program materials produced just this week reveal that Mr. Cuppy caused the Florida Trusts to invest in BILLC by entering into notes with it.[13]   For example, Mr. Cuppy caused the Florida Trust of Robert Rogan to enter into a note with BILLC, on which the trust received periodic interest payments. (Ex. T)

33. Mr. Cuppy then caused BILLC to employ at least a portion of these funds at the direction of or in conjunction with Rogan in a series of deals with Rogan-controlled entities, either making direct investments or operating a business in association with those entities.

34. The Rogan-controlled entities to which Mr. Cuppy transferred substantial funds of BILLC – and which also received debt and equity investments directly from the Florida and Belize Trusts – were a set of *Savannah, Georgia* real estate developments named **410 Montgomery** ("410"), **Gardens on Jones LLC** ("Gardens on Jones"), and **Taylor Row LLC** ("Taylor Row"). Mr. Cuppy and others associated with the three developments treated them as a joint project. (Exs. U & V)  Work on these investments appears to have begun at the latest in or about 1999. (Ex W)

35. BILLC appears to have used at least a portion of the money it borrowed from the Florida Trusts to purchase a 100% ownership interest in **410 Montgomery**. (Ex. X)

36. Like the Florida Trusts, the Belize Trusts (via Boulevard Investors, Ltd.) also sent funds to BILLC via a series of **transfers totaling $935,600.** (Ex. Y)  Unfortunately, the FATE program materials do not contain information on the Belize trusts, so we are not able to determine whether these transfers are debt or equity transactions. Nevertheless, the available proof reveals that, like the funds from the Florida trusts, BILLC used the money from Boulevard Investors, Ltd. to invest in the Savannah projects. (Ex. Z)[14]   However, without the discovery that

---

[12] Accomplished via transfers to Boulevard Management, Ltd. and Boulevard Investors, Ltd.

[13] Once again, Mr. Cuppy was on both sides of this transaction, serving as a trustee of the Florida Trusts while at the same time managing BILLC.

[14] At about the same time it received these funds from Boulevard Investors Ltd., BILLC appears to have sent about that same amount of money to a variety of business institutions in Savannah involved in the Savannah real estate developments:  Darby Bank, the Savannah law firm of McCorkle Pedigo and Johnson ("McCorkle"), and a developer in Savannah named Jerry Whitlow and his construction company,

is the focus of this motion to compel, we cannot determine which portion of these transfers were used to purchase BILLC's equity interest in 410.

37. In addition to ownership of one of the Savannah Developments, BILLC also operated a business managing Taylor Row, 410, and Gardens on Jones, from which BILLC received cash distributions. (Ex. U)  Edgewater funds transferred to BILLC through the Florida and Belize Trusts may well have been used as operating capital for this business.  Further discovery will clarify this.

38. <u>Investments by the Florida and Belize Trusts Directly in the Savannah Developments</u>.  Mr. Cuppy caused the Florida Trusts to spend a portion of the Edgewater funds to purchase a 66.66% of Taylor Row, in which BILLC held no equity interest. (Ex. DD)  Mr. Cuppy also caused the Florida Trusts to purchase equity holdings in Gardens on Jones, the precise size of which (as well as other details) cannot be determined without the discovery sought by this motion. (*See, e.g.*, Ex DD) (Florida Trusts' 2002 Tax Return Schedule E)

39. Mr. Cuppy also caused the Belize Trusts (via Boulevard Investors, Ltd.) to invest funds originating with Edgewater in the Savannah projects, although the precise nature of the Belize Trusts' investments is not yet clear.  In 2000, Mr. Cuppy caused Boulevard Investors, Ltd. to send $933,000 to a series of businesses closely involved in the Savannah developments, including Darby Bank and the McCorkle law firm.  Then, in 2001, Boulevard Investors, Ltd. sent $21,000 directly to Taylor Row and to 410. (Ex. EE)[15]

40. All of the foregoing notwithstanding, Mr. Cuppy  has refused to produce even a single document involving Boulevard Investors LLC, claiming that this entity has no connection to the affairs of Edgewater. (Ex. FF)  Although counsel for Dexia has repeatedly stressed the prior rulings of this Court as to tracing and other discovery principles, Mr. Cuppy has steadfastly refused to produce the subpoenaed materials relating to BILLC.

---

**Whitlow Construction**. (Exs. Z & AA)  Darby Bank provided financing at least for the Gardens on Jones and Taylor Row projects. (Exs.  BB & CC)  McCorkle appears to have served as local real estate counsel on the deals. **Jerry Whitlow** is registered agent for the Savannah projects.  Further discovery should reveal the precise nature of these transactions. Thus, irrespective of whether the money Boulevard Investors, Ltd. sent BILLC was a debt or equity investment in BILLC, the documentation reveals that Mr. Cuppy caused it to be funneled on to the Savannah developments.

[15] The records regarding the Taylor Row and 410 Savannah developments produced to date do not show Boulevard Investors, Ltd. holding a direct ownership interest. (We have not received sufficient materials regarding Gardens on Jones to determine whether the Belize Trusts own any of it.)  The transfers involving Taylor Row and 410 were therefore likely booked as either (i) loans to the developments themselves, (ii) loans to BILLC, or (iii) equity investments in BILLC.

41. <u>Rogan's Personal Involvement</u>.  Another reason Mr. Cuppy has refused to produce the subpoenaed materials is that he claims that Rogan "has no connection to Boulevard Investors LLC." (Ex. K)

42. This position is plainly a contrivance.  All available facts indicate that Mr. Rogan was deeply involved, and indeed the motivating force behind, the Savannah developments that received so much of the money he caused to be sent from Braddock and Bainbridge to the Florida and Belize Trusts.

43. Gardens on Jones and Taylor Row each list their principal place of business as 240 E. 90th Drive, Merrillville, IN, a small suite of offices that serves as the principal place of business for many other Rogan-related businesses.  (Ex. GG) (floor plan of 240 East 90th Drive taken from Braddock lease).[16]  Furthermore, a key Rogan employee, David Miller,[17] administered important elements of the financial affairs of all of the Savannah developments (Ex. V), in at least one instance connecting these actions with Bainbridge. (Ex. HH)  Finally, but most significantly, Peter Rogan's business records reflect that: (i) he personally traveled to Savannah during important periods in the progression of the Savannah projects, i.e., on January 27-28, 2000, on February 7-10, 2001,[18] and on March 18-20, 2002; and (ii) during the last of the trips listed, Rogan met with individuals at **Darby Bank** on March 18, 2002, a Bank that provided substantial financing for the Savannah projects.  (Ex. II)

<u>**Fred Cuppy**</u>

44.  Mr. Cuppy has long had quite substantial legal and financial dealings with Peter Rogan and his family, focussing especially upon the personal and business interests of Rogan and his family. Simply put, Dexia's investigation to date indicates that Mr. Cuppy appears to be one of two attorneys – Mr. Troy Myers of Florida being the other – upon whom Rogan has chiefly relied to assist him to attempt to protect from attack the millions of dollars Rogan has

---

[16] Among the Rogan-related businesses located at 240 E. 90th Drive are Braddock, Bainbridge, EPC, PGR, BFB Ltd.

[17] Mr. Miller is a key employee in most, and perhaps all, of the Rogan businesses, where he frequently serves as an officer, in effect the chief financial officer, e.g., Braddock, Bainbridge, Edgewater Property Company, PGR Properties, Inc., BFB, Ltd., and JKR Business.  Miller also serves as an accountant for the Rogan children's trusts.

[18] This trip appears to be especially significant because: (i) it occurred just before the beginning of a series of significant financings relating to the Savannah project; and (ii) Rogan brought along many of the other individuals who played important roles in the Savannah development prior to that time and after, i.e., Cuppy, Miller, Foley and Tatooles.  **Rogan** expensed the trip to EPC, Inc. (Ex. II)

obtained from Edgewater. To this end, Mr. Cuppy *inter alia* formed, acted as trustee and/or administered numerous trusts in the names of Rogan and his children, administered businesses Rogan caused to be created, and assisted with the administration of Edgewater, in particular in relation to Braddock and Bainbridge.

45. Mr. Cuppy's personal and business dealings with Peter Rogan and his immediate family are detailed with much more specificity in the companion motion filed at the same time as the instant motion, i.e., <u>Motion to Compel Fred Cuppy</u>.

46. It bears reemphasis here, however, that Mr. Cuppy has plainly been a part of efforts to transfer Edgewater funds through the Boulevard entities and back to Rogan. *See* ¶¶ 32-43, *supra*. For example, on February 17, 1999, Mr. Cuppy took part in a series of transfers whereby Mr. Cuppy as trustee for the Rogan children's U.S. trusts received a cash distribution more than $1.2 million from Braddock, and immediately "loaned" $1,350,000 to their company, Boulevard Management, Ltd., which in turn immediately transferred $1.2 million to Rogan. (Ex. JJ) A diagram of this transaction is attached as Exhibit KK. This transaction vividly belies Mr. Cuppy's claims that Rogan has had no control over the money in the Rogan children's trusts.

47. Furthermore, as noted in detail above, Mr. Cuppy caused BILLC and the Florida Trusts to invest in the Savannah real estate developments. BILLC owns 100% of 410 and the Florida Trusts own substantial portions of Gardens on Jones and Taylor Row. The Belize Trusts also made large transfers relating to the Savannah developments, the precise nature of which will become clear only through additional discovery.

       \*        \*        \*        \*        \*

48. The financial and business documents Dexia seeks from the Boulevard Entities accordingly are absolutely essential tracing documents without which Dexia will be unable to establish the ultimate destination of millions of dollars of Edgewater's funds Braddock and Bainbridge obtained.

### THE SUBPOENAS AT ISSUE AND THE BASIS FOR THAT DISCOVERY

49. The subpoenas Dexia served upon the Boulevard Entities consist of two interrelated parts: (i) a series of document requests identifying the sorts of documents sought, a number of which narrow those requests to documents pertaining to the that individuals or entities listed on "Rider B"; and (ii) Rider B, which is a list of persons and entities that are all related to

11

Edgewater, Rogan, Rogan's family, and/or businesses associated with them. The subpoena is attached.[19] (Ex. LL)

   50. A breakdown of the categories of individuals and entities listed on Rider B follows (the letters listed after each rubric correspond to specific individuals or entities listed on Rider B)[20]:

- <u>Parent Members of Edgewater Medical Center (f/k/a Northside Operation Co.)</u> – A, ZZ; and XXX

- <u>Foundations and Edgewater-Related Entities Edgewater Medical Center and/or Peter G. Rogan Controlled</u> – B*, T*, U*, V*, Z*, CC, KK, LL, WWW*;

- <u>Directors of Access, Vital and Edgewater</u> – C, F, M, P, W, Y, HH, TT, WW, PPP, QQQ, RRR, and TTT;

- <u>Employees and Officers of Braddock/Bainbridge Management LP and Officers of Edgewater</u> – DD, FF, JJ, YY, UU, WW, and SSS;

- <u>Doctors Convicted of Healthcare Fraud at Edgewater and their Businesses which Contracted with Edgewater</u> - E, X, GG, RR, CCC, DDD, and VVV;

- <u>Entities Possessing Ownership Interests (direct and indirect) in Braddock/Bainbridge Management LP (including agents for such entities)</u> – D*, J, K, L, N*, O, R, FF, JJ, VV, YY*, BBB, GGG, JJJ, KKK*, MMM, OOO, VVV, and YYY;

- <u>Individuals and Entities Received Funds and Assets of Edgewater (including agents for such entities who facilitated the transfer of such assets)</u> – all on list except possibly OO, PP, SS, and EEE;

- <u>Rogan, his Immediate Family, and Entities Peter Rogan or his Children's Trusts Owned or Controlled</u> - D*, G, J, K, L, N*, R, T*, U*, Z*, BB, EE, II*, MM, NN, OO, PP, QQ, SS, VV, XX*, AAA, EEE, FFF, GGG, HHH, III, JJJ, KKK, LLL, MMM, NNN, OOO, WWW, XXX, YYY;

- <u>Rogan Family Members (Insiders of Edgewater under 11 U.S.C. § 101 (31)(B)(vi))</u> – FFF, HHH, KKK, LLL, and NNN.

   51. The foregoing categories of documents are fundamentally seek documents pertaining to financial transactions or transfers involving funds that originated with transfers from Edgewater to Braddock and Bainbridge, i.e., tracing and assets discovery.

---

[19] The Boulevard Entity subpoenas contain identical requests, so the subpoena for Boulevard Investors, Ltd. is attached as a sample.

[20] The entities included on the following list that Braddock or Bainbridge managed during the 1994-2001 time frame are designated with an *.

## Tracing and Assets Discovery from the Boulevard Entities.

52. The subpoenas to the Boulevard Entities request all documents related to those entities' formation, ownership, control, tax returns, bank accounts, business dealings, and finances, which are relevant and reasonably calculated to lead to the discovery of admissible evidence regarding the transfers and location of Edgewater's assets (most of which had been posted as security for Dexia's loan guaranty).

53. Dexia seeks in specific any and all records relevant to the finances of the Boulevard Entities. Furthermore, Dexia also seeks any and all records relating to any of the individuals or entities on Rider B to the extent any of the individuals or entities on Rider B had any financial dealings with any of the Boulevard entities, or any parent, subsidiary or affiliate of those entities.

54. Furthermore, the Boulevard Entities' collectively were the recipients of millions of dollars that originated at Edgewater. Rogan caused: (i) **Edgewater to** send millions of dollars in management fees to **Braddock and Bainbridge**; and (ii) **Braddock and Bainbridge to** send this money on to one or another of the **Boulevard Entities**, i.e., Boulevard Investors, Ltd., Boulevard Investors LLC, the trusts (U.S. and Belize) in the names of Sara Caitlan Rogan, Robert Cashman Rogan, Brian Peter Rogan, and Caribe Trustees, Ltd. (collectively, the "Boulevard Entities"). Furthermore, Dexia has developed proof that Mr. Cuppy thereafter caused the **Boulevard Entities to** send substantial portions of these funds on to **other business entities under Mr. Cuppy's control**. These "other business entities under Mr. Cuppy's control" that appear to have received substantial portions of the funds that originated as Edgewater management fees include without limitation:

- CFMT of Florida LLC ("CFMT") (¶¶ 1-4, 10, 14-18, 23)
- Diagnostic Equipment, Inc. (¶¶ 1-4, 10, 14-18, 23)
- Myriad entities involved with the investments in Savannah, Georgia (¶¶ 1-4, 10, 14-18, 23

55. Crucially, Mr. Cuppy serve as either agent, director, and/or trustee of *each* of the Boulevard Entities, and <u>also</u> serves in the same capacities for a variety of the other business entities to which the Boulevard Entities transferred substantial amounts of this money. Mr. Cuppy and/or the Boulevard Entities thus possess or control a substantial volume of records that

13

are a *critical part* of the tracing and assets discovery that this Court has approved previously relating to Peter Rogan, his family, and his companies.[21]

56. *The purpose of the requested discovery is to permit Dexia to confirm the movement of these funds and to trace what happened to the funds.*

57. The discovery that the subpoenas seek from the Boulevard Entities is nearly identical to that which this Court has already ordered Peter Rogan, Braddock Management LP ("Braddock"), Bainbridge Management LP ("Bainbridge"), and other Edgewater insiders to produce. The Boulevard Entities are effectively in the same position as the Rogan parties that were subject to this Court's previous compulsion orders, in that they received large amounts of money from Braddock and Bainbridge and their disposition of those funds is critical to be able to complete the very same sorts of tracing and asset identification functions that underlay this Court compulsion orders to Rogan, Braddock, Bainbridge, and the other Rogan entities.

## DEXIA'S COMPLIANCE WITH MEET AND CONFER OBLIGATIONS: REPEATED ATTEMPTS TO OBTAIN FULL COMPLIANCE WITH SUBPOENAS

58. On April 5, 2004, on behalf of the Boulevard Entities, Fred Cuppy objected to Dexia's subpoenas. Boulevard Investors LLC, Boulevard Investors Ltd., and Caribe objected to the subpoenas *in toto,* stating that Dexia's requests are overly broad and that any documents in their possession are not relevant to the affairs of Edgewater. (Attached collectively as Exhibit MM). Mr. Cuppy refused to produce documents relating to: (i) Boulevard Investors LLC, Boulevard Investors, Ltd., Caribe, CFMT, and Diagnostic Equipment, Inc.; and (ii) "tracing" requests relating to transfers between and among various Rogan and Braddock/Bainbridge-related entities.

59. Mr. Cuppy agreed to and subsequently did produce documents relating to Boulevard <u>Management</u>, Ltd. (a Florida entity and the 99% limited partner of Braddock, which as noted is distinct from Boulevard <u>Investors</u>, Ltd., the Belize corporation that owns 99% of Bainbridge).

60. <u>No valid legal basis exists for Mr. Cuppy's decision to produce records for Boulevard Management, Ltd., but to refuse to produce most of the records for Boulevard Investors, Ltd.</u> Boulevard Management, Ltd. directly owns 99% of Braddock and Boulevard Investors, Ltd. directly owns 99% of Bainbridge. It is Dexia's view that the

---

[21] *See* ftnt. 1, *supra.*

determinative factor for Mr. Cuppy is the desire to help Rogan shield the funds sent through Boulevard Investors, Ltd., which is located offshore.

61. From April through June, Dexia's counsel engaged in extensive correspondence and discussion with counsel for Mr. Cuppy regarding his objections to Dexia's discovery from the Boulevard Entities, explaining in detail the connection of each entity to the affairs of Edgewater and the relevance and necessity of the objected-to request to the tracing of Edgewater's assets and its investigation of board independence issues. Dexia's correspondence and the responses of counsel for Mr. Cuppy and the Boulevard Entities is attached collectively as Exhibit NN.

62. The correspondence between Dexia and Mr. Cuppy's office led to the production of a limited set of documents from Boulevard Investors, Ltd., including some corporate formation documents and an account statement for a Morgan Stanley Active Assets Account for the years 2002-2004.

63. Dexia's counsel spent considerable time and effort in May, June, and July of 2004: (i) following up on numerous subpoenas issued to financial institutions; (ii) obtaining and reviewing voluminous materials received from 10 financial institutions, 8 law firms, and 25 other individuals and entities; and (iii) engaging in extensive efforts to ensure full compliance of Rogan and the Rogan-affiliated entities with Dexia's tracing and assets requests. Dexia's review of late-produced documents from Rogan and Rogan-related entities has revealed further connections between the Boulevard Entities and the assets and affairs of Edgewater.

64. Most recently, counsel for Dexia entreated counsel for Rogan to intercede with Mr. Cuppy to obtain the discovery sought here. Those efforts have been futile. Rogan's counsel informs that Mr. Cuppy maintains that he, and not Rogan, controls the records at issue and that Mr. Cuppy refuses to produce them.[22]

65. For the reasons stated below, the discovery Dexia seeks from the Boulevard Entities clearly is proper under Rule 26.

---

[22] Although Dexia has developed significant proof that belies this assertion, Rogan's ability to cause these records to be produced is beyond the scope of this motion and is addressed elsewhere.

# ARGUMENT

## I.    Controlling Legal Standards

### A.    Standard under Federal Rules of Civil Procedure

66. The documents Dexia seeks are fully discoverable under the Federal Rules of Civil Procedure because they are directly relevant to Dexia's allegations that Peter Rogan: (i) controlled and directed the affairs of Braddock and Bainbridge; (ii) controlled and dominated the board of Access through his long-standing personal and financial connections to its directors and members of its board committees; and (iii) knowingly participated in a conspiracy to funnel fraudulently obtained management fees and payments out of Edgewater and to Peter Rogan and his family through elaborate transfers between and among Braddock, Bainbridge, the Boulevard Entities, and trusts in the names of Rogan's three children. The documents are also discoverable in relation to the punitive damages Dexia seeks against Rogan.

67. The federal rules contemplate liberal discovery and define "relevancy" under Rule 26 broadly. *Stallings v. Union Pacific R. Co.*, 2003 U.S. Dist. LEXIS 9550, at *17 (N.D. Ill. 2003); *EEOC v. Staffing Network, LLC*, 2002 WL 31473840, at *1 (N.D. Ill. 2002). "A discovery request is relevant if there is any chance that the information sought may be relevant to the subject matter of the litigation." *Saket v. Am. Airlines, Inc.*, 2003 WL 685385, at *2 (N.D. Ill. 2003). "Relevancy is construed broadly to 'encompass any matter that bears on or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Id.* (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Discovery need not seek information admissible at trial, so long as the request appears reasonably calculated to lead to the discovery of admissible evidence. *See White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 366 (N.D. Ill. 2001).

68. "An objection to a document request must clearly specify the objection and how that objection relates to the documents being demanded. The burden is on the party resisting discovery to clarify and explain precisely why its objections are proper given the broad and liberal construction of the federal discovery rules." *In re Aircrash Disaster Near Roselawn*, 172 F.R.D. 295, 307 (N.D. Ill. 1997) (internal citations omitted); *see also Sabratek Liquidating LLC v. KPMG LLP*, 2002 WL 31520993 (N.D.Ill. Nov. 13, 2002). The Boulevard Entities must demonstrate to the court "that the requested documents either do not come within the broad scope of relevance defined pursuant to Fed. R. Civ. P. 26(b)(1) or else are of such marginal

relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Burke v. New York City Police Department*, 115 F.R.D. 220, 224 (S.D.N.Y. 1987). Respondents cannot satisfy this burden.

## II. THE DISCOVERY DEXIA SEEKS FROM THE BOULEVARD ENTITIES IS DIRECTLY RELEVANT TO DEXIA'S EFFORTS TO TRACE FUNDS AND ESTABLISH PETER ROGAN AS THE ULTIMATE BENEFICIARY OF THE HEALTH CARE FRAUD PERPETRATED BY BRADDOCK AND BAINBRIDGE.

### A. Initial Points.

69. The Boulevard Entities (via Mr. Cuppy) object to the subpoenas primarily on relevance and overbreadth grounds. These objections lack substantial basis, for those documents are highly relevant to several core issues in this matter. Dexia's requests are not overbroad and are directed at properly discoverable information under Fed. R. Civ. P. 26.

70. This Court already has previously entered an order approving exactly this sort of discovery – in fact, nearly identical documents requests – directed at other Edgewater insiders. (Ex. B) [23]

71. An examination of the requests at issue illustrate that they are neither overly broad nor unnecessarily burdensome. As detailed supra at ¶¶ 50-55, Dexia tailored its requests to focus primarily upon documents directly relating to Edgewater, Peter Rogan, and the former directors' dealings with Edgewater, Rogan, and Rogan-affiliated entities and individuals. (*See* Ex. LL at 5-10) Dexia's other requests relate to businesses, partnerships, trusts or other entities owned, managed, operated or controlled by the former directors. (*Id.* at 9, 10) As explained above, these requests go to core issues in this case relating to board independence and Rogan's control over Edgewater.

### B. Dexia is Permitted to Trace the Destination of the Funds that are the Subject of its Fraud Claim.

72. Courts routinely have compelled discovery of defendants' assets where, as here, the plaintiff alleges that defendants siphoned money or misappropriated assets for their own

---

[23] Also, in the Rule 2004 context, the bankruptcy court rejected just these arguments of overbreadth and undue burden and denied the motions to quash of Rogan and the other insiders on January 21, 2004 (leave to appeal this decision was denied by Judge Amy J. St. Eve on April 19, 2004). Thereafter, the bankruptcy court reaffirmed the propriety of such assets and tracing requests to former Edgewater insiders

benefit.[24] For example, in *Van Kampen High Yield Municipal Fund v. O'Donnell & Naccarato*, CIV.A. 02-1210, 2003 WL 751005 (E.D. Pa. Mar. 4, 2003), where plaintiffs alleged that defendant had converted funds from a mismanaged construction project for his own use, the Court ruled defendant's personal financial records "relevant to the Plaintiffs' claims and therefore discoverable," even over defendant's objection that there was no evidence demonstrating that he received funds from the construction project. *Id.* at *2.

73. The Boulevard Entities are directly relevant to the affairs of Edgewater because they were at the center of an elaborate web of partnerships, trusts and off-shore entities that Peter Rogan engineered and Fred Cuppy largely managed which: (i) funneled fraudulently-obtained money out of Edgewater and to Peter Rogan and his children; (ii) concealed that Peter Rogan and his enterprises were the true beneficiaries of the health care fraud Braddock and Bainbridge perpetrated; and (iii) facilitated Rogan's attempts to place these fraudulently obtained funds in real estate investments and off-shore accounts beyond the reach of Dexia and other potential creditors.

74. Dexia has pursued very substantial discovery designed to identify the destination of the funds fraudulently transferred from its coffers to Braddock and Bainbridge. Nevertheless, significant indication has arisen that Rogan and his cohort – of which Mr. Cuppy is a central part – have engaged in efforts to conceal the destination of these funds.

75. The funds have been transferred through multiple corporate layers and into domestic and off-shore trusts that Rogan contends he does not control, and on which he thus has refused to provide discovery. Also indicative of this obscurantism is the fact that Rogan has

---

again on February 20, 2004 and April 8, 2004 when it granted motions to compel production of the Rule 2004 discovery requested from Rogan and the other Edgewater insiders.

[24] *See, e.g., Shearson Lehman Hutton, Inc. v. Lambros,* 135 F.R.D. 195, 198 (M.D. Fla. 1990) (compelling defendants to produce their federal income tax returns because "the contents of defendants' tax returns may lead to admissible evidence concerning the merits of plaintiff's claims of financial impropriety and conversion by defendants"); *Jacobs v. Kennedy Van Saun Mfg. & Eng. Corp.,* 12 F.R.D. 523, 526 (M.D. Penn. 1952) (compelling discovery of defendant corporation's audits reports, general ledgers, and income statements, including any supporting documents evidencing "transactions between defendant and its officers, directors and shareholders and their families" where plaintiff alleged that defendant corporation had "siphoned off money" to the president of defendant corporation and to his family); *Constitution Bank v. Levine,* 151 F.R.D. 278, 280 (E.D. Pa. 1993) (compelling discovery of defendant's financial records pertaining to transactions involving family members where plaintiff alleged that defendant received fraudulently transferred assets from his father); *cf. Rorer Int'l Cosmetics, Ltd. v. Halpern,* 85 F.R.D. 43, 45 (E.D. Pa. 1979) (compelling discovery of defendant's bank records to ascertain whether they revealed

engaged in repeated and substantial efforts to delay or sidetrack the course of discovery. First, he stalled production of key financial records for months, and only made his initial substantial production of important personal financial records when faced with a motion for a rule to show cause. Even now, Rogan continues to fight the full production of his financial records that was ordered last June.

76. Furthermore, during this process, Rogan and his cohort have: redacted original versions of important financial documents, claimed documents did not exist that in fact did exist, and claimed not to have had contacts with trustees that plainly took place. Finally, with the assistance of Mr. Cuppy and others, Mr. Rogan has sought to shield the off-shore trusts in particular from any and all inquiry. For example, after refusing to produce and arguing against the production of the "irrevocable" trust Rogan set up in the Bahamas, Rogan maintained he would have no way of knowing where he could obtain a copy of the trust. Only after the Court pressed his counsel were the records produced. Still, Rogan refuses to produce any other details. Similarly, Mr. Cuppy cites a specious claim of privilege in refusing even to identify the beneficiaries of the Belize trusts that effectively own all of Bainbridge and 90% of Braddock.

## C. *Shapo v. Engle* Mandates the Requested Tracing Discovery

77. A case from the Northern District of Illinois is closely analogous to the facts presented here and highly instructive on the relevance of full financial discovery under such circumstances.

78. In *Shapo v. Engle*, 1999 WL 446853, at *1 (N.D. Ill. June 11, 1999), plaintiff Director of Insurance of the State of Illinois, in his capacity as liquidator of three insurance companies (the "Insurance Companies") sued several individuals and companies alleging *inter alia* the existence of a conspiracy. The alleged mastermind of the conspiracy was defendant Clyde Engle, the former board chairman the Insurance Companies, who allegedly carried out the conspiracy with former directors of the Insurance Companies and other affiliated businesses. *Id.* The conspiracy involved a scheme to defraud the Insurance Companies through transactions by which Engle and others improperly funneled money out of the Engle-controlled Insurance Companies to Engle-controlled entities, *i.e.*, parents or other downstream entities of the Insurance Companies. *Id.* The challenged transfers included: $6 million in "management fees"

any evidence of kickbacks in connection with sale of stock because the occurrence vel non of kickbacks is

to Engle-controlled parent companies and capital contributions for the benefit of Engle-controlled entities. *Id.* at *2-*4.

79. Plaintiff sought discovery as to transfers of funds and assets between and among the Insurance Companies, the parent companies, and the parent companies' subsidiaries. 2000 WL 876994, at *3 (N.D. Ill. July 3, 2000). Defendants objected to the discovery as irrelevant, so plaintiff moved to compel. Chief Judge Kocoras compelled discovery:

> In his complaint, Plaintiff has alleged a complex RICO conspiracy to defraud involving a network of transactions between various companies, subsidiaries, and affiliates. Even though Plaintiff may not have alleged transactions between some specific entities (i.e. two parent companies), <u>it is entirely possible that tracing the transfer of funds through the various entities "may be relevant to the subject matter of the action." Given the complexity and broad nature of the relationships and transactions at issue, the Court will not narrowly proscribe discovery so as to curtail the tracing of funds merely because the transfer of funds may involve two parent companies, rather than some other combination of entities.</u>

*Id.* (emphasis added).

80. As here, defendants did not fully comply with the order, so plaintiff moved to enforce it. 2001 WL 204804, at *1 (N.D. Ill. Mar. 1, 2001) Chief Judge Kocoras held that his order clearly had "envisioned the Plaintiffs being able to trace the money from the Insurance Companies, through the Downstream Affiliates to the Parent Companies, and then to its ***ultimate destination***." *Id.* (emphasis added). The Chief Judge explained why it was critical for plaintiff to know where the funds ended up: "Documentation that proves the final destination of the money could show that the money was indeed used for the benefit of the Parent Companies, and not for the benefit of the Insurance Companies."

81. As in *Shapo*, it is imperative that the Boulevard Entities[25] produce <u>all</u> documents in their possession, custody and control relating to their tax returns, ownership, control, formation, business dealings, and domestic and off-shore bank and investment accounts

---

clearly relevant to the question of fraud or misrepresentation).
[25] Fred Cuppy has acknowledged that is the attorney for the Belize trusts that own Boulevard Investors, Ltd. Therefore, he qualifies as an agent for those entities and can be obligated to produce documents related to those trusts Boulevard Investors in his capacity as an agent of those trusts.

so that Dexia may uncover the ultimate recipient and beneficiary of the assets of Edgewater fraudulently obtained and transferred to the Boulevard Entities by Braddock and Bainbridge.[26]

### D. **Requested Discovery is Essential Proof Regarding Rogan's Knowledge**.

82. The requested discovery is also of central relevance to Rogan's orchestration (through Cuppy) of numerous substantial transfers of Edgewater's funds to, through, and between Rogan-controlled entities (including those held in the names of Rogan family members). Whether the funds end up with Rogan or Rogan's children does not remove the point that the ultimate destination of the Edgewater-originated funds is relevant to establish Rogan's knowledge of the illegal nature of the funds.

83. One of the central issues in Dexia's case against Rogan is the question of whether Rogan knew or had reason to know of the health care fraud scheme being perpetrated at Edgewater Medical Center. The fact that Rogan and his family were the beneficiaries of millions of dollars of proceeds from that fraud scheme constitutes circumstantial proof that Rogan did indeed know what was happening.

84. Unless Dexia is permitted to discover the information sought from the Boulevard Entities, Dexia will not be able to complete this task.

### E. **The Requested Documents are Discoverable to Establish Defendants' Net Worth and Pecuniary Position**.

85. "[E]vidence of a defendant's net worth and pecuniary position may be introduced in a case in which punitive damages is an issue." *Pickering v. Owens-Corning Fiberglas Corp.*, 638 N.E.2d 1127, 1139 (Ill. App. Ct. 1994) (allowing discovery of financial statements, business plans and financial projections, and appraisals, estimates, and statements of

---

[26] Even if Mr. Cuppy and the Boulevard Entities do not have such documents in their immediate physical possession, this does not relieve them of their production obligations. Under Fed. R. Civ. P. 34, a party is required to produce requested documents if they are within his "possession, custody or control." In construing Rule 34, the courts have rejected a narrow physical-possession test, focusing instead on whether the party from whom documents have been requested "has a legal right to custody or control of the documents in question." *Kissinger v. Reporters Committee for Freedom of the Press*, 100 S. Ct. 960, 975 n.6 (1980). *See also Wilson v. Sundstrand Corp.*, 2003 WL 21961359, *9 (N.D. Ill. Aug 18, 2003) ("Control" for purposes of Rule 34(a) means "the legal right to obtain the documents requested upon demand."); *In Re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill. 1977) ("The test is whether the party has a legal right to control."). Accordingly, Mr. Cuppy and the Boulevard Entities must seek out documents from attorneys, accountants, financial institutions and any other sources from which they have the right to request and receive documents responsive to Edgewater's requests.

fair market value in connection to punitive damages claim) (internal citations omitted). *See also Deal v. Byford,* 537 N.E.2d 267, 272 (Ill. 1989) ("financial status of the defendant" relevant to assessing punitive damages award); *Kay v. First Continental Trading, Inc.,* 1997 WL 614378, at *2 (N.D. Ill. Sept. 23, 1997) (evidence of net worth admissible where punitive damages are at issue). As *Aspen v. King World Prods. Corp.,* 2001 WL 1403001, at *3 (N.D. Ill. Nov. 9, 2001) explains, "there can be no doubt that net worth is discoverable under Rule 26(b)(1) of the Federal Rules of Civil Procedure, as it regards a matter 'that is relevant to the claim' of a party: that is, plaintiff's punitive damages claim." Thus, substantial authority makes the existence and location of Rogan's personal assets relevant to the punitive damage determination in this case.

86. Obviously, discovery of "assets" is at the core of any net worth determination. The "tracing" requests track the flow of funds to and from the Boulevard Entities to related individuals and entities, allowing Dexia: (a) to confirm that the discovery Rogan, Braddock and Bainbridge provides as to their assets is accurate; and (b) to ensure that any transfers of assets from Rogan, Braddock and Bainbridge to others were made for proper consideration and not for the purpose of hiding assets. *See, e.g., EEOC v. Ian Schrager Hotels,* 2000 WL 307470, *4 (C.D. Cal. March 3, 2000) ("Clearly, plaintiff may obtain defendants' financial information, to the present, to determine whether defendants have attempted to transfer, or have transferred, income or assets to others to avoid potential liability if defendants lose the pending litigation.)

87. Each of these two points are essential to the punitive damage question regarding each of the three defendants (i) Rogan, (ii) Braddock, and (iii) Bainbridge. Dexia has already received indications that Braddock and Bainbridge will each to claim that they are entirely insolvent and, thus, financially judgment proof. Further, Dexia also expects Rogan to claim that he lacks sufficient funds to satisfy a judgment for Dexia's full out-of pocket damages here well exceeding $60,000,000 and counting. The discovery Dexia seeks from the Boulevard Entities is utterly essential to enable Dexia to determine whether Braddock, Bainbridge, and Rogan, contrary to their claims, indeed have access to very substantial assets. If, for example, such discovery reveals that Rogan has been orchestrating the flow and attempted concealment of assets – which the offshore transfer of huge portions of these funds already strongly suggests – the aforementioned net worth claims of Rogan, Braddock and Bainbridge would be undercut (for as seen Rogan plainly controls Braddock and Bainbridge).

22

88. The claims by Rogan and Mr. Cuppy that Rogan does not control the operations or financial resources of the Boulevard Entities does not help Mr. Cuppy to block production of the requested records. Dexia strongly disputes these claims, and is gathering increasing evidence to support its position. *See supra* at ¶¶41-43. Whether Rogan controls these assets merely constitutes a factual controversy that a jury may eventually have to decide, but it does not prevent Dexia from discovering information on these issues. *Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579-80 (11th Cir. 1986) (discoverability determined by whether allegations sufficient to allow discovery in attempt to prove allegations, not party will ultimately prevail on the theory at issue).

## F.  **Transfers Among Co-Conspirators**

89. Where, as here, the Complaint alleges a widespread conspiracy to defraud or to divert funds, courts have been particularly willing to compel discovery of any documents concerning transfers between and among defendants. *See, e.g., Shapo v. Engle,* No. 98 C 7909, 2001 WL 204804, at *2 (N.D. Ill. Mar. 1, 2001); *Shapo v. Engle,* No. 98 C 7909, 2000 WL 876994, at * 3 (N.D. Ill. July 3, 2000); *Van Kampen High Yield Municipal Fund v. O'Donnell & Naccarato,* No. CIV.A. 02-1210, 2003 WL 751005, at *2 (E.D. Pa. Mar. 4, 2003). It is already clear that the financial records of the Boulevard Entities should reflect transfers between and among themselves and/or the defendants in this case. Therefore, no question exists that the subpoenaed records should be produced.

## G.  **Alter Ego Claims.**

90. Respondents' financial records, especially records evidencing transfers of assets originating with the various Defendants, are further relevant to establishing the relationship between Defendants and entities they owned and controlled (i.e., the Boulevard Entities). Dexia's Complaint is replete with allegations that Rogan, directly and indirectly, controlled the other Defendants, and that, on information and belief, Rogan also controlled additional entities that were used by Rogan and other Defendants to transfer and conceal funds and assets fraudulently obtained from Edgewater. (Amend. Cmplt. at ¶¶ 17-19, 22-23, 54, 132-33, 135, 161-62).

91. The allegations in Dexia's Complaint are thus sufficient to support an inference that the various entity Defendants, as well as the entities that owned and controlled them, were mere "alter egos" of Rogan. "The issue is not whether [a party] may ultimately

prevail on the [alter ego] theory, but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove their allegations." *Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579-80 (11th Cir. 1986).

92.    Where, as here, the complaint "contains allegations suggestive of an alter ego argument," the plaintiff "must be allowed to take discovery regarding the relationships among the various defendants." *Ross v. UKI Ltd.,* No. 02 Civ. 9297, 2004 WL 67221, at *7 (S.D.N.Y. Jan. 15, 2004). One of the best ways to ascertain the relationships among the various defendants is through financial records and tracing of funds. For example, in *Pielet Bros. Scrap Iron and Metal Limited Partnership v. Reynolds Metal Co.,* No. 90 C 3807, 1994 WL 649105 (N.D. Ill. Nov. 15, 1994), the plaintiff sought to compel defendants to produce financial records, including general ledgers and documents pertaining to bank accounts, banking institutions, and authorized signatories, for the purpose of uncovering evidence which plaintiffs could use to pierce the corporate veil of various corporate and limited partnership entities. The court granted plaintiff's motion because "such documents appear directly relevant to determining whether funds have been commingled or whether an entity has been treating the assets of another as its own." *Id.* at *3. *See also McLeod, Alexander, Powel & Apffel,* 894 F.2d 1482, 1485-86 (5th Cir. 1990) (concluding that defendant's tax returns and cancelled checks were relevant to show how much defendant and corporation "paid on each other's bills and how closely their financial affairs were intertwined"); *United States v. Seaga Corp. of Ill.,* No. 00 C 50389, 2002 WL 31045388, at *2 (N.D. Ill. Sept. 11, 2002) (compelling discovery of defendant's tax returns as relevant to plaintiff's alter ego claim).

93.    Analogous to the "veil piercing" theory at issue in *Pielet Bros.,* Dexia alleges that Rogan directly and indirectly entered into a myriad of lucrative management contracts with Edgewater and other related entities to exert control over the hospital's operations and to siphon large sums of money from Edgewater. (Amend. Cmplt. at ¶¶ 26, 56, 57) The Complaint further alleges that Rogan achieved these ends by using a wide array of different forms and organizations to attempt to insulate himself from personal responsibility for the misconduct he perpetrated and caused to be perpetrated at and through Edgewater. (*Id.* at ¶ 26)

94.    As in *Pielet Bros.,* this Court should grant Dexia's motion to compel the financial records of the Boulevard Entities, including those records evidencing transfers of assets between Defendants and the Boulevard Entities that owned and controlled them, because such

documents are directly relevant to determining whether Rogan, indeed, siphoned money from Edgewater as alleged, funneled this money to the various entity Defendants, and ultimately to those entities that owned and controlled them. The relevance of these documents cannot reasonably be refuted.

      95. Moreover, given the "complex web of corporations and limited partnerships" Defendant Rogan utilized in perpetrating the massive fraud against Dexia and others, Dexia is entitled to discover documents relating to any transfers of assets between and among the entities Defendants arguably controlled, in order to determine whether those entities were mere alter egos of Defendant Rogan. *See Pielet Bros. Scrap Iron and Metal Ltd. P'ship v. Reynolds Metal Co.*, No. 90 C 3807, 1994 WL 649105, at *4 (N.D. Ill. 1994) (compelling discovery of documentation relating to agreements, financial transactions and transfers of assets between various entities where there existed "a fairly complex web of corporations and limited partnerships owned and controlled by three individuals" and plaintiff alleged that the corporate and partnership entities were merely "shell" entities for their individual owners ); *Abu-Nassar v. Elders Futures Inc.*, No. 88 Civ. 7906, 1991 WL 45062, at *16 (S.D.N.Y. Mar. 28, 1991) (compelling discovery of documents relating to changes in defendant's corporate form, transfers of assets and information regarding related entities because plaintiff's requests "are entirely relevant to its claims of alter ego liability and fraudulent conveyances")

## CONCLUSION

WHEREFORE, for the reasons stated, Dexia respectfully requests that this Court grant its motion to compel and order Boulevard Investors, Ltd., Boulevard Investors LLC, the three Belize trusts (i.e., the trusts of Sara Caitlin Rogan, Robert Cashman Rogan, and Brian Peter Rogan), and Caribe Trustees, Ltd. to produce any and all records in their possession, custody or control that are responsive to the subpoenas Dexia served upon them.

Dated:  October 4, 2004

Plaintiff Dexia Crédit Local,

By:_____
        One of its attorneys

SIDLEY AUSTIN BROWN & WOOD LLP
Scott Mendeloff
Gabriel Aizenberg
Eric Pruitt
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

CHI 3047897v1

# EXHIBIT N

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8288 | **DATE** | 12/9/2004 |
| **CASE TITLE** | Dexia Credit Local vs. Rogan, et al. | | |

**MOTION:**    [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 12/14/2004 at 10:00 A.M..

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]    Plaintiff's motion to compel production of documents from Boulevard investors, Ltd., et al. [112] is granted in part and denied in part as stated on the reverse of this order. Plaintiff's motion to compel production of documents from Fred Cuppy [doc. # 113] is granted in part and denied in part as stated on the reverse of this order. The respondents shall produce the documents required by this order by 01/04/05.  The parties are to submit a joint statement on any open issues in discovery and a list of all proposed depositions by the close of business on 12/10/04.

(11) ■  [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 13 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | rbf | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | | |
| mm | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |



(Reserved for use by the Court)

# ORDER

For the reasons stated more fully on the record and in a separate Memorandum Opinion and Order dated 12/8/04, the Court rules as follows on the following motions to compel:

1. Plaintiff's motion to compel production of documents from Boulevard Investors, Ltd., et al. [112] is granted in part and denied in part, as follows:

A. With request to all production required by this order, the time period for production will be limited to 01/01/95 to the present, and - in the case of documents involving financial transactions or transfers of funds or assets - production only shall be required for transactions or transfers in excess of $5,000.00.

B. The motion is GRANTED as to Requests Nos. 1 (with the modification that the production will include not only documents showing transfers of funds or assets, but also the purpose(s) for the transfers), 5 (limited to documents sufficient to show ownership and/or interest, and not all documents related to ownership and interest). 7, 8 (limited to documents sufficient to show identity and location, and not all documents establishing identity and location), 10 (limited to subparts a-d, j-k and p), 11-13, 14-18 (limited to documents the respondents physically possess relating to the lead entities named in each request, excluding the additional entities set forth in subparts a-d of each request), 19-21, 22 (limited to assets held in another person's name for which the respondents possess any interest), and 23 (limited to communications between each respondent and board members or committee members of Edgewater, Access or Vital, and to contracts and agreements between each respondent and persons or entities listed on Rider B).

C. The motion is DENIED as to Requests Nos. 2-4 (which are duplicative of Request No. 1, as modified), 6 and 9.

2. Plaintiff's motion to compel production of documents from Fred Cuppy [doc. # 113] is granted in part and denied in part, as follows:

A. With request to all production required by this order, the time period for production will be limited to 01/01/95 to the present, and - in the case of documents involving financial transactions or transfers of funds or assets - production only shall be required for transactions or transfers in excess of $5,000.00.

B. The motion is GRANTED as to Requests Nos. 4-12 (limited t documents the respondent physically possess relating to the lead entities named in each request, excluding the additional entities set forth in subparts a-d of each request), 13-16, 18, 21 (with the modification that the production will include not only documents showing transfers of funds or assets, but also the purpose(s) for the transfers), 25 (limited to documents sufficient to show identity, and not all documents concerning identity), 27, 29, 31-33, 34 (limited to documents in respondent's possession, custody or control relating to Caribe Trustees, Ltd., excluding the additional entities set forth in subparts a-d of the request), and 35 (limited to documents sufficient to show residences, their location, and whether they were rented or owned).

C. The motion is DENIED as to Requests Nos. 1-3 as moot (in light of the representation that all responsive documents have been produced), 17, 19-20 as moot ( in light of the representation that all responsive documents have been produced), 22-24 (which are duplicative of Request No. 21, as modified), 26, 28 and 30.

**EXHIBIT O**

# SIDLEY AUSTIN BROWN & WOOD LLP

BEIJING

BRUSSELS

CHICAGO

DALLAS

GENEVA

HONG KONG

LONDON

BANK ONE PLAZA
10 S. DEARBORN STREET
CHICAGO, ILLINOIS 60603
TELEPHONE 312 853 7000
FACSIMILE 312 853 7036
www.sidley.com

FOUNDED 1866

LOS ANGELES

NEW YORK

SAN FRANCISCO

SHANGHAI

SINGAPORE

TOKYO

WASHINGTON, D.C.

WRITER'S DIRECT NUMBER
(312) 853-1093

WRITER'S E-MAIL ADDRESS
epruitt@sidley.com

April 7, 2005

## By E-Mail

Limo Cherian
O'Rourke McCloskey & Moody
161 North Clark Street, Suite 2230
Chicago, Illinois 60601

> Re: *Dexia Crédit Local v. Peter G. Rogan et al.* (02 C 8288) (N.D. Ill.)
> *Edgewater Medical Center v. Peter Rogan et al.* (04 A 2327) (N.D. Ill.)
>
> Subpoenas to JKR Business

Dear Limo:

This letter relates to the subpoenas of Dexia Crédit Local and Edgewater Medical Center to JKR Business in the above-referenced cases. As you may recall, among the items requested in our subpoena to JKR Business were bank account records. You previously informed us that, to the best of your knowledge: (i) JKR Business did not appear to have had any corporate existence and (ii) there were no bank account records for JKR Business. We recently discovered the attached check from Braddock Management LP to JKR Business. Please note that the reverse side of the check shows that it was deposited into JKR Business account #109252. The number "071006486" on the back of the check is an ABA routing number identifying the financial institution to which the check was deposited. As evidenced by the attached internet search result, "071006486" is the routing number for The Private Bank and Trust Company of Chicago. Consistent with JKR Business' obligation to produce any documents in its possession, custody, or control, we request that you obtain and produce any and all records (including wire records, cancelled checks, signature cards, accounting opening and closing records) relating to the JKR Business account at The Private Bank and Trust Company, and records for any other JKR Business account that has not previously been disclosed.

SIDLEY AUSTIN BROWN & WOOD LLP IS AN ILLINOIS LIMITED LIABILITY PARTNERSHIP PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN BROWN & WOOD PARTNERSHIPS

SIDLEY AUSTIN BROWN & WOOD LLP                    CHICAGO

Limo Cherian
April 7, 2005
Page 2

As always, please do not hesitate to call me with any questions or concerns.

Sincerely,

Eric S. Pruitt

cc:    Gabriel Aizenberg



**BRADDOCK MANAGEMENT, L.P.**
MIDWEST REGION OFFICE
P.O. BOX 10489
MERRILLVILLE, IN 46411-0489

BANK OF AMERICA
CHICAGO, IL

2-3/710

CHECK NO. 4172

4172

Dec 31, 1998    *********$108.66

DATE                    AMOUNT

MEMO:

One Hundred Eight and 66/100 Dollars

PAY
TO THE
ORDER
OF

JKR Business
240 E. 90th Drive
P.O. Box 10489
Merrillville, IN 46411-0489

*Authorized Signature*

BOA 002670

⑆004172⑆ ⑉071000039⑉    ⑈00000 10866⑈



BOA 002671



# Federal Reserve Financial Services
### *Creating Nationwide Solutions for Your Payment Needs*

**Products and Services**

- **Fedwire® and FedACH℠** Routing Numbers

- **Reference Guides and Operating Circulars**

- **Fee Schedules**

- **Testing Opportunities**

- **Fedwire Status**

- **Holiday Schedules**

- Get Information By District

- **Events and Seminars**

- **Subscribe to Email Notification**

Search This Site | GO |

### Financial Services
# Federal Reserve E-Payments Routing Directe

- Search for Fedwire Participants
- Search for FedACH Participant
- Receiving Depository Financial Institutions (RDFIs)

- Download E-Payments Routing Directories
- Federal Reserve Routing Information

- Fedwire Treasur Information
- Frequently Aske

Legal Notices, Privacy Policy and

**Fedwire Participant Details**

### Name, location, and routing information

| | |
|---|---|
| Bank Name | THE PRIVATE BANK AND TRUST COMPANY |
| Location | CHICAGO, Illinois |
| Routing Number | 0710-0648-6 |
| Telegraphic Name | PRIVATE BANK CHGO |

### Fedwire eligibility

| | |
|---|---|
| Book-Entry Securities | Eligible |
| Funds | Eligible |

New search  Revise search

Technical Requirements
The effective date of this Fedwire directory is April 6, 2005.

Top

This site is a product of the Federal Reserve Banks. Please see Legal Notices and Privacy Policy. Pages on this site marked (PDF) require the use of Acrobat® Reader® 4.05 or higher. Adobe also provides a more accessible download page. Address comments and questions to the Financial Servic

**EXHIBIT P**

# LEASE ADDENDUM

The following document is an addendum to the existing Residential Tenancy Lease Agreement between:

the Landlord:    Sylvia & Kevin Johnston
                 11535 - 4ᵗʰ Avenue Richmond, BC V7E 3H2

and

the Tenant:      Judith & Peter Rogan
                 476 Wexford Road, Valparaiso, IN USA 46385

The address of the property being rented to the Tenant (called the residential premises in this Tenancy Agreement) is:

PH3 603 - 1155 Vancouver, BC V6B 5P2
Address                                        Phone

The address for service and the telephone number of the Landlord or Landlord's Agent:

1010 West Queens Road, North Vancouver, BC V7R 4S9    604-984.7368 (RENT)
Address                                                Phone

The words Tenant and Landlord in this Tenancy Agreement have the same meaning as in the *Residential Tenancy Act (RTA)*, and the singular of these words includes the plural. In this Tenancy Agreement, the words residential premises and residential property have the same meaning as in the *RTA*. The residential property includes the building and land on which the residential premises are located.

Tenant and Landlord agree to extend the current lease in effect dated: October 21ˢᵗ, 2007.

For the above residential premises from May 1ˢᵗ, 20007 to October 31ˢᵗ, 2007.

At a rate of: $ 5000.00 per month

All existing terms and regulations remain in effect. The Tenant must vacate the premises by the following date: November 1ˢᵗ, 2007 or continue on a pro-rated fixed term basis for a period of six months at a rental rate of $5000.00. Such services as Tivo, MSNBC and movie channels will now be services included in the rent. The Owner will be financially responsible for the one time power washing of the patio prior to the Tenants landscaping.

By signing this Lease Addendum, the Landlord and the Tenant are bound by its terms.

Landlord's Signature                          14/5/07
                                             day/month/year

Tenant's Signature                            1/5/07
                                             day/month/year

Tenant's Signature                            1/5/07
                                             day/month/year

**EXHIBIT Q**

08/29/2007 08:51 FAX  604 678 6084    HSBC BANK CANADA    ☑002/016

H-312

**HSBC ⟨X⟩**

**HSBC Bank Canada** ·

**ACCOUNT OPENING SIGNATURE CARD**                    Date:   17Oct2006

---

**Declaration**

I have received, read, acknowledge and agree to the Personal Banking Agreement, including paragraph 22, which describes how you will collect, use and disclose my Personal Information. In particular, I agree that you may: (a) collect and use my Personal Information and, where permitted by law, share it within the HSBC Group, to identify and inform me of products and services provided by the HSBC Group that may be of interest to me; (b) collect and use my Personal Information to promote the products and services of select third parties that may be of interest to me; and (c) collect, use and share my SIN for the additional purposes of accuracy on credit checks, meeting legal and regulatory requirements, collections, and for internal audit (including security), statistical, and record keeping purposes. I may at any time refuse or withdraw my consent to (a), (b) or (c) by: contacting you at 1-888-310-HSBC (4722); or visiting the HSBC web site at www.hsbc.ca. I understand that if I do refuse or withdraw my consent to (a), (b) or (c) it will not affect my eligibility for credit or other products or services.

I acknowledge written notice of, and hereby expressly consent to, the collection of credit reports and other financially related information, about me from third parties, including credit bureaus and credit reporting agencies, when it is necessary for providing products and services requested by me.

I have received, read, acknowledge and agree to paragraph 24 of the Personal Banking Agreement, which includes the non-US person statement.

Account Number :    280-089295-150

Customer Name:   JUDITH ROGAN

*Judith K. Rogan*

ID (2 Pieces Required)

| | |
|---|---|
| **CUSTOMER HAS NO SIN** | 999999999 |
| **CANADIAN/FOREIGN PASSPORT** | ▬▬▬ US |
| **MAJOR CREDIT CARD** | ▬▬▬ CITI VISA US |

Approved By   *[signature]* w762

---

Account Holder Name:   JUDITH ROGAN

Date: 17Oct2006                                    Account Number:280-089295-150

Page    3 of 3    Prepared By:   CLIM - CHEVY MABASA

**EXHIBIT R**

12/13/2006  14:15  WED  7083437651                    1ST SUBURBAN NATL BK                    PAGE  02/02
                                                                                              Page 1 of 1

## FedLine  FedPayments Manager℠ — Funds                    Print  Close Window

Environment:  Front-End-PROD          ABA:           071921707
Mode:         PROD                    Service Unit:  071921707
Cycle Date:   11/24/2006             System Date/Time:  11/24/2006 14:36:33

Delivered to FRN:  11/24/2006 06:35:22
IMAD:              20061124 B1QGM8C 001861 11240588          Test/Prod:  Prod
OMAD:              20061124 QMGFRK081 011261 11240588

Sender ABA (3100):          021001088  MARINE NYC
Receiver ABA (3400):        071921707  1ST SUBURBAN
Amount (2000):              99,980.00
Type Code (1510):          1000 - Transfer of Funds
Business Function (3600):   CTR - Customer Transfer
Reference Number (3320):

Originator (5000)
        ID Code:            D - DDA Account Number
        Identifier:
        Name:              ROGAN JUDITH
        Address:           1155 MAINLAND ST
                           VANCOUVER BC V6B5P2

Beneficiary (4200)
        ID Code:            D - DDA Account Number
        Identifier:
        Name:              HOGAN MARREN LTD.
        Address:           USA

Originator Financial Institution (5100)
        ID Code:            D - DDA Account Number
        Identifier:
        Name:              HSBC BANK CANADA/TREASURY SETTLEMNT
        Address:           3381 STEELES AVENUE EAST STE 110
                           NORTH YORK ON M2H 357 CANADA

Financial Institution to Financial Institution (6500)
        Text:              /ACC/FIRST SUBURBAN BANK, MAYWOOD I
                           L USA/BKCD/CRED

Charges (3700)
        Charge Details:    B - Charges Applied to Beneficiary
                           USD 6.00

Instructed Amount (3710)
        Currency Code:     USD
        Amount:            100000.00

**EXHIBIT S**

HSBC BANK CANADA    VANCOUVER
999 WEST HASTINGS ST., VANCOUVER
B.C. V6C 1H3    (604) 895 7100

Page    3

Statement Date 17NOV2006

JUDITH ROGAN
1155 MAINLAND ST
VANCOUVER BC V6B 5R2

240

| Date | Details | Debit | Credit | Balance |
|---|---|---|---|---|
| | SEE NEW STATEMENT | | | |
| | STATEMENT PERIOD IS 18OCT2006 to 17NOV2006 | | | |
| | OPENING BALANCE | | | 0.00 |
| 03NOV2006 | CR MEMO | | 1,499,992.50 | 1,499,992.50 |
| | JUDGE NICK ISI | | | |
| | HSBC/OJ8073VX26007 | | | |
| | OCEANIC BANK AND TRUST | | | |
| | NASSAU, BAHAMAS | | | |
| | TRSN DEPOSIT | | | |
| 17NOV2006 | NEW DEPOSIT | 1,499,992.50- | | 0.00 |
| | 240-089295-221 | | | |
| | TRSN DEPOSIT | | | |
| | NEW DEPOSIT | | 1,500,775.91 | 1,500,775.91 |
| | 240-089295-220 | | | |
| | TRSN DEPOSIT | | 1,499,275.91- | |
| | NEW DEPOSIT | | | |
| | 240-089295-221 | | | |
| | PPT TRANSFER | 50,897.14- | | 49,902.86 |
| | TT SUBD00143 | | | |
| | JUDITH E. ROGAN | | | |
| | TRSN DEPOSIT | | 100.00 | 50,002.86 |
| | REDEMPTION | | | |
| | 240-089295-221 | | | |
| | RR MEMO | 50,000.00- | | 2.86 |
| | TRSF TO CAD ACC. | | | |
| | AT 1.1282 | | | |
| 17NOV2006 | CR MEMO | | 749,992.53 | 749,995.39 |
| | JUDITH ROGAN INWARD WIRE | | | |
| | TT MST3W000276669 | | | |
| | TRSN DEPOSIT | 749,995.39- | | 0.00 |
| | NEW DEPOSIT | | | |
| | 240-089295-221 | | | |
| 17NOV2006 | TRSN DEPOSIT | | 1,402,505.50 | 1,402,505.50 |
| | REDEMPTION | | | |
| | 240-089295-221 | | | |
| | TRSN DEPOSIT | | 750,073.51 | 2,152,579.01 |
| | REDEMPTION | | | |
| | 240-089295-221 | | | |

*Please refer to the back of page one for information about foreign currency accounts.

Continued on next page

HSBC BANK CANADA
999 WEST HASTINGS ST., VANCOUVER
B.C. V6C 1M3 (604) 895 7100

ZBO

JUDITH ROGAN
1155 MAINLAND ST
VANCOUVER BC V6B 5P2

Page 4

Statement Date 17NOV2006
[redacted]

| | | |
|---|---|---|
| TERM DEPOSIT | 2,152,579.01- | 0.00 |
| NEW DEPOSIT [redacted] | | |
| CLOSING BALANCE | | 0.00 |

Total Debits 5,903,439.95-
Total Credits 5,903,439.95

For customers borrowing based on prime, prime is 6.75 %

TAKING A TRIP THIS SEASON?
MAKE SURE YOU PACK SOME TRAVEL INSURANCE. GET THE COVERAGE THAT'S RIGHT FOR YOU.
VISIT WWW.HSBC.CA FOR MORE INFORMATION, OR CALL TRAVEL UNDERWRITERS
AT 1-888-838-7878 TODAY.

* * * * * END OF STATEMENT * * * * *

*Please refer to the back of page one for information about foreign currency accounts.

**EXHIBIT T**

Form 3520-A (2005)                                                                                                 Page 3

## 2005 Foreign Grantor Trust Owner Statement (see instructions)

Important: Trustee must prepare a separate statement for each U.S. owner and include a copy of each statement with Form 3520-A. Trustee is also required to send to each U.S. owner a copy of the owner's statement. U.S. owner must attach a copy of its statement to Form 3520.

| 1a Name of foreign trust | b Employer identification number |
|---|---|
| PETER G ROGAN IRREVOCABLE TRUST 001 | ▓▓▓▓▓▓▓ |

c Number, street, and room or suite no. (if a P.O. box, see instructions)
c/o Oceanic Bank and Trust Limited Bayside Executive Park, West Bay St. and Blake Rd., P.O. Box AP59213

| d City or town | e State or province | f ZIP or postal code | g Country |
|---|---|---|---|
| Nassau | New Providence | | Bahamas |

2  Did the foreign trust appoint a U.S. agent (defined in the instructions) who can provide the IRS with all relevant trust information? ☒ Yes ☐ No
If "Yes," complete lines 3a through 3g.

| 3a Name of U.S. agent | b Identification number |
|---|---|
| DAI, Inc. | ▓▓▓▓▓▓▓ |

c Number, street, and room or suite no. (if a P.O. box, see instructions)
c/o Frederick M. Cuppy, 3100 N. Ocean Blvd., Unit 703

| d City or town | e State or province | f ZIP or postal code | g Country |
|---|---|---|---|
| Fort Lauderdale | Florida | 33308 | U.S.A. |

| 4a Name of trustee | b Identification number (if any) |
|---|---|
| Oceanic Bank and Trust Limited | |

c Number, street, and room or suite no. (if a P.O. box, see instructions)
Bayside Executive Park, West Bay St. and Blake Rd., P.O. Box AP59213

| d City or town | e State or province | f ZIP or postal code | g Country |
|---|---|---|---|
| Nassau | New Providence | | Bahamas |

5  The tax year of the owner of the foreign trust to which this statement relates ▶ 2005

| 6a Name of U.S. owner | b Identification number |
|---|---|
| Peter G. Rogan | ▓▓▓▓▓▓▓ |

c Number, street, and room or suite no. (if a P.O. box, see instructions)
476 Wexford

| d City or town | e State or province | f ZIP or postal code | g Country |
|---|---|---|---|
| Valparaiso | Indiana | 46383 | U.S.A. |

h Service Center where U.S. owner files its income tax returns ▶
Cincinnati, Ohio

7  Attach an explanation of the facts and law (including the section of the Internal Revenue Code) that establishes that the foreign trust (or portion of the foreign trust) is treated for U.S. tax principles as owned by the U.S. person. See attached statement

8  If the trust did not appoint a U.S. agent, list the trust documents attached to Form 3520-A (see instructions).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 9  Gross value of the portion of the trust treated as owned by the U.S. owner | $ | 25,031,489 |
|---|---|---|

### 2005 Statement of Foreign Trust Income Attributable to U.S. Owner (see instructions)
Report each item on the proper form or schedule of your tax return.

| | | |
|---|---|---|
| **Income** | 1  Interest | 52,193 |
| | 2  Dividends | 15,449 |
| | 3  Gross rents and royalties | 0 |
| | 4  Income from partnerships and fiduciaries | 2,222,969 |
| | 5  Capital gains (losses) | (230,492) |
| | 6  Ordinary gains (losses) | 0 |
| | 7  Other income (attach schedule) | 0 |
| **Expenses** | 8  Interest expense | 3 |
| | 9a  Foreign taxes (attach schedule) | 0 |
| | b  State and local taxes | 37,000 |
| | 10  Amortization and depreciation (depletion) | 0 |
| | 11  Trustee and advisor fees | 4,133 |
| | 12  Charitable contributions | 0 |
| | 13  Other expenses (attach schedule) | 0 |

Under penalties of perjury, I declare that I have examined this return, including any accompanying reports, schedules, or statements, and to the best of my knowledge and belief, it is true, correct, and complete. _INC._ _THE AGENT_

Trustee Signature ▶ ✗ _[signature]_     Title ▶ Corporate Secretary     Date ▶ 9/8/06

STF FED4741F.5

Form 3520-A (2005)

RC 000000084

**PETER G. ROGAN IRREVOCABLE TRUST 001**
**Attachment to 2005 Foreign Grantor Trust Owner Statement**
**EIN** ▮▮▮▮▮▮▮▮

Line 7 - Explanation of facts and law:

The U.S. Owner identified on line 6 is treated as the owner of the entire foreign trust to which this statement is attached under Section 679 of the Internal Revenue Code. Such U.S. Owner transferred either directly or indirectly all of the property contributed to the trust and there are one or more U.S. Beneficiaries to which the trustee may accumulate or distribute income and principal to/for the benefit of.

RC 000000085

**PETER G. ROGAN IRREVOCABLE TRUST 001**
Attachment to 2005 Foreign Grantor Trust Owner Statement
EIN ███████

Foreign Trust Income Attributable to U.S. Owner

<u>Line 2 – Dividends</u>

| | | |
|---|---|---|
| Total Dividends | $ | 15,449 |
| Qualified Dividends (included in Total) | | 6,780 |

<u>Line 5 -- Capital Gains (Losses)</u>

| | |
|---|---|
| Net Long Term Capital Loss | $ (285,919) |
| Net Short Term Capital Gain | 55,427 |
| Net Capital Loss | $ (230,492) |

RC 000000086

**EXHIBIT U**

Department of the Treasury

# TD F 90-22.1
Rev 7/00 SUPERSEDES ALL
PREVIOUS EDITIONS

## REPORT OF FOREIGN BANK
## AND FINANCIAL ACCOUNTS
Do NOT file with your Federal Tax Return

FILE COPY

OMB No. 1506-0009

| 1 Filing for Calendar Year | 2 Type of Filer | 3 Taxpayer Identification Number |
|---|---|---|
| 2006 | a [X] Individual   b [ ] Partnership   c [ ] Corporation   d [ ] Fiduciary | ▇▇▇▇▇ |

## Filer Information

| 4 Last Name or Organization Name | 5 First Name | 6 Middle Initial |
|---|---|---|
| Rogan | Judith K | |

| 7 Address (Number, Street, and Apartment or Suite Number) | 8 Date of Birth |
|---|---|
| 476 Wexford | ▇▇▇▇▇ |

| 9 City | 10 State | 11 ZIP/Postal Code | 12 Country | 13 Title (Not necessary if reporting a personal account) |
|---|---|---|---|---|
| Valparaiso | IN | 46385-8045 | US | |

| 14 Are these accounts jointly owned? | 15 Number of joint owners | 16 Taxpayer Identification Number of joint owner (if known) |
|---|---|---|
| a [ ] Yes   b [X] No | | |

| 17 Last Name or Organization Name | 18 First Name | 19 Middle Initial |
|---|---|---|
| | | |

## Information on Financial Accounts

| 20 Number of Foreign Financial Accounts in which a financial interest is held | 21 Type of account |
|---|---|
| 2 | a [ ] Bank   b [X] Securities   c [ ] Other |

| 22 Maximum value of account | 23 Account Number or other designation |
|---|---|
| a [ ] Under $10,000   c [ ] $100,000 to $1,000,000   b [X] $10,000 to $99,999   d [ ] Over $1,000,000 | ▇▇▇▇▇ |

| 24 Name of Financial Institution with which account is held | 25 Country in which account is held |
|---|---|
| Oceanic Bank and Trust Limited | Bahamas |

| 26 Does the filer have a financial interest in this account? | 27 Last Name or Organization Name of Account Holder |
|---|---|
| a [X] Yes   b [ ] No   If no, complete boxes 27-35 | |

| 28 First Name | 29 Middle Initial | 30 Taxpayer Identification Number |
|---|---|---|
| | | |

| 31 Address (Number, Street, and Apartment or Suite Number) | 32 City |
|---|---|
| | |

| 33 State | 34 ZIP/Postal Code | 35 Country |
|---|---|---|
| | | |

| 36 Signature | 37 Date |
|---|---|
| | |

This form should be used to report a financial interest in, signature authority, or other authority over one or more financial accounts in foreign countries, as required by the Department of the Treasury Regulations (31 CFR 103). No report is required if the aggregate value of the accounts did not exceed $10,000. SEE INSTRUCTIONS FOR DEFINITION. File this form with:

**U.S. Department of the Treasury, P.O. Box 32621, Detroit, MI 48232-0621.**

## PRIVACY ACT NOTIFICATION

Pursuant to the requirements of Public Law 93-579 (Privacy Act of 1974), notice is hereby given that the authority to collect information on TD F 90-22.1 in accordance with 5 USC 552a(e) is Public Law 91-508; 31 USC 5314; 5 USC 301; 31 CFR 103.

The principal purpose for collecting the information is to assure maintenance of reports where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. The information collected may be provided to those officers and employees of any constituent unit of the Department of the Treasury who have a need for the records in the performance of their duties. The records may be referred to any other department or agency of the United States upon the request of the head of such department or agency for use in a criminal, tax, or regulatory investigation or proceeding. The information collected may also be provided to appropriate state, local, and foreign law enforcement and regulatory personnel in the performance of their official duties.

Disclosure of this information is mandatory. Civil and criminal penalties, including in certain circumstances a fine of not more than $500,000 and imprisonment of not more than five years, are provided for failure to file a report, supply information, and for filing a false or fraudulent report.

Disclosure of the Social Security number is mandatory. The authority to collect is 31 CFR 103. The Social Security number will be used as a means to identify the individual who files the report.

FDFZ9101L   07/24/02

APPRV #053

R 00137

| **Continuation Page** | | Form TD F 90-22.1 |
|---|---|---|
| This side can be copied as many times as necessary in order to provide information on all accounts. | | |

| 1 Filing for Calendar Year | 3 Taxpayer Identification Number | 4 Filer Last Name or Business Name | Page Number |
|---|---|---|---|
| 2006 | ▓▓▓▓▓ | Rogan | 2 of 2 |

**2 Type of Filer**
a [X] Individual    c [ ] Corporation
b [ ] Partnership   d [ ] Fiduciary

**21 Type of Account**
a [X] Bank    c [ ] Other
b [ ] Securities

**22 Maximum value of account**
a [ ] Under $10,000    c [ ] $100,000 to $1,000,000
b [ ] $10,000 to $99,999    d [X] Over $1,000,000

**23 Account Number, or other designation**
▓▓▓▓▓▓▓▓

**24 Name of Financial Institution with which account is held**
HSBC Bank of Canada

**25 Country in which account is held**
Canada

**26 Does the filer have a financial interest in this account?**
a [X] Yes
b [ ] No
If no, complete boxes 27-35.

**27 Last Name or Organization Name of Account Owner**

| 28 First Name | 29 Middle Initial | 30 Taxpayer Identification Number | 31 Address (Number, Street, and Apt or Suite No.) |
|---|---|---|---|
| | | | |

| 32 City | 33 State | 34 ZIP/Postal Code | 35 Country |
|---|---|---|---|
| | | | |

**2 Type of Filer**
a [ ] Individual    c [ ] Corporation
b [ ] Partnership   d [ ] Fiduciary

**21 Type of Account**
a [ ] Bank    c [ ] Other
b [ ] Securities

**22 Maximum value of account**
a [ ] Under $10,000    c [ ] $100,000 to $1,000,000
b [ ] $10,000 to $99,999    d [ ] Over $1,000,000

**23 Account Number, or other designation**

**24 Name of Financial Institution with which account is held**

**25 Country in which account is held**

**26 Does the filer have a financial interest in this account?**
a [ ] Yes
b [ ] No
If no, complete boxes 27-35.

**27 Last Name or Organization Name of Account Holder**

| 28 First Name | 29 Middle Initial | 30 Taxpayer Identification Number | 31 Address (Number, Street, and Apt or Suite No.) |
|---|---|---|---|
| | | | |

| 32 City | 33 State | 34 ZIP/Postal Code | 35 Country |
|---|---|---|---|
| | | | |

**2 Type of Filer**
a [ ] Individual    c [ ] Corporation
b [ ] Partnership   d [ ] Fiduciary

**21 Type of Account**
a [ ] Bank    c [ ] Other
b [ ] Securities

**22 Maximum value of account**
a [ ] Under $10,000    c [ ] $100,000 to $1,000,000
b [ ] $10,000 to $99,999    d [ ] Over $1,000,000

**23 Account Number, or other designation**

**24 Name of Financial Institution with Which Account is Held**

**25 Country in which account is held**

**26 Does the filer have a financial interest in this account?**
a [ ] Yes
b [ ] No
If no, complete boxes 27-35.

**27 Last Name or Organization Name of Account Owner**

| 28 First Name | 29 Middle Initial | 30 Taxpayer Identification Number | 31 Address (Number, Street, and Apt or Suite No.) |
|---|---|---|---|
| | | | |

| 32 City | 33 State | 34 ZIP/Postal Code | 35 Country |
|---|---|---|---|
| | | | |

R 00138

This form should be used to report a financial interest in, signature authority, or other authority over one or more financial accounts in foreign countries, as required by the Department of the Treasury Regulations (31 CFR 103). No report is required if the aggregate value of the accounts did not exceed $10,000. SEE INSTRUCTIONS FOR DEFINITION. File this form with:

**U.S. Department of the Treasury, P.O. Box 32621, Detroit, MI 48232-0621.**

**Paperwork Reduction Act.** The estimated average burden associated with this collection of information is 10 minutes per respondent or recordkeeper, depending on individual circumstances. Comments regarding the accuracy of this burden estimate, and suggestions for reducing the burden should be directed to the Department of the Treasury, Financial Crimes Enforcement Network, Suite 200, 2070 Chain Bridge Road, Vienna VA 22182-2536. You are not required to provide the requested information unless a form displays a valid OMB control number.

F0029102L  11/26/02    APPRV #053

# EXHIBIT V



SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

epruitt@sidley.com
(312) 853-1093

BEIJING      GENEVA       SAN FRANCISCO
BRUSSELS     HONG KONG    SHANGHAI
CHICAGO      LONDON       SINGAPORE
DALLAS       LOS ANGELES  TOKYO
             NEW YORK     WASHINGTON, DC

FOUNDED 1866

August 24, 2007

**By Email and Facsimile**

Michael J. O'Rourke
O'Rourke Katten & Moody
161 N. Clark Street, Suite 2230
Chicago, Illinois 60601

Re:    *Dexia v. Rogan* (02 C 8288) — Citation to Judith Rogan

Dear Mike:

I am writing in relation to Judith Rogan's objections and document production in response to Dexia Crédit Local ("Dexia") Citation to Discover Assets in the above-referenced case. As noted in the Citation, we will not be able to proceed with Mrs. Rogan's examination until we have satisfactorily resolved the document production issues addressed in this letter. To date, Mrs. Rogan response to the Citation has been severely deficient, for reasons we explain in detail below. Accordingly, we will file a rule to show cause as to why Mrs. Rogan should not be held in contempt if we do not receive the information and/or production requested below by 5:00 p.m. on Tuesday, August 28th.

Before we proceed with addressing Mrs. Rogan's compliance with her production obligations, a note of caution. As you know, the Citation prohibits Mrs. Rogan from, *inter alia*, making or allowing any transfer or other disposition of, or interfering with, any property belonging to the judgment debtor, Peter Rogan. We have developed evidence that Mrs. Rogan has previously facilitated such transfers. Accordingly, we urge you to caution Mrs. Rogan that she is prohibited from making or allowing any such transfers.

I.    **General Objections.**

**General Objection No. 1** – Mrs. Rogan objects generally to all documents requested "which call for production of purely private and personal documents." This objection was not specifically raised in Mrs. Rogan's response to Requests No. 1–10. Mrs. Rogan's invocation of this objection in response to Requests No. 11–15 is addressed below. Please confirm by 5:00 p.m. on Tuesday, August 28th whether Mrs. Rogan has withheld any documents responsive to Requests No. 1–10 on the basis of this general objection.

**General Objection No. 2** – Mrs. Rogan objects to all requests to the extent that they call for the production of privileged documents. It is well-established that the party seeking to withhold materials from discovery bears the burden of establishing the essential elements to



demonstrate the materials are privileged. *See United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). Accordingly, Fed.R.Civ.P. 26(b)(5) requires that parties withholding otherwise discoverable information provide detailed descriptions of all information withheld to enable the requesting party to assess the applicability of the privilege. Furthermore, the privilege must be established on a document-by-document basis; a blanket claim failing to specify what information is protected will not suffice. *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992). We specifically requested that Mrs. Rogan provide us with a privilege log on July 5, 2007. Despite these requirements of which you surely are aware and our July 5th request, Mrs. Rogan has not yet provided us with a privilege log for documents she has withheld from production. By 5:00 p.m. on Tuesday, August 28th, Mrs. Rogan must provide a privilege log providing a detailed explanation for each document withheld from production. The log, inter alia, must state the sender, recipient, date, type of document (e.g., memo, letter, etc.), identify the client and attorney, and provide a sufficient description of the subject matter so that we can assess whether or not it is privileged.

**General Objection No. 3** – Mrs. Rogan objected to producing documents without the entry of an appropriate protective order. As documented in my July 5th letter, the parties have agreed that Mrs. Rogan's document production will be governed by the terms of the protective order previously entered by Judge Filip in this case.

## II.    Specific Objections and Document Production Issues.

Below I address Mrs. Rogan's objections to specific document requests as well as deficiencies we have discovered in Mrs. Rogan's document production to date.

**Request No. 1** – Mrs. Rogan agreed to produce documents responsive to our request for "[a]ll documents (written or electronic) relating to Your assets and liabilities . . ." However, there are several areas in which Mrs. Rogan's production is deficient.

Oceanic Bank and HSBC account documents – Dexia served its Citation on Mrs. Rogan through personal service and by sending the Citation to you on June 20, 2007. Since that time, we repeatedly have requested production of the full account documents for Mrs. Rogan's accounts at Oceanic Bank & Trust in the Bahamas and HSBC in Canada.

> On July 5, 2007, after reviewing Mrs. Rogan's initial production of documents at your offices, I noted that Mrs. Rogan had not produced documents related to her bank accounts at Oceanic Bank & Trust and HSBC. That same day, I sent you a letter noting that Mrs. Rogan had not produced these documents and stating that we expected Mrs. Rogan to immediately produce these key financial records.

> On July 10th, you responded to my letter by stating that "we are pulling together the HSBC and Bahamas trust documents for production   I will call you in the next couple of days when I have them."

**SIDLEY** SIDLEY AUSTIN LLP

> I responded to you on July 11th to emphasize that "the citation seeks not just the account statements for the HSBC, Oceanic Bank and other accounts, but also requires production of cancelled checks, wire transfer records, records of deposits, account opening documents, and communications relating to the accounts."

> On July 13th, Mrs. Rogan produced some account records to us. However, after examining the records, we discovered that the production contained **no** records for Mrs. Rogan's Oceanic Bank account and only a summary account statement for the HSBC account covering the period January 1, 2007 through July 2007.

> On August 14th, I sent you another letter stating that we still had not received any documents for Mrs. Rogan's account at Oceanic Bank and that the summary statement Mrs. Rogan produced for the HSBC account was not adequate. My August 14th email made clear that the Citation requires Mrs. Rogan to produce full account records for both the Oceanic Bank and HSBC accounts for the period January 1, 2004 through the present, "including: account opening documents, monthly account statements, all back up for individual credits and debits to the account (*i.e.*, records of deposit, checks, wire transfer records) and all correspondence or communications Mrs. Rogan has regarding these account[s]."

> On August 20th, you called to tell me that Mrs. Rogan was contacting HSBC to obtain the documents we were requesting, that Mrs. Rogan did not have any Oceanic Bank account documents in her possession, and that you had a "call in" to John Foley regarding obtaining the Oceanic Bank account statements. You also told me that you would call me on August 22nd with an update on when we could expect to receive these documents. I did not hear anything from you August 22nd.

Mrs. Rogan has been on notice since at least June 20th that she needed to provide us with her bank records, including full monthly statements, records of transfers and other documents related to her accounts. You stated on July 10th that Mrs. Rogan was gathering the Oceanic and HSBC documents. Despite these facts, we *still* have not received these documents (apart from the summary records for January–July 2007 produced for the HSBC account). If Mrs. Rogan did not have these records in her personal possession, she should have requested the records from HSBC and Oceanic weeks ago. There is no justification for the delay in producing these documents. The HSBC and Oceanic documents must be produced by 5:00 p.m. on Tuesday, August 28th.

Other Bank and Investment Accounts - Mrs. Rogan provided us with one-page, 2006 year end account summaries for many of her bank and investment accounts. However, as noted above, our requests covered the period January 1, 2004 through the present and required Mrs. Rogan to produce not only year end account summaries, but all account opening documents, monthly account statements, individual records of deposit, checks, wire transfer records, and all correspondence or communications Mrs. Rogan has regarding these accounts.



SIDLEY AUSTIN LLP

MICHAEL J. O'ROURKE
AUGUST 24, 2007
PAGE 4 | CHICAGO

Based upon our review, it appears that Mrs. Rogan may only have produced account documents in her immediate physical possession. However, Judge Schenkier repeatedly has affirmed in this case that a party responding to discovery requests has a responsibility to produce not only documents in her immediate possession, but also documents in her custody or control, i.e., documents that the party has the ability to receive upon request. *See, e.g., Dexia Credit Local v. Rogan et al.*, 231 F.R.D. 538, 541 (N.D. Ill. 2004). Based upon our review of the documents provided to date, Mrs. Rogan still has not produced the following documents to Dexia:

| | | | |
|---|---|---|---|
| Brandywine Fund | | Judith K. Rogan | ➢ No monthly account statements for period January 1, 2004 through present;<br><br>➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| DWS Scudder | | Judith K. Rogan Revocable Trust | ➢ No monthly account statements for January 2004 through March 2004, August 2004 through December 2004, or January 1, 2005 through present;<br><br>➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| Ameritrade | | Judith K. Rogan Revocable Trust | ➢ No monthly account statements for July 2004, November 2004, April 2005 through August 2005, October 2005 through December 2005 and February 2006;<br><br>➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| 1st Nat'l Bank of Valparaiso | | Judith K Rogan | ➢ No monthly account statements for period January 1, 2004 |

**SIDLEY**

SIDLEY AUSTIN LLP

MICHAEL J. O'ROURKE
AUGUST 24, 2007
PAGE 6 | CHICAGO

| | | Trustee | ➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| | | | through present; |
| 1st Nat'l Bank of Valparaiso | ▬▬▬ | Peter Rogan or Judith K | ➢ No monthly account statements for period January 1, 2004 through December 31, 2004; <br><br> ➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| 1st Nat'l Bank of Valparaiso | Safe Deposit Box | Peter and Judith Rogan | ➢ No inventory of the contents of safe deposit box; <br> ➢ No copies of the bank's records of access to the safe deposit box or other records relating to the safe deposit box. |
| Clipper Fund | ▬▬▬ | Judith K Rogan | ➢ No account opening documents; <br><br> ➢ No monthly account statements for period January 1, 2004 through present; <br><br> ➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |
| Ameritrade | ▬▬▬ | Judith K Rogan Trustee | ➢ No account opening documents; <br><br> ➢ No monthly account statements for period January 1, 2004 through present; <br><br> ➢ No records of individual deposits, checks, or wire transfer records for period January 1, 2004 through present. |

**SIDLEY** SIDLEY AUSTIN LLP

MICHAEL J. O'ROURKE
AUGUST 24, 2007
PAGE 6 | CHICAGO

By 5:00 p.m. on Tuesday, August 28th, provide us with a specific date within the next two weeks when we will receive the foregoing documents. If you believe any of the records identified above already have been produced, please identify by Bates number where those documents are to be found in Mrs. Rogan's production.

**Request No. 6** – Mrs. Rogan agreed to produce all "communications, correspondence, or agreements" between Mrs. Rogan, any individual or entity on Rider B of the Citation, and Oceanic Bank. To date, Mrs. Rogan has not produced any such documents to Dexia. Mrs. Rogan (or her agents) must have had some communication with Oceanic Bank in setting up her account and arranging transfers to and from the account. If such communications are in the possession of Messrs. Foley, Tatooles, Cuppy or Myers or some other individual acting on Mrs. Rogan's behalf, Mrs. Rogan must request the responsive documents from those individuals. By 5:00 p.m. on Tuesday, August 28th, provide us with a specific date within the next two weeks when we will receive the foregoing documents.

**Requests Nos. 7-10** – Mrs. Rogan agreed to produce responsive documents "to the extent they exist." By 5:00 p.m. on Tuesday, August 28th, provide us with a specific date within the next two weeks when we will receive the foregoing documents.

**Requests Nos. 11-15** – Mrs. Rogan has objected to these requests on the grounds that they seek "irrelevant and purely private information" that is outside the proper scope of a citation to discover assets. This objection is without merit. Dexia's citation to discover assets was issued pursuant to 735 ILCS 5/2-1402 and Illinois Supreme Court Rule 277. The type of information discoverable under this provision is extremely broad. *See Gerald E. Kennedy v. Four Boys Labor Services, Inc.*, 279 Ill.App.3d 361, 367 (1996) (noting that "in interpreting the provisions of section 2-1402, the provisions are to be liberally construed.") In fact, Illinois courts explicitly have held that in the context of a citation proceeding, a "fishing expedition" is permissible so long as it is based on a belief that assets are in the possession of the third party. *See Terry Regan and Dennis Egan v. Garfield Ridge Trust & Savings Bank*, 247 Ill. App. 3d 621, 624 (1993) (holding that "a fishing expedition for assets is permissible in the context of an initial proceeding to discover assets"); *Federal Loan Corp. v. Harris*, 17 Ill.App.3d 49, 50 (1974) (same).

The Seventh Circuit has held that a judgment creditor can properly use a citation to discover assets to request non-financial information that may assist the judgment creditor in discovering the location of the judgment debtor's assets. *See Matrin-Trigona v. Gouletas*, 634 F.2d 354, 357 (7th Cir. 1980) (affirming contempt order against citation respondent who refused to provide information regarding his place of birth, location of his telephone, and information relating to his filings as a candidate for public office) Thus, during discovery in this case, Mr. Rogan produced his own calendar, address book, passport and information evidencing travel. Each of these categories of documents contained information relevant to Mr. Rogan's assets and control over various investments. Mr. Rogan's calendar, airline ticket receipts and passport



provided evidence of his travel to the Bahamas to coordinate a transfer of funds from his Bahamian trust to a U.S. bank account in 2002. Mr. Rogan's address book similarly provided information regarding Mr. Rogan's connections to investments of which he claimed to have no knowledge.

Here, Dexia has requested from Mrs. Rogan the same types of documents that Mr. Rogan already produced and which the Seventh Circuit in *Gouletas* found relevant in a citation proceeding. Specifically, Dexia requested a copy of Mrs. Rogan's calendar (Request 11), address book or contacts list (Request 12), passport (Request 13), applications or other documents related applications for temporary or permanent residency (Request 14) and document sufficient to show Mrs. Rogan's travel by airplane or boat (Request 15). These requests seek relevant information relating to the potential disposition and location of Mr. Rogan's assets, which we have reason to believe have flowed through accounts in Mrs. Rogan's name. For example, Mrs. Rogan opened her foreign accounts in the Bahamas and Canada during the pendency of this litigation. It appears that a substantial amount of these funds likely originated with Mr. Rogan, were transferred by Mr. Rogan to Mrs. Rogan's foreign accounts, and then used by Mrs. Rogan for Mr. Rogan's personal expenses, *e.g.*, Mrs. Rogan's payment of Mr. Rogan's $100,000 retainer fee with Hogan Marren, Ltd. in connection with its representation of Mr. Rogan in his appeal of *U.S. v. Rogan*. In addition, given that she is Mr. Rogan's wife, information about her travel and contacts is likely to reveal information about her husband's whereabouts and locations in which he has disposed of assets. Documents responsive to these requests must be produced by 5:00 p.m. on Tuesday, August 28th.

**Request No. 16** – Mrs. Rogan has objected to our request for communications between Mrs. Rogan and Fred Cuppy, Troy Myers, John Tatooles or John Foley regarding the individuals or entities on Rider B as: (i) seeking documents protected by the attorney-client privilege and (ii) outside the proper scope of a citation.

First, we note that we have never seen any documents suggesting that Mrs. Rogan has an attorney-client relationship with Messrs. Cuppy, Myers, Tatooles or Foley in relation to the entities and individuals identified in Rider B. The fact that these individuals are attorneys does not make every communication Mrs. Rogan had with them privileged. Accordingly, for each document withheld from production, Mrs. Rogan must provide us with a detailed privilege log providing the basis for her claim of privilege. *See Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 145 F.R.D. 84, 88 (N.D. Ill. 1992) (holding that "[f]or each document, the log should identify the date, the author and all recipients, along with their capacities. The log should also describe the document's subject matter, purpose for its production, and a specific explanation of why the document is privileged or immune from discovery. These categories . . . must be sufficiently detailed to allow the court to determine whether the discovery opponent has discharged its burden of establishing the [existence of a privilege]. Accordingly, descriptions such as 'letter re claim,' 'analysis of claim,' or 'report in anticipation of litigation' -- with which we have grown all too familiar -- will be insufficient."). *See also In re Air Crash Near Roselawn, Ind.*, 1997 WL 97096, *2 (N.D. Ill. 1997) (same).



Second, the requested documents are within the proper scope of a citation. Messrs. Cuppy, Myers, Tatooles and Foley jointly manage the affairs of a large web of entities directly and indirectly owned by Mr. Rogan's domestic and foreign trusts and the domestic and foreign trusts of the Rogan children. Discovery to date has established that millions of dollars have flowed between and among these entities for Mr. Rogan's benefit. As noted above, documents currently in our possession indicate that Mr. Rogan also has caused funds to be transferred to Mrs. Rogan for his benefit. In light of the fact that Mrs. Rogan has no apparent ownership or other interest in the entities on Rider B (with the exception of JKR Business and her revocable trust), the fact that Mrs. Rogan has had any communications with Messrs. Cuppy, Myers, Tatooles or Foley regarding the entities on Rider B would be directly relevant to her knowledge of the affairs of the entities that have been used to hold and/or transfer and conceal the location of Mr. Rogan's assets.

By 5:00 p.m. on Tuesday, August 28th, provide us with a specific date within the next two weeks when we will receive the foregoing documents.

**Requests No. 17–24** - These requests seek billing records and records of payment for services provided by various law firms to Mrs. Rogan, Mr. Rogan, or the entities and individuals on Rider B. Mrs. Rogan has objected to these requests on the basis of "common law privileges" and as outside the proper scope of a citation. We have no idea what "common law" privileges Mrs. Rogan is invoking. In any event, Mrs. Rogan must identify with specificity the privilege she is invoking for *each* document she is withholding based on this objection and must provide a detailed privilege log providing the factual basis for her privilege claims as described above. With respect to Mrs. Rogan's relevance objection, the requested documents clearly are within the proper scope of a citation. Dexia has requested billing records and records of payment provided by various law firms. The firms named in these requests all have provided services to Mr. Rogan that directly or indirectly relate to the disposition of his assets. These firms' billing records likely will contain descriptive entries that may evidence the location of Mr. Rogan's assets. Indeed, Magistrate Judge Schenkier previously ordered Messrs. Cuppy, Foley and Tatooles to produced *unredacted* attorney invoices to Dexia. The invoices that these attorneys produced contained a wealth of information pertaining to Mr. Rogan's assets. Accordingly, we have every reason to believe that attorney invoices in Mrs. Rogan's possession similarly would contain information regarding the disposition of Mr. Rogan's assets and therefore are properly within the scope of the citation. The records of payment themselves are also directly relevant to Mr. Rogan's assets. The law firms named in Requests No. 17-24 all have provided services to Mr. Rogan and/or entities under his control. We already have discovered that Mr. Rogan caused Mrs. Rogan to use her HSBC account to pay for services Hogan Marren Ltd. rendered to Mr. Rogan. Records evidencing how all of these firms have been paid will establish the source of funds Mr. Rogan used to pay for their services.

By 5:00 p.m. on Tuesday, August 28th, provide us with a specific date within the next two weeks when we will receive the foregoing documents.

*           *           *



MICHAEL J. O'ROURKE
AUGUST 24, 2007
PAGE 9 | CHICAGO

As noted above, Dexia will move for a rule to show cause against Mrs. Rogan if we do not receive the following by 5:00 p.m. on Tuesday, August 28th:

➢ Confirmation of whether Mrs. Rogan has withheld documents responsive to Requests No. 1-10 based on General Objection No. 1;

➢ A privilege log for all documents withheld on a claim of privilege;

➢ A full and complete production of the Oceanic Bank and HSBC documents; and

➢ A specific date within the next two weeks when we will receive the documents responsive to Request No. 1 identified on pages 4-5, *supra*, and the documents responsive to Requests No. 6-24.

As always, please contact me with any questions or concerns you may have about our requests.

Sincerely,

Eric S. Pruitt

cc:     Gabriel Aizenberg
        AUSA Joseph Stewart

**EXHIBIT W**

[Back One Page]

# COOK COUNTY RECORDER OF DEEDS
## EUGENE 'GENE' MOORE

Result For:[0421027116]

| Document No. | Executed | Recorded | Document Type | Case No. | Amount |
|---|---|---|---|---|---|
| 0421027116 | 06/03/2004 | 07/28/2004 | WARRANTY DEED | | $1,107,500.00 |

**Legal Description**

Section-Township: 10-39-14                    SubDiv-Condo: 0329719204

Lot #:                    Block #:  Part of Lot:

Building:

**Property Description**

17-10-112-011-1088  UPIN  Condo Unit Numbers
17-10-112-011-1590  UPIN  Condo Unit Numbers
17-10-112-011-1551  UPIN  Condo Unit Numbers

| Grantor(s) | Name: 55 ERIE INVESTORS LLC Trust Number:- |
|---|---|
| Grantee(s) | Name: JUDITH K ROGAN TRUST Trust Number:- <br> Name: ROGAN JUDITH K TRUST Trust Number:- |
| Prior Document | |

Grantor / Grantee
Document Number
Legal Search
PIN Search
Trust Number
Subdivision Search

Forms

View Purchased
Documents

## COOK COUNTY RECORDER OF DEEDS DISCLAIMER

While the Cook County Recorder of Deeds (CCRD) attempts to keep this website up to date with existing law and policies, the CCRD does not guaranty the accuracy of any of the information contained herein, including, but not limited to, database information and document images. CCRD also does not guaranty the legality of the documents and database information contained herein and accepts no liability for any damages incurred, whether directly, indirectly, incidental, punitive or consequential, as a result of any errors, omissions or discrepancies in any information published on this website or any use of this website, including, but not limited to use of on-line forms or affidavits.

Copyright © 2005 Cook County Recorder of Deeds. All rights reserved.
For assistance with the use of this website, please click here rodsupport@cookcountygov.com or call 312-603-5154 Monday - Friday between the hours of 9:30 a.m. and 5:30 p.m. CDT.

## SPECIAL WARRANTY DEED
### (LLC to individual)

THIS AGREEMENT, made this 3rd day of June, 2004, between 55 ERIE INVESTORS LLC, a Delaware limited liability company, as GRANTOR, created and existing under and by virtue of the laws of the State of Delaware and duly authorized to transact business in the State of Illinois, and Judith K. Rogan Revocable Trust Dated April 19, 1989, of 240 East 90th Drive, Merrillville, as GRANTEE(S), WITNESSETH, that GRANTOR, for and in consideration of the sum of Ten Dollars ($10.00) in hand paid by GRANTEE(S), the receipt whereof is hereby acknowledged, and pursuant to the authority given by the Management Committee of said GRANTOR, by these presents does REMISE, RELEASE, ALIEN AND CONVEY unto GRANTEE(S), FOREVER, all of the following described real estate, situated in the County of Cook and State of Illinois known and described as follows, to wit:

### SEE ATTACHED EXHIBIT A

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereon, and all the estate, right, title, interest, claim or demand whatsoever, of GRANTOR, either in law or equity, of, in and to the above described premises, with the hereditaments and appurtenances: TO HAVE AND TO HOLD said premises as above described. Grantor also hereby grants to the Grantee, its successors and assigns, as rights and easements appurtenant to the subject unit described herein, the rights and easements for the benefit of said unit set forth in the declaration of condominium; and Grantor reserves to itself, its successors and assigns, the rights and easements set forth in said declaration for the benefit of the remaining land described herein.

And the GRANTOR, for itself, and its successors, does covenant, promise and agree, to and with the GRANTEE(S), that it has not done or suffered to be done, anything whereby the said premises hereby granted are, or may be, in any manner encumbered or charged, except as herein recited; and that the said premises, against all persons lawfully claiming, or to claim the same, by, through or under it, it WILL WARRANT AND DEFEND, subject to those exceptions set forth on attached Exhibit B.

PIN#: Part of    17-10-112-001-0000
                 17-10-112-007-0000, and
                 17-10-112-008-0000

Address of Real Estate: 55 East Erie, Unit #3205 & P-357 & 358, Chicago, Illinois 60611

IN WITNESS WHEREOF, said GRANTOR has caused its name to be signed by its authorized signatory the day and year first above written.

**Near North National Title Corp**
**222 North Lasalle Street**
**Chicago, Illinois  60601**

GRANTOR:

55 ERIE INVESTORS LLC,
a Delaware limited liability company

By: _____
Joshua Silverman, authorized signatory

Doc#: 0421027116
Eugene "Gene" Moore   Fee: $90.50
Cook County Recorder of Deeds
Date: 07/28/2004 03:46 PM Pg: 1 of 4

THE ABOVE SPACE FOR RECORDER'S USE ONLY

STATE OF ILLINOIS    )
                     )   SS
COUNTY OF COOK       )

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that Joshua Silverman, authorized signatory of 55 ERIE INVESTORS LLC (the "Company"), personally known to me to be the same person whose name is subscribed to the foregoing instrument as such general partner, appeared before me in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as the free and voluntary act of the Company, for the uses and purposes therein set forth.

Given under my hand and notarial seal this 3rd day of June, 2004.

_____
Notary Public

```
           SEAL
    "OFFICIAL SEAL"
      Mary Couzin
Notary Public, State of Illinois
My Commission Expires July 19, 2005
```

This instrument was prepared by:    Michael Maremont
                                    70 East Lake Street #800
                                    Chicago, IL  60601

Mail recorded document to:

JOHN FOLEY, ESG, 205 N. MICHIGAN AVE, #4300, CHICAGO, IL 60601

Send subsequent tax bills to:

JUDITH ROGAN, 55 EAST ERIE #3205, CHICAGO, IL 60611

## EXHIBIT A

Unit 3205 and Parking Space Units 357, 358 in the 55 East Erie Condominium as delineated on a survey of the following described real estate:

The Northwest 1/4 (except the South 40 feet thereof) and the Northeast 1/4 of Block 35 in Kinzie's Addition to Chicago in the North Fractional Section 10, Township 39 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Which survey is attached as Exhibit "B" to the Declaration of Condominium recorded October 24, 2003 as document number 0329719204, and as amended from time to time, together with its undivided percentage interest in the common elements, all in Cook County, Illinois.

PIN: 17-10-112-001, 17-10-112-007 and 17-10-112-008

## EXHIBIT B

(a) covenants, conditions, and restrictions of record; (b) terms, provisions, covenants, and conditions of the Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for 55 East Erie Condominium, recorded with the Cook County Recorder's Office on October 24, 2003 as Document No. 0329719204 (the "Declaration"), and all amendments, if any, thereto; (c) private, public, and utility easements, including any easements which may hereafter be executed by Grantor and any easements which may be established by or implied from the Declaration, or amendments thereto, if any, and private alleys and roads and highways, if any; (d) party wall rights and agreements, if any; (e) limitations and conditions imposed by the Illinois Condominium Property Act; (f) special taxes or assessments for improvements not yet completed; (g) any unconfirmed special tax or assessment; (h) installments not due at the date hereof for any special tax or assessment for improvements heretofore completed; (i) general taxes not yet due and payable; (k) installments due after the date hereof of assessments established pursuant to the Declaration; (l) possible encroachments, if any, which do not materially, adversely impair the use and enjoyment of the premises; and (m) acts done or suffered by Grantee(s) or anyone claiming by, through or under Grantee(s).



**EXHIBIT X**

# Monthly Account Statement

**September 1, 2005 through September 30, 2005**

| | |
|---|---|
| Investment Professional: | LAWRENCE LITTLEWOOD<br>L P LITTLEWOOD & ASSOC INC<br>2713 FLOSSMOOR ROAD<br>FLOSSMOOR IL 60422-1100<br>(708) 798-9360 |
| Shareholder Services: | (800) 621-1048<br>8 a.m. to 5 p.m. (CST) Monday through Friday |
| International: | Call collect (312) 537-7000<br>8 a.m. to 5 p.m. (CST) Monday through Friday |
| Scudder ACCESS: | (800) 972-3060<br>24 hours a day, 7 days a week |
| Web Site: | www.scudder.com |

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
240 E 90TH DR
MERRILLVILLE IN 46410-8102

002754

իիիխիութիերիվիիմաիութերմիհիկիիրի

---

## Your Portfolio Value

| | |
|---|---|
| Total Value on 08/31/2005 | $8,691.29 |
| Purchases/Reinvested Distributions | $500,378.38 |
| Redemptions/Withdrawals | -$383,000.00 |
| Transfers | $0.00 |
| **Total Value on 09/30/2005** | **$126,069.67** |

The street address for Scudder Investments Service Company has changed to 210 W 10th St, Kansas City, MO, 64105. Please make a note of this change when mailing overnight or certified items for account processing. If you have questions, please call Shareholder Services at (800) 621-1048.

---

## Your Portfolio Summary by Fund Name

| Fund Name | Total<br>Shares Owned | x | Share Price<br>on 09/30/2005 | = | Value on<br>09/30/2005 |
|---|---|---|---|---|---|
| **Non-Retirement** | | | | | |
| Scudder Government & Agency Money Fd | 126,069.670 | | $1.00 | | **$126,069.67** |
| **Total Portfolio** | | | | | **$126,069.67** |

---

## Account Activity

■ **Scudder Government & Agency Money Fd**

Fund Number    JUDITH K ROGAN REVOCABLE TR
NASDAQ                              JKR BUSINESS
Account Number

| Reference Number | Trade Date | Transaction Description | Dollar Amount | Balance |
|---|---|---|---|---|
| | | Beginning Value on 09/01/2005 | | $8,691.29 |
| | 09/06/2005 | SHARE PURCHASE-WIRE | $499,988.00 | $508,679.29 |
| | 09/08/2005 | CHECK REDEMPTION 189 | -$253,000.00 | $255,679.29 |
| | 09/13/2005 | CHECK REDEMPTION 190 | -$40,000.00 | $215,679.29 |
| | 09/15/2005 | CHECK REDEMPTION 191 | -$15,000.00 | $200,679.29 |
| | 09/21/2005 | CHECK REDEMPTION 192 | -$50,000.00 | $150,679.29 |
| | 09/22/2005 | CHECK REDEMPTION 193 | -$25,000.00 | $125,679.29 |
| | 09/23/2005 | INCOME REINVEST | $390.38 | $126,069.67 |
| | | Ending Value on 09/30/2005 | | $126,069.67 |

Access your account 24 hours a day, seven days a week using ScudderACCESS (800) 972-3060

---

| Transaction Description Legend | ARC  Account Receivable Entry | POP  Point-Of-Purchase |
|---|---|---|

---

Not FDIC Insured   No Bank Guarantee   May Lose Value

*54100*
KFM...*54100* .0836335020. 12005 .12005. CNSMMK01 INVMSS.. ... . . . MF

US DAM 000000059

# Monthly Account Statement

**November 1, 2005 through November 30, 2005**

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
240 E 90TH DR
MERRILLVILLE IN 46410-8102

001682

|||
|---|---|
| **Investment Professional:** | LAWRENCE LITTLEWOOD<br>L P LITTLEWOOD & ASSOC INC<br>2713 FLOSSMOOR ROAD<br>FLOSSMOOR IL 60422-1100<br>(708) 798-9360 |
| **Shareholder Services:** | (800) 621-1048<br>8 a.m. to 5 p.m. (CST) Monday through Friday |
| **International:** | Call collect (312) 537-7000<br>8 a.m. to 5 p.m. (CST) Monday through Friday |
| **Scudder ACCESS:** | (800) 972-3060<br>24 hours a day, 7 days a week |
| **Web Site:** | www.scudder.com |

---

## Your Portfolio Value

| | |
|---|---|
| Total Value on 10/31/2005 | $81,394.38 |
| Purchases/Reinvested Distributions | $1,502,139.12 |
| Redemptions/Withdrawals | -$799,000.00 |
| Transfers | $0.00 |
| **Total Value on 11/30/2005** | **$784,533.50** |

Does your portfolio contain a proper value-style component? Talk with your financial advisor or call Shareholder Services to learn more about Scudder-Dreman value funds.

---

## Your Portfolio Summary by Fund Name

| Fund Name | Total Share Owned | Share Price x on 11/30/2005 = | Value on 11/30/2005 |
|---|---|---|---|
| **Non-Retirement**<br>Scudder Government & Agency Money Fd | 784,533.500 | $1.00 | $784,533.50 |
| **Total Portfolio** | | | $784,533.50 |

---

## Account Activity

■ **Scudder Government & Agency Money Fd**

**Fund Number**
**NASDAQ**
**Account Number**


JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS

| Reference Number | Trade Date | Transaction Description | Dollar Amount | Balance |
|---|---|---|---|---|
| | | Beginning Value on 11/01/2005 | | $81,394.38 |
| | 11/03/2005 | CHECK REDEMPTION 196 | -$15,000.00 | $66,394.38 |
| | 11/04/2005 | SHARE PURCHASE-WIRE | $1,499,988.00 | $1,566,382.38 |
| | 11/09/2005 | SAME DAY WIRE REDEMPTION | -$775,000.00 | $791,382.38 |
| | 11/25/2005 | CHECK REDEMPTION 197 | -$9,000.00 | $782,382.38 |
| | 11/25/2005 | INCOME REINVEST | $2,151.12 | $784,533.50 |
| | | Ending Value on 11/30/2005 | | $784,533.50 |

Access your account 24 hours a day, seven days a week using ScudderACCESS (800) 972-3060.

---

| Transaction Description Legend | ARC  Account Receivable Entry | POP  Point-Of-Purchase |
|---|---|---|

*82100*
KFM-.*821C

IK01.INVMSS ...,....MME .. .,,001175763

US DAM 000000071



# Year-End Account Statement

January 1, 2006 through December 31, 2006

**DWS SCUDDER**
Deutsche Bank Group

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
475 WEXFORD RD
VALPARAISO IN 46385-8045

| Investment Professional: | LAWRENCE LITTLEWOOD |
| --- | --- |
| | L P LITTLEWOOD & ASSOC INC |
| | 2713 FLOSSMOOR ROAD |
| | FLOSSMOOR IL 60422-5100 |
| | (708) 798-9360 |
| Shareholder Services: | (800) 621-1048 |
| | 8 a.m. to 5 p.m. (CST) Monday through Friday |
| International: | Call collect (816) 435-7177 |
| | 8 a.m. to 5 p.m. (CST) Monday through Friday |
| InvestorACCESS: | (800) 621-1048 |
| | 24 hours a day, 7 days a week |
| Web Site: | www.dws-scudder.com |

This statement reflects all account activity that occurred during 2006. Please retain it for your records. Tax forms will be mailed, as applicable, in January 2007. From all of us at DWS Scudder, best wishes for a happy and prosperous new year.

## Your Portfolio Value

| | Period 01/01 - 12/31/2006 | Year to Date 01/01 - 12/31/2006 |
| --- | --- | --- |
| Beginning Portfolio Value | $687,259.39 | $687,259.39 |
| Purchases/Reinvested Distributions | $1,857,056.27 | $1,857,056.27 |
| Redemptions/Withdrawals | -$2,490,000.00 | -$2,490,000.00 |
| Transfers | $0.00 | $0.00 |
| **Ending Portfolio Value on 12/31/2006** | **$54,315.66** | **$54,315.66** |

## Your Portfolio Summary by Fund Name

| Fund Name | Total Shares Owned | x | Share Price on 12/31/2006 | = | Value on 12/31/2006 |
| --- | --- | --- | --- | --- | --- |
| Non-Retirement | | | | | |
| DWS Government & Agency Money Fund | 54,315.660 | | $1.00 | | $54,315.66 |
| Total Portfolio | | | | | $54,315.66 |

## Account Activity

■ Account Number:

Fund Name:
Fund Number:
NASDAC

Registered to:
JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS

| Trade Date | Transaction Description | Dollar Amount | Balance |
| --- | --- | --- | --- |
| | Beginning Value on 01/01/2006 | | $687,259.39 |
| 01/25/2006 | EXPEDITED REDEMPTION | -$350,000.00 | $337,259.39 |
| 01/25/2006 | INCOME REINVEST | $1,815.70 | $339,075.09 |
| 02/24/2006 | INCOME REINVEST | $1,126.03 | $340,201.12 |
| 03/10/2006 | SHARES PURCHASED BY WIRE | $1,000,000.00 | $1,340,201.12 |
| 03/10/2006 | EXPEDITED REDEMPTION | -$275,000.00 | $1,065,201.12 |
| 03/21/2006 | SAME DAY WIRE REDEMPTION | -$600,000.00 | $465,201.12 |
| 03/24/2006 | INCOME REINVEST | $2,071.78 | $467,272.90 |
| 04/24/2006 | SAME DAY WIRE REDEMPTION | -$100,000.00 | $367,272.90 |
| 04/25/2006 | INCOME REINVEST | $1,752.68 | $369,025.58 |
| 05/25/2006 | INCOME REINVEST | $1,360.41 | $370,385.99 |

Page 1 of 4

US DAM 000000005

# Monthly Account Statement

November 1, 2006 through November 30, 2006


**DWS**
**SCUDDER**
Deutsche Bank Group

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
476 WEXFORD RD
VALPARAISO IN  46385-8045

**Investment Professional:** LAWRENCE LITTLEWOOD
L P LITTLEWOOD & ASSOC INC
2713 FLOSSMOOR ROAD
FLOSSMOOR IL 60422-1100
(708) 798-9360

**Shareholder Services:** (800) 621-1048
*8 a.m. to 5 p.m. (CST) Monday through Friday*

**International:** Call collect (816) 435-7177
*8 a.m. to 5 p.m. (CST) Monday through Friday*

**InvestorACCESS:** (800) 621-1048
*24 hours a day, 7 days a week*

**Web Site:** www.dws-scudder.com

Let DWS Scudder be your partner in global investing. Talk with your financial advisor or visit www.dws-scudder.com to learn about our global perspective.

| Your Portfolio Value | Period 11/01 - 11/30/2006 | Year to Date 01/01 - 11/30/2006 |
|---|---|---|
| Beginning Portfolio Value | $6,991.19 | $687,259.39 |
| Purchases/Reinvested Distributions | $847,057.03 | $1,856,788.83 |
| Redemptions/Withdrawals | -$800,000.00 | -$2,490,000.00 |
| Transfers | $0.00 | $0.00 |
| **Ending Portfolio Value on 11/30/2006** | **$54,048.22** | **$54,048.22** |

## Your Portfolio Summary by Fund Name

| Fund Name | Total Shares Owned | x | Share Price on 11/30/2006 | = | Value on 11/30/2006 |
|---|---|---|---|---|---|
| Non-Retirement | | | | | |
| DWS Government & Agency Money Fund | 54,048.220 | | $1.00 | | $54,048.22 |
| **Total Portfolio** | | | | | **$54,048.22** |

## Account Activity

■ **Account Number**

**Fund Name**
**Fund Number**
**NASDAQ**

**Registered to:**
JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS

| Reference Number | Trade Date | Transaction Description | Dollar Amount | Balance |
|---|---|---|---|---|
| | | Beginning Value on 11/01/2006 | | $6,991.19 |
| | 11/07/2006 | SHARES PURCHASED BY WIRE | $846,200.00 | $853,191.19 |
| | 11/08/2006 | EXPEDITED REDEMPTION | -$50,000.00 | $803,191.19 |
| | 11/14/2006 | SAME DAY WIRE REDEMPTION | -$750,000.00 | $53,191.19 |
| | 11/24/2006 | INCOME REINVEST | $857.03 | $54,048.22 |
| | | **Ending Value on 11/30/2006** | | **$54,048.22** |

Access your account 24 hours a day, seven days a week using InvestorACCESS (800) 621-1048.

| Transaction Description Legend | ARC  Account Receivable Entry | POP  Point-Of-Purchase |
|---|---|---|

US DAM 000000121

# EXHIBIT Y

ISSUED BY THE

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia Public Finance Bank and Crédit Local de France, )<br><br>Plaintiff, )<br><br>v. )<br><br>PETER G. ROGAN et al. )<br><br>Defendants. ) | No. 02 C 8288<br><br>Judge Mark Filip |

## CITATION TO DISCOVER ASSETS TO THIRD PARTY

TO:     Mrs. Judith Rogan
        476 Wexford Avenue
        Valparaiso, Indiana 46385

A Judgment against defendants Peter G. Rogan ("Rogan"), Braddock Management LP ("Braddock"), and Bainbridge Management, Inc. ("Bainbridge") (collectively, "Judgment Debtors") was entered on May 3, 2007 in the amount of $124,280,712.79 plus post-judgment interest, and remains unsatisfied in the amount of $124,280,712.79 plus post-judgment interest.

**YOU ARE COMMANDED** to appear at Sidley Austin LLP, One South Dearborn St., Chicago, Illinois 60603 on **July 30, 2007 at 9:30 a.m.** and be examined under oath relating to any and all accounts, property, income or assets of Judgment Debtors. Please note that the examination date is conditional and subject to change by Plaintiff Dexia Crédit Local based on its assessment of the completeness and status of your production of documents.

**YOU ARE COMMANDED** to produce prior to the examination all documents, papers and records identified in Rider A. The documents, papers and records must be produced by **July 5, 2007** and should be delivered to Eric Pruitt, Sidley Austin LLP, One South Dearborn St., Chicago, Illinois 60603.

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to Judgment Debtors or to which Judgment Debtors may be entitled or that may be acquired by or become due to Judgment Debtors and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to Judgment Debtors, until the further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.

YOUR FAILURE TO APPEAR AND ANSWER AS HEREIN DIRECTED MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT.

### CERTIFICATE OF ATTORNEY

I, Eric S. Pruitt, certify to the Court, under penalties as provided by law pursuant to 735 ILCS 5/1-109 that the following information is true:

1. Judgment was entered in the amount of $124,280,712.79 on May 3, 2007.
2. Name of the Court entering Judgment:  United States District Court, Northern District of Illinois, Eastern Division
3. Case No. 02-8288

| | |
|---|---|
| Dated:  June 7, 2007 | ISSUED:  JUN - 7 2007 |
| PLAINTIFF DEXIA CRÉDIT LOCAL | MICHAEL W. DOBBINS, Clerk of the District Court |
| By: _____<br>   One of Its Attorneys | |
| SIDLEY AUSTIN LLP<br>Scott Mendeloff<br>Gabriel Aizenberg<br>Eric S. Pruitt<br>One South Dearborn Street<br>Chicago, Illinois  60603<br>(312) 853-7000 | _____<br>(By) Deputy Clerk |
| *Counsel for Dexia Crédit Local* | |

## IN THE UNITED STATES DISTRICT COURT
### CASE NO. 02 C 8288
## AFFIDAVIT OF SPECIAL PROCESS SERVER

**Lewis Ellis**, being first duly sworn on oath deposes and says that he served process in the above mentioned cause.

That he served the within:

( ) Summons & Complaint
( X ) Citation to Discover Assets
( ) Rule to Show Cause
( ) Subpoena
( X ) Other: **Citation Notice, Certificate of Attorney**

1.  ( ) By leaving a copy with the named party, ------- personally on -------.

2.  ( X ) On the within named party, **Judith Rogan**, by leaving a copy with **Refused Name, Refused Title/Relation**, who states that they are a member of the household on **June 8, 2007**, and informed that person of the contents thereof, and that further he mailed a copy of same in a sealed envelope with postage prepaid addressed to the party on **06/12/2007**.

3.  ( ) On the within party, ------- by leaving a copy with -------, on -------, and informed that person of the contents thereof.

4.  ( X ) That the sex, race and approximate age of the person with whom he left the documents were as follows:

**SEX: Male**          **RACE: Caucasian**          **APPROXIMATE AGE: 45-50**

5.  ( X ) That the place where and the time of day when the documents were served were as follows:

**PLACE: 476 Wexford Ave., Valparaiso, IN 46385**
**TIME OF DAY: 3:16 PM**

6.  ( ) That he was unable to serve the within named party ------- located at -------- for the reason: -------

Signed and Sworn to before me
This 12th day of June 2007.

OFFICIAL SEAL
KELLY L DENT
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/02/09

Lewis Ellis
Special Process Server
IT'S YOUR SERVE, INC.
Private Detective No. 117-000885

## CITATION NOTICE

United States District Court
for the Northern District of Illinois
219 South Dearborn Street, Chicago, Illinois

Dexia Credit Local,      Judgment Creditor
Sidley Austin LLP
1 South Dearborn St.
Chicago, Illinois 60603

v.

Peter G. Rogan,      Judgment Debtor
476 Wexford Rd. Valparaiso, Indiana
46385

Braddock Management LP, Judgment Debtor
240 East 90th Drive, Merrillville,
Indiana 46411

Bainbridge Management, Inc., Judgment Debtor
240 East 90th Drive, Merrillville,
Indiana 46411

Judgment Amount:      $124,280,712.79 (Case No. 02-8288)

This citation is directed to Judith Rogan.

Return Date and Time: July 5, 2007 (documents)
July 30, 2007 at 9:30 a.m. (examination)

NOTICE: The court has issued a citation against you. The citation directs that you produce documents and appear at the place designated above to be examined for the purpose of allowing the judgment creditor to discover income and assets belonging to the judgment debtors, or in which the judgment debtors have an interest. The citation was issued on the basis of a judgment against the judgment debtors, in favor of the judgment creditor in the amount stated above. On or after the date stated above, the court may compel the application of any discovered income or assets toward payment on the judgment.

The amount of income or assets that may be applied toward the judgment is limited by federal and Illinois law. The JUDGMENT DEBTOR HAS THE RIGHT TO ASSERT STATUTORY EXEMPTIONS AGAINST CERTAIN INCOME OR ASSETS OF THE JUDGMENT DEBTOR WHICH MAY NOT BE USED TO SATISFY THE JUDGMENT IN THE AMOUNT STATED ABOVE:

(1) Under Illinois or federal law, the exemptions of personal property owned by the debtor include the debtor's equity interest, not to exceed $2,000 in value, in any personal property as chosen by the debtor; Social Security and SSI benefits; public assistance benefits; unemployment compensation benefits; worker's compensation benefits; veteran's benefits; circuit breaker property tax relief benefits; the debtor's equity interest, not to exceed $1,200 in value, in any one motor vehicle, and the debtor's equity interest, not to exceed $750 in value, in any implements, professional books, or tools of the trade of the debtor.

(2) Under Illinois law, every person is entitled to an estate in homestead, when it is owned and occupied as a residence, to the extent in value of $7,500, which homestead is exempt from judgment.

(3) Under Illinois law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 15% of gross weekly wages or (ii) the amount by which disposable earnings for a week exceed the total of 45 times the federal minimum hourly wage.

(4) Under federal law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 25% of disposable earnings for a week or (ii) the amount by which disposable earnings for a week exceed 30 times the federal minimum hourly wage.

(5) Pension and retirement benefits and refunds may be claimed as exempt under Illinois law.

The judgment debtor may have other possible exemptions under the law.

THE JUDGMENT DEBTOR HAS THE RIGHT AT THE CITATION HEARING TO DECLARE EXEMPT CERTAIN INCOME OR ASSETS OR BOTH. The judgment debtor also has the right to seek a declaration at an earlier date, by notifying the clerk in writing at 219 S. Dearborn, 20th Floor, Chicago, Illinois 60604. When so notified, the Clerk of the Court will obtain a prompt hearing date from the court and will provide the necessary forms that must be prepared by the judgment debtor or the attorney for the judgment debtor and sent to the judgment creditor and the judgment creditor's attorney regarding the time and location of the hearing.

## PROOF OF SERVICE

_____ declares under penalty of perjury under the laws of the United States of America that the information declared in the Proof of Service is true and correct:

I am over 21 years of age and not a party to this case. I served this Citation to Discover Assets at the date and place specified below as follows:

_____

_____

_____

Signed and Sworn by the Party Making Service

_____

Date

## RIDER A

Dexia Crédit Local ("Dexia") hereby requests that the following documents be produced for inspection and copying.

## INSTRUCTIONS AND DEFINITIONS

1.    The following definitions apply to all requests:

a.    The term **"documents (written or electronic)"** is used in the broadest sense and shall include all items, including, but not limited to: calendars, records, bills, invoices, correspondence, memoranda, writings of any kind, drawings, and notes, and shall include the original and each non-identical copy or draft thereof. The term "document" shall also include every other means by which information is recorded or transmitted, including but not limited to: electronic mail, tape recordings, video recordings, microfilms, punch cards, computer magnetic tape, computer disks, computer programs, storage tapes, printouts, data processing records, and the written information necessary to understand and use such information. Information maintained in electronic form shall be produced in electronic form.

b.    **"Relating to," "relate to,"** and/or **"concerning"** include describing, discussing, reflecting, constituting, evidencing, referring to, concerning, involving, memorializing, dealing with, and bearing on (whether factually, legally, or otherwise).

c.    **"Communication"** includes all forms of transmission of information, whether oral or in writing or through some other medium.

d.    **"Control"** means the possession, whether direct or indirect, or in concert with one or more other persons, of the power to direct or cause the direction of the management or policies of an entity through, inter alia, membership, board representation, an

ownership interest (by vote or value) equal to or greater than 50 percent, voting agreements, agency agreements, trusts, or power of attorney.

      e.    "Correspondence" means and refers to any documents, or copies or drafts thereof, sent or received by anyone.

      f.    "You" or "Your" means Judith Rogan, any corporations, partnerships, or other entities that You Control, manage, are employed by, or in which You have an ownership interest, any foreign or domestic trusts for which you are a Settlor, Trustee or beneficiary, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on Your behalf.

    2.    The following rules of construction apply to all discovery requests:

      a.    "And" and "or" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the interrogatory all information which might otherwise be construed to be outside its scope.

      b.    The use of the singular form of any word includes the plural and vice versa.

    3.    These document requests call for the production of all responsive documents in Your possession, custody, or control, without regard to the physical location of such documents. This includes, but is not limited to, all responsive documents contained in Your general archive, chronological, or other files, as well as in all files of specific personnel who may be in possession of responsive documents.

    4.    If any portion of a document is responsive to any request, the entire document should be produced.

2

5.      If You are unable to answer or respond fully to any document request, answer or respond to the extent possible and specify the reasons for Your inability to answer or respond in full.

6.      If the documents that You produce have been removed from files in which they are normally kept for the purpose of making production, please describe each storage file. Further, documents shall be produced in such fashion as to identify the department, branch, or office in whose possession they were located and, where applicable, the person in whose possession they were found and the business address of each document's custodian(s).

7.      If any document was, but is no longer, in Your possession or subject to Your control, state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to another location; or (d) has been otherwise disposed of. In each instance, explain the circumstances surrounding the disposition and state the date or approximate date thereof.

8.      If any document is withheld, in whole or in part, for any reason, including but not limited to, any claim of privilege, whether work-product or attorney-client, confidentiality or trade secret, set forth separately with respect to each such document: (a) the nature of the privilege or ground of confidentiality claimed; (b) the type of document; (c) the length of the document; (d) the authors of the document; (e) the addressees of the document; (f) all persons who received copies of the document; (g) the date of the document; and (h) the general subject matter of the document.

9.      Unless a specific request indicates otherwise, the time period covered by these document requests includes the period from **January 1, 2004 through the present.**

3

10.    These document requests are to be regarded as continuing in nature. You are requested to provide, by way of supplementary responses, such additional documents and things as may hereafter be obtained by You pursuant to Federal Rule of Civil Procedure 26(e).

## DOCUMENT REQUESTS

1. All Documents (written or electronic) relating to Your assets and liabilities, including but not limited to:

- tax returns and filings (foreign, federal, state, and municipal), including but not limited to all W-2s, Form 1099s, Form 1044s, Forms 3520 and 3520A, K-1s, gift tax filings, work papers and accompanying schedules.

- property leases;

- mortgages, loan agreements, and other credit instruments;

- credit and/or debit card statements;

- insurance policies;

- indemnification agreements;

- agreements or other documents evidencing Your management, ownership (whether in whole or in part), or Control of any entity;

- financial statements, including but not limited to balance sheets, general ledgers, cash receipts journals, cash disbursement journals, statements of cash flows, and any reports of any auditors or accountants concerning any such financial statements, bank statements, and statements concerning any form of investment.

- saving account statements;

- checking account statements;

- check registers;

- Treasury Forms TD F 90-22.1 (Report of Foreign Bank and Financial Accounts)

- certificates of deposit;

4

- safety deposit boxes (inventories and records of access);

- real property;

- cooperative shares;

- savings certificates;

- U.S. savings bonds;

- Treasury bills/bonds;

- municipal bonds;

- annuities;

- brokerage accounts (e.g., stock, commodities, etc.)

- mutual funds;

- domestic or foreign trusts for which You are a Settlor, beneficiary or Trustee;

- business and personal credit, charge, and/or debit card statements;

- copies of any debit or credit card in your possession, custody or control;

- boats;

- airplanes;

- automobiles or other motorized vehicles; and

- notes payable and receivable.

2.  All Documents (written or electronic) sufficient to identify any transfer of funds or assets (directly or indirectly), including without limitation, cash, between the individuals and entities listed on Rider B and You, including, without limitation, invoices; bills; payments; loans; investments; repayments of investments or loans; communications; emails; meetings; telephone records; telephone messages; memos; discussions; correspondence; files; or

5

any agreements or understandings; checks; bank statements; profit statements; reports; work plans; and/or analysis.

       3.  All Documents (written or electronic) sufficient to identify any transfer of funds or assets (directly or indirectly), including without limitation, cash, between or among the individuals and entities listed on Rider B, including, without limitation, invoices; bills; payments; loans; investments; repayments of investments or loans; communications; emails; meetings; telephone records; telephone messages; memos; discussions; correspondence; files; or any agreements or understandings; checks; bank statements; profit statements; reports; work plans; and/or analysis.

       4.  In the event that You have any Documents responsive to paragraphs 2 and 3 of this subpoena, provide any and all documents sufficient to identify the purposes for which any relevant transactions occurred. This should include, but not be limited to, general and subsidiary ledgers, general and subsidiary journals, W-2's, 1099's, tax reporting materials, loan agreements, statements of account, correspondence, memoranda, notes, and accounting materials.

       5.  All Documents (written or electronic) sufficient to identify any direct or indirect ownership or Control exercised by Peter G. Rogan, Judith K. Rogan, Robert C. Rogan, Brian P. Rogan or Sara C. Rogan over the entities and individuals listed on Rider B.

       6.  All Communications, Correspondence, or agreements between or among You, any individual or entity on Rider B, and Oceanic Bank and Trust, Ltd. (Bahamas).

       7.  All Communications, Correspondence, or agreements between or among You, any individual or entity on Rider B, and T Protection, Ltd. (BVI).

       8.  All Communications, Correspondence, or agreements between or among You, any individual or entity on Rider B, and J.S. Archibald & Co. (BVI).

6

9.  All Communications, Correspondence, or agreements between or among You, any individual or entity on Rider B, and Higgs and Johnson.

10. All Communications, Correspondence, or agreements between or among You, any individual or entity on Rider B, and Belize Bank.

11. A copy of Your calendar (written or electronic) for the period January 1, 2004 through the present.

12. A copy of Your (written or electronic) address book, contacts list, or other list of names/addresses/phone numbers that You maintain for personal and/or business purposes for the period January 1, 2004 through the present.

13. A copy of Your current passport, including all visas and related Documents.

14. A copy of any and all applications or other documents related to applications for temporary or permanent residency or citizenship in Canada and/or anywhere outside the United States.

15. Documents sufficient to show all Your travel via airplane or boat, including dates of travel and the departure and destination venues.

16. All Communications, Correspondence, or agreements between You and Fred Cuppy, Troy Myers, John Tatooles, or John Foley regarding any individual or entity on Rider B.

17. All billing records and records of payment relating to services that Harper Grey LLP has provided to You or any individual or entity on Rider B.

18. All billing records and records of payment relating to services that Hogan Marren, Ltd. has provided to You or any individual or entity on Rider B.

19. All billing records and records of payment relating to services that John Tatooles has provided to You or any individual or entity on Rider B.

7

20. All billing records and records of payment relating to services that John Foley has provided to You or any individual or entity on Rider B.

21. All billing records and records of payment relating to services that Burke Costanza & Cuppy LLP has provided to You or any individual or entity on Rider B.

22. All billing records and records of payment relating to services that Cohen & Thiros, P.C. has provided to You or any individual or entity on Rider B.

23. Documents sufficient to identify any law firms or attorneys, other than those identified in Requests No. 17-22, that have provided services for the benefit of You or any individual or entity on Rider B.

24. All billing records and records of payment relating to services provided by any law firm or attorney identified in the documents produced pursuant to Request No. 23.

8

## RIDER B

A.    **"410 Montgomery, LLC"** means 410 Montgomery, LLC and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

B.    **"AMTR Services Corp. (BVI)"** means AMTR Services Corp. (BVI) and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

C.    **"Bainbridge"** means Bainbridge Management, Inc. and Bainbridge Management L.P., their predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf.

D.    **"BFB Ltd."** means BFB Ltd. and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

E.    **"Belize Bank"** means Belize Bank, 60 Market Square, Belize City, Belize, and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

F.    **"Boulevard Investors LLC"** means Boulevard Investors LLC and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys,

subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest..

      G.     "Boulevard Investors, Ltd." means Boulevard Investors, Ltd. and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

      H.     "Boulevard Management, Inc." means Boulevard Management, Inc. and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf.

      I.     "Boulevard Management, Ltd." means Boulevard Management, Ltd. and its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf.

      J.     "Braddock" means Braddock Management, Inc. and Braddock Management, L.P., their predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf.

      K.     "Burke Costanza & Cuppy LLP" means Burke Costanza & Cuppy LLP, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on their behalf.

      L.     "Caribe Trustees, Ltd." means Caribe Trustees, Ltd., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries,

2

affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

M.    **CFMT Ltd. (Belize)** means CFMT Ltd. (Belize) its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

N.    **"CFMT of FLA, LLC"** means CFMT of FLA, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

O.    **"The Commons at Wilmington Island"** means The Commons at Wilmington Island, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest..

P.    **"CST of FLA, LLC"** means CST of FLA, LLC, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

3

Q.     "**Fred Cuppy**" means Frederick Cuppy, and any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, is a trustee, or in which he has an ownership interest, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on his behalf and any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, or in which it has an ownership interest.

R.     "**DAI, Inc.**" means DAI, Inc., its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

S.     "**Darby Bank and Trust Company**" means Darby Bank and Trust Company, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

T.     "**Delta Harbor Plantation**" means Delta Harbor Plantation, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

U.     "**Dynamic Alliance, Inc.**" means Dynamic Alliance, Inc., its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

4

V.    **"EPC"** means Edgewater Property Company, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

W.    **"Gardens Development Co., LLC"** means Gardens Development Co., LLC, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

X.    **"Gardens on Jones, LLC"** means The Gardens on Jones, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

Y.    **"Health Care Management, LLC"** means Health Care Management, LLC its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

Z.    **"Healthco Family Nursing Services, LLC"** means Healthco Family Nursing Services, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

AA.    **"HHC Corporation (BVI)"** means HHC Corporation (BVI), its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

BB.    **"Higgs and Johnson"** means Higgs and Johnson, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

CC.    **"Hoover Creek Plantation Partners, LLC"** means Hoover Creek Plantation Partners, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

DD.    **"Hoover Creek Condo Partners, LLC"** means Hoover Creek Condo Partners, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

EE.    **"Hoover Creek Partners, LLC"** means Hoover Creek Partners, LLC its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest..

6

**FF.** **"Jones Square"** means Jones Square, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

**GG.** **"JKR Business"** means JKR Business, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

**HH.** **"J.S. Archibald and Co." (BVI)"** means J.S. Archibald, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

**II.** **"McCorkle, Pedigo and Johnson LLP"** means McCorkle, Pedigo and Johnson LLP, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys and anyone acting or purporting to act on its behalf.

**JJ.** **"Myers"** means Troy Myers, and any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, is a trustee, or in which he has an ownership interest, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on his behalf and any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, or in which it has an ownership interest.

**KK.** **"MWUC Limited"** means MWUC Limited, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

7

LL.   "New World Trustees, Ltd." means New World Trustees, Ltd. New World Trustees, Ltd., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

MM.   "Oceanic Bank and Trust Ltd. (Bahamas)" means " Oceanic Bank and Trust Company (Bahamas), its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

NN.   Palmetto Commons Partners, LLC" means Palmetto Commons Partners, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

OO.   "PGR" means PGR Properties, Inc., its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

PP.   "PGR Business" means PGR Business, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

QQ.   "Ponce Inlet, LLC" means Ponce Inlet LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

8

**RR.** **"PPR GmbH"** means PPR GmbH, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

**SS.** **"Premier Center, LLC"** means Premier Center, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

**TT.** **"Brian P. Rogan"** means Brian P. Rogan (Social Security #▮▮▮▮▮▮▮▮) and any employees, agents, attorneys, or anyone acting or purporting to act on his behalf.

**UU.** **"Brian Peter Rogan Trust"** means the Brian Peter Rogan Trust (FEIN ▮▮▮▮▮▮▮▮) and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

**VV.** **"Brian Peter Rogan Trust (002) (Belize)"** means the Brian Peter Rogan Trust (002) (Belize) (FEIN ▮▮▮▮▮▮▮) and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

**WW.** **"Judith K. Rogan"** means Judith K. Rogan (Social Security #▮▮▮▮▮▮▮▮) and her, parents, grandparents, siblings, children, grandchildren, any corporations, partnerships, trusts, or other entities that she Controls, manages, is employed by, is a trustee , or in which she has an ownership interest, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on her behalf..

9

XX.    "**Judith K. Rogan Revocable Trust**" means Judith K. Rogan Revocable Trust and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

YY.    "**Peter G. Rogan Irrevocable Trust**" means the Peter Rogan Irrevocable Trust and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

ZZ.    "**Peter G. Rogan Revocable Trust**" means the Peter Rogan Revocable Trust and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

AAA.    "**Peter G. Rogan**" means Peter G. Rogan (Social Security #⬛⬛⬛⬛⬛⬛), his spouse, parents, grandparents, siblings, children, grandchildren, any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, is a trustee , or in which he has an ownership or beneficial interest, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on his behalf.

BBB.    "**Robert C. Rogan**" means Robert C. Rogan (Social Security #⬛⬛⬛⬛⬛⬛) and any employees, agents, attorneys, or anyone acting or purporting to act on his behalf.

CCC.    "**Robert Cashman Rogan Trust**" means the Robert Cashman Rogan Trust (FEIN # 35-6568917) and its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

DDD.  "Robert Cashman Rogan Trust (002) (Belize)" means the Robert Cashman Rogan Trust (002) (Belize) (FEIN # ██████████) its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

EEE.  "Sara Caitlin Rogan" means Sara Caitlin Rogan (Social Security # ██████████) and any employees, agents, attorneys, or anyone acting or purporting to act on her behalf.

FFF.  "Sara Caitlin Rogan Trust" means the Sara Caitlin Rogan Trust (FEIN # ██████████) its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

GGG.  "Sara Caitlin Rogan Trust (002) (Belize)" means the Sara Caitlin Rogan Trust (002) (Belize) (FEIN # ██████████) its trustees, officers, directors, employees, agents, attorneys, or anyone acting or purporting to act on its behalf, and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

HHH.  "RPP Finance, Ltd." means RPP Finance, Ltd., its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

11

III.    **"RPP Finance Trust"** means RPP Finance Trust dated March 8, 1995, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

JJJ.    **"Seal Wrap Systems, LLC"** means Seal Wrap Systems, LLC, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

KKK.    **"Sheridan Investment Properties, LLC"** means Sheridan Investment Properties, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

LLL.    **"Side Gardens"** means Side Gardens, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

MMM.    **"T Protection Ltd. (BVI)"** means T Protection Ltd. (BVI), its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations,

partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

     **NNN.    Taylor Row, LLC"** means Taylor Row, LLC, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

     **OOO.    "Walnut Hills, LLC"** means Walnut Hills, LLC, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

     **PPP.    "Jerry Whitlow"** means Jerry Whitlow, his spouse, any corporations, partnerships, trusts, or other entities that he Controls, manages, is employed by, is a trustee or in which he has an ownership interest, and any employees, agents, attorneys, consultants, accountants or anyone acting or purporting to act on his behalf.

     **QQQ.    "Whitlow Construction"** means Whitlow Construction, its predecessors in interest, successors in interest, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf.

     **RRR.    "Wilmington Condo Commons, LLC"** means Wilmington Condo Commons, LLC, its predecessors in interest, successors in interest, trustees, officers, directors, employees, agents, attorneys, subsidiaries, affiliates and anyone acting or purporting to act on its behalf and any corporations, partnerships, trusts, or other entities that it Controls, manages, is employed by, or in which it has an ownership interest.

13

**EXHIBIT Z**

**CONFIDENTIAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DEXIA CREDIT LOCAL, f/k/a Dexia<br>Public Finance Bank and Credit Local de France )<br><br>Plaintiff, )<br>v. )<br><br>PETER G. ROGAN, et al. )<br><br>Defendants. )<br>_____ )<br>EDGEWATER PROPERTY COMPANY )<br>and PGR PROPERTIES, INC., )<br><br>Counterplaintiffs, )<br>v. )<br><br>DEXIA CREDIT LOCAL, )<br><br>Counterdefendant. ) | No. 02 C 8288<br><br>Honorable Mark Filip<br><br>Mag. Judge Sidney I. Schenkier |

### PETER ROGAN'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF DEXIA CREDIT LOCAL'S FIRST SET OF INTERROGATORIES

Defendant Peter Rogan ("Rogan") hereby responds to Interrogatories Nos. 1, 2, 3, 7, 8 and 9 of Plaintiff Dexia Credit Local's ("Dexia's") First Set of Interrogatories as follows:

### GENERAL OBJECTIONS TO INTERROGATORIES

1.    Rogan objects generally to these interrogatories to the extent that they call for documents protected by the attorney-client privilege and/or the work product doctrine or any other available privileges and protections.

CONFIDENTIAL

| ▆▆▆▆▆▆ for Peter G. Rogan Revocable Trust | Scudder Investments (formerly known as Zurich) | $30,591.92 as of 1/31/04 |
|---|---|---|
| ▆▆▆▆▆▆ Peter G. Rogan Revocable Trust | Bank One, NA Indiana Market PO Box 260180 Baton Rouge, LA 70826 | $8,470.65 as of 12/31/03 |
| ▆▆▆▆▆▆ previously ▆▆▆▆▆▆ | Howe Barnes Investments, Inc. 135 LaSalle Street, Suite 1500 Chicago, IL 60603 | $0.00 as of 2/28/03 |
| ▆▆▆▆▆▆ | US Bank POB1800 ST. Paul, MN 55101 | $5,434 as of 3/31/04 |

Rogan and/or members of his family at various times may have held accounts at the following institutions: Northern Trust Money Market; U.S. Bank; Bear Stearns; Oceanic Bank and Trust; Merrill Lynch; Bank of America; T.D. Waterhouse; and First National Bank of Valparaiso.

Further, pursuant to Fed. R. Civ. P. 33(d) Rogan responds by stating that the information requested in this Interrogatory may be obtained by examining the documents produced.

2. List all of Your assets and liabilities, with a description of each asset or liability and its actual or estimated value as of the present date, including but not limited to any asset, whether liquid or not, held outside the country; any asset or property held in the name of a member of the Rogan Family; and any asset held in another person's name for which You possess any interest. This includes, but is not limited to, all real property owned by You or in which You had any legal or beneficial interest, or any options to purchase property or deposits placed on property by You.

RESPONSE: Rogan incorporates by reference his General Objections. Rogan objects to this request as overly broad and not reasonably calculated to lead to the discovery of relevant evidence to the extent that the requests seek information pertaining to the Rogan Family. Rogan further objects to this request as vague to the extent the terms "for which You possess any interest" are unclear and overly broad. Further, Rogan designates the following schedule as responsive:

CONFIDENTIAL

(7)    The foregoing Personal Financial Statement includes assets owned by the Peter G. Rogan Revocable Trust dated 9/8/1988.

Subject to these objections, Rogan further states as follows:

Rogan states that he does not possess knowledge of all of Judith Rogan's assets or financial affairs, nor does he posses control over them. Rogan states that she owns the residence at 476 Wexford Road, Valparaiso, IN, a condominium at 55 E. Erie, Chicago, IL, land in Longboat Key, FL and various automobiles. She files tax returns separately and independently of Rogan, and has done so for approximately the last 10 years.

Rogan states that he does not possess knowledge of, nor control over, Robert C. Rogan's assets or financial affairs. Robert Rogan has been managing his financial affairs and investing independently for at least the last five years. He files tax returns separately and independently of Rogan, and has done so for approximately the last 10 years.

Rogan states that he does not possess knowledge of, nor control over, Brian P. Rogan's assets or financial affairs. Brian Rogan has been working and managing his financial affairs independently of Rogan. He files tax returns separately and independently of Rogan, and has done so for approximately the last 10 years.

With the exception of knowledge of the existence of a Bank of America account, Rogan states that he does not possess knowledge of, nor control over, Sara C. Rogan's assets or financial affairs. She is a college student, and she files tax returns separately and independently of Rogan, and has done so for approximately the last 10 years.

Rogan further states that he does not possess knowledge of, nor control over, the assets of the trusts in the names of his children, or the insurance trust in his name. Rogan is not the trustee of any of these trusts.

8

**EXHIBIT AA**

**EMBARKATION LAW GROUP**
Immigration and Citizenship Lawyers

Receipt (T 07-267 )

June 22, 2007

From:    Judith Rogan

Amount: Two thousand.............................................................xx/100 Dollars $2000

For: CDN Trust                                    File #

Cash

Received by:

Catherine Oliver

Lawyers

Darryl W. Larson
Joshua B. Sohn
Adrian D. Huzel
Negar Azmudeh
Saba Z. Naqvi*

* also a member of the
  State Bar of California

P.O. Box 26
Princess  Building
6th Floor
609 W. Hastings St.
Vancouver        BC
Canada   V6B 4W4

Tel: 604.662.7404
Fax:604.662.7466
www.elgcanada.com

**JR000760**

**EXHIBIT BB**

REPORT NUMBER: R09263
SOURCE PROGRAM: B16423
498: D62JM237A

WIRE PURCHASED CONFIRMATION REPORT
FOR FUND    11 DEPOSIT #
16:00  TRANSMISSION ON 09/02/2005

SUPER SHEET DATE: 09/02/2005
CURRENT DATE: 09/02/2005
PAGE: 5
TIME: 16:03:50

| WIRE TIME | MONEY/NET REP NUM | WIRE AMOUNT | ACCOUNT NUMBER | WIRE TEXT |
|---|---|---|---|---|
| 15:50 | 050902006178 | $499,988.00 | | O SND=<br>RCV=<br>BBK= SCUDDER GOVERNMENT MONEY FUND*ACCOUNT NO. 980-916-2934*<br>BNF= SMITH BOGAN REVOCABLE TRUST*RFB= SWF OF 05/09/02*<br>DNF= ACCOUNT NO:<br>ORG= *AND<br>OGB= OCEANIC BANK AND TRUST LTD.*P.O. BOX 8220*NASSAU BAHAMAS*<br>BBI= UNITED MISSOURI BK OF KANSAS CPITY MA 10TH AND GRAND KANSAS CITY*<br>MO 64105* |

JPMORGAN CHASE BANK=
UMB BANK, N.A.TYP= FED*

11/103152l6

US DAM 000000133
SEP-02-2005  17:00

NOV-03-2005  17:18                                              P.01/01

WIRE PURCHASES CONFIRMATION REPORT
FOR FUND        T1  DEPOSIT #
16:30   TRANSMISSION ON 11/03/2005

PAGE: 2
SUPER BNK'S DATE: 11/03/2005
CURRENT DATE: 11/03/2005
TIME: 16:13:13

REPORT NUMBER: R0923S
SOURCE PROGRAM: 815473
JOB: 0420237A

| WIRE TYPE | MONEYNET REF NBR | USBE AMOUNT | ACCOUNT NUMBER | WIRE TEXT |
|-----------|------------------|-------------|----------------|-----------|
| 16:14 | 031103005769 | $1,499,988.00 | | 0 SND= ▮▮▮▮▮▮▮▮ JPMORGAN CHASE BANK▮NY▮ |
| | | | | RCV= ▮▮▮▮▮▮▮ UMB BANK, N.A.ITY= FED▮ |
| | | | | BNF= UNITED MISSOURI BANK OF KANSAS▮CITY, N.A. 10TR AND SENDR▮ |
| | | | | KANSAS CITY, MO ▮▮▮▮ANSA MO▮ |
| | | | | BNF= 00001165294▮4▮ORDER MOVEMENT MONEY FUN▮REF▮ SHF OF 05/11/05▮ |
| | | | | ORG= ▮▮▮▮▮00▮ OCEANIC BANK AND TRUST LTD.▮P.O. BOX 8020▮NASSAU BAHAMAS▮ |
| | | | | OBI= FFC: JUDITH ROMAN REVOCABLE TRUST▮ACCOUNT NO: ▮▮▮▮▮▮▮▮ |

TOTAL DEPOSIT AMOUNT        $1,527,605.76

NUMBER OF WIRES     2

US DAM 000000132

JAN 30 2007 16:27 FR DEUTSCHE BANK    212 454 6101 TO 913128863501    P.03

MAR-10-2     09:55      DST SYSTEMS                                    P.01/01



** TOTAL PAGE.03 **

US BANK 603000003

JAN 30 2007 16:27 FR DEUTSCHE BANK 212 454 6101 TO 913128863501 P.02

NOV-07-2006 10:55 DST SYSTEMS INC. P.01/01

11 - 10315214

US DAM 000000002

**EXHIBIT CC**

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4
 5   DEXIA CREDIT LOCAL, f/k/a Dexia  )
     Public Finance Bank and Credit   )
 6   Local de France,            )
                                 )
 7         Plaintiff,            )
                                 )
 8   vs.                         ) No. 02 C 8288
                                 )
 9   PETER G. ROGAN; et al.,     )
                                 )
10         Defendant.            )
     _____)
11
12
13
14
15    VIDEOTAPED DEPOSITION OF ROBERT ROGAN
16            Los Angeles, California
17          Thursday, September 1, 2005
18
19
20
21
22
23
     Reported by:
24   REBECCA CORRAL
     CSR No. 7021
25   Job No. 913319
```

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4
 5   DEXIA CREDIT LOCAL, f/k/a Dexia  )
     Public Finance Bank and Credit   )
 6   Local de France,            )
                                 )
 7         Plaintiff,            )
                                 )
 8   vs.                         ) No. 02 C 8288
                                 )
 9   PETER G. ROGAN; et al.,     )
                                 )
10         Defendant.            )
     _____)
11
12
13
14
15        Videotaped Deposition of ROBERT
16   ROGAN, taken on behalf of Plaintiff, at
17   555 W. 5th Street, 40th Floor, Los
18   Angeles, California, beginning at 10:00
19   a.m. and ending at 2:18 p.m. on
20   Thursday, September 1, 2005, before
21   REBECCA CORRAL, Certified Shorthand
22   Reporter No. 7021.
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4      SIDLEY, AUSTIN, BROWN & WOOD LLP
        BY:  ERIC S. PRUITT and SCOTT T. MENDELOFF
 5      Attorneys at Law
        10 S. Dearborn Street
 6      Chicago, Illinois 60603
        (312) 853-1093
 7
     For Third Party Witness Robert Rogan:
 8
        HAHN & HAHN
 9      BY:  LAURA V. FARBER
        Attorney at Law
10      301 E. Colorado Boulevard, 9th Floor
        Pasadena, CA  91101-1977
11      (626) 796-9123
12   Also Present:
13      Peter Rogan
14      ESQUIRE DEPOSITION SERVICES
        Peter Messenger, videographer
15      6222 Wilshire Boulevard, Suite 204
        Los Angeles, California 90048
16      (323) 938-2461
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   INDEX
 2   WITNESS:                    EXAMINATION
 3   ROBERT ROGAN
 4
 5   BY MR. PRUITT                    6
 6
 7
 8               EXHIBITS
 9   PLAINTIFF'S
10   109  U.S. Bank Statement for Robert C. Rogan   49
11   110  Tax Return Information for            61
          Robert C. Rogan
12
     111  Trust Agreement for Robert Cashman Rogan   83
13        Trust
14   112  Transfer of Situs of Trust and Designation  87
          of Special Trustee
15
     113  Deed of Settlement dated 6-10-97       98
16
     114  Check for $150,000 payable to         126
17        Robert C. Rogan
18   115  Letter dated 2-4-99 to Mr. Cuppy from   132
          Mr. Scott Gross
19
     PREVIOUSLY MARKED
20
     68   Letter dated 8-31-04 to Mr. Holmen from   102
21        Mr. Myers with attachments
22
23            INFORMATION REQUESTED
24                 (None)
25
```

1  existence of bank or investment accounts held by the
2  trust?
3      A  No.
4      Q  Have you ever seen any account documents
13:20:42  5  relating to banking or investment accounts held by the
6  trust?
7      A  Yes.
8      Q  When did you see those?
9      A  In the statement of assets.
13:20:52 10     Q  So I understand, were there account statements
11  attached to or included with this statement of assets?
12     A  No.
13     Q  Okay.  Was there information regarding the
14  existence of bank or investment accounts contained in
13:21:08 15  the statement of assets?
16     A  Yes.
17     Q  Do you have any recollection regarding specific
18  bank or investment accounts held by the trust?
19     A  No.
13:21:24 20     Q  Other than this information contained in the
21  statement of assets, have you ever seen any actual
22  account statements for an account held by the trust?
23     A  No.
24     Q  Do you have any knowledge regarding who has the
13:21:42 25  ability to deposit or withdraw money from accounts held

93

1  by the trust?
2      A  No.
3      Q  Okay.  Do you have any knowledge regarding the
4  Florida Trust having an ownership interest in any
13:21:54  5  businesses?
6          MS. FARBER:  Objection.  What's the Florida
7  Trust?
8          MR. PRUITT:  I'm sorry.  I am going to -- I
9  will refer to the Robert Rogan Trust as the Florida
13:22:02 10  Trust, as well.
11         MS. FARBER:  Okay.  Because I didn't know --
12         MR. PRUITT:  No, I am sorry, I skipped -- I
13  pulled that out of nowhere.  You are right to point that
14  out.  I may refer to this as the Robert Rogan Trust or
13:22:14 15  the Florida Trust.  So you are clear, I am talking about
16  the same thing.  I will repeat the question.
17     Q  Do you have any knowledge regarding this
18  Florida Trust as having any ownership interest in any
19  businesses?
13:22:22 20     A  Yes.
21     Q  What's your understanding in that regard?
22     A  I am sorry, my understanding of --
23     Q  What knowledge do you have regarding the
24  Florida Trust ownership of any businesses?
13:22:36 25     A  I know that it owns a portion of PDR

94

1  Properties.
2      Q  How did you come to know that?
3      A  The statement of assets.
4      Q  Do you have any understanding as to what
13:22:56  5  percentage of PDR Properties is owned by the trust?
6      A  I don't recall.
7      Q  Other than PDR Properties, is there any other
8  businesses which you know the Florida Trust to own?
9      A  No.
13:23:06 10     Q  Are there any other businesses which you know
11  the Florida Trust to have owned in the past or had an
12  ownership interest in?
13     A  No.
14     Q  I am just going to ask you some specific
13:23:20 15  entities.  We'll try to go through them quickly.
16         Do you have any knowledge regarding the Florida
17  Trust having an ownership interest in a company called
18  Edgewater Operating Company?
19     A  No.
13:23:30 20     Q  Do you have any knowledge regarding the Florida
21  Trust having an ownership interest in a company called
22  Boulevard Management, LTD?
23     A  No.
24     Q  Okay.  Do you have any knowledge regarding --
13:23:38 25  is it fair to say that you have no knowledge regarding

95

1  the business or financial affairs of a company called
2  Boulevard Management, LTD?
3      A  I am sorry, so we just changed questions?
4      Q  We did.  I am sorry.
13:23:48  5      A  Could you just repeat that.
6      Q  I am sorry.  Was it your testimony that you
7  have no knowledge of the Florida Trust having an
8  ownership interest in a company called Boulevard
9  Management, LTD?
13:24:00 10     A  Yes.  I have no knowledge.
11     Q  Is it fair to say, then, that you have no
12  knowledge regarding the business or financial affairs of
13  an entity called Boulevard Management, LTD?
14     A  I have no knowledge.
13:24:10 15     Q  Okay.  Do you have any knowledge regarding
16  Boulevard Management, LTD having an ownership interest
17  in a company called Braddock Management, LP?
18     A  No.
19     Q  Do you have any knowledge regarding the
13:24:22 20  business or financial affairs of a company called
21  Braddock Management, LP?
22     A  I know that it exists.
23     Q  Do you know anything else about Braddock
24  Management, LP beyond its existence?
13:24:32 25     A  No.

96

1    Q  Do you have any knowledge regarding the Florida
2    Trust having an ownership interest in an entity called
3    Gardens on Jones?
4    A  No.
13:24:48  5    Q  Is it fair to say that you have no knowledge
6    regarding the business or financial affairs of an entity
7    called Gardens On Jones?
8    A  I have no knowledge.
9    Q  Do you have any knowledge regarding the Florida
13:24:58  10    Trust having an ownership interest in a company called
11    Taylor Row, LLC?
12    A  I am getting twisted in the question format, so
13    I have no knowledge of this -- is that an appropriate --
14    Q  Of the Florida Trust having an ownership
13:25:12  15    interest in a company called Taylor Row, LLC?
16    A  I have no knowledge of that.
17    Q  Have you ever heard of a company called Taylor
18    Row, LLC?
19    A  No.
13:25:18  20    Q  Is it fair to say, then, that you have no
21    knowledge regarding the business or financial affairs of
22    a company called Taylor Row, LLC?
23    A  I have no knowledge.
24    Q  Do you have any knowledge regarding the Florida
13:25:28  25    Trust having an ownership interest in a company called

97

1    Walnut Hills, LLC?
2    A  No.
3    Q  Is it fair to say that you have no knowledge
4    regarding the business or financial affairs of Walnut
5    Hills, LLC?
6    A  I have no knowledge.
7    Q  Have you ever heard of a company called Walnut
8    Hills, LLC?
9    A  No.
13:25:48  10    Q  Mr. Rogan, other than the Florida Trust that we
11    have been discussing, are you aware of being the
12    beneficiary for any other trust?
13    A  No.
14    MR. PRUITT: I will hand to the witness a
13:26:10  15    document bearing Bates No. BI 1842 through 1870,
16    described as -- on page BI 1844 as the Deed of
17    Settlement for the Benefit of Robert Cashman Rogan,
18    parentheses, Trust, 002. Ask that it be marked
19    Exhibit 112 -- 113, excuse me.
20    (Plaintiff's Exhibit 113 was marked for
21    identification by the court reporter.)
22    MR. PRUITT: Just take a moment, again, to look
23    at the document, familiarize yourself with it, and I
24    will have some similar questions.
13:27:34  25    Q  Mr. Rogan, have you ever seen this document

98

1    before?
2    A  No.
3    Q  Mr. Rogan, has anyone ever told you that you
4    are the beneficiary of a trust organized in the country
13:27:44  5    of Belize?
6    A  No.
7    Q  Is it fair to say, then, that you have no
8    knowledge regarding the financial affairs of what I will
9    call the Belize Trust?
13:28:00  10    A  I have no knowledge.
11    Q  I will ask a series of questions now very
12    similar to the ones we just went through.
13    Do you have any knowledge regarding who handles
14    the financial affairs of this Belize Trust?
13:28:14  15    A  No.
16    Q  Do you have any knowledge regarding the
17    existence of bank or investment accounts held by this
18    Belize Trust?
19    A  No.
13:28:22  20    Q  Do you have any knowledge, then, regarding who
21    has the ability to deposit or withdraw money from the
22    trust accounts?
23    A  No.
24    Q  Do you have any knowledge regarding this Belize
13:28:40  25    Trust having any ownership interest in any companies or

99

1    businesses?
2    A  No.
3    Q  Is it fair to say, then, that you have no
4    knowledge regarding the Belize Trust having an ownership
13:28:50  5    interest in a company called Boulevard Investors, LTD?
6    A  I have no knowledge.
7    Q  Have you ever heard of a company called
8    Boulevard Investors, LTD?
9    MS. FARBER: Did you already ask these
13:29:02  10    questions or are you asking different?
11    MR. PRUITT: Well, I don't know if I asked it
12    in connection with -- there are two companies named
13    Boulevard Investors. That's where some of the confusion
14    lies, I think.
15    MS. FARBER: Okay.
16    Go ahead and answer.
17    THE WITNESS: The answer is no.
18    BY MR. PRUITT:
19    Q  Okay. Do you have any knowledge regarding the
13:29:20  20    Belize Trust having an ownership interest in a company
21    called Bainbridge Management?
22    A  No.
23    Q  Have you ever heard of Bainbridge Management?
24    A  Yes.
13:29:30  25    Q  Do you have any understanding as to what

100

25

BRIAN PETER ROGAN    AUGUST 15, 2005

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4
5    DEXIA CREDIT LOCAL, f/k/a DEXIA    )
6    PUBLIC FINANCE BANK, and CREDIT    )
7    LOCAL de FRANCE,    ) No. 02 C 8288
8         Plaintiffs,    )
9    -vs-    )
10    PETER C. ROGAN,    )
11         Defendant.    )
12
13         The deposition of BRIAN PETER ROGAN,
14    called for examination, taken pursuant to the
15    Federal Rules of Civil Procedure of the United
16    States District Courts pertaining to the taking of
17    depositions, taken before ANNE E. FOGARTY, a Notary
18    Public within and for the County of Cook, State of
19    Illinois, and a Certified Shorthand Reporter, CSR
20    No. 84-3870, of said state, at Suite 5500, Bank One
21    Plaza, 10 South Dearborn Street, Chicago, Illinois,
22    on the 15th day of August, A.D. 2005, at 10:10 a.m.
23
24

**Page 2**

1    PRESENT:
2    SIDLEY AUSTIN BROWN & WOOD, LLP,
3    (Bank One Plaza, 10 South Dearborn Street,
4    Chicago, Illinois 60603,
5    312-853-7000), by:
6    MR. ERIC S. PRUITT and
7    MR. SCOTT T. MENDELOFF,
8         appeared on behalf of the
9         Dexia Plaintiffs;
10    WINSTON & STRAWN,
11    (35 West Wacker Drive,
12    Chicago, Illinois 60601,
13    312-558-5600), by:
14    MR. NEIL H. HOLMEN,
15         appeared on behalf of the Defendant;
16    O'ROURKE KATTEN & MOODY,
17    (161 North Clark Street, Suite 2230,
18    Chicago, Illinois 60601,
19    312-849-2020), by:
20    MR. MICHAEL J. O'ROURKE,
21         appeared on behalf of the Deponent.
22    ALSO PRESENT:
23    MR. PETER C. ROGAN.
24    REPORTED BY: ANNE E. FOGARTY, CSR No. 84-3870.

**Page 3**

1         (WHEREUPON, the witness was duly
2    sworn.)
3         BRIAN PETER ROGAN,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6         EXAMINATION
7    BY MR. PRUITT:
8         Q.   Could you state your name and spell your
9    name for the court reporter.
10         A.   Brian Peter Rogan, B-r-i-a-n P-e-t-e-r
11    R-o-g-a-n.
12         Q.   This deposition was noticed as being
13    taken pursuant to the Federal Rules of Civil
14    Procedure. My name is Eric Pruitt. I'm an attorney
15    who represents the plaintiff Dexia Credit Local in
16    this action.
17         Have you ever given a deposition before?
18         A.   No.
19         MR. O'ROURKE:  Can I just, before we go on,
20    just a point I want to clear up. Is this deposition
21    just for this case or is it going to be for –
22         MR. MENDELOFF:  We don't intend on taking his
23    deposition again.
24         MR. O'ROURKE:  Okay, Scott. So we expect this

**Page 4**

1    will be it? I was just curious.
2         MR. HOLMEN:  We won't have to go through any
3    of the kids' depositions twice?
4         MR. MENDELOFF:  No.
5         MR. O'ROURKE:  All right. I'm sorry. Go
6    ahead.
7         MR. MENDELOFF:  Absent something
8    extraordinary.
9         MR. O'ROURKE:  Extraordinary. Okay.
10    BY MR. PRUITT:
11         Q.   I'm just going to explain a little bit
12    about what is going to happen to you today. I'm
13    going to ask you questions, which you'll have to
14    answer. Please wait for the entire question before
15    answering as it is difficult for the court reporter
16    to record two people talking at once.
17         If your counsel raises an objection, let
18    him raise the objection, but you're still required
19    to answer my question unless your counsel directs
20    you otherwise. If there is any question I ask that
21    you don't understand for any reason, please let me
22    know. Please let me know how it is confusing, and
23    I'll try to rephrase the question for you.
24         Without telling me anything regarding

1 (Pages 1 to 4)

BRIAN PETER ROGAN   AUGUST 15, 2005

Page 65

1  a quick look at this document. My first question
2  will be whether or not you've ever seen this
3  document before?
4      A.  No, I have never seen this document
5  before.
6      Q.  Mr. Rogan, have you ever discussed this
7  document with anyone?
8      A.  No.
9      Q.  So is it fair to say that prior to
10  seeing this document today you were not aware of any
11  transfer of the situs of the Brian Peter Rogan Trust
12  of December 31, 1992?
13      A.  Yes. I never knew of its existence.
14      Q.  So, Mr. Rogan, is it fair to say that
15  you have no knowledge regarding the financial
16  affairs of this trust?
17      MR. O'ROURKE:  Objection, Counsel. He said he
18  had no knowledge of the trust, never saw it before.
19  It is asked and answered.
20      MR. PRUITT:  Okay.
21  BY MR. PRUITT:
22      Q.  Go ahead and answer, Mr. Rogan.
23      A.  Can you repeat the question.
24      Q.  Is it fair to say that you have no

Page 66

1  knowledge regarding the financial affairs of this
2  trust?
3      A.  That is correct, I have no knowledge of
4  the financial affairs of the trust, yes.
5      Q.  Is it fair to say that you have no
6  knowledge regarding who handles the business affairs
7  of this trust?
8      MR. O'ROURKE:  Same objection. He's already
9  asked and answered that he has no knowledge of this
10  trust. Go ahead.
11  BY THE WITNESS:
12      A.  Can you repeat the question.
13  BY MR. PRUITT:
14      Q.  Sure. Is it fair to say that you have
15  no knowledge regarding who handles the business
16  affairs of this trust?
17      A.  Yes, it is fair to say that.
18      Q.  Mr. Rogan, is it fair to say you have no
19  knowledge regarding any ownership holdings of this
20  trust, whether it has interest in any corporation or
21  partnerships?
22      MR. O'ROURKE:  Same objection.
23  BY THE WITNESS:
24      A.  No, I don't know.

Page 67

1  BY MR. PRUITT:
2      Q.  Mr. Rogan, have you ever heard of a
3  company called Boulevard Management, LTD?
4      A.  No.
5      Q.  Mr. Rogan, have you ever heard of a
6  company called Edgewater Operating Company?
7      A.  No.
8      Q.  Mr. Rogan, have you ever heard of a
9  company called Braddock Management, LP?
10      A.  No.
11      Q.  Mr. Rogan, have you ever heard of a
12  company called Gardens on Jones?
13      A.  Yes.
14      Q.  What's your knowledge regarding Gardens
15  on Jones?
16      A.  It is an apartment complex.
17      Q.  What's the basis -- to your knowledge
18  where is this apartment complex located?
19      A.  I think in Savannah, Georgia.
20      Q.  How did you come to understand that this
21  apartment complex is in Savannah Georgia?
22      A.  I've seen it.
23      Q.  When did you see it?
24      A.  The first part of May of 2005.

Page 68

1      Q.  Was there anyone with you when you saw
2  the Gardens on Jones apartment complex?
3      A.  Yes.
4      Q.  Who was with you?
5      A.  Fred Cuppy was with me.
6      Q.  Was anyone else with you?
7      A.  I don't remember specifically, no. It
8  was a construction site, so physically there were
9  people there but I don't remember who else was
10  there.
11      Q.  How long were you in Savannah when you
12  went there in May of 2005?
13      A.  Three or four days.
14      Q.  Did anyone else accompany you to
15  Savannah, Georgia?
16      A.  No.
17      Q.  Was any other member of your family in
18  Savannah, Georgia, during this period in May
19  of 2005?
20      A.  No.
21      Q.  Was David Miller with you in Savannah --
22  strike that.
23      Was Troy Myers in Savannah in 2005?
24      A.  I don't know a gentleman by the name of

17 (Pages 65 to 68)

BRIAN PETER ROGAN   AUGUST 15, 2005

Page 129

BY MR. PRUITT:

1  BY MR. PRUITT:
2      Q.   Could you spell that?
3      A.   I don't know.
4          A couple by the name of the Zergots. 1
5  don't know how to spell that either.
6      Q.   That's fine.
7      A.   I've seen them with Fred Cuppy before.
8  You know, that's all off the top of my head.
9      Q.   Mr. Rogan, these people you just named,
10 Mr. DuChamps and his wife, are these the people
11 you've seen them with the most during the past
12 15 years?
13     A.   Those are people that I remember seeing
14 my parents with in the past 15 years.
15     Q.   Are there any other individuals that you
16 would see them with more regularly?
17     A.   I couldn't say.
18     Q.   Mr. Rogan, moving on to a new subject,
19 have you ever heard of a company called Walnut
20 Hills, LLC?
21     A.   No.
22     MR. O'ROURKE: I'm sorry, what was the name?
23     MR. PRUITT: Walnut Hills, LLC.
24     MR. O'ROURKE: I'm sorry. Thank you.

Page 130

1  BY MR. PRUITT:
2      Q.   Mr. Rogan, I previously -- strike that.
3          Mr. Rogan, are you aware of the
4  existence of any trusts set up in a foreign country
5  for which you are a beneficiary?
6      A.   No.
7      MR. PRUITT:  I hand to the witness a document
8  Bates numbered BI 1791 through BI 1841 entitled Deed
9  of Settlement dated June 10, 1997, between AMTR
10 Services Corp., a British Virgin Islands
11 Corporation, and Caribe Trustees Limited, a Belize
12 corporation.  This will be marked Deposition Exhibit
13 No. 107.
14         (WHEREUPON, a certain document was
15          marked Deposition Exhibit No. 107,
16          for identification, as of
17          08-15-2005.)
18 BY MR. PRUITT:
19     Q.   Mr. Rogan, if you want to just take a
20 quick look at that document.  My first question to
21 you is whether or not you've ever seen this
22 document?
23     A.   No, I have never seen this document.
24     MR. PRUITT: For the record, this document on

Page 131

1  the page Bates stamped BI 1793 is entitled The Deed
2  of Settlement for the Benefit of Brian Peter Rogan
3  (Trust 002).
4  BY MR. PRUITT:
5      Q.   Mr. Rogan, is it fair to say that you
6  have no knowledge regarding any of the financial
7  affairs of this trust?
8      A.   Yes.
9      Q.   Is it fair to say that you have no
10 knowledge regarding who handles the business and
11 financial affairs of this trust?
12     A.   Yes.
13     Q.   Is it fair to say you have no knowledge
14 regarding the existence of any bank or investment
15 accounts held by this trust?
16     A.   Yes.
17     Q.   Mr. Rogan, have you ever heard about the
18 existence of this trust prior to this moment in this
19 deposition?
20     A.   No.
21     Q.   Mr. Rogan, have you ever heard of a
22 corporation called Boulevard Investors, LTD?
23     A.   No.
24     Q.   Is it fair to say you have no knowledge

Page 132

1  regarding the business or financial affairs of
2  Boulevard Investors, LTD?
3      A.   Is it fair to say that I do not have?
4  Yes, it is fair to say that, yes.
5      Q.   Mr. Rogan, do you have any knowledge
6  regarding a company called Bainbridge Management,
7  LP?
8      A.   Yes.
9      Q.   What do you know about Bainbridge
10 Management, LP?
11     A.   Just that I know that my dad is
12 associated with them in some manner.
13     Q.   Do you understand how your father is
14 associated with them?
15     A.   No.
16     Q.   Do you know anything about what
17 Bainbridge Management, LP, does?
18     A.   No.
19     Q.   What's the basis for your understanding
20 that your father is associated with Bainbridge
21 Management, LP?  How do you know that?
22     A.   Conversation.  He says "I work at a
23 company called Bainbridge Management."
24     Q.   Have you had any discussions with your

33 (Pages 129 to 132)



```
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4
5    DEXIA CREDIT LOCAL, f/k/a Dexia  )
     Public Finance Bank and Credit   )
6    Local de France,                 )
                                      )
7              Plaintiff,             )
                                      )
8        vs.                          ) No. 02 C 8288
                                      )
9    PETER G. ROGAN; et al.,          )
                                      )
10             Defendant.             )
                                      )
11   _____ )
12
13
14
15        VIDEOTAPED DEPOSITION OF SARA ROGAN
16             Los Angeles, California
17             Friday, September 2, 2005
18
19
20
21
22
23
     Reported by:
24   REBECCA CORRAL
     CSR No. 7021
25   Job No. 912733
                                              1
```

```
1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHEASTERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4
5    DEXIA CREDIT LOCAL, f/k/a Dexia  )
     Public Finance Bank and Credit   )
6    Local de France,                 )
                                      )
7              Plaintiff,             )
                                      )
8        vs.                          ) No. 02 C 8288
                                      )
9    PETER G. ROGAN; et al.,          )
                                      )
10             Defendant.             )
                                      )
11   _____ )
12
13
14
15        Videotaped Deposition of SARA
16    ROGAN, taken on behalf of Plaintiff, at
17    555 W. 5th Street, 40th Floor, Los
18    Angeles, California, beginning at 11:01
19    a.m. and ending at 12:42 p.m. on
20    Friday, September 2, 2005, before
21    REBECCA CORRAL, Certified Shorthand
22    Reporter No. 7021.
23
24
25
                                              2
```

```
1    APPEARANCES:
2
3    For Plaintiff:
4        SIDLEY, AUSTIN, BROWN & WOOD LLP
         BY:  ERIC S. PRUITT
5        Attorney at Law
         10 S. Dearborn Street
6        Chicago, Illinois 60603
         (312) 853-1093
7
     For Third Party Witness Robert Rogan:
8
         HAHN & HAHN
9        BY:  LAURA V. FARBER
         Attorney at Law
10       301 E. Colorado Boulevard, 9th Floor
         Pasadena, CA 91101-1977
11       (626) 796-9123
12   Also Present:
13       Peter Rogan
14       ESQUIRE DEPOSITION SERVICES
         Tony Bloodworth, videographer
15       6222 Wilshire Boulevard, Suite 204
         Los Angeles, California 90048
16       (323) 938-2461
17
18
19
20
21
22
23
24
25
                                              3
```

```
1                      INDEX
2    WITNESS:                  EXAMINATION
3    SARA ROGAN
4
5        BY MR. PRUITT               6
6
7
8                    EXHIBITS
9    PLAINTIFF'S
10   116  U.S. Bank Statement for S. Caitlin Rogan  24
11   117  Trust Agreement for Sara Caitlin Rogan    30
          Trust
12
     118  Transfer of Situs of Trust and        31
13        Designation of Special Trustee for Sara
          Caitlin Rogan Trust dated 12-31-92
14
     119  Deed of Settlement dated 6-10-97       36
15
     120  Check for $150,000 payable to         74
16        Sara C. Rogan
17   121  Letter dated 2-4-99 to Mr. Cuppy from  78
          Mr. Scott Gross
18
     122  Letter dated 2-4-99 to Mr. Cuppy from  78
19        Terry Gross
20   PREVIOUSLY MARKED
21   68   Letter dated 8-31-04 to Mr. Holmen from  40
          Mr. Myers with attachments
22
23            INSTRUCTION NOT TO ANSWER
24                    (None)
25
                                              4
```

| | | |
|---|---|---|
| | 1 | whether the Florida Trust owns any companies or |
| | 2 | partnerships? |
| | 3 | A  No. |
| | 4 | Q  Have you ever heard of a company called |
| 11:37:02 | 5 | Edgewater Operating Company? |
| | 6 | A  No. |
| | 7 | Q  Is it fair to say that you have no knowledge |
| | 8 | regarding whether the Florida Trust ever had an |
| | 9 | ownership interest in Edgewater Operating Company? |
| 11:37:12 | 10 | A  That is fair. |
| | 11 | Q  Have you ever heard of a company called |
| | 12 | Boulevard Management LTD? |
| | 13 | A  No. |
| | 14 | Q  Do you have any knowledge regarding whether the |
| 11:37:24 | 15 | Florida Trust has ever had an ownership interest in a |
| | 16 | company called Boulevard Management LTD? |
| | 17 | A  I have no knowledge. |
| | 18 | Q  Do you have any knowledge regarding the |
| | 19 | business or financial affairs of Boulevard Management |
| | 20 | LTD? |
| | 21 | A  No. |
| | 22 | Q  Have you ever heard of a company called |
| | 23 | Braddock Management, LLP? |
| | 24 | A  Yes. |
| 11:37:44 | 25 | Q  What have you heard? |

33

| | | |
|---|---|---|
| | 1 | A  Nothing. |
| | 2 | Q  What is – do you have any understanding as to |
| | 3 | what Braddock Management, LP did or does? |
| | 4 | A  No. |
| 11:38:00 | 5 | Q  To your knowledge, is your father involved with |
| | 6 | Braddock Management, LP? |
| | 7 | A  I don't know. |
| | 8 | Q  Okay.  Where did you first hear about Braddock |
| | 9 | Management, LP? |
| 11:38:08 | 10 | A  I don't remember. |
| | 11 | Q  Do you have any knowledge regarding Boulevard |
| | 12 | Management LTD having an ownership interest in a company |
| | 13 | called Braddock Management, LP? |
| | 14 | A  No. |
| 11:38:26 | 15 | Q  Do you have any knowledge regarding what |
| | 16 | business Braddock Management, LP is in? |
| | 17 | A  No. |
| | 18 | Q  Do you have any knowledge regarding whether the |
| | 19 | Florida Trust has any ownership interest in a company |
| 11:38:44 | 20 | called Gardens On Jones? |
| | 21 | A  No. |
| | 22 | Q  Have you ever heard of a company called Gardens |
| | 23 | On Jones? |
| | 24 | A  No. |
| 11:38:52 | 25 | Q  Do you have any knowledge regarding the |

34

| | | |
|---|---|---|
| | 1 | business or financial affairs of Gardens On Jones? |
| | 2 | A  No. |
| | 3 | Q  Have you ever heard of a company called Taylor |
| | 4 | Row, LLC? |
| 11:39:02 | 5 | A  No. |
| | 6 | Q  Do you have any knowledge regarding the Florida |
| | 7 | Trust ever having an ownership interest in a company |
| | 8 | called Taylor Row, LLC? |
| | 9 | A  No. |
| 11:39:12 | 10 | Q  Do you have any knowledge regarding the |
| | 11 | business or financial affairs of Taylor Row, LLC? |
| | 12 | A  No. |
| | 13 | Q  Have you ever heard of a company called Walnut |
| | 14 | Hills, LLC? |
| 11:39:20 | 15 | A  No. |
| | 16 | Q  Do you have any knowledge of whether the |
| | 17 | Florida Trust has ever had an ownership interest in |
| | 18 | Walnut Hills, LLC? |
| | 19 | A  No. |
| 11:39:32 | 20 | Q  Do you have any knowledge regarding the |
| | 21 | business or financial affairs of Walnut Hills, LLC? |
| | 22 | A  No. |
| | 23 | Q  Ms. Rogan, are you aware of whether you are the |
| | 24 | beneficiary for any trust that exists outside of the |
| 11:39:46 | 25 | United States? |

35

| | | |
|---|---|---|
| | 1 | A  No. |
| | 2 | Q  Has anyone ever told you that you are the |
| | 3 | beneficiary of a trust created in the country of Belize? |
| | 4 | A  No. |
| 11:39:58 | 5 | Q  Have you ever heard anyone discuss a Belize |
| | 6 | trust which you are a beneficiary? |
| | 7 | A  No. |
| | 8 | MR. PRUITT:  Hand the witness a document |
| | 9 | bearing Bates No. BI 1871 through 1909.  Exhibit 120. |
| | 10 | MS. FARBER:  Aren't you on 119? |
| | 11 | MR. PRUITT:  119, Excuse me. |
| | 12 | (Plaintiff's Exhibit 119 was marked for |
| | 13 | identification by the court reporter.) |
| | 14 | MR. PRUITT:  Same thing, just ask you to take a |
| | 15 | look at it and I will ask you some questions. |
| | 16 | For the record, on the third page of this |
| | 17 | document bearing the Bates No. BI 1873 bears the title |
| | 18 | at the top, The Deed of Settlement for the Benefit of |
| | 19 | Sara Caitlin Rogan, parentheses, Trust 002, closed |
| 11:41:02 | 20 | parentheses. |
| | 21 | THE WITNESS:  Okay. |
| | 22 | BY MR. PRUITT: |
| | 23 | Q  Have you ever seen this document before? |
| | 24 | A  No. |
| 11:41:16 | 25 | Q  Have you ever heard anyone discuss The Deed of |

36

9

1    Settlement for the Benefit of Sara Caitlin Rogan Trust?
2        A. No.
3        Q. Have you ever heard of a company called AMTR
4    Services Corp.?
11:41:24 5        A. No.
6        Q. Have you ever heard of a company called Green
7    Bay Trustees Limited?
8        A. No.
9        Q. Do you have any knowledge regarding the
11:41:42 10    financial affairs of -- I will call this the Belize
11    Trust?
12        A. No.
13        Q. Do you have any knowledge regarding who might
14    handle the financial affairs of the Belize Trust?
11:41:50 15        A. No.
16        Q. Do you have any knowledge regarding whether the
17    Belize Trust has any bank or investment accounts?
18        A. No.
19        Q. Do you have any knowledge regarding who may
11:42:06 20    have the ability to withdraw or deposit money into
21    accounts held by the Belize Trust?
22        A. No.
23        Q. Do you have any knowledge regarding whether the
24    Belize Trust owns any companies or partnerships?
11:42:16 25        A. No.

                                                                    37

1        Q. Have you ever heard of a company called
2    Boulevard Investors LTD?
3        A. No.
4        Q. Is it fair to say, then, that you have no
11:42:30 5    knowledge regarding whether the Belize Trust has any
6    ownership interest in a company called Boulevard
7    Investors LTD?
8        A. That is fair.
9        Q. Have you ever heard of a company called
11:42:44 10    Bainbridge Management, LP?
11        A. Yes.
12        Q. What do you recall hearing about Bainbridge
13    Management, LP?
14        A. I don't remember.
11:42:52 15        Q. Do you know who you have discussed
16    Bainbridge -- have you ever discussed Bainbridge
17    Management, LP with anyone?
18        A. No, not that I remember.
19        Q. Do you have any understanding as to whether
11:43:06 20    your father has any involvement with Bainbridge
21    Management, LP?
22        A. No.
23        Q. Do you have any sense of what Bainbridge
24    Management, LP does?
11:43:12 25        A. No.

                                                                    38

1        Q. Okay. Do you have any knowledge regarding
2    whether the Belize Trust has ever had an ownership
3    interest in a company called Bainbridge Management, LP?
4        A. No.
11:43:28 5        Q. Have you ever heard of a company called
6    Boulevard Investors, LLC?
7        A. No.
8        Q. Do you have any knowledge regarding whether the
9    Belize Trust has ever had an ownership interest in a
11:43:40 10    company called Boulevard Investors, LLC?
11        A. No.
12        Q. Do you have any knowledge regarding the
13    business or financial affairs of Boulevard Investors,
14    LLC?
11:43:46 15        A. No.
16        Q. Have you ever heard of a company called 410
17    Montgomery, LLC?
18        A. No.
19        Q. Is it fair to say that you have no knowledge
11:44:00 20    regarding the business or financial affairs of 410
21    Montgomery, LLC?
22        A. That's fair.
23        Q. Have you ever heard of a company called Seal
24    Wrap Systems, LLC?
11:44:10 25        A. No.

                                                                    39

1        Q. Do you have any knowledge regarding whether the
2    Belize Trust has ever had an ownership interest in a
3    company called Boulevard Management LTD?
4        A. No.
11:44:38 5        Q. Ms. Rogan, we just discussed the Florida Trust
6    and the Belize Trust. Do you have any knowledge or
7    understanding of being the beneficiary of any other
8    trusts?
9        A. No.
11:44:48 10        MR. PRUITT: Handing the witness a document
11    previously marked Exhibit 68.
12        (Plaintiff's Exhibit 68 was marked for
13    identification by the court reporter.)
14    BY MR. PRUITT:
11:45:08 15        Q. Again, just ask you to look at it, familiarize
16    yourself with it.
17        For the record, on the second page of this
18    document, Bates No. RDX 063808 bears the title Peter G.
19    Rogan, as Settlor, and New World Trustees, Bahamas,
11:45:44 20    Limited as Trustee, Deed of Settlement.
21        Did we get "as Settlor" after Peter G. Rogan?
22        A. Okay.
23        Q. Have you ever seen this document before?
24        A. No.
11:46:04 25        Q. Have you ever heard anyone discuss the

                                                                    40

**EXHIBIT DD**

Check # 182 for $300,000.00

ENDORSE HERE:

X __ For deposit only to
Peter G. Rogan

DO NOT SIGN / WRITE / STAMP BELOW THIS LINE
FOR FINANCIAL INSTITUTION USE ONLY

Money Market - Account #

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
24 EAST 107TH DRIVE
MERRILLVILLE, IN 46411-0489

**ZURICH**

DATE 3-1-05                                    182
                                              16-65/610

PAY TO THE
ORDER OF    Peter G. Rogan              | $ 300,000.00

Three Hundred Thousand & 00/100 _____ DOLLARS

ZURICH GOVERNMENT MONEY FUND
Bank Three through
UMB Bank
KANSAS CITY, MO 64141          NOT VALID IF LESS THAN $500

FOR _____          Judith K Rogan

⑆101000695⑆101 82 2⑈          ⑈00300000000⑆

Money Market - Account # ██████████

Check # 184 for $200,000.00

JDITH K ROGAN REVOCABLE TR
OR BUSINESS
N0 EAST 90TH DRIVE
J BOX 10489
ERRILLVILLE, IN 46411-0489

Ⓩ **ZURICH**     184

DATE 3-15-05          18-69/1010

TO THE
ER OF  *Peter G. Rogan*          $ 200,000.00

*Two Hundred Thousand & 00/100*          DOLLARS

RICH GOVERNMENT MONEY FUND
A Payable Through
S BANK
XAS CITY, MO 64101

NOT VALID LESS THAN $500

*Judith K Rogan*

⑈0⑈000695⑈⑈0⑈84⑈          ⑈⑈00⑈20000000⑈





**DEPOSIT TICKET**

**PETER G. ROGAN**
BUSINESS
476 WEXFORD ROAD
VALPARAISO, IN 46385

BANK ONE
INDIANAPOLIS, INDIANA 46277

$ 500,000.00

## Cancelled Checks

Money Market - Account # ████████

Check # 186 for $145,000.00

ITH K ROGAN REVOCABLE TR
BUSINESS
EAST 80TH DRIVE
OX 10489
LLLVILLE IN 45411-0489

**ZURICH**

186

DATE 0-13-05

18-49/1010

PAY
TO THE Faith D. Rogan
ORDER
OF

$ 145,000.00

One Hundred Forty Five Thousand and 00/100 ... DOLLARS

GOVERNMENT MONEY FUND

NOT VALID LESS THAN $500

⑈1000695⑈1 101 8 ⑈ 　 ⑈001⑈500000⑈

## Cancelled Checks

Money Market - Account # ████████



Check # 188 for $20,000.00

## Cancelled Checks

Money Market - Account # ▇▇▇▇▇

Check # 189 for $253,000.00

JUDITH K ROGAN REVOCABLE TR
JKR BUSINESS
240 EAST 90TH DRIVE
PO BOX 10489
MERRILLVILLE, IN 46411-0489

**ZURICH**

189

DATE 9-2-05

16-68/1010

PAY TO THE ORDER OF  Peter B. Rogan                    $253,000.00

00 HUNDRED FIFTY THREE THOUSAND & 00/100 DOLLARS

ZURICH GOVERNMENT MONEY FUND
Draft Payable Through
UMB BANK
KANSAS CITY, MO 64141

NOT VALID LESS THAN $500

Judith K Rogan

FOR

⑈101000695⑈ 10189⑈  ⑈00253000000⑈

ENDORSE HERE
Peter B. Rogan
FOR DEPOSIT ONLY

## ancelled Checks

Money Market - Account #████████

Check # 194 for $25,000.00



K ROGAN REVOCABLE TR
BSINESS
ST 90TH DRIVE
18488
LVILLE, IN 46411-0488

Ⓩ ZURICH    194

DATE 10-3-05    18-69/1019

HE    Petu D. Rogan    $25,000.00

wenty Five Thousand 00/100 DOLLARS

OOVERNMENT MONEY FUND
be Through
TY, MO 64141

NOT VALID LESS THAN $500

Judith K Rogan

I000695I: I10194I    II000 2500000II



12/21/2005    4566    $190,646.38



12/21/2005  4565  $572,818.20



01/13/2006  4548  $20,000.00



01/26/2006  4604  $335,000.00



02/13/2006  4612  $18,172.00



03/27/2006  4589  $525,000.00



03/14/2006  4583  $250,000.00



04/20/2006  4598  $40,000.00



04/27/2006  4615  $10,000.00



05/26/2006   4624   $20,000.00



06/14/2006  4633  $150,000.00



06/22/2006  4639  $100,000.00



06/28/2006  4640  $10,000.00



06/28/2006  4641  $40,000.00



06/30/2006   4643   $400,000.00



07/21/2006  4659  $30,000.00



07/21/2006  4695  $10,000.00



08/23/2006   4672   $15,000.00



09/11/2006  4691  $50,000.00



09/28/2006  4718  $7,500.00



10/23/2006  4736  $2,000.00



04/23/2007  4854  $2,807.00



04/23/2007  4854  $2,807.00

# EXHIBIT EE

# DEXIA/EDGEWATER MATTERS: DISCOVERY MOTIONS AND ORDERS RELATING TO ROGAN FINANCES*

| Number | Date | Description |
|---|---|---|
| 1 | 1/12/2004 | Motion To Quash Subpoenas Seeking Financial Records On Behalf Of BFB, Ltd, Bainbridge Management Inc., Braddock Management LP, Bainbridge Management LP, Edgewater Property Co And PGR Properties, Inc. |
| 2 | 1/14/2004 | Motion To Quash Subpoenas On Behalf Of Peter G Rogan |
| 3 | 2/9/2004 | Notice Of Appeal Of An Order Denying Motion To Quash Filed On Behalf Of Peter G Rogan |
| 4 | 2/9/2004 | Notice Of Appeal Of An Order Filed On Behalf Of Bainbridge Management Inc, Bainbridge Management LP, Braddock Management LP, Edgewater Property Co And PGR Properties, Inc. |
| 5 | 2/10/2004 | Motion To Quash Subpoena Filed On Behalf Of Peter G. Rogan |
| 6 | 2/12/2004 | Order Denying Peter G Rogan's 2/10/2004 Motion To Quash Subpoena |
| 7 | 2/18/2004 | Motion To Compel Rogan And Rogan To Comply With Discovery Requests Pursuant To Bankruptcy Rule 2004 |
| 7 | 2/19/2004 | Notice Of Appeal Of An Order On Motion To Quash Filed On Behalf Of Peter G Rogan |
| 8 | 4/6/2004 | Motion To Compel Rogan And Rogan To Comply With Discovery Requests Pursuant To Bankruptcy Rule 2004 |
| 9 | 5/18/2004 | Motion To Compel Defendants Peter G. Rogan, Braddock Management, LP, Bainbridge Management, LP, Bainbridge Management, Inc., Edgewater Property Company, And PGR Properties, Inc. To Respond To Document Requests And Answer Interrogatories. |
| 10 | 5/27/2004 | Order By Hon. Sidney Schenkier Setting Deadline For Defendants To Respond To Plaintiff's Motion To Compel Defendants To Respond To Document Requests And Answer Interrogatories |
| 11 | 7/24/2004 | Motion By Dexia For Rule To Show Cause Why Defendants Should Not Be Held In Contempt, And For Sanction |
| 12 | 7/29/2004 | Motion By Dexia To Compel Production Of Documents In Response To Third-Party Subpoenas |
| 13 | 8/3/2004 | Supplemental Filing In Support By Plaintiff Dexia To Its Motion For A Rule To Show Cause Why Defendants Should Not Be Held In Contempt And For Sanctions |
| 14 | 8/4/2004 | Order By Hon. Sidney Schenkier That Defendants Produce Documents |
| 15 | 8/16/2004 | Order By Hon. Sidney Schenkier That Defendants Produce Documents |
| 16 | 9/21/2004 | Order By Hon. Sidney Schenkier That Defendants Produce Documents |
| 17 | 10/4/2004 | Motion By Dexia To Compel Production Of Documents From Boulevard Investors, Ltd, Boulevard Investors, LLC, The Trusts Of Sara Caitlan Rogan, Robert Cashman Rogan, And Brian Peter Rogan, And Caribe Trustees, Ltd. |
| 18 | 10/4/2004 | Motion By Dexia To Compel Production Of Documents From Fred Cuppy |
| 19 | 10/19/2004 | Order By Hon. Sidney Schenkier Granting Motion To Compel Rogan To Obtain Documents From, *Inter Alia*, The Boulevard Entities |
| 20 | 2/23/2005 | Motion By Dexia To Compel Production Of Edgewater-Related Documents From Peter Rogan, Braddock Management LP, Bainbridge Management LP And Bainbridge Management, Inc. |
| 21 | 2/23/2005 | Joint Motion By Dexia And Edgewater To Compel And For Sanctions |
| 22 | 3/14/2005 | Notice Of Motion For Presentment Of Motion, And Motion, By Plaintiff Dexia For Sanctions Against Fred Cuppy And Boulevard Entities |
| 23 | 3/31/2005 | Order Granting In Part And Denying In Part Dexia's Motion For Sanctions Against Fred Cuppy And Boulevard Entities |
| 24 | 4/18/2005 | Motion By Dexia To Compel Production Of Documents |
| 25 | 5/31/2005 | Order Granting In Part And Denying In Part Dexia's Motion To Compel Production Of Documents |
| 26 | 3/1/2007 | Motion By Dexia To Compel Fred Cuppy To Respond To Discovery Dispute Letter And Document Subpoena |

* This chart includes orders and opinions from multiple actions involving Dexia, Edgewater and Rogan because the parties previously agreed that discovery in any of those actions would be equally applicable in all such actions.

**EXHIBIT FF**



**Boulevard Bank**

Member Boulevard Bancorp

November 12, 1993

**PERSONAL AND CONFIDENTIAL**

Mr. Peter G. Rogan
Chairman & Chief Executive Officer
Edgewater Medical Center
5700 N. Ashland Avenue
Chicago, Illinois  60660

RE:  Proposed Line of Credit for Your New Home

Dear Peter:

In connection with the $1,000,000 line of credit, I have enclosed
a blank Personal Financial Statement form.  For your convenience,
your most recent statement we have on file is enclosed.  It makes
it a little less painful to fill the new one out!  We will also
need a copy of your 1992 tax return.  Please update the new form
and return it along with the tax return to my attention at your
earliest convenience.

I will begin working on the Loan Committee presentation while
this information is being compiled.  Hopefully the cost
information on locking in a rate for the end loan will be
available by the time we go to Loan Committee for approval.

Thank you for your attention to this matter.

Best Regards,

Charles E. Schroeder, Jr.
Vice President

CES/bh
WP/Edgewater.1

Enclosures

**Boulevard Bancorp, Inc.**
Member FDIC

**CONFIDENTIAL**

## PERSONAL STATEMENT

| ☑ INDIVIDUAL CREDIT | ☐ JOINT CREDIT WITH SPOUSE | ☐ JOINT CREDIT WITH OTHER |
|---|---|---|

| APPLICANT (To be filled out by applicant and each co-applicant not related by marriage to the other applicant) | CO-APPLICANT (To be filled out only if assets held jointly or co-applicant) |
|---|---|

| Name PETER G. ROGAN | Name |
|---|---|
| Social Security No. ▓▓▓ | Date of Birth ▓▓▓ | Home Phone 8·19/464·4091 | Social Security No. | Date of Birth | Home Phone |
| Present Address 4036 GULF OF MEXICO Dr. | No. Years 2 | Present Address | No. Years |
| City LONGBOAT KEY | State FL | Zip Code 34228 | City | State | Zip Code |
| Previous Address (if at present address less than one year) Street 8 | No. Years | Previous Address (if at present address less than one year) Street | No. Years |
| City | State | Zip Code | City | State | Zip Code |
| Employer ENTERHEALTH ASSOC | No. Years 7 | Employer | No. Years |
| Business Street Address 5700 N. ASHLAND AVE | Business Phone 312/878·8080 | Business Street Address | Business Phone |
| City CHICAGO | State IL. | Zip Code 60660 | City | State | Zip Code |
| Position/Title PRES. | Type of Business MGT CONSULTING | Position/Title | Type of Business |
| Date of Will 1988 | | Date of Will |
| Name of Executor F.R LUPA | | Name of Executor |
| No. of Dependents 4 | Age(s) of Dependent(s) 9, 12, 15, 71 | No. of Dependents | Age(s) of Dependent(s) |
| Name & Address of Nearest Relative | | Name & Address of Nearest Relative |

Personal Bank accounts carried at _____ B.B. _____

Products utilized _____

Statement Must be Signed Below by Applicant(s).

To: Boulevard Bancorp, Inc., Chicago, Illinois

I/We authorize the Bancorp or any of its affiliates to make whatever credit inquiries that it deems necessary in connection with this credit application or in the course of review or collection of any credit extended in reliance on this application. I/We authorize and instruct any person or consumer reporting agency to compile and furnish to the Bancorp or any of its affiliates any information that it may have or obtain in response to such credit inquiries and agree that such information, along with this application, shall remain the Bancorp's or any of its affiliates' property whether or not credit is extended. I/We authorize the Bancorp or any of its affiliates to answer questions about the Bancorp's or any of its affiliates' credit about the Bancorp's or any of its affiliates' credit experience with me/us.

The information contained herein is submitted for the purpose of procuring, establishing and maintaining credit with you in behalf of the undersigned or persons, firms or corporations in whose behalf the undersigned may either severally or jointly with others execute a guaranty in your favor. The undersigned warrants that the following financial statement has been carefully read and is true, correct, and complete and that you may consider this statement as continuing to be true, correct, and complete until a written notice of a change is given to you by the undersigned.

Signature _____     Date Signed _11/24_ 19 _93_

Signature _____     Date Signed _____ 19_____
Spouse, if assets jointly held

4000340 9/91

# INCOME STATEMENT

| Annual Income | Previous Calendar Year 19 _92_ | | | Anticipated Current Calendar Year 19 _93_ | | |
|---|---|---|---|---|---|---|
| | Applicant | Co-Applicant | Total | Applicant | Co-Applicant | Total |
| Salary (Gross) | 400,000 | | | 400,000 | | |
| Bonus and Commissions | | | | | | |
| Dividends | 200,000 | | | 200,000 | | |
| Interest | 200,000 | | | 200,000 | | |
| Rental Income (Net) | | | | | | |
| General/Limited Partnership Income (Net) | | | | | | |
| Trust Income | | | | | | |
| Pension/Annuity Income | | | | | | |
| Alimony, Child Support, Separate Maintenance (Income from alimony, child support or separate maintenance payments need not be revealed if you do not choose to have it considered as a basis for repaying your obligations to this bank.) | | | | | | |
| Other Income (Describe) BUSINESS | 4,000,000 | | | 5,000,000 | | |
| Total | | | | | | |
| Annual Fixed and Variable Expenses | Previous Calendar Year | | | Anticipated Current Calendar Year | | |
| | Applicant | Co-Applicant | Total | Applicant | Co-Applicant | Total |
| Home Mortgage Payments (Principal and Interest) | 30,000 | | | 30,000 | | |
| Loan Payments (Excluding Mortgages) | | | | 100,000 | | |
| Property Taxes/Assessments | 6,000 | | | 6,000 | | |
| Taxes (City, State, Federal) | 2,000,000 | | | 2,000,000 | | |
| Insurance Premiums | 2,000 | | | 2,000 | | |
| Alimony, Child Support/Maintenance | | | | | | |
| Living Expenses | 150,000 | | | 150,000 | | |
| Other (Itemize) | | | | | | |
| Total | | | | | | |

Notes: Tax Return Net Income as of __10/92__ was $ 9,118,746

Contingent Liabilities                                                                 Amount

Are you contingently liable for any additional partnership/other contributions?   ☐ Yes  ☑ No   $

Are you an Endorser, Co-Maker or guarantor on any notes?   ☑ Yes  ☐ No   See below

Do you have any outstanding Letters of Credit?   ☐ Yes  ☑ No   _____

Are you contingently liable on any lease or contract?   ☐ Yes  ☑ No   _____

Are there any suits or legal actions pending against you?   ☐ Yes  ☑ No   _____

Are any of your tax obligations past due?   ☐ Yes  ☑ No   _____

If yes, give details*: __BB Loans__

\* If more space needed, please provide detail on separate sheet of all partnership obligations, guarantees or co-maker obligation.

Applicant    Co-Applicant    Joint Owner

**Schedule A**    CASH, CHECKING AND SAVINGS ACCOUNTS, CERTIFICATES OF DEPOSIT, MONEY MARKET FUNDS, ETC.

| Name of Financial Institution | Type of Account | In Name of | Account Number | If pledged, to whom? | Total |
|---|---|---|---|---|---|
| B & FIRST NAT BANK VALPARAISO; Northern Trust FL. | AR VARIOUS CHKING & MONEY MKT | PGIL | | NO | |

Total Cash and Short-Term Investments    3,116,000

**Schedule B**    MARKETABLE SECURITIES (STOCKS, BONDS, U.S. GOVERNMENT, MUTUAL FUNDS) (Do not include deferred compensation — See Schedule H)

| Name of Security | No. of Shares or Par Value of Bonds, Notes & Bills | Which Exchange? | In Name of | Cost Basis | Market Value | If pledged, to whom? |
|---|---|---|---|---|---|---|
| VARIOUS in B&T Trust Dept | | | PGIL | | 4,100,000 | B&T |
| VARIOUS Bonds | | | PGL Trust | | 1,440,000 | NO B&B |
| | | | | | | |
| | | | | Total | | |

**Schedule C**    ACCOUNTS AND NOTES RECEIVABLE

| Name of Debtor | Collateral | Interest Rate | Payable | Maturity Date | Unpaid Balance | If pledged, to whom? |
|---|---|---|---|---|---|---|
| EDGEWATER MES LEVEE | | $ | per | | 10,000 | |
| drhulette | | $ | per | | 55,000 | |
| | | $ | per | | | |
| | | | | | Total | |

**Schedule D**    INSURANCE - LIFE (Whole, Term, Group) AND DISABILITY

| Amount | Name of Company | Beneficiary | Owner | Loans | Cash Value* |
|---|---|---|---|---|---|
| See attached | | | | | |
| | | | Total | | |

**Amount you would receive if you surrendered the policy, or the amount you could borrow against it.

**Schedule E**    REAL ESTATE USED AS PERSONAL RESIDENCE (List each mortgage on a property separately)

| Property Description and Location | Titleholder | Date Acquired | Cost | Market Value | Mortgage Mortgagor | Maturity | Current Amt. |
|---|---|---|---|---|---|---|---|
| 1 VALPARAISO HOUSE | PGL & JHR | 1983 | 250 K | 400,000 | IND FED S&L | 1994 | 104,000 |
| | | | Total | | | Total | |

*If title is in the name of a land trust:

1. Is beneficial interest assigned? Yes _____ No _____ If yes, to whom? _____

2. Are you directly or indirectly obligated on this debt? Yes _____ No _____ If yes, to whom? _____

**Schedule F**    VESTED INTEREST IN PENSION/PROFIT SHARING/DEFERRED COMPENSATION PLANS

| Name of Company | Owner | Beneficiary | Payout Basis | Dates Available | Amount |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | Total | |

**Schedule G**    UNLISTED SECURITIES OWNED

| Description of Securities | In Name(s) of | No. of Shares Owned | % Ownership | Book Value (As of Date) | Amount | If pledged, to whom |
|---|---|---|---|---|---|---|
| EDCOMMTER on top deal | PGR | 70 | 70 | 9/30/93 | 860,000 | 44 |
| Edgenta Property | | 100 | 100 | | 418,000 | N/A |
| | | | | Total | | |

**Schedule H**    REAL ESTATE INVESTMENT (List each mortgage on a property separately.) (If more than 50% of net worth fill out Schedule L)

| Property Description and Address | Title in Name(s)* of | Date Acquired / % Owned | Cost of Entire Property | Appraised Market Value of Entire Property | Current Mortgage or Other Debt Against Property | Net Equity (Market Value less Debt) | Your Share (% Owned x Net Equity) |
|---|---|---|---|---|---|---|---|
| 1. RESIDENTIAL LOTS IV | PGR | 1992 / 100 | 226,000 | 226,000 | — | 226,000 | 100 |
| 2. | PL | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| *If title is in name of a land trust | | | Total | | | Total | |

1. Is beneficial interest assigned? Yes _____ No _____ If yes, to whom? _____

2. Are your directly or indirectly obligated on this debt? Yes _____ No _____ If yes, to whom? _____

**Schedule I**    GENERAL AND/OR LIMITED PARTNERSHIP INTEREST (OTHER THAN REAL ESTATE)

| Name of Partnership | In Name of | Type of Investment | % Ownership | Book Value as of / $ Amount | Amount Pledged |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Total | |

**Schedule J**    ACCOUNTS AND NOTES PAYABLE
*Monthly    Quarterly    Semi-annual    Annual

| To Whom? | Payment Amount | *M/Q/SA/A (Indicate Frequency) | Opening Date | Maturity Date | Description of Collateral (if any) (if unsecured so state) | Current |
|---|---|---|---|---|---|---|
| BV | | | | | Bonds | 536,000 |
| | | | | | | |
| | | | | | | |
| | | | | Total | | |

## BALANCE SHEET AS OF _____
(Attach Additional Schedules or Utilize Space as Needed)

| Assets | Applicant | Co-Applicant | Joint Ownership | Total |
|---|---|---|---|---|
| Cash and Short-term Investments (Schedule A) | 3,116,100 | | | |
| Listed Stocks and Bonds Including Gov't Securities (Schedule B) | 5,520,000 | | | |
| Accounts and Notes Receivable (Schedule C) | 6,100 | | | |
| Cash Value (Net of Policy Loans) Life Insurance (Schedule D) | | | | |
| Other Liquid Assets | | | | |
| Total Liquid/Marketable Assets | | | | |
| Real Estate Owned-Personal Residence(s) (Market Value) (Schedule E) | 400,000 | | | |
| Vested Interest in Pension/Profit Sharing/Deferred Compensation (Schedule F) | | | | |
| IRA/KEOGH Accounts | 100,000 | | | |
| Unlisted Stocks (Schedule G) | 845,100 | | | |
| *Equity Interest in Business | | | | |
| Real Estate Investments (Schedule H) | 236,000 | | | |
| *General and/or Limited Partnership Interests (Other than Real Estate) (Schedule I) | | | | |
| Personal Property | 400,000 | | | |
| | | | | |
| | | | | |
| Other Assets (Itemize) | | | | |
| | | | | |
| | | | | |
| Total Assets | 10,151,100 | | | |
| **Liabilities** | **Applicant** | **Co-Applicant** | **Joint Ownership** | **Total** |
| Notes Payable — Banks Secured (Schedule J) | 535,000 | | | |
| Notes Payable — Banks Unsecured (Schedule J) | — | | | |
| Notes Payable — Others (Schedule J) | — | | | |
| Credit Card Balances | 5,000 | | | |
| Accounts Payable (Schedule J) | | | | |
| Unpaid Income Taxes   due @ 1993 | 700,000 | | | |
| Margin Accounts | | | | |
| Mortgages | 104,000 | | | |
| Mortgages Due Beyond One Year (Schedule E)   see above | | | | |
| Other Liabilities (Itemize) | | | | |
| | | | | |
| | | | | |
| Total Liabilities | 1,344,000 | | | |
| Net Worth (Total Assets Minus Total Liabilities) | | | | |

| | | |
|---|---|---|
| Are there any bad and doubtful assets excluded from this statement? | ☐ Yes | ☒ No |
| Are any of your assets pledged, loaned or hypothecated? | ☐ Yes | ☒ No |
| Are you a partner or officer in any other venture? | ☐ Yes | ☐ No |
| Have any of your debts ever been discharged, satisfied or settled under the Bankruptcy Act? | ☐ Yes | ☐ No |

If yes, give details:

*If more than 20% of total assets, attach a current balance sheet and profit and loss statement of the business.

## LIFE INSURANCE CARRIED

| Name of Insurance Company | Policy Owner | Beneficiary | Face Amount |
|---|---|---|---|
| Conn. Gen'l | Peter Rogan | PGR Rev Trust | $    15,000 |
| Bankers | Group | Judith Rogan | 25,000 |
| ACHE | Peter Rogan | PGR Rev Trust | 450,000 |
| New England | Peter Rogan | PGR Rev Trust | 500,000 |
| New England | Peter Rogan | PGR Rev Trust | 500,000 |
| Republic (Key Man) | Peter Rogan | PGR Rev Trust | 3,000,000 |
| North American | Peter Rogan | PGR Rev Trust | 1,500,000 |
| New England | Jt. Survivorship | Trust | 7,500,000 |

CES1129.DOC

# EXHIBIT GG

01/08/1991  04:06    878-4431         EDGEWATER                    PAGE  02



# EDGEWATER MEDICAL CENTER

March 4, 1994

**VIA FACSIMILE**

Mr. Charles Carter
Mr. John Kotynski
Precision Construction
2605 Garfield Avenue
Highland, IN 46322

Gentlemen:

This is in follow-up to our meeting of Tuesday, March 1, 1994. During that meeting, we agreed that in an effort to enhance the communication process between Precision and Judy and Dan Schuman, we would institute a number of reports. The first report will be a detailed schedule of the tasks to be accomplished between now and the end of the job. This schedule will identify who is responsible for the task(s) and when that task and/or decision will be made or completed.

The second report is a "To Do" list. This list will be initially prepared by Charlie and presented to us for our additions. Once that is done, the "To Do" list will be continually updated.

Both of the above reports are to be faxed to Judy and to Dan Schuman by Friday, March 4, 1994. This will allow Judy and I to meet with Dan this weekend, make any changes to the reports and provide that back to Charlie for his update. In addition, after these initial reports are completed this Friday, the weekly updates will be prepared by Charlie and faxed to Dan and Judy every Friday thereafter.

On a related matter, we also discussed the Hyre Electric and the Light Touch System. Charlie thought we had agreed to a conclusion on this item. I stated that this is not the case. I have not agreed to Dave's suggested solution and I discussed with Dan an

1

5700 NORTH ASHLAND AVENUE   CHICAGO, ILLINOIS 60660-4086   (312) 878-6000   FAX: (312) 878-8884

appropriate solution. I understand that Dan and Precision are to discuss this and to reach a conclusion. I am not certain whether this is to be done with Charlie or Dave Van Dyke.

Finally, I received a copy of a Request for Draw that was faxed to Fred Cuppy and in turn forwarded to me. Fred is out-of-town until Tuesday but in the interim, Dan, Judy and I will be reviewing the request. As Fred communicated with Dave Sawyer, we may in fact withhold some of the request because of lack of completion of the tasks. In addition, Fred requested that any credits due us be included in this draw. This request dove-tails into my request of Charlie that all the credits due us be brought up-to-date and current by this Friday, March 4, 1994.

In light of the ongoing discussions concerning the Hyre Electric/Light Touch System and the lack of documentation on the credits due us, both of these items need to be resolved before any draw requests can be acted upon.

I believe that this captures the essence of the meeting and some further updates that have occurred. Should you have any questions, please contact Dan Schuman.

Sincerely,

Peter G. Rogan
President

PGR/mr

cc: Fred Cuppy
    Dan Schuman

----

PRECISN.LTR

2

**EXHIBIT HH**

# O'ROURKE McCLOSKEY & MOODY

Michael J. O'Rourke
Kelly A. McCloskey
Michael C. Moody
Mitchell B. Karren
Andrew N. Levine
Limo T. Cherian
Joel L. Lipman
Richard F. Linden
Brian M. Dougherty
Michael Tecson

161 North Clark Street, Suite 2230
Chicago, Illinois 60601

(312)849-2020   (312)849-2021 Fax

In Washington, D.C.:
O'ROURKE & CUNDRA

818 18th Street, N.W. Suite 800
Washington, D.C. 20006
(202) 861-2350
(202) 861-2352 Fax

Steven D. Cundra
Amy E. Gluck

August 13, 2004

**By Facsimile (312) 853-7036**
Eric S. Pruitt, Esq.
Sidley Austin Brown & Wood
10 S. Dearborn St.
Chicago, Ill. 60603

Re: <u>Dexia Credit Local v. Peter G. Rogan, et al.</u>
Case No. 02 C 8288

Dear Eric:

This letter confirms our conversations this week wherein I advised you that we are representing Judy Rogan, JKR Business and Brian Rogan with respect to the plaintiff Rule 45 subpoenas issued in the above-captioned matter and that we would file our responses and objections to same no later that August 20, 2004. Please call me or Limo Cherian of this office who is assisting me if you have any questions and thank you for your cooperation on this.

Very truly yours,

Michael J. O'Rourke

cc: Judy Rogan
    Brian Rogan
    Limo T. Cherian

**O'ROURKE KATTEN & MOODY**
161 North Clark Street, Suite 2230
Chicago, Illinois 60601

(312) 849-2020   (312) 849-2021 Fax

March 15, 2007

**By Facsimile**
Eric S. Pruitt, Esq.
Sidley Austin Brown & Wood. LLP
10 S. Dearborn St
Chicago, IL  60603

   Re: Déxia Credit Local v. Peter Rogan, et al.
     02 C 8288 (N.D. Ill)

Dear Mr. Pruitt:

  This letter is in response to your subpoena on Judy Rogan. The manner of service was improper. In addition, the subpoena requests production of Mrs. Rogan's personal financial records which are confidential and beyond the scope of relevant material to your litigation. Please contact the undersigned to discuss these objections and to identify a proper scope of production, if one is agreeable. Thank you very much.

          Very truly yours,

          Michael J. O'Rourke

cc: Mr. Andrew N. Levine



**U. S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Joseph A. Stewart* | *Dirksen Federal Building* | *Telephone: (312) 469-6008* |
| *Assistant United States Attorney* | *219 South Dearborn Street, Fifth Floor* | *Fax: (312) 886-3501* |
| | *Chicago, Illinois 60604* | *Joseph.stewart@usdoj.gov* |

February 14, 2007

Michael J. O'Rourke
O'Rourke Katten & Moody
161 North Clark Street
Suite 2230
Chicago, Illinois 60601

      Re:    *United States v. Peter Rogan v. Judith Rogan, citation respondent,*
                No. 02 C 3310 (N.D. Ill.)

Dear Mr. O'Rourke:

On behalf of respondent Judith Rogan, on February 1, 2007 you met with me, Melissa Childs, and Eric Pruitt to discuss the production of documents in connection with the citation to discover assets served on Judith. This letter memorializes our agreements and differences from that meeting.

First, we provided you with a copy of the memorandum opinion imposing the $64 million judgment against Judith's husband Peter. We explained to you that one of the many findings in the judgment was that Peter had made extensive use of family members to perpetrate and conceal his fraud by, among other things, placing assets in the names of family members. As a result, in the citation directed to Judith we requested not only documents relating to assets in Peter's name but assets in Judith's name also. Examination of both is required to make a responsible determination whether Judith is or was holding assets belonging to Peter that may be subject to the judgment. You took the position that there would be nothing wrong with Peter, having seen "a fire coming," placing assets in a family member's name. We disagreed and insisted on the production of all documents relating to assets in either Peter's name or Judith's name (or their respective trusts and business entities).

Second, we provided you with Schedule A, a list of business entities and trusts for which we had subpoenaed bank records and advised you that we further sought information from Judith regarding assets held in those entities' names pursuant to paragraph 19 of the citation and subpoena riders. We showed you examples of transfers from the subpoenaed bank records that indicate Judith is acting as Peter's agent to move money.

Michael J. O'Rourke
February 13, 2007
Page 2

Third, we briefly reviewed the 2003-2005 tax returns you produced and requested the supporting documentation for the distribution from the trust and other income from investments for each financial institution referenced therein (US Bank, FNB, Zurich, Scudder, Clipper, Ameritrade, Reserve Funds, MetLife, Bainbridge, BFB, Chase, Edgewater Property, JKR Trust, PGR Trust, Morgan Stanley, Oceanic Bank, and DAI).

You agreed to consult with your client on the above issues and advise us of her position. You also agreed to produce the documents removed from Peter's Merrillville, Indiana business office, as we understand approximately nine boxes of those documents are in Judith's possession or control. We further advised you that we are aware of at least one laptop computer that contained a "Peachtree" accounting software and banking/financial records for the Rogans individually, as well as their businesses. Our document production request includes the Peachtree computer records as well.

We further agreed not to require duplicate production of documents and will share with you whatever documents we receive from third parties. Finally, we warned you of our position that the citation's transfer prohibition on Judith applies to all asset transfers of Peter's property, not merely property titled in Peter's name.

We would like to meet again on Tuesday, February 20, 2007 at noon at Sidley Austin LLP (immediately following our 11:00 a.m. meeting with Fred Cuppy's attorney) to discuss document production. Please call me to confirm your availability next week.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By: _____
Joseph A. Stewart
Assistant United States Attorney

cc:  Eric Pruitt, Sidley Austin

**EXHIBIT II**

# O'ROURKE KATTEN & MOODY

161 NORTH CLARK STREET
SUITE 2230
CHICAGO, ILLINOIS 60601

(312) 849-2020
(312) 849-2021 FAX

July 13, 2007

**VIA REGULAR MAIL**
Eric S. Pruitt, Esq.
Sidley Austin Brown & Wood. LLP
10 S. Dearborn St
Chicago, IL  60603

Re:    Déxia Credit Local v. Peter Rogan, et al.
          02 C 8288 (N.D. Ill)

Dear Mr. Pruitt:

Enclosed please find additional documents Bates Numbered R 00137-00220 being produced by Judy Rogan.  If you have any questions, feel free to contact Michael O'Rourke.

Sincerely,

Angela B. O'Rourke
Legal Assistant

cc:    Michael J. O'Rourke
         Andrew N. Levine

**EXHIBIT JJ**

# Rogan-Related Business Entities and Trusts Identified During Discovery in Dexia / Edgewater Proceedings

1.    410 Montgomery, LLC
2.    AMTR Services Corp. (BVI)
3.    Bainbridge Management, Inc.
4.    Bainbridge Management L.P.
5.    BFB Ltd.
6.    Boulevard Investors LLC
7.    Boulevard Investors, Ltd. (Belize)
8.    Boulevard Management, Inc.
9.    Boulevard Management, Ltd.
10.   Braddock Management, Inc.
11.   Braddock Management, L.P.
12.   Caribe Trustees, Ltd.
13.   CFMT Ltd. (Belize)
14.   CFMT of FLA, LLC
15.   The Commons at Wilmington Island
16.   CST of FLA, LLC
17.   DAI, Inc.
18.   Dynamic Alliance, Inc.
19.   Edgewater Property Company
20.   Gardens Development Co., LLC
21.   The Gardens on Jones, LLC
22.   Health Care Management, LLC
23.   Healthco Family Nursing Services, LLC
24.   HHC Corporation (BVI)
25.   Hoover Creek Plantation Partners, LLC
26.   Hoover Creek Condo Partners, LLC
27.   Hoover Creek Partners, LLC
28.   JKR Business
29.   MWUC Limited
30.   Palmetto Commons Partners, LLC

31.   PGR Properties, Inc.

32.   PGR Business

33.   Ponce Inlet LLC

34.   PPR GmbH

35.   Brian Peter Rogan Trust

36.   Brian Peter Rogan Trust (002) (Belize)

37.   Judith K. Rogan Revocable Trust

38.   Peter Rogan Irrevocable Trust (Bahamas)

39.   Peter Rogan Revocable Trust

40.   Robert Cashman Rogan Trust

41.   Robert Cashman Rogan Trust (002) (Belize)

42.   Sara Caitlin Rogan Trust

43.   Sara Caitlin Rogan Trust (002) (Belize)

44.   RPP Finance, Ltd.

45.   RPP Finance Trust

46.   Seal Wrap Systems, LLC

47.   Sheridan Investment Properties, LLC

48.   T Protection Ltd. (BVI)

49.   Taylor Row, LLC

50.   Walnut Hills, LLC

51.   Wilmington Condo Commons, LLC

CHI 4025096v.1

**Ex. KK**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Honorable **Bruce W. Black**                              Hearing Date  October 3, 2007

Bankruptcy Case          02 B 07378          Adversary No.          04 A 02328

Title of Case  **Edgewater Medical Center v. Edgewater Property Company et al**

Brief Statement of Motion  **Show Cause Hearing**

Names and Addresses of moving counsel

Representing

### ORDER

This matter having coming before the court on a status hearing to show cause why Edgewater Property Company and Peter Rogan should not be held in contempt of court; IT IS HEREBY ORDERED Edgewater Property Company and Peter Rogan are held in contempt of court for failure to appear at today's court hearing as required per this court's order dated 09/26/2007 and for failure to comply with this court's orders dated 08/15/2007 and 08/29/2007. Status on a sanctions hearing is set for NOVEMBER 7, 2007 at 10:30 a.m.

*Bruce W. Black*

U S Bankruptcy Judge Bruce W. Black

**EXHIBIT**

_____

**Ex. LL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Edgewater Medical Center,,          )   03 A 04843, et al
                                    )   Chicago, Illinois
                                    )   9:30 a.m.
                        Debtor.     )   October 18, 2006

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE BRUCE W. BLACK

APPEARANCES:

For Debtor:                         Mr. Scott Mendeloff;
                                    Mr. Gabriel Aizenberg;
                                    Mr. Eric Pruitt;

For Edgewater Property
Company:                            Mr. Phillip Reed;

For Peter Rogan:                    Mr. Joseph Spiegler;
                                    Mr. Chris Stathopolous;

Court Reporter:                     Jackleen DeFini, CSR, RPR
                                    U.S. Courthouse
                                    219 South Dearborn
                                    Room 661
                                    Chicago, Il.  60604.

2

1          THE COURT:  We will jump ahead to the

2   10:00 o'clock matters, the Edgewater matters.

3          MR. MENDELOFF:  Scott Mendeloff,

4   Gabriel Aizenberg and Eric Pruitt on behalf of the

5   debtor.

6          MR. REED:  Phil Reed on behalf of

7   Edgewater Property Company and PGR Properties and

8   Bainbridge, Inc.

9          MR. SPIEGLER:  Joseph Spiegler and

10  Chris Stathopoulos on behalf of Peter Rogan.

11         THE COURT:  Gentlemen, what happened

12  upstairs, if anything?

13         MR. SPIEGLER:  I appeared before Judge

14  Darrah.  Judge Darrah granted the motion to withdraw

15  and ordered Mr. Rogan to appear, or substitute

16  counsel to appear on November 1, the date on which he

17  set the matter over.

18         We -- I should say Mr. Stathopoulos

19  and Mr. Reed spoke with Mr. Rogan this morning.  Mr.

20  Rogan is out of town.  I informed him that he's not

21  scheduled to be back until October 27th.  And that's

22  how matters were left.  We explained to him that we

23  would be appearing before you today and Judge

24  Schenkier on Friday.  And Judge Darrah this morning.

25         MR. MENDELOFF:  We find that of grave

3

1  concern.  We don't want to wait until the 27th to

2  find out what the status is of counsel.  There's a

3  briefing schedule in the Properties case.  What we do

4  not want to do is work very hard, we already have

5  been, putting together post-trial findings, findings

6  of fact, conclusions of law, that will be extensive

7  and very expensive only to find out Mr. Rogan ends up

8  defaulting.  And he has an obligation to appear with

9  counsel.  If it's not going to be Mayer Brown, that's

10  his choice.  But we do not want to wait until the

11  27th to begin to find out about this.  That is, as

12  far as we're concerned, courting disaster.  The final

13  brief is due, I think, the first week in November.

14              MR. REED:  November 2nd.

15              MR. MENDELOFF:  So that's completely

16  unacceptable to us.  Your Honor, I reinforce the

17  point raised in our brief, there's very clear Seventh

18  Circuit case law that says that substitution of

19  counsel cannot be used to obtain a continuance.  And

20  we would urge the court to maintain the current

21  schedule.  I think Mr. Rogan, by saying he's not

22  going to be back until the 27th, creates a situation

23  in which he won't have a brief to file, and then he

24  will be making due process arguments about why he

25  should be able to get an extension.

4

1          MR. REED:  Your Honor, Mr. Mendeloff

2    raises some fair points.  There's no question about

3    it, that with a briefing schedule that contemplates

4    massive filings on the 2nd, that it's fair to be

5    concerned about whether these filings are going to be

6    necessary; what's Mr. Rogan going to do.  Your Honor

7    yesterday expressed concern that Mr. Rogan appreciate

8    this is not going to be a cause for delay of any

9    kind.  We discussed those concerns with Mr. Rogan

10   this morning.  He fully appreciates that no delay is

11   possible under the circumstances.  And he understands

12   the consequences of (A) not filing briefs or not

13   being represented by counsel.

14          And, you know, also have to bear in

15   mind that in this particular proceeding that the

16   property company action is two corporations that are

17   actually the parties in interest.  What I suggested

18   to Mr. Rogan this morning was that because Judge

19   Schenkier has directed that he appear on Friday, and

20   that if it is impossible for him to get back, that he

21   at least make himself available by phone so that

22   Judge Schenkier and Your Honor can satisfy

23   themselves, satisfy the court, that there's no delay,

24   that the litigant is aware that no delay is going to

25   come of this, and that he's fully aware of the

5

1  consequences.

2          I also think -- I have to say, it's

3  probably fair what Mr. Mendeloff points out, that the

4  parties ought to know sooner rather than later.

5          MR. MENDELOFF:  And, by the way, he's

6  in Vancouver, so he's outside the United States right

7  now, according to counsel.

8          Does he know that you're making these

9  representations to the court?  Did he authorize that?

10          MR. REED:  I told him -- I don't want

11  to get into the substance of the conversation.  But I

12  said, you know, we need to confirm to the court that

13  he's aware -- that he's aware there's no delay; that

14  no delay is going to come of this.  And that I told

15  him that.  The way I phrased it to him was that both

16  judges want to know that he is aware of the potential

17  consequences of proceeding unrepresented,

18  particularly in this proceeding where it's

19  corporations that are the litigants rather than an

20  individual.

21          THE COURT:  I will first of all grant

22  the motion to exceed the page limitation.  And I will

23  continue all these matters until 10:30 next Tuesday,

24  that's October 24th.  I will order him to be here,

25  unless he is in front of Judge Schenkier this coming

6

1   Friday.  Obviously he can get here from Vancouver, if

2   he wants to.  Obviously he can have new attorneys, if

3   he wants to.  And it's certainly my view that if he

4   chooses to terminate the services of the present

5   attorneys and does not want to have new attorneys,

6   indeed it would be almost impossible for new

7   attorneys to step into this case at this point.  He's

8   asking to be defaulted and he's asking to give up on

9   this litigation.  And he's an intelligent person.

10  He's been present in this court when we've talked

11  about scheduling.  And there's simply no excuse for

12  what he's trying to do.  And it will not get him more

13  time.  So I will see you and him at 10:30 on October

14  24th.  He's ordered to be here.  I can't imagine any

15  reason that would cause me to continue the November

16  3rd date.  So that's all I need to say for right now.

17              MR. REED:  Understood, Your Honor.

18              MR. MENDELOFF:  Can we submit an order

19  to that effect, Your Honor?

20              THE COURT:  You may.

21              (Which were all the proceedings had in

22              the above-entitled cause, October 18,

23              2006, 9:30 a.m.)

24  I, JACKLEEN DE FINI, CSR, RPR, DO HEREBY CERTIFY
    THAT THE FOREGOING IS A TRUE AND ACCURATE
25  TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
    ENTITLED CAUSE.

1                IN THE UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

3   DEXIA CREDIT LOCAL,                )   Docket No. 02 C 8288
                                       )
4                       Plaintiff,     )
                                       )
5            v.                        )   Chicago, Illinois
                                       )   October 24, 2006
6   PETER G. ROGAN, et al.,            )   9:30 o'clock a.m.
                                       )
7                       Defendants.    )

8                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE SIDNEY I. SCHENKIER
9
    APPEARANCES:
10
    For the Plaintiff:              SIDLEY AUSTIN, by
11                                  MR. SCOTT T. MENDELOFF
                                    MR. ERIC S. PRUITT
12                                  One South Dearborn Street
                                    Chicago, Illinois 60603
13
    For Defendant Rogan:            WINSTON & STRAWN, by
14                                  MR. JOSEPH ANDREW SPIEGLER
                                    MR. NEIL E. HOLMEN
15                                  35 West Wacker Drive
                                    41st Floor
16                                  Chicago, Illinois 60601

17                                  JOHNSON & BELL, by
                                    MR. CHRISTOPHER J. STATHOPOULOS
18                                  33 West Monroe Street
                                    Suite 2700
19                                  Chicago, Illinois 60603

20

21
                        ALEXANDRA ROTH, CSR, RPR
22                        Official Court Reporter
                        219 South Dearborn Street
23                              Room 1224
                          Chicago, Illinois 60604
24                            (312) 294-0134

25

1    APPEARANCES:    (Continued)

2    For Defendant Brainbridge        MAYER, BROWN ROWE & MAW, by
     and Braddock:                    MR. PHILLIP STEWARD REED
3                                     71 South Wacker Drive
                                      Chicago, Illinois 60606
4
     For Mr. Cuppy:                   SONNENSCHEIN NATH & ROSENTHAL, by
5                                     MR. HAROLD C. HIRSHMAN
                                      MS. CAMILLE E. BENNETT
6                                     7800 Sears Tower
                                      Chicago, Illinois 60606
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 (Proceedings had in open court:)

2 THE CLERK:  02 C 8288, Dexia Credit Local versus

3 Rogan.

4 MR. MENDELOFF:  Good morning, your Honor.  Scott

5 Mendeloff and Eric Pruitt on behalf of Dexia.

6 MR. SPIEGLER:  Good morning, your Honor.  Joseph

7 Spiegler, Neil Holmen and Chris Stathopoulos for Mr. Rogan.

8 MR. REED:  Good morning, your Honor.  Phillip Reed on

9 behalf of Brainbridge Management, Inc.  We have also filed

10 appearances in this matter on behalf of Brainbridge Management

11 LP, which is in bankruptcy, and Braddock Management LP, which

12 is a now dissolved corporation.

13 THE COURT:  Okay.  Is Mr. Rogan here?

14 MR. SPIEGLER:  We've not seen him today, and we've not

15 heard from him or received any correspondence from him

16 confirming that he would attend today's proceeding.  He -- we

17 attempted to contact him by phone on several occasions, e-mail.

18 There is no indication that those messages, both voicemail and

19 electronic mail, were not received.  And as I said, we have not

20 received any confirmation one way or the other from Mr. Rogan.

21 We have had no actual contact.

22 THE COURT:  You did have some communication with him

23 last week, I take it, for the purpose of rescheduling our

24 hearing that was set for Friday to today, because I understand

25 he was up in Canada?

1    MR. REED:  Yes.  But we had had -- the conversation

2  that we had had with him was a conversation that had occurred

3  before we actually were in court here, up in Judge Black's.  So

4  since we were last in front of your Honor, we have -- we

5  certainly have -- Winston has had any response back from Mr.

6  Rogan.

7    MR. SPIEGLER:  We contacted him.  We attempted to

8  contact him after we left Judge Black's court --

9    THE COURT:  Okay.

10    MR. SPIEGLER:  -- room, which was approximately an

11  hour after we left your courtroom.

12    MR. HOLMEN:  We phoned him yesterday, I did, left

13  voicemails at his office and on his cell phone to call us and

14  reminded him of the hearings today.

15    THE COURT:  Okay.  I see some other attorneys who are

16  familiar to me from this case sitting in the back.  I will

17  invite them to come up.

18    MS. BENNETT:  Good morning, your Honor.  Camille

19  Bennett for Fred Cuppy.

20    MR. HIRSHMAN:  Harold Hirshman as well, your Honor.

21    THE COURT:  Are you aware whether your client has had

22  any communication with Mr. Rogan about this case?

23    MR. HIRSHMAN:  We are not.

24    THE COURT:  Have you?

25    MR. HIRSHMAN:  Have we had any contact?  No.

1    THE COURT:  All right.  Let me address something that

2    pertains to a motion that was filed on behalf of Mr. Cuppy

3    before we go back to these other matters.  It's a motion for

4    leave to file a response of third party Fred Cuppy to certain

5    statements in Dexia's response to the motion to withdraw.

6    Do you have an objection to him filing it?

7    MR. MENDELOFF:  Yes.

8    THE COURT:  All right.  Overruled.  It's filed.

9    I am not going to say anything more about it because

10   what you say and what he says about Mr. Cuppy are not material

11   to my decisions.

12   MR. MENDELOFF:  That's fine, Judge.  That's my

13   objection.

14   THE COURT:  Then you shouldn't have said it in the

15   brief.

16   MR. MENDELOFF:  Okay.  It was a representative

17   statement, your Honor.

18   THE COURT:  We are not going to have more argument

19   about this particular point, which is peripheral to everything

20   else we are talking about.

21   MR. MENDELOFF:  All right.

22   THE COURT:  Now, let's go back to -- and obviously you

23   are free to stay or to leave.  I wanted to get that resolved so

24   you could leave if you wish.

25   MR. HIRSHMAN:  Thank you, your Honor.

1        THE COURT:  Now, going back to the situation with Mr.

2   Rogan, well, he was supposed to be here.  He is not here.  I

3   guess I will assume he is not going to be up -- or down in

4   Judge Black's courtroom, because I won't expect him to show any

5   favoritism to Judge Black over me.

6        What's the plaintiff's view of the motion to withdraw

7   at this point?

8        MR. MENDELOFF:  Until we have substitute counsel, your

9   Honor, we feel it would be improvident to remove counsel, as

10  much as I hate to say that.  I don't want to put them through

11  this.  I feel for them.  We don't object as long as there is

12  substitute counsel.

13       But how else are we going to be communicating with Mr.

14  Rogan with any chance of getting a response?

15       THE COURT:  Let me ask you, what have they told you

16  over the last week that they can get a response?

17       MR. MENDELOFF:  They were talking to him last time the

18  day that we were here, communicating with him.  I mean, I

19  don't -- that's much more recent than anybody else.

20       And, your Honor, I -- our next step is going to move

21  for a default judgment.  And, you know, we can't just -- and we

22  got an even bigger problem in front of Judge Black, your Honor,

23  which I won't detail for your Honor.  But there is a briefing

24  schedule.

25       So as much as I hate to have these lawyers on the

1    hook, I don't --

2            THE COURT:  All right.  What do the lawyers on the

3    hook have to say?

4            MR. REED:  Two things, your Honor.  No. 1, your Honor

5    points out, I think, that the most important point, which is

6    apparently we don't have the ability to communicate with him

7    effectively at this point.  At least we have not since we were

8    last in front of the Court.

9            Perhaps more importantly from our standpoint, he has

10   discharged us.  We are not authorized to do anything on his

11   behalf.  So it's very difficult to act on his behalf in any

12   courtroom when he has instructed us quite clearly, do not do

13   anything.  So I don't have any guidance as a lawyer.  I feel

14   like I don't have a client.  I realize that it is -- or I can't

15   act effectively on a client who won't tell me what to do and

16   what not to do.

17           So we have not done anything since he instructed us

18   not to do anything.  And that was the last communication that

19   we had other than the communication the morning of the last

20   courtroom hearing.

21           MR. HOLMEN:  We received the very same -- it was one

22   communication addressed both to Mayor Brown and to Winston, as

23   far as being discharged and instructions not to do anything

24   else on his behalf.

25           THE COURT:  Okay.

1          MR. SPIEGLER:  And one further point.  I echo what Mr.

2   Reed said and Mr. Holmen as well, even though it's not

3   instructive or binding on you.  It's not binding on you, but I

4   do believe it's instructive that Judge Darrah has granted our

5   motion to withdraw from that case, which is the one that's the

6   most pressing in terms of the entry of a judgment against Mr.

7   Rogan and the appeal rights.

8          So he has instructed Mr. Rogan to appear in his

9   courtroom, I believe it's November 1.  Whether Mr. Rogan

10  appears I don't know at this time.  And what action Judge

11  Darrah will take in response, I don't know.

12         But the first step, and I think it's distinct from the

13  issues that Mr. Mendeloff may have, is whether we have been

14  discharged, whether it's appropriate for us to withdraw.

15         MR. MENDELOFF:  First of all, that was an unopposed

16  motion in front of Judge Darrah.  It was not a situation as

17  here where we feel that we need to have some transition.

18         And secondly, the case law that we have cited, and

19  there is other case law that we have not cited intentionally

20  but that exists, indicates that the Court has the power to keep

21  formal counsel -- former counsel on as advisory counsel.  We

22  are not suggesting that.

23         THE COURT:  But I can't force Mr. Rogan to communicate

24  with you.

25         MR. MENDELOFF:  You can't.  But how are we all to

1    communicate with him, your Honor?

2            THE COURT:  Well, I suppose I mean it's an interesting

3    question.  You can't communication with him in any way because

4    he is a represented party.  Of course, if I allow them out,

5    then you can communicate with him.

6            MR. MENDELOFF:  I can't imagine he is going to contact

7    us if he is not contacting these people.

8            THE COURT:  I don't know.  I don't know.

9            This case, though, is a little bit different from

10   Judge Darrah's case in this respect, that as I understand it in

11   that case Mr. Rogan was the only defendant.

12           MR. HOLMEN:  Right.

13           MR. SPIEGLER:  That's correct.

14           THE COURT:  In this case we have individual and

15   corporate defendants.  And the withdrawal of counsel from a

16   corporate defendant carries its own consequences that are

17   distinct when you have a pro se party who's a real person.  And

18   that was one of the concerns that I expressed last week, and

19   that's why I asked whether, without getting into the detail of

20   it, whether you had the opportunity to counsel Mr. Rogan with

21   respect to the specific consequences of withdrawal of counsel

22   for a corporate entity without there being successor counsel.

23   And I think that it was clear that you hadn't had that

24   opportunity.

25           And I express that not as a criticism.  I express that

1   not as a criticism because things have moved, it seems to me,

2   in a rather precipitous way from what I understand without a

3   lot of warning to defense counsel.

4          So that is a concern to me.  And it's also concerning

5   to me that after having adjusted the schedule for Mr. Rogan to

6   be here, to accommodate him, because he had another date with

7   Judge Black, that he is not here.

8          I have to say that I still am uncomfortable letting

9   the attorneys out without me having him in court so that I can

10  understand what he is doing, so that he can tell me what he is

11  doing, so that he can tell me if he is planning to have

12  successor counsel, either for himself or the corporation, how

13  he intends to proceed in the case after terminating his

14  counsel.  I would like to know those answers, and I'd like to

15  be able to explain to him without any filter about the

16  consequences of certain actions.

17         Now, that doesn't mean I am going to keep you in.  I

18  understand Mr. Mendeloff's position, but I am not going to keep

19  you in indefinitely on this because there is a point at which a

20  repetitive failure of Mr. Rogan to come is an answer to those

21  questions perhaps in and of itself.

22         So what I will do is, I am going to put this over

23  again.  I am going to put it over to November 1, which is the

24  date he is supposed to be here for a hearing with Judge Darrah.

25         What time is the --

1        MR. SPIEGLER:  I am just checking.  I was anticipating

2   that question.  I believe it's 9:00 o'clock, your Honor.

3        THE COURT:  Okay. Are you able to get my calendar?

4   No?

5        The electronic world is wonderful when it works.

6        What I will do is, I will see you at 8:30.  I will

7   give -- just to wrap up a few loose ends.  I am going to

8   continue the motion to withdraw until that time.  I will urge

9   you to continue your efforts to try to reach out to Mr. Rogan

10  to both inform him of that date -- I gather he knows about it

11  because at least for Judge Darrah that he knows of this date --

12  and to express to him the questions that I had so that perhaps

13  he can give that some thought if he chooses to come.

14        There is one other motion pending.  That was a motion

15  by Dexia to file a memorandum in excess of 15 pages.  That's

16  granted.  That was with respect to the memorandum in response

17  to the motion to withdraw.

18        I also have taken a look at the submission that was

19  submitted by Dexia late yesterday concerning the idea of

20  stand-by counsel, which has now been I guess modified to be a

21  request rather for something that isn't called stand-by

22  counsel.  It's not clear exactly what it's called.  Advisory

23  counsel?

24        MR. MENDELOFF:  Mini special master.

25        THE COURT:  Judicial helper.

1          MR. MENDELOFF:  Right.  Consultant.

2          THE COURT:  Yes, which is an interesting concept that

3    I don't think obviates some of the problems that I identified.

4          You know, one of the problems with the stand-by

5    counsel, I want to go back to talk about that for a minute.

6    You know, the stand-by or shadow counsel, as we discussed, is

7    kind of a useless exercise if Mr. Rogan won't talk with that

8    person.  And if it was a useless exercise, that would I guess

9    be a cautionary point in and of itself.

10         But I think that it bears other risks.  One is that if

11   Mr. Rogan were to talk to the person, I appreciate the

12   solicitousness of concern that I may be burdened with

13   repetitive requests for clarification or explanation.  But if

14   that counsel provides that to Mr. Rogan, you know, the request

15   for that explanation or clarity from the stand-by counsel may

16   not always be consistent with what I say.  It may create an

17   inconsistency potentially that would frustrate rather than

18   advance things.

19         And there is another problem too.  We have talked

20   about whether it makes sense to appoint a volunteer to do this.

21   Although if I appoint a person, they're really not a volunteer.

22   But they don't get paid except potentially out of the recovery.

23   But then how does that work if that puts them at cross-purposes

24   with the person that they are shadow counseling?

25         Moreover, is there an attorney-client relationship

1   between the stand-by counsel and Mr. Rogan?  And if not, would

2   that make him less interested in talking to the person because

3   he would have to know that.  And if there was, that carries its

4   own difficulties because if it's supposed to help me, then how

5   can I know what they really said if there is privilege

6   attached.  And is the person -- if there is a privilege, that

7   means there is an attorney-client relationship.  Is the person

8   who's stand-by counsel subject to the potential of a

9   malpractice action?

10           MR. MENDELOFF:  The idea -- to get around that, the

11  idea was to have the person being someone who would just be

12  available to reiterate and or articulate the details of your

13  Honor's orders rather than to provide any advice on those

14  orders.  BUT in terms of paying that person, it struck us that,

15  you know, certainly we would pay for 50 percent of it, and

16  there are litigants here who are corporate defendants who can

17  be ordered to pay.

18           THE COURT:  Well, who, if Mr. Rogan terminates those

19  attorneys and they don't have successor counsel, are going to

20  be defaulted.

21           MR. MENDELOFF:  Right.  The point --

22           THE COURT:  You know, at that point, if they are

23  defaulted, you know, as a matter of discovery in the case do I

24  order a defaulted party to pay fees for discovery process?  You

25  know, that's an interesting question.

1          But I guess setting aside those issues, I guess even

2     as reformulated in your supplement, I am not persuaded that

3     kind of a general, as I called it, Judge's helper, would be of

4     much value here.  If in fact Mr. Rogan proceeds without having

5     counsel and actually proceeds in the case as opposed to simply

6     abandons the case, you know, whether there are particular

7     things that would happen that would make it useful to have a

8     special master, you know, we can take up at that time.

9          MR. MENDELOFF:  All right.

10         THE COURT:  I just don't think that generally

11    appointing somebody to be an ombudsman is going to help.

12         MR. MENDELOFF:  We were just concerned --

13         THE COURT:  I would note this is interesting because a

14    couple -- it must be a month ago, for the first time that I am

15    on the bench somebody cited to me Marbury versus Madison.  It

16    was in the context of a discovery motion.  And so my reaction

17    was, this is probably a stretch if you are citing to me Marbury

18    versus Madison in need of a discovery motion.

19         So you didn't go back quite as far as Marbury, but

20    citing the 1812 decision of United States versus Hudson shows

21    great creativity.

22         MR. SPIEGLER:  We are this close.

23         MR. MENDELOFF:  We are showing how well established

24    the idea is.

25         THE COURT:  I understand.

1          MR. SPIEGLER:  Over 200 years.

2          THE COURT:  All right.  So I am going to set it over

3     for November 1.  I am going to reiterate that we expect Mr.

4     Rogan to be here.  And the Court will consider all appropriate

5     sanctions if he is not.

6          MR. MENDELOFF:  Thank you, your Honor.

7          THE COURT:  And that I am not going to extend another

8     opportunity for him to appear on this matter.

9          MR. SPIEGLER:  Okay.

10         THE COURT:  This is his last chance.

11         MR. MENDELOFF:  Shall we put that in an order of some

12    sort?  We did that with Judge Blank.  It didn't matter

13    obviously but --

14         THE COURT:  I don't know.  Was he here?  Was he

15    supposed to be here earlier today?

16         MR. MENDELOFF:  Judge --

17         MR. HOLMEN:  10:30.

18         MR. MENDELOFF:  -- but Judge Black requiring him to be

19    here.

20         THE COURT:  Let's see if he is there at 10:30.  If he

21    is there at 10:30, come back afterwards.  I will be around.

22       (Which were all the proceedings had at the hearing of the

23          within cause on the day and date hereof.)

24

25

16

1                           CERTIFICATE

2            I HEREBY CERTIFY that the foregoing is a true, correct

3   and complete transcript of the proceedings had at the hearing

4   of the aforementioned cause on the day and date hereof.

5

6   _____          10-26-06
                                        _____
7   Official Court Reporter               Date
    U.S. District Court
8   Northern District of Illinois
    Eastern Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDGEWATER MEDICAL CENTER, | )  No. 02 B 07378 |
| | )      04 A 02327 |
| | )      04 A 02328 |
| | )  Chicago, Illinois |
| | )  10:30 a.m. |
| Debtor. | )  October 24, 2006 |

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE BRUCE W. BLACK

APPEARANCES:

| | |
|---|---|
| Trustee: | Mr. Eugene Crane |
| For the Debtor: | Mr. Scott Mendeloff;<br>Mr. Eric Pruitt; |
| For the EPC and PGR: | Mr. Phillip Reed;<br>Mr. Timothy Casey; |
| For Peter Rogan: | Mr. Joseph Spiegler;<br>Mr. Chris Stathopolous; |
| Court Reporter: | Amy Doolin, CSR, RPR<br>U.S. Courthouse<br>219 South Dearborn<br>Room 661<br>Chicago, IL  60604. |

2

1          THE CLERK:  Edgewater Medical Center.

2          MR. CRANE:  Good morning, Your Honor.

3  Eugene Crane, custodian of Edgewater Medical Center.

4          MR. MENDELOFF:  Scott Mendeloff and

5  Eric Pruitt on behalf of Edgewater.

6          MR. SPIEGLER:  Good morning, Your

7  Honor.  Joseph Spiegler and Chris Stathopolous for

8  Peter Rogan.

9          MR. REED:  Good morning, Your Honor.

10  Phillip Reed on behalf of Edgewater Property Company

11  and PGR Properties, Inc., in adversary proceeding

12  04 A 02328, and on behalf of Bainbridge Management,

13  Inc., in adversary proceeding 04 A 02327.  We've also

14  filed appearances in that proceeding on behalf of

15  Braddock Management, LP, which is dissolved, and

16  Bainbridge Management, LP, which is in bankruptcy.

17          MR. CASEY:  Good morning, Your Honor.

18  Tim Casey on behalf of Edgewater Property Company and

19  PGR Properties in the main bankruptcy case, as well

20  as adversary 03 A 04843.

21          THE COURT:  Good morning, all.

22          Mr. Mendeloff.

23          MR. MENDELOFF:  Your Honor issued an

24  order last week requiring Mr. Rogan to be here.  He

25  is not.  We are extremely concerned about the

3

1   briefing schedule and wasting a lot of money that we

2   may or may not ever see again.  We continue to work

3   as hard as we have to get this brief done.  We would

4   save an awful lot of money if we didn't finish, if we

5   didn't have to finish this brief.  And we hate to put

6   in the money for no reason at all.

7              Mr. Rogan, there was an order issued.

8   I know I sent it to opposing counsel.  I'm confident

9   that they sent it on to him.  They can speak for

10   themselves, but based on our hearing that we just had

11   in front of Judge Schenkier, he has not been in touch

12   with them.

13              THE COURT:  I take it he did not

14   appear Friday before Judge Schenkier?

15              MR. MENDELOFF:  We pushed that over to

16   this morning.

17              MR. SPIEGLER:  That's correct.  We

18   attempted to contact him on multiple occasions by

19   phone at different phone numbers, we left messages,

20   sent e-mails.  There was no indication that either

21   the voice mail messages or the e-mail messages were

22   received, and he did not contact us one way or the

23   other to confirm whether he would be present in Judge

24   Schenkier's courtroom.

25              THE COURT:  And he certainly is not

4

1    present here.   Does anyone have anything else to say

2    regarding attempts to contact, Mr. Rogan?

3                    MR. REED:  No, Your Honor.  Winston

4    has taken the lead in trying to contact him, although

5    we did forward a copy of the order that was entered

6    in your courtroom last week.  And with respect to the

7    briefing schedule that is basically the end of next

8    week, since Mr. Rogan instructed us that we were no

9    longer his counsel and we ought not to do any work,

10   we have not done any work.  So, you know, that's the

11   status of briefing or the briefs on behalf of EPC and

12   PGR in the trial that was conducted in this courtroom

13   over the summer.

14                   MR. CASEY:  Your Honor, I can report

15   to the court I did not get the order, but I did send

16   an e-mail about what I understood Your Honor's order

17   was last week and did not hear.  The matters that we

18   have in the main bankruptcy case, nothing is going on

19   in that other than the time to obtain acceptances

20   runs at the end of December, and everything has been

21   in abeyance pending the litigation.  And our

22   litigation matter, the adversary is in abeyance until

23   the conclusion of other adversaries.

24                   And as I understand it, Judge

25   Schenkier this morning just put it over again to a

5

1    date next week, the same date as Judge Darrah entered

2    when he allowed counsel to withdraw and ordered Mr.

3    Rogan to appear on a date certain.

4            MR. MENDELOFF:  That was November 1st,

5    Your Honor.  But unlike those cases -- and in this

6    case Your Honor already has issued an order requiring

7    him to appear today, and, furthermore, the issue

8    regarding the briefing.  At this stage it is our view

9    that Mr. Rogan has received a couple of different

10   notices.  And under the law if he withdraws counsel

11   and does not have substitute counsel, the case is to

12   be defaulted.  That is the situation here.

13           So it is our view that the proper

14   approach at this stage would be to grant EPC and

15   PGR's motion to withdraw and default Mr. Rogan on the

16   trial that we just had.  And if Your Honor wishes,

17   you could default him without prejudice, with

18   prejudice to attach at a date certain in the future.

19   But we really want to be able to save money.  And if

20   we don't have to write this brief, it's going to save

21   quite a bit of money.  It's already cost us a lot of

22   money to get to where we are.

23           MR. REED:  Your Honor, I am still

24   counsel of record for EPC and PGR in that matter, but

25   I do not feel that I am authorized to take a position

6

1   one way or the other.  From Mr. Rogan's standpoint,

2   he has directed us to cease all work on his behalf

3   and on behalf of the corporations that he heads.

4                    MR. CASEY:  Your Honor, we're in the

5   same position, other than our litigation is in

6   abeyance and there is nothing pending at this time.

7                    THE COURT:  Well, I don't want people

8   to waste a lot of time and money, including myself.

9   I guess I have no money to waste, just time.  It

10  seems to me that the appropriate thing to do is to

11  grant the motions, all motions to withdraw as

12  attorneys.  He has fired everyone and instructed all

13  three firms, as I understand it, to do nothing

14  further.

15                    He has not authorized anyone to enter

16  appearances on behalf of the entities, so the

17  entities I believe as of now are in default since

18  they can't represent themselves.  I think the next

19  step should be for the plaintiff and the debtor to

20  file motions for default judgment.

21                    Perhaps we can set those for November

22  8 at 11:00 o'clock, giving significant time for the

23  notice to be sent to Mr. Rogan and anyone else who

24  needs notice.  And we can stay the briefing schedule

25  until further order.  But we'll review that on

7

1  November 8.  And assuming that Mr. Rogan does not

2  respond and that there are no attorneys to go

3  forward, a default judgment would moot the briefing

4  schedule.

5              MR. MENDELOFF:  And one final thing,

6  Your Honor.  As to the future briefing schedule, can

7  the record be clear that Your Honor is -- Your Honor

8  had indicated last time that you were not predisposed

9  to extend the briefing for Mr. Rogan.  And to the

10  extent that an attorney does appear before then, Your

11  Honor will not be, as I understand it, providing

12  extensive additional time.

13              THE COURT:  That's correct.  The 10th

14  is a holiday.  And I wouldn't expect much time beyond

15  the 10th, which is a week, if there is an attorney

16  that appears before the 8th.  But obviously anybody

17  who is going to appear has got a lot of work to do,

18  but that doesn't prejudge what I would say if

19  somebody actually shows up with a proposed time

20  schedule.  But as of now the plaintiffs should not

21  work further on the brief.

22              MR. MENDELOFF:  We will not.

23              THE COURT:  Anything else?

24              MR. CASEY:  Your Honor, I had attached

25  draft orders to both our motions, but I have extra

8

1   copies, for our withdrawal.

2             THE COURT:  All right.  The orders

3   will be entered allowing withdrawal.  And, Mr.

4   Mendeloff, will you submit a draft order regarding

5   the additional things that I've ordered?

6             MR. MENDELOFF:  Yes, Your Honor.

7             THE COURT:  Anything else?

8             (No response.)

9             THE COURT:  All right.  Thank you.

10             (Which were all the proceedings had in

11             the above-entitled cause, October 24,

12             2006, 10:30 a.m.)

13   I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
14   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS (Chicago)

DEXIA CREDIT LOCAL, fka          )
Dexia Public Finance Bank        )
and Credit Local de France,      )
                                 )
            Plaintiff,           )
                                 )
        v.                       )    Docket No. 02-CV-8288
                                 )
PETER G. ROGAN, et al.,          )    Chicago, Illinois
                                 )    November 1, 2006
            Defendants.          )


STATUS HEARING
BEFORE THE
HONORABLE MAGISTRATE JUDGE SIDNEY I. SCHENKIER


**PLEASE NOTE:  Problems in the courtroom recording
equipment rendered portions of this hearing un-
transcribable.**


APPEARANCES:

For Plaintiff:              SCOTT T. MENDELOFF
                           GABRIEL AIZENBERG
                           ERIC PRUITT
                           SIDLEY AUSTIN BROWN & WOOD LLP
                           Bank One Plaza
                           10 South Dearborn Street
                           Chicago, IL  60603


For Defendants:

PETER G. ROGAN             JOSEPH SPIEGLER
                           CHRISTOPHER J. STATHOPOULOS
                           WINSTON & STRAWN LLP
                           35 West Wacker Drive
                           41st Floor
                           Chicago, IL  60601

2

APPEARANCES:   (Continued)

For Defendants:


BRADDOCK MANAGEMENT          PHILLIP S. REED
BAINBRIDGE MANAGEMENT        MAYER, BROWN, ROWE & MAW, LLP
EDGEWATER MANAGEMENT         190 S. LaSalle Street
BAINBRIDGE MANAGEMENT,       Chicago, IL  60603
   LP
BRADDOCK MANAGEMENT LP




Also Present:

REPRESENTING
FRED CUPPY:                  CAMILLE E. BENNETT
                             SONNENSCHEIN, NATH & ROSENTHAL
                             233 South Wacker Drive
                             Suite 7800
                             Chicago, IL  60606






        PLEASE PROVIDE CORRECT VOICE IDENTIFICATION


Transcribed by:              Riki Schatell
                             6033 North Sheridan Road, 28-K
                             Chicago, Illinois  60660
                             773/728-7281


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

 1          THE CLERK:  02-C-8288, Dexia v. Rogan.

 2          THE COURT:  Good morning.

 3          MR. MENDELOFF:  Good morning, your Honor, Scott

 4   Mendeloff, Eric Pruitt and Gabriel Aizenberg on behalf of

 5   Dexia.

 6          MR. SPIEGLER:  Joe Spiegler and Chris Stathopoulos on

 7   behalf of Mr. Rogan.

 8          MR. REED:  Phillip Reed on behalf of Edgewater

 9   Properties, (inaudible) PGR Properties, Inc., Bainbridge

10   Management, Inc.  We've also filed appearances on behalf of

11   Bainbridge Management LP, which is in bankruptcy, and Braddock

12   Management LP1, which is dissolved.

13          THE COURT:  Okay.  Has anybody talked to Mr. Rogan?

14          MR. SPIEGLER:  We have not spoken to Mr. Rogan.

15   We --

16          THE COURT:  Has anybody communicated with him in any

17   other way?

18          MR. SPIEGLER:  Yes.  Winston & Strawn, I believe

19   Mayer, Brown Rowe and Maw as well, have sent letters nearly

20   identical, apprising him of the dates for various hearings

21   including one in this court and the repercussions associated

22   with his failure to appear at those.  We sent it via certified

23   mail, certified mail return receipt requested, and electronic

24   mail.  We've not received a return receipt but have reason to

25   -- There's an indication that the email which contained this

4

1    letter was, in fact, opened by Mr. Rogan.

2              THE COURT:  Okay.

3              MR. SPIEGLER:  So . . .

4              THE COURT:  That was sent to his email address?

5              MR. SPIEGLER:  That's correct.

6              THE COURT:  And as well as the corporate address?

7              MR. SPIEGLER:  Yes.  Corporate and home addresses,

8    and --

9              THE COURT:  All right.

10             MR. SPIEGLER:  -- since the letters went out I've

11   received and I don't think Winston has received any telephone

12   communications with him but we have each received an email, not

13   responding to this in particular but another email from Mr.

14   Rogan indicating with respect to other matters that would

15   indicate the email address is still operative.

16             THE COURT:  Okay.  Without prying into the details of

17   the other matters, did any of those other matters that were the

18   subject of Mr. Rogan's email involve his attendance or not

19   (inaudible)?

20             MR. SPIEGLER:  No.

21             MR. REED:  No.

22             THE COURT:  Did it indicate in any way his intentions

23   with respect to representation of the corporate entity?

24             MR. SPIEGLER:  No.

25             MR. REED:  No.

5

1          THE COURT:  Okay.  All right.

2          MR. SPIEGLER:  I have a copy of that letter if you --

3     If the Court would like it.  Obviously we have copies back at

4     the office if necessary.

5          THE COURT:  Yes.

6          MR. SPIEGLER:  If there's an issue about him -- our

7     attempts at contacting him and his awareness of this court

8     date.

9          THE COURT:  I (inaudible) if anybody is raising that

10    as an issue.  Does anybody else have anything to say with

11    respect?  Let's start with the motions to withdraw.  I mean

12    I've reviewed all the papers.  We've talked about that at the

13    last two proceedings.

14         MR. REED:  I do have one thing to add and I think the

15    government has particularly mentioned this as a particular

16    concern?

17         THE COURT:  Did you say the government?

18         MR. REED:  The United States government has mentioned

19    this.  And I'm sure that this concerns Dexia as well.  The

20    email that we did receive indicated that the business address

21    for Bainbridge -- for the Bainbridge entities and the corporate

22    entities would be shut down.

23         THE COURT:  Okay.

24         MR. REED:  That they'd be closing up shop, so I'm not

25    sure exactly where Mr. Rogan will receive notices, your Honor.

6

The operative address we had is his current home address.

THE COURT:  Did he say -- Are you including in that, I guess that's the Bainbridge and Braddock?

MR. REED:  Bainbridge, Braddock, EPC and PGR (inaudible).

THE COURT:  Okay.

MR. MENDELOFF:  Your Honor, we have reason to believe that there has been no activity at the business address, 240 East (inaudible), but if anybody is going in there to (inaudible) shut it down, other than Mr. Rogan we wouldn't know who that would be since I don't think there are any other employees at this stage.  (Inaudible) curious as to how that was effectuated.

MR. REED:  Well, I think that the -- I don't know how it was effectuated but the indication was simple abandonment.

MR. MENDELOFF:  Oh.  Well, okay, then we should talk to the landlord about the materials there.

THE COURT:  All right.

MR. MENDELOFF:  Your Honor, we have a few things to say about the situation, you know, (inaudible).

THE COURT:  Well, do they involve anything I should hear before ruling on the motions to withdraw?

MR. MENDELOFF:  No.

THE COURT:  Pardon me?

MR. MENDELOFF:  No.

7

1        THE COURT:  All right.  I'm going to grant the

2    motions to withdraw so that is the motion on behalf of Mayer

3    Brown, Docket Entry 280, and then the supplement Docket Entry

4    282, as well as the Winston & Strawn motion to withdraw, Docket

5    No. 278 (inaudible).

6        MR. SPIEGLER:  Thank you, your Honor.

7                                        (Pause.)

8        THE COURT:  Okay.  So it is yours.

9        MR. MENDELOFF:  Your Honor, the order you entered

10   indicated that Mr. Rogan failed to appear.  You (inaudible)

11   sanctions on that score.  We would ask the Court to (inaudible)

12   sanction require Mr. Rogan to pay for our time and (inaudible),

13   number one, and number two, as to --

14       THE COURT:  Let me say this:  That's granted for one

15   attorney.  You don't need three here for that.  So --

16       MR. MENDELOFF:  (Inaudible, multiple voices) --

17       THE COURT:  -- I'll grant that as for the proceeding

18   today as well as for the hearing on October 24th, because we

19   had re-set an earlier scheduled date for the 24th to attempt to

20   accommodate his schedule, so I will grant, as a sanction for

21   his failure to appear on the 24th and on November 1st

22   reasonable fees associated with -- associated fees for one

23   attorney for Dexia to appear at each.

24       MR. MENDELOFF:  Now as to the --

25       THE COURT:  I'll let you pick which attorney.

8

1      MR. MENDELOFF:  As to the 24th, though, I note that

2   there were issues there that we expected to address regarding

3   discovery and that's (inaudible) why I needed Mr. Pruitt to

4   accompany me.  I asked him to --

5      THE COURT:  I think that you're probably quite

6   capable of addressing those issues.  Just from my observation

7   over the last several years, you have not typically been mute

8   when there is a need to (inaudible) issues that were raised,

9   and if we kind of added up the words that you spoke at these

10  proceedings and the words that Mr. Pruitt spoke, I think you

11  would understand the basis for my ruling.

12     MR. MENDELOFF:  I do, your Honor.  (Inaudible) the

13  reason being that (inaudible).

14     THE COURT:  Well, I think that Mr. Pruitt has

15  probably well informed all of us --

16     MR. MENDELOFF:  Yes.

17     THE COURT:  -- (inaudible, multiple voices) these

18  issues.

19     MR. MENDELOFF:  Yes.

20     THE COURT:  And I would expect that you would be

21  fully informed before you came to court.

22     MR. MENDELOFF:  That's fine, your Honor.

23     THE COURT:  Thanks.

24     MR. MENDELOFF:  As to issues regarding the discovery,

25  though, that are outstanding.